COMMONWEALTH OF KENTUCKY
PERRY CIRCUIT COURT
CASE NO. 21-CI-00221
*FILED ELECTRONICALLY*

ASHOKKUMAR R. PATEL, ET AL.                                          **PLAINTIFFS**

v.              **PLAINTIFFS' SECOND MOTION**
     **FOR SANCTIONS AGAINST LALAJI DEFENDANTS**

GRAM RESOURCES, INC., ET AL.                                          **DEFENDANTS**

\*\*\*\*\* \*\* \*\* \*\*\*\*\*

Come Plaintiff, Ashokkumar R. Patel, M.D. ("Dr. Patel") and Plaintiff, Mahender Pampati, M.D. ("Dr. Pampati"), by counsel, and for reasons set forth herein move the Court for sanctions including but not limited to the exclusion of the testimony of Defendant, Anand Lalaji, M.D. ("Lalaji") on any topic at trial of this matter on behalf of himself and/or Defendant, Gram Resources, Inc. ("Gram Resources"), Defendant, Hazard Radiology Associates, Inc. ("Hazard Radiology"), Defendant, TRG Holdings G &H, LLC ("TRG"), Defendant, The Radiology Group, LLC ("Radiology Group") and together with Gram Resources, Hazard Radiology, Lalaji, TRG and collectively the "Lalaji Defendants") by reason of Lalaji's blatant perjurious deposition testimony, *occurring on not one, but two separate occasions; and the Lalaji Defendants' history of abuse of the rules of civil procedure.*.

Dr. Patel and Dr. Pampati reserve the right to supplement their pending motion for partial summary judgment,  motions in limine, and motion to exclude Lalaji's proffered testimony as an expert witness and request additional relief on the basis of newly discovered evidence.  This Motion is not intended to limit or preclude such supplementation.  Specifically, and without limitation, Dr. Patel and Dr. Pampati reserve the argument that newly-discovered evidence and Lalaji's conduct justify dismissal of the Lalaji Defendants' counterclaim and the striking of all defenses of the Lalaji Defendants to the claims of Dr. Patel and Dr. Pampati.

## PERTINENT FACTUAL BACKGROUND TO MOTION

These are the pertinent facts to this motion:

1.      The affirmative defenses (including a right of setoff) and counterclaim of the Lalaji Defendants to and on the claims of Dr. Patel and Dr. Pampati, primarily arise from the allegations made by the Lalaji Defendants, that Dr. Patel and Dr. Pampati authorized and directed someone other than themselves to, using their personal login information, "fraudulently" electronically affix their electronic signatures to radiology study reports performed for Mountain Comprehensive Care Clinic patients, and that:

> A.      This was a violation of Medicare and federal law as Dr. Patel and Dr. Pampati respectively did not personally review and sign the transcribed reports; and that even though Dr. Patel and Dr. Pampati had conducted the radiology studies and dictated the reports, this resulted in alleged potential liability of the Lalaji Defendants under federal health care programs.  Section 3.3.2.4 of the Medicare Program Integrity Manual and the False Claims Act. 31 USCA 3729.

> B.      As a result, the Lalaji Defendants had allegedly been compelled to voluntarily, in accordance with the U.S. Department of Health & Humans Services, Office of Inspector General's (OIG) Provider Self-Disclosure Protocol and allegedly had in or around December 2021/January 2022, Self-Disclosed the actions of Dr. Patel and Dr. Pampati so as to resolve the Lalaji Defendants liability under federal health care programs.

See (i) October 28, 2021 Lalaji Defendants' Employment Termination letter to Dr. Patel, a true copy of which is attached hereto and made a part hereof as **Exhibit 1** ("Patel Termination Letter"), (ii) October 28, 2021 Lalaji Defendants' Employment Termination letter to Dr. Pampati, a true copy of which is attached hereto and made a part hereof as **Exhibit 2** ("Pampati Termination Letter"), (iii) transcript of April 3, 2023 deposition of Lalaji a true copy of which is attached hereto and made a part hereof in its entirety as **Exhibit 3** ("Lalaji 2023 Dep.) at pp. 73-76, (iv) Lalaji Defendants' Complaint in *TRG Holdings G &H, LLC v. Patel Et Al*., Civil Action No. 2021CV356141, In the Superior Court of Fulton County, State of Georgia (since removed to the

United States District Court for the Northern District of Georgia, Atlanta Division and assigned case no. 1:21-cv-04694-JPB), a true copy of which is attached hereto and made a part hereof as **Exhibit 4** ("Lalaji Defendants Georgia Action") at paragraph 32, and (v) the Lalaji Defendants' Supplemental Expert Disclosure, a true copy of which is attached hereto and made a part hereof as **Exhibit 5** ("Lalaji Supplemental Disclosure").

2.      During the deposition of Lalaji, individually and as the designated representative of the entity Lalaji Defendants occurring August 1, 2022, a true copy of which is attached hereto and made a part hereof as **Exhibit 6** ("Lalaji 2022 Dep."); in response to specific questioning on the Lalaji Defendants' voluntary self-disclosure in accordance with the OIG's Provider Self-Disclosure Protocol, of the actions of Dr. Patel and Dr. Pampati, Lalaji testified as follows:

> **Q      I'm just asking what your understanding is. And then what is your understanding of whether CMS has contacted TRG about any of these allegedly fraudulent reports?**
>
> A      So my understanding is that as a radiologist you have to make sure that the report that goes out has got all the words, everything that you want on the report. You are taking responsibility for that read; okay? Nobody else is. And you are certifying it. When you log in with your credentials, you are certifying and officially attesting to the fact that you have looked at this report, you've looked at the images, and this is the report and the findings that are associated with that patient. And in this particular case that did not happen, and hence the fraud that's being alleged that was performed. In terms of us contacting CMS, all I can tell you is that we have submitted -- we have to self-report. So we have submitted all of the sort of information, we followed their process, and we've submitted it, and they usually have anywhere from -- *you know, it could take them up to a year to a year and a half to basically respond, you know, because they just move very slow and they're backlogged. So we've got confirmation that all of that has been received and that an investigator will be contacting us, and that's where we're at right now. (emphasis added)*
>
> **Q      Has CMS or a MAC or anybody associated with this process presented TRG with a billing that they feel is improper?**
>
> A      *No (emphasis added).*

See Lalaji 2022 Dep. At pp. 83-84.

3.      During the Lalaji 2023 Dep., in response to specific questioning on the Lalaji Defendants' voluntary self-disclosure in accordance with the OIG's Provider Self-Disclosure Protocol, of the actions of Dr. Patel and Dr. Pampati about which the Lalji Defendants assert were improper, Lalaji testified as follows:

Q       But they put together the package and they submitted it; correct?
A       The actual act of doing it?  Correct.
Q       Well, I mean, they assembled the documents?
A       That's correct.
Q       And they determined what documents needed to be included; correct?
A       That's where my involvement with Morris, Manning & Martin was.  We all determined which documents and which provisions and sections of all of these documents are applicable.
Q       Okay.  So you did this with lawyers; correct?
A       *We did this with our general counsel, who's a lawyer, our counsel and our director of administration.*
Q       Did you tell your counsel and the other lawyer at Morris, Manley --
MR. HOSTETTLER:  Manning.
Q       -- Manning; excuse me --
MR. MACLIN:  Thank you, Aaron.
Q       -- what to put in the report?
MR. HOSTETTLER:  Hold on.  The question on the table is did you tell your counsel what to put in the report; is that correct?
MR. MACLIN:  Yes.  Or did they -- yes, that's the question.
MR. HOSTETTLER:  Yeah, I'm going to let you answer that.  We'll just take it question by question, but you can go ahead and answer that.
A       Okay.  We both read through all of these guidelines specific to the violation, and we agreed together that -- with my input, that this is what was going into the reporting into HHS.
Q       Did you send any money in?
A       You don't send money in until you get a further -- you have to wait for them to go through that process.
Q       Have you heard back from anybody on this report?
A       *We received confirmation that it was received, and since that point we have not heard back yet.*
Q       Any idea when any report will be back or any response will be back?
A       *No.  It could take up to six years.*
Q       So as you sit here today, you don't know if there's going to be any action taken by HHS or whoever you reported to; correct?
A       *We do not know.*

*Emphasis added.*  See Lalaji 2023 Dep. At pp. 75-77.

4.      At approximately 3:00 p.m. on May 10, 2023, the Lalaji Defendants provided their responses to Dr. Patel's and Dr. Pampati's Fourth Interrogatories and Requests for Documents, a true copy of which is attached hereto and made a part hereof as **Exhibit 7**.  The Lalaji Defendants' have refused to produce their voluntary self-disclosure in accordance with the OIG's Provider Self-Disclosure Protocol.[1]  However, they produced a single document with the Lalaji Defendants' responses to Dr. Patel's and Dr. Pampati's Fourth Interrogatories and Requests for Documents, which was the following email communication dated *March 18, 2022* from Jennifer Hilton, Paralegal Specialist, U.S. Department of Health & Human Services, Office of Inspector General to Chloe Dallaire, *the Lalaji Defendants' in-house counsel* ("OIG March 18, 2022 Email") and which states:

> **From:** Hilton, Jennifer L (OIG/OCIG) <u>&lt;Jennifer.Hilton@oig.hhs.gov&gt;</u>
> **Sent:** Friday, March 18, 2022 12:35 PM
> **To:** Chloe Dallaire <u>&lt;cdallaire@theradiologyroup.org&gt;</u>
> **Subject:** HHS OIG Self-Disclosure: Ashokkumar Patel
>
> I am writing to inform you that your submission to the Office of Inspector General (OIG) Self- Disclosure Protocol (Protocol) made on behalf of the above entity has not been accepted.  By declining to accept this submission into the Protocol, the OIG is not expressing an opinion regarding the conduct disclosed or your legal position.
>
> Jennifer Hilton
> Paralegal Specialist
> U.S. Department of Health & Human Services
> Office of Counsel to the Inspector General

*In other words that the OIG had provided notice to the Lalaji Defendants, on <u>March 18, 2022</u> (before both the 2022 Lalaji Dep. And the 2023 Lalaji Dep.) that the OIG had declined to accept for consideration and review that the actions of Dr. Patel and Dr. Pampati in*

---

[1] Despite alleging claims expressly based on the alleged violation of CMS signature protocols by Dr. Patel and Dr. Pampati, and asserting alleged potential damages on that basis, the Lalaji Defendants have asserted before this Court that their alleged self-report to CMS cannot be produced because of confidentiality rules.  Accordingly, neither Dr. Patel and Dr. Pampati nor the Court can determine what was alleged and/or provided to CMS.

*authorizing and directing someone other than themselves to, using their personal login information, electronically affix their electronic signatures to radiology study reports performed for Mountain Comprehensive Care Clinic patients, would result in any violations of under federal health care programs. Clearly materially pertinent and relevant information underlying the defenses and counterclaim and other actions of the Lalaji Defendants.*

5.      KRS 523.020 defines Perjury as a "a material false statement' made in in any official proceeding under an oath required or authorized by law. Material false statement: means any false statement, regardless of its admissibility under the rules of evidence which could have affected the outcome of the proceeding. See KRS 523.010.

6.      The Lalaji Defendants have a history, and a course and conduct of ignoring and abuse of the civil rules of procedure resulting in awards of sanctions.  See the Order entered by U.S. District Judge Robert E. Wier in the remand of this cases back to this Court, a true copy of which is attached hereto and made a part hereof as **Exhibit 8** and the Orders of Magistrate Judge Hanley A. Ingram and U. S. District Judge, Claria Horn Boom  in *Ayos v. TRG Holdings G&H, LLC, Et Al.*, true copies of which are attached hereto and made a part hereof as **Exhibit 9**.

## **ARGUMENTS**

### I
### LALAJI'S REPEATED STATEMENTS UNDER OATH ON THE STATUS OF THE LALAJI DEFENDANTS' SELF-DISCLOSURE TO THE OIG, OF THE ACTIONS OF DR. PATEL AND DR. PAMPATI, ARE PERJURIOUS

A perjurious statement is a material false statement' made in in any official proceeding under an oath required or authorized by law. See KRS 523.020.  A material false statement means any false statement, regardless of its admissibility under the rules of evidence which could have affected the outcome of the proceeding. See KRS 523.010.

The OIG March 18, 2022 Email establishes that Lalaji's repeated statements **under oath** on the status of the Lalaji Defendants' Self- Disclosure to the OIG were false.

As evidenced without limitation by the Patel Termination Letter, the Pampati Termination Letter, the Lalaji Defendants' Georgia Action, the Lalaji Defendants' Answer and Counterclaim, the Lalaji Expert Disclosure and numerous pleadings filed herein by the Lalaji Defendants, Lalaji's repeated false statements under oath on the status of the Lalaji Defendants' Self- Disclosure to the OIG were and are **material** and **could affect the outcome** of this proceeding.

## II
## LALAJI'S REPEATED PERJURIOUS STATEMENTS WARRANT THE EXCLUSION OF ALL TESTIMONY BY LALAJI ON BEHALF OF HIMSELF AND THE LALAJI DEFENDANTS

In *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 323 (1994) the United States Supreme Court stated that "[f]alse testimony in a forma proceeding is intolerable. We must neither reward nor condone such a flagrant 'affront' to the truth-seeking function in adversary proceedings." Lalaji's repeated misrepresentations of material facts under oath justify and require substantial consequences.

### A.    Lalaji's testimony should be excluded based on the Court's contempt power.

Kentucky Courts have inherent authority to administer justice because the court's power of contempt is the very embodiment of that authority. See *Murphy v. Commonwealth*, 50 S.W.3d 173, 186 (Ky. 2001) ("If the courts are to have the power to control participants in the judicial process and effectively administer justice, the power of contempt must be more than a hollow threat.") And, the scope of a court's contempt power is broad, even extending to public officials, as well as all branches of government and its agencies. *Louisville Metro Dept. of Corrections v. King*, 258 S.W.3d 419, 421 (Ky.App. 2007); see also *Commonwealth, Department of Natural Resources and Environmental Protection v. Williams*, 536 S.W.2d 474, 476 (Ky. 1976). Additionally, contempt

is an equitable remedy. *Glanton v. Renner*, 285 Ky. 808, 149 S.W.2d 748, 750 (1941). And, "[i]n equity the award of costs and [attorney] fees is largely within the discretion of the court, depending on the facts and circumstances of each particular case." *Dorman v. Baumlisberger*, 271 Ky. 806, 113 S.W.2d 432, 433 (1938); see also Batson v. Clark, 980 S.W.2d 566, 577 (Ky.App.1998); *Kentucky State Bank v. AG Services, Inc*., 663 S.W.2d 754, 755 (Ky.App.1984); see also *Lake Village Water Ass'n, Inc. v. Sorrell*, 815 S.W.2d 418, 421 (Ky.App.1991) (recognizing the court's inherent power to shift fees "regardless of the existence of statutory authority or remedial rules"). *Kentucky Ret. Sys. v. Foster*, 338 S.W.3d 788, 803 (Ky. Ct. App. 2010).

"[I]t has generally been recognized that courts (even without express authority given by the constitution, statute, or rule of a supreme court of a state) have inherent power to prescribe rules to regulate their proceedings and to facilitate the administration of justice." *Kentucky Farm Bureau Mutual Ins. Co. v. Wright*, 136 S.W.3d at 459 (Ky. 2004), quoting *Craft v. Commonwealth,* 343 S.W.2d 150, 151 (Ky. 1961)). *Collins v. Combs*, 320 S.W.3d 669, 675 (Ky. 2010).

*Primm v. Isaac*, 127 S.W.3d 630, 639 (Ky. 2004) held that exclusion of a witness from testifying is an appropriate sanction for false testimony:

> [S]hould the trial court determine that the witness has not provided complete and unevasive answers to the deposition questions, or "has falsified, misrepresented, or obfuscated the required data, the aggrieved party may move to exclude the witness from testifying or move to strike that witness's testimony and, or further, move for the imposition of costs and attorney's fees in gathering the information necessary to expose the miscreant expert."

While *Primm* is directed to the production of information by expert witnesses (one of Lalaji's claimed roles in this case), its rationale is equally valid and applicable in the case of any witness who has provided false testimony to the tribunal.

At a minimum, the Court's inherent power to regulate and control its proceedings must include the power to prevent the repetition of perjured testimony at trial in this case by excluding

Lalaji's testimony. Given multiple opportunities to testify truthfully that the U.S. Department of Health & Human Services, Office of Inspector General had decided to take no action on the Lalaji Defendants' alleged self-report, Lalaji instead consistently provided false and misleading testimony to create the inaccurate impression that sanctions were possible or even likely. These perjured statements were made by Lalaji individually and as the designated representative of the Lalaji Defendants. False statements under oath in a deposition mislead not only the opposing party, but also the Court itself. The circumstances of these perjured statements lead to the reasonable inference that they were made in order to gain an unfair advantage in this action against Dr. Patel and Dr. Pampati. Through his false testimony, Lalaji has established that he has zero credibility. As such, it is appropriate for the Court to exercise its contempt power to exclude Lalaji's testimony on any topic at trial of this matter on behalf of himself and/or the Lalaji Defendants.

      **B.**      **Lalaji's testimony should be excluded based on discovery abuse.**

In their first set of requests for production of documents served on the Lalaji Defendants on August 9, 2021, Dr. Patel and Dr. Pampati made the following request:

> **REQUEST NO. 14:** Produce all Documents provided to or received from any regulatory agency or instrumentality which in any way identify or refer to Defendants, jointly or severally.

This request, and others, should have triggered the production of the Lalaji Defendants' alleged self-report to CMS and any response from the agency. The Lalaji Defendants had a duty to seasonably supplement their responses and production of documents pursuant to CR 26.05. In their responses served October 7, 2021, the Lalaji Defendants produced no responsive documents; and never supplemented their responses to produce either their alleged self-report to CMS or any response from the agency, until the May 10, 2023 response to Dr. Patel's and Dr. Pampati's Fourth

Interrogatories and Requests for Documents, **Exhibit 7** hereto.  To be clear, Request No. 3 of the

Fourth Interrogatories and Requests for Documents was:

> **REQUEST NO. 3:** Produce all records relating any reporting by Defendants
> relative to any aspect of the plaintiffs' medical practices including but not limited
> to their certification of reads or diagnostic studies or any billing practices.

In response to this request, the Lalaji Defendants produced only one document, the OIG March

18, 2022 Email.  The entire alleged basis of the Lalaji Defendants' termination of Dr. Patel's and

Dr. Pampati's employment and the Lalaji Defendants' Counterclaim was the alleged violation of

CMS guidelines for authentication of radiology reports.  Nevertheless, the Lalaji Defendants have

entirely failed and refused to produce the alleged self-report, and failed until May 10, 2023 to

produce the OIG March 18, 2022 Email.

CR 37.02(2)(a) provides for a range of sanctions for failure to respond to discovery,

including but not limited to (a) determining disputed facts to be established, (b) excluding support

for a party's claims or defenses or prohibiting introduction of designated matters into evidence, (c)

striking pleadings, dismissal of the action, or default judgment, or (d) finding contempt of court.

CR 37.02(3) provides for an award of costs and fees.

The Lalaji Defendants have manifestly failed in their duty to accurately respond to and

supplement responses to Dr. Patel's and Dr. Pampati's written discovery.  The Lalaji Defendants

designated Lalaji as their representative and disclosed him as their expert witness. He has

repeatedly given false testimony.  All of these actions have caused clear detriment and prejudice

to Dr. Patel and Dr. Pampati in litigating this case and have caused detriment to the Court and the

administration of justice in this action and justify sanctions for discovery abuse.

## CONCLUSION

The Lalaji Defendants' current perjurious actions are among the gravest and most serious

and are clearly intentional.  Moreover, the Lalaji Defendants have a history, and a course and conduct of ignoring and abuse of the civil rules of procedure resulting in awards of sanctions by other Court's in this or similar matters. KRE 406 Habit; Routine Practice provides that evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice. The Lalaji Defendants' current actions and history of abuses warrant the Court's exercise of sanctions under its contempt power and for discovery abuse, by the exclusion of Lalaji's testimony on any topic at trial of this matter on behalf of himself or the Lalaji Defendants[2] and the award in favor of Dr. Patel and Dr. Pampati of attorney's fees and costs in an amount to be determined by subsequent hearing by this Court..

## <u>NOTICE OF HEARING</u>

The parties shall take notice that the foregoing Motion shall come on for hearing before the Perry Circuit Court, Special Judge Kimberly Childers, sitting in the Knott County Judicial Center, 53 West Main Street, Hindman, Kentucky 41822, on May 30, 2023 at the hour of 9:30 a.m. or as soon thereafter as counsel may be heard in the

Respectfully submitted,

*/s/ Robert E. Maclin, III*
Robert E. Maclin, III (KBA #43025)
Luke Morgan (KBA #83181)
McBrayer PLLC
201 East Main Street, Suite 900
Lexington, Kentucky 40507
remaclin@mcbrayerfirm.com
lmorgan@mcbrayerfirm.com

---

[2] Dr. Patel and Dr. Pampati reserve the right to supplement their pending motions in light of this newly-discovered evidence.

11

egreen@mcbrayerfirm.com
*Counsel for Plaintiff, Ashokkumar R. Patel, M.D.*
*and Plaintiff, Mahender Pampati, M.D.*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served, on this 15th day of May, 2023, via the Kentucky Courts e-filing system and electronically upon the following:

R. Aaron Hostettler, Esq.
Jay Milby Ridings, Esq.
Kelsey Lee Bryant, Esq.
Hamm, Milby & Ridings, PLLC
120 North Main Street
London, KY 40741
aaron@hmrkylaw.com
jridings@hmrkylaw.com
kelsey@hmrkylaw.com
crystal@hmrkylaw.com
*Counsel for Defendants, Gram Resources,*
*Inc., Hazard Radiology Associates, Inc., TRG*
*Holdings G & H, LLC, The Radiology Group,*
*LLC, and Anand Lalaji, M.D.*

Barry D. Hunter, Esq.
Frost Brown Todd PLLC
250 West Main Street, Suite 2800
Lexington, KY 40508
bhunter@fbtlaw.com
*Counsel for Defendant, William Crenshaw*

Courtesy Copy Via Email
To Hon. Kimberly Childers
c/o AngelaShort@kycourts.net

*/s/ Robert E. Maclin, III*
Robert E. Maclin, III (KBA #43025)

12

# EXHIBIT 1



the
radiology
group

October 28, 2021

Dr. Ashokkumar Patel
3037 Bob White Trail
Lexington, KY 40509

Dr. Patel:

We have learned that with your knowledge and consent, someone other than yourself fraudulently signed your name on medical reports. You instructed persons other than yourself to access unsigned medical reports through the Novarad database using your login information and sign medical reports on your behalf. This was a violation of Medicare and federal law as you did not personally review and sign the reports. Section 3.3.2.4 of the Medicare Program Integrity Manual and the False Claims Act, 31 USCA § 3729. This was in violation of the following two (2) provisions in your signed offer letter and Key Employee Covenants Agreement with Gram Resources, Inc., and Hazard Radiology Associates, Inc. (the Companies):

> (1) See Key Employee Covenants Agreement, Section 5, which is incorporated by reference in section (g) of "Termination for Cause" : "Employee agrees to…(iv) abide by all laws and ordinances of the United States, and the state, county, and municipality in which the Employee is working"; and

> (2) Offer letter, Termination for Cause: "Your employment may be terminated by the Companies upon written notice to you in the event of any of the following ("Cause"): … (e) commission by you of any act constituting a breach of fiduciary duty, fraud, or misrepresentation…"

Pursuant to the signed offer letter: "In the event of any breach under items (b), (e) or (f) above, the Companies may provide written notice of immediate termination, and no further amounts or benefits shall be payable to you hereunder." Based on this provision, effective today, Monday, October 25, 2021, your employment is terminated.

In addition to your fraudulent activity, you breached your fiduciary duty to the Companies, violated the non-compete clause of your offer letter under Section IV., Covenants Against Competition and Solicitation, and disparaged the Companies in violation of your offer letter.



During your employment with the Companies, you may have had access to highly sensitive, confidential, and secret information belonging to the Companies and its subsidiaries. We wish to remind you of your continuing obligations of confidentiality and non- disclosure with regard to that information pursuant to Section 3, Nondisclosure of Confidential Information and Trade Secrets of your offer letter. You are obligated to keep confidential, and not to disclose to anyone, any information relating to the Companies' business, which is of secret or confidential nature and which you relinquished by reason of your sale to and employment with the Companies in August 2020.

Further, you are obligated to refrain from soliciting other customers, suppliers, employees, and/or contractors and not compete. We insist that you continue to honor these obligations pursuant to Section 4, Covenants Against Competition and Solicitation and Section 6(b) Termination of the Key Employee Covenants Agreement.

If you are in possession of materials, equipment, documents, or any other property belonging to Gram Resources, Hazard Radiology Associates, The Radiology Group or any related Companies, all must be returned immediately to The Radiology Group pursuant to Section 6(c) Termination of the Key Employee Covenants Agreement. Please contact Tracy Gillum, Practice Manager, to make arrangement to complete this process.

Sincerely,

Akira LeBlanc
Human Resources & Compliance Manager
The Radiology Group, LLC
aleblanc@theradiologygroup.org

# EXHIBIT 2



October 28, 2021

Dr. Mahender Pampati
221 Gorman Ridge
Hazard, KY 41701

Dr. Pampati:

We have learned that with your knowledge and consent, someone other than yourself fraudulently signed your name on medical reports. You instructed persons other than yourself to access unsigned medical reports through the Novarad database using your login information and sign medical reports on your behalf. This was a violation of Medicare and federal law as you did not personally review and sign the reports. Section 3.3.2.4 of the Medicare Program Integrity Manual and the False Claims Act, 31 USCA § 3729. This was in violation of the following two (2) provisions in your signed offer letter and Key Employee Covenants Agreement with Gram Resources, Inc., and Hazard Radiology Associates, Inc. (the Companies):

(1) See Key Employee Covenants Agreement, Section 5, which is incorporated by reference in section (g) of "Termination for Cause" : "Employee agrees to…(iv) abide by all laws and ordinances of the United States, and the state, county, and municipality in which the Employee is working"; and

(2) Offer letter, Termination for Cause: "Your employment may be terminated by the Companies upon written notice to you in the event of any of the following ("Cause"): … (e) commission by you of any act constituting a breach of fiduciary duty, fraud, or misrepresentation…"

Pursuant to the signed offer letter: "In the event of any breach under items (b), (e) or (f) above, the Companies may provide written notice of immediate termination, and no further amounts or benefits shall be payable to you hereunder." Based on this provision, effective today, Monday, October 25, 2021, your employment is terminated.

In addition to your fraudulent activity, you breached your fiduciary duty to the Companies, violated the non-compete clause of your offer letter under Section IV., Covenants Against Competition and Solicitation, and disparaged the Companies in violation of your offer letter.



During your employment with the Companies, you may have had access to highly sensitive, confidential, and secret information belonging to the Companies and its subsidiaries. We wish to remind you of your continuing obligations of confidentiality and non- disclosure with regard to that information pursuant to Section 3, Nondisclosure of Confidential Information and Trade Secrets of your offer letter. You are obligated to keep confidential, and not to disclose to anyone, any information relating to the Companies' business, which is of secret or confidential nature and which you relinquished by reason of your sale to and employment with the Companies in August 2020.

Further, you are obligated to refrain from soliciting other customers, suppliers, employees, and/or contractors and not compete. We insist that you continue to honor these obligations pursuant to Section 4, Covenants Against Competition and Solicitation and Section 6(b) Termination of the Key Employee Covenants Agreement.

If you are in possession of materials, equipment, documents, or any other property belonging to Gram Resources, Hazard Radiology Associates, The Radiology Group or any related Companies, all must be returned immediately to The Radiology Group pursuant to Section 6(c) Termination of the Key Employee Covenants Agreement. Please contact Tracy Gillum, Practice Manager, to make arrangement to complete this process.

Sincerely,

Akira LeBlanc
Human Resources & Compliance Manager
The Radiology Group, LLC
aleblanc@theradiologygroup.org

# EXHIBIT 3

Anand P. Lalaji, M.D.   4/3/2023

1 (Pages 1 to 4)

---

**Page 1**

COMMONWEALTH OF KENTUCKY
PERRY CIRCUIT COURT
CASE NO. 21-CI-00221

ASHOKKUMAR R. PATEL,    )  DEPOSITION TAKEN ON BEHALF
ET AL.                  )     OF THE PLAINTIFFS
                        )        BY:  NOTICE
        PLAINTIFFS      )
                        )
VS.                     )
                        )
                        )
GRAM RESOURCES, INC.,   )
ET AL.                  )
        DEFENDANTS      )  WITNESS:
                        )  ANAND P. LALAJI, M.D.

*  *  *  *          *  *  *  *

        The deposition of ANAND P. LALAJI, M.D.,
was taken on behalf of the plaintiffs before
MARYBETH C. SOWARDS, Certified Court Reporter and
Notary Public in and for the State of Kentucky at
Large, at the law offices of McBrayer PLLC located
at 201 East Main Street, Lexington, Kentucky, on
Monday, April 3, 2023, commencing at the
approximate hour of 9:55 a.m.
        Said deposition was taken pursuant to
notice previously filed, pursuant to the Kentucky
Rules of Civil Procedure, in the above-styled
action now pending before the Perry Circuit Court
of Kentucky.

*  *  *  *          *  *  *  *

---

**Page 2**

                    APPEARANCES

        ON BEHALF OF THE PLAINTIFFS:

            Mr. Robert E. Maclin III
            Mr. D. Luke Morgan
            Mr. Scott A. Schuette
                McBrayer PLLC
                 Suite 900
            201 East Main Street
          Lexington, Kentucky  40507

        ON BEHALF OF THE DEFENDANTS
     GRAM RESOURCES, INC., HAZARD RADIOLOGY
   ASSOCIATES, INC., TRG HOLDINGS G & H, LLC,
  THE RADIOLOGY GROUP, LLC, AND ANAND LALAJI, M.D.:

            Mr. R. Aaron Hostettler
            Hamm, Milby & Ridings, PLLC
             120 North Main Street
            London, Kentucky  40741

        ALSO PRESENT:

            Dr. Ashokkumar Patel

        *  *  *  *          *  *  *  *

                     INDEX

Caption. . . . . . . . . . . . . . . . . . . . . . . .1
Appearances and Index. . . . . . . . . . . . . . . . .2
Exhibits . . . . . . . . . . . . . . . . . . . . . . .3
Examination by Mr. Maclin. . . . . . . . . . . . 4 - 128
Reporter's Certificate . . . . . . . . . . . . . . .129

        *  *  *  *          *  *  *  *

---

**Page 3**

                    EXHIBITS

Plaintiff's Exhibit No. 1. . . . . . . . . . . . . . . .5

(Plaintiffs' Notice of Deposition of
Anand Lalaji, M.D., dated 3/29/23)
Plaintiff's Exhibit No. 2. . . . . . . . . . . . . . . .6
(Curriculum Vita of Dr. Lalaji)
Plaintiff's Exhibit No. 3. . . . . . . . . . . . . . .12
(Defendants' Supplemental Expert Witness
Disclosure dated 3/10/23)

Plaintiff's Exhibit No. 4. . . . . . . . . . . . . . .14

(Documents supporting Dr. Lalaji's opinions)

Plaintiff's Exhibit No. 5. . . . . . . . . . . . . . .44

(Medicare Program Integrity Manual,
revised 6/19/20)
Plaintiff's Exhibit No. 6. . . . . . . . . . . . . . .88
(E-mail from Dr. Lalaji to Drs. Patel and
Pampati dated 5/21/21)

Plaintiff's Exhibit No. 7. . . . . . . . . . . . . . 117

(MLN Fact Sheet entitled, Complying with
Medicare Signature Requirements)
Plaintiff's Exhibit No. 8. . . . . . . . . . . . . . 122
(Medicare Learning Network document entitled,
Complying with Medicare Signature Requirements)

        *  *  *  *          *  *  *  *

---

**Page 4**

                ANAND P. LALAJI, M.D.,
having been first duly placed under oath, was
examined and testified as follows:
                    EXAMINATION
BY MR. MACLIN:
     Q       Would you state your name for the
record, please?
     A       Anand P. Lalaji.
     Q       Dr. Lalaji, as you know, my name's Rob
Maclin, and I represent the plaintiffs in this
case.  I'm going to ask you some questions, and I
want to kind of go over the rules for your
deposition today.  You know you're under oath and
you've got a duty to give truthful and accurate
responses to the best of your ability.  Will you do
that, sir?
     A       Yes.
     Q       If you don't understand a question I
present to you, if it's unclear, and sometimes
folks', including me, voices trail off, you need to
ask me to repeat or clarify the question.
Otherwise it'll be presumed for the record that you
understood it.  Will you agree to do that, sir?
     A       I will.
     Q       The most important rule is that we

---

Anand P. Lalaji, M.D.   4/3/2023

Page 5

1  don't get to talk over each other.  We're not CNN
2  or MSNBC, you know.  You need to let me finish my
3  questions before you begin an answer, and by the
4  same token I'm going to give you the opportunity to
5  complete your answer before I start another
6  question.  If we could both try to do that; okay?
7  A        Absolutely.
8  Q        Did you talk to anybody to prepare for
9  your deposition other than your counsel?
10  A        Just my counsel.
11  Q        There's some documents in front of you
12  which we've already marked.  The first one is
13  Exhibit 1.  Would you take a minute and look at
14  that, please?  That's the notice of deposition.
15  With the exception of the fact that via
16  videoconference on the fourth line has been struck
17  out and in person has been inserted, have you seen
18  that instrument before?
19          (Said document is filed with this
20          deposition and marked as Plaintiff's
21          Exhibit No. 1 for purposes of
22          identification.)
23  A        This document?
24  Q        Yes, sir.
25  A        Yes.

Page 6

1  Q        And did you gather the documents and
2  the other materials that are referred to therein to
3  produce with you today or have --
4  A        Yes.  Sorry.
5  Q        It's okay.  We all do that.  The worst
6  thing about it is sometimes people answer questions
7  that are not the questions that are being asked, so
8  that's another reason why it's important.
9          So the first thing that we've asked you
10  to produce is a copy of your CV, and that's been
11  marked as Exhibit 2, and that's in front of you.
12  And if you'd take a look at that and make sure
13  that's a complete copy of your CV.
14          (Said document is filed with this
15          deposition and marked as Plaintiff's
16          Exhibit No. 2 for purposes of
17          identification.)
18  A        Yes.
19  Q        Let's kind of talk about your
20  employment.  What's your present employment,
21  Dr. Lalaji?
22  A        I'm the chief executive officer of The
23  Radiology Group.
24  Q        And tell me what The Radiology Group
25  is.

Page 7

1  A        It's a radiology practice, national
2  radiology practice, that covers teleradiology
3  services for hospitals in several states.
4  Q        And what's the practice of radiology,
5  Doctor?
6  A        It's basically the interpretation of
7  radiographic, radiologic images by board-certified
8  or board-eligible radiologists.
9  Q        And when you say CEO, that's chief
10  executive officer, like president of the company or
11  corporation?
12  A        Yeah, chief executive officer.
13  Q        And you talked about reading -- I guess
14  in layman's terms a radiograph is what's commonly
15  referred to as an x-ray?
16  A        Yeah, a radiograph is an x-ray;
17  correct.
18  Q        And do you read any other kind of
19  studies, MRIs or anything like that?
20  A        MRIs, CAT scans, ultrasounds, and x-
21  rays.
22  Q        And those are all read by the folks
23  that work for The Radiology Group?
24  A        That's correct.
25  Q        And how many medical professionals are

Page 8

1  employed either directly or as independent
2  contractor of The Radiology Group as we sit here
3  today, Doctor?
4  A        I don't know the exact number.
5  Q        Can you give me a range, Doctor?
6  A        Between 65 to 75.
7  Q        And they would be medical doctors or
8  DOs?
9  A        Correct.
10  Q        And they would be board-certified or
11  board-eligible to be board-certified?
12  A        Correct.
13  Q        And where are those folks, those 65 to
14  75 medical doctors, located?
15  A        All over the country.  I mean, I don't
16  know -- they're probably within 20 to 25 different
17  states.  I don't know them all.
18  Q        And do you supervise or do you manage
19  these 65 to 75 medical professionals you just
20  identified?
21  A        So we have a whole infrastructure
22  around the operations of the company and managing
23  the radiologists.
24  Q        Can you describe that to me, please,
25  sir?

Anand P. Lalaji, M.D.   4/3/2023

3 (Pages 9 to 12)

9

1    A          So we have a chief operating officer,
2    and under the chief operating officer we have
3    clinical operations directors, credentialing and
4    licensing, you know, the IT services, payer,
5    enrollment, et cetera.  And then all of those
6    individuals support the operations and the activity
7    of the radiologists.
8    Q          So setting aside the 65 to 75 medical
9    doctors that you just identified, how many other
10   employees does The Radiology Group have, Doctor?
11   A          The actual employees is roughly about
12   -- again, I don't know this exact number, but if
13   you want a range, it's probably between 55 to 60-
14   ish, like low sixties.
15   Q          How many folks directly report to you
16   on a regular basis?
17   A          The executive leadership team.  So it's
18   one, two, three, four -- four people.
19   Q          And could you identify those four folks
20   and what their job duties are?
21   A          The chief operating officer, the chief
22   development officer, the chief clinical officer,
23   and our general counsel.
24   Q          So on a daily basis do you report to an
25   office facility?

10

1    A          Yes.  We have our main headquarters in
2    Atlanta.
3    Q          I realize, Doctor, that we all live in
4    kind of a different world with a lot of folks that
5    work remotely, but how many folks on a regular
6    basis would be in the main headquarters office in
7    Atlanta of The Radiology Group?
8    A          I'd say about between 25 to 35.
9    Q          And you personally, do you work
10   remotely or do you go in every day?
11   A          Go in every day.
12   Q          Go ahead if you would -- I guess we
13   skipped past something.  Could you tell me the
14   folks that have the four positions that you
15   referred to, the COO, chief development officer,
16   chief clinical officer, and general counsel?
17   A          The actual names?
18   Q          Yes, sir.
19   A          Shawn Kramer is the chief operating
20   officer --
21   Q          Was that with a C or a K?
22   A          K.  -- Allan Schroeder as chief
23   development officer; Chloe Dallaire as general
24   counsel, and Tejal Lalaji as chief clinical
25   officer.

11

1    Q          Is that a relation?
2    A          That's my wife.
3    Q          Is she a medical doctor?
4    A          She's a radiologist.
5    Q          And on a daily basis how does your day
6    unfold when you get -- say you get to the office at
7    around 8:30 or 9:00, I presume?
8    A          It varies, but --
9    Q          Typically.
10   A          What time I get to the office?
11   Q          No.  How does your day unfold?  What do
12   you do during the day?
13   A          Oh, just there's clinical time for
14   interpretations.  I'm a orthopedic sports medicine
15   radiologist, so I read MRIs of athletes, you know,
16   so I usually have about two hours of clinical
17   readout.  And then I have meetings.  I have, you
18   know, different just business-related or
19   administrative-related meetings.
20   Q          So I would presume that's like dealing
21   with -- business-related, dealing with personnel,
22   dealing with staffing, dealing with IT matters,
23   that kind of stuff?
24   A          Yeah, in general, with the people that
25   report to me; correct.

12

1    Q          And you are a member of the American
2    College of Radiology?
3    A          Correct.
4    Q          Any other society memberships?
5    A          The Society of Skeletal Radiology and a
6    member of the RSNA, the Radiological Society of
7    North America.
8    Q          And you're going to -- pursuant to what
9    we've marked as Exhibit 3, you're going to offer
10   some opinions in this case; is that correct?
11   A          Can you elaborate?
12   Q          Well, this is what's been disclosed,
13   if you'll look at what's marked as Exhibit 3.  And
14   you've been identified as an expert.
15              (Said document is filed with this
16              deposition and marked as Plaintiff's
17              Exhibit No. 3 for purposes of
18              identification.)
19   A          Yes.  Yeah.
20   Q          And have you seen Exhibit 3 before?
21   And once again, Doctor, if I give you a document to
22   look at --
23   A          I'll take my time and look at it.
24   Q          -- you take as long as you need to look
25   at it.

Anand P. Lalaji, M.D.   4/3/2023

4 (Pages 13 to 16)

---

**13**

1  A        Yeah.
2  Q        We've got as much time as we need to
3  properly get through this today, and tomorrow if it
4  takes that long.
5  A        Yes.
6  Q        And the opinions that you're going to
7  offer in this case, are they all set forth on
8  Exhibit 3?
9  A        Yes.
10 Q        And there's nothing that's not in
11 Exhibit -- no opinions that you intend to offer
12 that are not set forth in Exhibit 3?
13 A        That is correct.
14 Q        And your counsel provided some
15 documents --
16 A        Uh-huh. (Affirmative)
17 Q        -- that you relied upon and intend to
18 rely upon, and they're collectively in front of you
19 and marked as Exhibit 4.  And take a minute and go
20 through what we've marked as Exhibit 4 and I want
21 to make sure --
22 A        Yep.
23 Q        -- that's all the documents that you
24 rely upon in making the opinions that you're going
25 to offer in this case, which are Exhibit 3.

---

**14**

1            MR. MACLIN:  I think there's a
2         schedule, Aaron, of what you printed
3         out that's in here.
4            MR. HOSTETTLER:  Okay.
5  Q        Make sure that's everything, Doctor.
6  There's a -- this is what your counsel provided as
7  a schedule of what comprises Exhibit 4.
8            (Said document is filed with this
9         deposition and marked as Plaintiff's
10        Exhibit No. 4 for purposes of
11        identification.)
12 A        That's correct, yeah.
13 Q        We'll talk about that in a minute.
14 Now have you ever testified as an
15 expert before?
16 A        No.
17 Q        Okay.  And you're going to talk about I
18 guess a number of different things which are set
19 forth in Exhibit 3, but you're going to talk about
20 Medicaid reporting and filing requirements; is that
21 correct?
22 A        Medicare and Medicaid.
23 Q        Okay.
24 A        CMS.
25 Q        And have you ever written any treatises

---

**15**

1  on anything that's got to -- concerning Medicaid
2  and Medicare reporting requirements, Stark Act
3  requirements, HIPAA -- you know what HIPAA is;
4  correct?
5  A        Uh-huh. (Affirmative)
6  Q        Yes?
7  A        Yes, yes.
8  Q        That's another thing.  If you would say
9  yes or no if the question calls for a --
10 A        Sure, yeah.
11 Q        -- yes or no response as opposed to a
12 nod or an uh-huh --
13 A        Yes.
14 Q        -- or something like that.  We don't
15 want the court reporter to become angry with either
16 one of us.
17 A        Sure.
18 Q        So have you ever written any treatises
19 that address Medicaid -- Medicaid, Stark, HIPAA,
20 broad kind of requirements or duties of medical
21 doctors?
22 A        What's a treatise?
23 Q        A treatise would be a learned book or a
24 learned article concerning the obligations or
25 duties of a person or medical doctor under

---

**16**

1  something.
2  A        So like an article or a published
3  article --
4  Q        Yes.
5  A        -- of some sort?
6  Q        Yes.
7  A        No, I have not.
8  Q        Have you ever attended any seminars or
9  classes on obligations of medical doctors under the
10 Stark Act, under the anti-fraud requirements of
11 Medicaid or Medicare, or of Medicaid or Medicare
12 reporting?
13 A        So in -- we can start all the way back
14 in medical school.  There are classes and seminars
15 and webinars, you know, in medical school that
16 address that specific topic.  In residency there's
17 also, through a five-year residency, as you get
18 into the later years, there's also compliance
19 education in regards to CMS Services.  Then
20 throughout the last 18 years of running TRG, we
21 undergo yearly and quarterly compliance -- CMS
22 compliance guideline audits that are conducted
23 internally.  And then to do those we go through --
24 you know, we go through training in terms of noting
25 the compliance requirements.  So --

---

Anand P. Lalaji, M.D.   4/3/2023

17

1   Q        Okay.
2   A        -- that's how --
3   Q        I'm sorry.
4   A        -- that's how -- I guess that's the
5   shape or form of the type of education in that
6   regard.
7   Q        **Who provides you with the training that**
8   **you just identified?**
9   A        Okay.  So back in the beginning it's a
10  -- I don't know the name of the exact person 13
11  years ago or 14 years ago, but it is a sort of
12  expert consulting-type firm that provides that
13  education.  It's usually in conjunction with
14  whatever billing entity that we are utilizing at
15  the time.  And then TRG itself has a large
16  healthcare compliance practice that audits us and
17  provides us guidance of all of the education of CMS
18  regulation at Morris, Manning & Martin in Atlanta.
19  And the attorney is Michele Madison.
20  Q        **So an attorney named Michele Madison**
21  **who has legal training provides instructions on**
22  **CMS, Medicaid, Medicare, Stark Act, HIPAA**
23  **requirements?**
24  A        Yes.
25  Q        **And she teaches those classes regularly**

18

1   to folks at your company?
2   A        It's not in the formula -- it's not in
3   the -- like the actual structure of a class in a
4   classroom and et cetera.  We have annual meetings
5   where she goes through, you know, kind of all of
6   the things that we need to be adhering to in terms
7   of what you just described as the regulations of
8   CMS and Medicare/Medicaid, HIPAA.  I think, you
9   know, because we are Joint Commission-certified,
10  also Joint Commission and the requirements of Joint
11  Commission, et cetera.
12  Q        **So you've never taught any of those**
13  **classes; correct?**
14  A        Never what?
15  Q        **You've never taught or provided any of**
16  **that instruction personally; correct?**
17  A        Correct.
18  Q        **And someone at -- you rely upon folks**
19  **at TRG to do the internal audits; correct?  Not**
20  **you; correct?  When I say internal audits, internal**
21  **Medicaid/Medicare, CMS, Stark, HIPAA requirement**
22  **audits; correct?**
23  A        Again, it's Michele Madison at Morris,
24  Manning & Martin that initiates sort of an annual
25  sort of guidelines and requirements under that law

19

1   that we have to follow.  Then what we do, there is
2   a compliance committee at TRG that's made up of --
3   it's a compliance committee at TRG that's made up
4   of all of the relevant parties that meet on a
5   monthly basis and go over all of those regulations
6   to make sure that we're in compliance.
7   Q        **Who's on the compliance committee,**
8   **Doctor?**
9   A        There are I think eight or nine people.
10  I don't know all of them, but the chief operating
11  officer, the chief clinical officer, HR, our HR
12  head -- let's see -- our medical director, the
13  director of operations, director of finance, head
14  of BIM, which is business information management,
15  and a few other people that I don't remember.
16  Q        **And you're not on that committee;**
17  **correct?**
18  A        No.  I conduct a -- I do a semi-annual
19  meeting with the chief clinical officer and chief
20  operating officer on the compliance.  And obviously
21  if there's -- there hasn't been, but if there's
22  anything that's noteworthy that comes out of the
23  compliance meeting, then I immediately get informed
24  in terms of strategizing, you know, any resolution
25  on that.

20

1   Q        **Doctor, I'm going to ask you again**
2   **because I want to make sure.  Sometimes folks do**
3   **double negatives.  You said no, but it is a correct**
4   **statement that you're not on this compliance**
5   **committee; correct?**
6   A        I'm not on the monthly compliance
7   committee; correct.
8   Q        **And you talked about Ms. Manning [sic]**
9   **providing some level of guidance.  What did she**
10  **specifically address?**
11  A        Ms. Manning?
12  Q        **You said Michele --**
13  A        Madison.
14  Q        **Oh, Madison.  I'm sorry, sir.  Thank**
15  **you for the correction.**
16           **What does Ms. Madison specifically**
17  **address?**
18  A        So in the radiology practice, when you
19  -- so there's different categories.  So one is, is
20  you have to provide the appropriate -- through the
21  PACS system that you use, you have to provide the
22  appropriate security safeguards in terms of HIPAA
23  compliance and meaningful use criteria.  There's
24  also cybersecurity and, you know, those types of
25  things.  That's one category that she knows the

Anand P. Lalaji, M.D.   4/3/2023

6 (Pages 21 to 24)

---

**Page 21**

1    regulations of.
2        The second one is the HIPAA Act and,
3    you know, private medical information and, you
4    know, all of that. And then lastly, the CMS
5    guidelines of billing Medicare and Medicaid in
6    terms of, you know, what specific things that need
7    to be, you know, done so that we are compliant in
8    CMS guidelines. So it's like those three different
9    things.
10   Q        Does she teach on signature
11   requirements?
12   A        That is part of her CMS -- that's part
13   of their process. That's one of many things that
14   CMS requires.
15   Q        Okay. You talked about you spend a
16   couple hours a day routinely making studies of
17   radiographs or other types of, you know, medical
18   examinations.
19   A        You mean interpreting --
20   Q        Yes.
21   A        -- radiology images?
22   Q        Yes.
23   A        Correct.
24   Q        And then how do you memorialize your
25   interpretations?

---

**Page 22**

1    A        So in our system we use voice
2    recognition. And so when you're viewing the exam
3    you choose a template from a dropdown menu, and
4    then you voice-dictate all of the findings that you
5    see within the document viewer using voice
6    recognition. Once you're done you hit approve, and
7    then the study gets approved with your electronic
8    signature. I myself have to approve that. Nobody
9    else has access or anything to approve that report.
10   Q        And your signature on the report is an
11   authentication of the report; correct, as a medical
12   doc --
13   A        That's correct.
14   Q        Remember our deal. I finish, you
15   finish.
16        So your signature on the report is an
17   authentication of the accuracy of the report;
18   correct?
19   A        The signature on the report is an
20   authentication that I have -- I personally have
21   reviewed the study and confirmed the accuracy of
22   the report.
23   Q        But you just said you dictated the
24   report.
25   A        No, you voice-dictate.

---

**Page 23**

1    Q        That's correct. And then after you get
2    through with voice-dictating it, you hit another
3    button on the computer?
4    A        So voice dictation is -- voice
5    recognition actually; it's not voice dictation.
6        Right.
7    A        So when you talk, it types
8    automatically. There's no intermediary; right?
9    Q        Right. And so then after you get
10   through you hit approve, and your electronic
11   signature is affixed; correct?
12   A        Yeah, once you proof the report to make
13   sure everything is accurate.
14   Q        When you proof the report, do you
15   review the images again as you go through? I mean,
16   in other words --
17   A        Possibly, yeah.
18   Q        -- do you review the images twice, or
19   do you sometimes don't review them twice; correct?
20   A        Well, so if I see something that's in
21   the report that you, know, is like weirdly worded
22   or it doesn't say what I originally said, then I'll
23   go back to the images and verify and then go back
24   to the report and fix and then -- and then proceed.
25   Q        But you don't always review the images

---

**Page 24**

1    twice; correct?
2    A        Not in -- not every single case.
3    Q        And in fact, the American College of
4    Radiology recognizes that radiologists don't need
5    to review the images twice unless they need
6    something they need to fix; correct?
7    A        Correct. If you have reviewed the
8    images, then you don't have to review them twice.
9    Q        So when you're reviewing images or some
10   part of making a report of a study, is that a
11   system that The Radiology Group has, or is that for
12   each I guess medical facility or hospital or The
13   Radiology Group has some sort of relationship?
14   A        No, it's the PACS system that The
15   Radiology Group uses, but, you know, every --
16   probably 99.99 percent of every facility in the
17   United States and probably globally now utilizes
18   the same process where there's a voice recognition
19   system like PowerScribe, you know, then the
20   radiologist voice-dictates, proofs the report, goes
21   back to the images if they need to, and then, you
22   know, certifies the report themselves. So it could
23   be our PACS system or it could be the hospital PACS
24   system. It just depends on how it's set up.
25   Q        Does The Radiology Group physically

Anand P. Lalaji, M.D.   4/3/2023

7 (Pages 25 to 28)

25

1   staff radiologists at facilities that it has
2   contracts with?
3   A       As of this moment or what time period?
4   Q       Right now.
5   A       As of this moment we --
6           MR. HOSTETTLER: Hold on a minute;
7   hold on a minute. I object to that as
8   outside the scope of the purpose of
9   this deposition.
10          You can answer that question,
11  though, Doctor.
12          THE WITNESS: Okay.
13  A       Yes.
14  Q       What about in the past two years? Has
15  that been the same case over the past two years?
16  A       Yes.
17  Q       And why would that occur?
18  A       Well, certain facilities require, you
19  know, things on site, like procedures,
20  interventional procedures, and so you would -- you
21  know, if we had a contract with the hospital or an
22  entity like an imaging center, et cetera, where we
23  would have to provide a radiologist on site to do a
24  specific function, such as procedures.
25  Q       What do you mean by procedures?

26

1   A       Biopsies as an example.
2   Q       Let's look at, if you would, what's
3   marked as Exhibit 3. And you're offering a number
4   of opinions in Exhibit 3, and the first thing I
5   want to understand, Doctor, is the facts upon which
6   you're prepared to offer the opinions that are in
7   Exhibit 3. I mean, you generally stated, just to
8   clarify -- and I'll try not to ask compound
9   questions but I want to make sure you understand,
10  you generally stated that, you know, Dr. Patel and
11  Pampati have violated Medicare and related federal
12  laws, but I want to understand the facts upon which
13  you base those or you're going to base those
14  opinions that are set forth in Exhibit 3. So what
15  are the facts?
16          MR. HOSTETTLER: Hold on. I object
17  to that as being overly broad.
18          You can answer.
19  A       There's a lot. So, you know, let me
20  ask you -- let me ask you, when you say, what are
21  the facts, are you asking what are we using as a
22  basis to provide the statements within Exhibit 3?
23  Q       Yes.
24  A       So it's the whole CMS regulatory
25  manual, the Medicare Program Integrity Manual, the

27

1   actual False Claims Act law, and sort of all of the
2   federal statutes and laws related to that. That's
3   where it's coming from.
4   Q       Well, I understand that those are the
5   instruments that you just referred to --
6   A       Uh-huh. (Affirmative)
7   Q       -- that are actually a part of Exhibit
8   -- they are Exhibit 4. But what I want to
9   understand, Doctor, is the underlying facts upon
10  which you have interpreted and what reliance on the
11  documents and instruments that are Exhibit 4 which
12  cause you or support your opinions which are set
13  forth in Exhibit 3.
14  A       Okay. So Dr. Patel and Pampati
15  essentially allowed -- they allowed nonmedical
16  personnel, nonradiologists, nondoctors, that had no
17  certification or basis, to make accurate
18  representations of themselves, you know, and
19  allowed and gave access to their electronic
20  signature mechanism in the ERAD PACS system that
21  the MCHC Clinic provided. So they did not -- they
22  gave their access to secretaries. I believe they
23  were Nancy Campbell, Crystal Eversole, and even our
24  -- you know, in transition our manager on the
25  ground there, Tracy Gillum. They logged in as

28

1   representing Dr. Patel or Dr. Pampati, and then
2   they signed all of those reports.
3           Their name does not appear on the
4   report because they were representing themself as
5   the radiologists that gave them that access. And
6   so Dr. Patel and Dr. Pampati did not review those
7   reports before they got sent out to the healthcare
8   providers in that clinic. The signature
9   requirements and specifically the --
10  Q       Let's -- excuse me. I just want to
11  know the facts for now.
12  A       Sure.
13  Q       And we'll talk about what you -- so
14  help me understand. So the reports that you're
15  talking about are only the Mountain Comprehensive
16  Care reports?
17  A       That's correct.
18  Q       So they're Mountain Comp -- I'm just
19  going to say Mountain Comp; is that okay?
20  A       Uh-huh. (Affirmative)
21  Q       Yes?
22  A       Yes.
23  Q       And the report was prepared and
24  dictated by Dr. Patel and Pampati; correct?
25  A       No.

Anand P. Lalaji, M.D.   4/3/2023

---

29

1  **Q       They didn't dictate it?**
2  A       They dictate the report.  It wasn't
3  prepared by them.
4  **Q       They dictated the report?**
5  A       Yes.
6  **Q       And they did the interpretation of the**
7  **radiograph; correct?**
8  A       That's correct.  But they didn't voice-
9  dictate the report.  They dictated to a
10 transcriptionist so it's like a recording device.
11 It's not -- they did not see the words -- you know,
12 as what's done today, the words are typed onto the
13 screen so you can proofread it, you know, as the
14 M.D. and the certifying doctor, that you can
15 approve it.  And what they were utilizing was
16 either a phone or a Dictaphone where the recording
17 was sent to a transcriptionist.  The
18 transcriptionist would type up that report and then
19 send it to their queue for review.  They gave the
20 access to the secretaries to review those or just
21 sign off on those reports basically.
22 **Q       So the first issue is, there's no**
23 **questions or issues that Dr. Patel and Dr. Pampati**
24 **did a study of the x-ray image; correct?**
25 A       They interpreted the x-ray image,

---

30

1  meaning they looked at the study and they came up
2  with a diagnosis and they transcribed that to a
3  transcriptionist.
4  **Q       What's the general purpose of HIPAA,**
5  **Doctor?**
6  A       HIPAA?
7  **Q       Yeah.  Yes, sir.**
8  A       So you're talking about a totally
9  different thing now?
10 **Q       I'm asking your opinion of what it**
11 **does.  It protects medical records and medical**
12 **information of patients; correct?**
13 A       Yeah, it's -- I'm testifying as an
14 expert to the CMS regulation of Medicare and
15 Medicaid; okay?  I'm not testifying as a HIPAA
16 expert.
17 **Q       Well, as a medical doctor don't you**
18 **have HIPAA obligations?**
19 A       Of course, yeah.
20 **Q       And what would those obligations be,**
21 **generally speaking?**
22 A       Generally speaking, you can't share
23 private -- you know, you can't share private
24 information, you know, about patients that could
25 potentially -- it's just a protective mechanism,

---

31

1  you know, to not share confidential, private
2  information of patients; correct.
3  **Q       And one of the things that you are**
4  **supposed to testify pursuant to Exhibit 3 is the**
5  **complaint that you initiated on behalf of your**
6  **company in Georgia; correct?  Isn't that part of**
7  **Exhibit 3?**
8          MR. HOSTETTLER:  Let me object to
9  that.
10         You can answer, Doctor, if you
11 know.
12         MR. MACLIN:  Well, it's part of the
13 disclosure.  I'm sorry, but you said
14 he's prepared to testify on the issues
15 in the complaint in Georgia.  It's part
16 of your disclosure.
17 **Q       Turn to the fourth or sixth physical**
18 **page.  It's attached.  Isn't that what you're going**
19 **to talk about here today, Doctor?**
20 A       You're talking about the basis of our
21 suit, which is the CMS -- which is the CMS fraud
22 False Claims Act basis of the case in Georgia;
23 correct.
24 **Q       And you've attached to --**
25         MR. MACLIN:  And I've left out,

---

32

1  Aaron, the big thick manual that was
2  Exhibit 1 just for ease.
3  **Q       But Exhibit 2 to that complaint in**
4  **Georgia is what, Doctor?  It's part of Exhibit 3.**
5          MR. HOSTETTLER:  Yeah, yeah.  His
6  testimony as it relates to that Georgia
7  complaint is confined to CMS-related
8  matters.  The intent there was not that
9  he would be testifying as to the
10 totality of the matters in that
11 complaint.
12         MR. MACLIN:  It says in paragraph
13 four on page three, the defendants
14 further anticipate Dr. Lalaji will
15 testify in accordance with the matters
16 alleged in the Georgia complaint, a
17 copy of which is attached hereto and
18 incorporated by reference as if set
19 forth fully at length verbatim.
20         MR. HOSTETTLER:  Yeah, if you want
21 to ask him, you know, what specifically
22 about that complaint he's prepared to
23 testify to, that's fine.
24         MR. MACLIN:  I want to ask him
25 specifically about Exhibit 3 to the

---

Anand P. Lalaji, M.D.   4/3/2023

9 (Pages 33 to 36)

**33**

1    complaint.
2        MR. HOSTETTLER:  Exhibit 3 to the
3    Georgia complaint?
4        MR. MACLIN:  Yes.
5    Q        You see that, Dr. Lalaji?
6    A    Uh-huh.  (Affirmative) Yes.
7    Q        What is that?
8    A    It appears to be a report that was
9    generated by Dr. Pampati from MCHC -- let's see.
10   Yeah, I believe it's an example of the fraud
11   perpetuated because it says, signed by Mahender
12   Pampati, which he did not.
13   Q        Who's the patient's name?
14   A    I believe it says Madison Crider.
15   Q        And what's his [sic] date of birth?
16   A    10/1/2004.
17   Q        And what's his medical diagnosis from
18   the study that Dr. Pampati did, authenticated?
19   A    I believe it was dictated so we don't
20   actually -- if he didn't review this -- when he
21   didn't review this report, we don't know exactly if
22   that was the intent of what he wanted on the
23   report.  So I can't tell you if his diagnosis is
24   related to the patient because, you know, any
25   missing word can easily be -- you know, it could be

**34**

1    -- you know, remote could be acute, recent could be
2    remote, you know.  Without any proofreading from
3    the physician themselves, you know, I cannot -- you
4    know, I can't tell you if this is an accurate
5    diagnosis or not.
6    Q        Doctor, you saw the Georgia complaint
7    before it was filed, and you authorized it to be
8    filed; correct?
9    A    Correct.
10   Q        Why in the world did you authorize the
11   disclosure of protected health information of this
12   young man named Madison Crider in the public
13   record?
14   A    This -- I don't think this falls under
15   -- this is not a HIPAA testimony; right?  Like this
16   is a CMS Medicare expert testimony.  So I can't
17   answer that question.
18   Q        You don't know whether this is a HIPAA
19   violation or not for disclosing this protected
20   health information in the public record, do you?
21       MR. HOSTETTLER:  Just show my
22   objection to relevance.
23       You can answer if you have an
24   opinion.
25   A    I don't -- I don't have an opinion.

**35**

1    Q        You don't know, do you?
2    A    I don't have an opinion.
3    Q        One way or the other; correct?
4    A    I don't have an opinion.
5    Q        Well, let's look at this protected
6    health information, which is Exhibit 3, and
7    somewhere you said CMS or Medicaid/Medicare
8    violation.  I think you said that a few moments
9    ago.  What's the Medicare/Medicaid violation?
10   A    Okay.  So the Medicare/Medicaid or CMS
11   overall violation is -- and it's -- you know, it's
12   specific within this manual, it's clear as day,
13   basically says that there -- this is a false claim
14   because it stated, signed by Mahender Pampati, when
15   he actually did not sign the report.  A secretary
16   signed the report representing him without
17   proofreading the report, and the report says it's
18   been signed by Mahender Pampati, which he has not
19   done.  That is a clear-cut violation of CMS law.
20   Q        How do you know that Dr. Pampati did
21   not review this report after it was transcribed?
22   A    Because if you look at the previous
23   exhibit, and go to number four, sign MCHC reports
24   for Patel and Pampati; never sign Trent's unless
25   they call needing one or he is off for a period of

**36**

1    time.  Tracy Gillum, our manager, was given those
2    login informations for Patel and Pampati, and that
3    was a clear-cut direction and mandate from
4    Dr. Patel and Pampati that these secretaries were
5    signing those reports.  And this probably, since
6    that PACS system was installed and -- you know, we
7    don't know how far back it goes, but we know at
8    least five or six years.
9    Q        Your testimony is with certainty that
10   there were never any -- when you say MCH you mean
11   Mountain Comp; right?
12   A    Yes.
13   Q        Okay.  So your testimony is that there
14   were never any Mountain Comp reports where a
15   transcriptionist had a concern with the actual
16   dictation that was subsequently reviewed by either
17   Pampati or Patel?
18   A    Can you repeat that question?  There
19   was a bunch of stuff in there.
20   Q        Let me rephrase the question.  Thank
21   you for asking me to clarify, Doctor.
22       Is your testimony that every single
23   Mountain Comp study was never reviewed by Dr. Patel
24   or Dr. Pampati as the case might be?
25   A    That is not my testimony.

Anand P. Lalaji, M.D.   4/3/2023

10  (Pages 37 to 40)

---

37

1   Q        Well, what is your testimony?
2   A        That whether there was one report or a
3   hundred reports that were actually done the correct
4   way, an overwhelming majority of the reports were
5   done in this fraudulent way.
6   Q        I want to make sure I understand what
7   you're saying, fraudulent way.  Are you saying that
8   Dr. Patel or Dr. Pampati giving a secretary their
9   proxy to affix an electronic signature to a report
10  in and of itself is fraud?
11  A        Yes.
12  Q        And it's fraud not because Dr. Patel or
13  Dr. Pampati didn't do the study; it's fraud because
14  they gave a proxy to affix their signature to a
15  secretary?  Is that what you're saying, Doctor?
16  A        It's two things.  It's the fixing the
17  signature and the secretaries are not certified to
18  review the reports and make sure that they are
19  accurate to go out.
20  Q        But you don't know whether Dr. Patel or
21  Dr. Pampati actually reviewed the report in any
22  particular case, do you?
23  A        We -- we -- so let me answer that now.
24  So we know that Dr. Patel and Dr. Pampati, in an
25  overwhelming majority of cases, which means it

---

38

1   could be 70 percent to 99 percent, were not
2   reviewing these reports before they went out and
3   the secretaries were signing them.  I don't know
4   exactly the number because we're talking about
5   hundreds of thousands of reports, but it is -- you
6   know, it is a -- that is what I'm testifying to.
7           And the reason that we know that they
8   did not review those reports is because of two
9   things.  One is the dictation system shows that,
10  meaning in terms of like logging in by the
11  secretary to sign the report, and two is the
12  testimony of the secretaries that, you know, will
13  be forthcoming and, you know, especially the
14  manager that was on the ground that was asked to do
15  this.
16  Q        When you say the overwhelming majority
17  of the reports were not reviewed, you said it's
18  somewhere between 70 percent and 99 percent?  I
19  think that's what you said?
20  A        That's correct.
21  Q        And what's the -- I mean, do you have
22  any statistics?  Can you say, I've got something
23  that says 70 percent?
24  A        We have the reports that were submitted
25  as claims to CMS that were signed -- that were

---

39

1   signed by the secretaries.  We -- through -- you
2   know, in the near future, through subpoenas and,
3   you know, other things that will come down the
4   line, we will obtain -- we will obtain the logs of
5   the -- logs of the login sessions to show that
6   Dr. Patel and Dr. Pampati were not the ones signing
7   these reports.
8   Q        As you sit here today, Dr. Lalaji, you
9   can't tell me what percentage of the studies that
10  were authenticated using the signature of
11  Dr. Pampati or Dr. Patel have been rereviewed by
12  Dr. Patel or Dr. Pampati; correct?
13  A        What do you mean by rereview?
14  Q        Well, you've said basically that the
15  study is dictated by Dr. Pampati or Dr. Patel;
16  correct?
17  A        Correct.
18  Q        And then you said that Dr. Patel and
19  Dr. Pampati gave the secretary their proxy to affix
20  their electronic signature to the report; correct?
21  A        And review the accuracy of the report.
22  Q        How do you know that the secretary
23  looked at the report?
24  A        We don't.
25  Q        Then why did you say the secretary

---

40

1   reviewed the accuracy of the report if you don't
2   know that she -- presuming it's a she, she looked
3   at it?  Maybe she just affixed a signature.
4   A        No, no.  That was -- my understanding
5   was that you were asking me about Dr. Pampati and
6   Patel, not the secretaries, so I was a little
7   confused there.  So let's go back and answer that
8   -- reask me that question.
9   Q        Sure.  You said the secretary reviewed
10  the report, but you don't know whether she reviewed
11  -- presuming it's a she, you don't know whether the
12  secretary reviewed the report or she simply, you
13  know, as Dr. Patel or Dr. Pampati's proxy affixed
14  his signature; correct?
15  A        The secretary would batch-sign the
16  report, meaning like you can choose a hundred
17  reports and just sign all of them.  So they would
18  not have reviewed anything.
19  Q        So you're not saying -- just to make
20  sure I understand, you're not saying that Dr. Patel
21  and Dr. Pampati permitted a secretary to review a
22  study, you're just saying that they permitted as a
23  proxy the secretary to affix their electronic
24  signature to a report; correct?
25  A        I have an issue with your word of proxy

---

Anand P. Lalaji, M.D.   4/3/2023

11  (Pages 41 to 44)

41

1    because it's clear that a doctor cannot allow a
2    person that's not certified as a physician to sign
3    as representing themselves as that physician.  That
4    is -- if that's what you're calling a proxy, then
5    that is completely false -- I mean, it's completely
6    fraudulent, and Medicare says that doctors cannot
7    use anybody else as proxies.
8    Q       Well, let's not use the word proxy
9    since you don't like it, but --
10   A       Well, it's not I don't like it, it's --
11   Q       -- basically, Doctor, my question is,
12   Dr. Patel and Dr. Pampati authorized the secretary
13   to affix their signature, their electronic
14   signature, to a report; correct?
15   A       That's correct.
16   Q       And you don't know how many reports
17   were not reviewed twice, written and then reviewed,
18   by Dr. Patel and Dr. Pampati; correct?
19   A       Not the exact number.
20   Q       And you agree with me Dr. Patel and
21   Dr. Pampati did the interpretations that are in all
22   of the Mountain Comp reports; correct?
23   A       They reviewed the images and
24   transcribed the study.  CMS is -- CMS is -- it
25   doesn't matter to CMS if they did it once, if they

42

1    did it 50 times, if they did it 10,000 times.
2    Every act is considered a false claim.  So even if
3    they did it 50 percent of the time, that is still a
4    violation of the False Claim Act.
5    Q       And it's a violation of the False Claim
6    Act not because they didn't do the work; it's a
7    violation because somebody else affixed the
8    signature?
9    A       Well, let me take you through a
10   scenario.
11   Q       No; is that -- just let me ask you to
12   answer the question, please, Doctor.  There's not
13   an issue that Dr. Patel or Dr. Pampati did the
14   work.  The issue is that somebody else affixed the
15   signature for them.  Is that what you're saying is
16   the false claim violation?
17   A       That is a hundred percent of the false
18   claim violation.
19   Q       Then show me in the documents that
20   you've stated that you've relied upon, which are
21   Exhibit 4, which you've already agreed is
22   everything you've relied on, show me where it says
23   that.
24           MR. HOSTETTLER:  Let me just object
25   to the scope of that question and its

43

1    breadth.
2           You can answer if you're able.
3    A       Well, give me a few minutes.  I will
4    show you exactly where it says that.
5           MR. HOSTETTLER:  If you need a
6    highlighted version -- I don't know if
7    those are highlighted.
8           THE WITNESS:  I think these are
9    highlighted, yeah.
10          MR. MACLIN:  Those are the
11   highlighted version.
12   A       Of course today I did not bring my
13   glasses, so --
14          Yeah, this is not highlighted.  This
15   whole document is not.  I need that one.
16          MR. HOSTETTLER:  Okay; yeah.
17          THE WITNESS:  Yeah.
18   Q       Which document are you looking at?
19   A       Medicare Program Integrity Manual.
20   Q       Which?
21          MR. HOSTETTLER:  Effective 6/19 of
22   '20.  This is the current version.
23          THE WITNESS:  That's the current
24   version; okay.
25   Q       You're looking at the 6/19?

44

1    A       Yeah.  So if you go to section 3.3.2.4.
2    Q       Okay; I have it.
3    A       So go to the second paragraph.  For
4    medical review purposes, Medicare requires that
5    services provided/ordered/certified be
6    authenticated by the persons responsible for the
7    care of the beneficiary in accordance with
8    Medicare's policies.  For example, if the
9    physician's authenticated documentation
10   corroborates --
11   Q       Wait a second.  Who highlighted that
12   for you, Doctor?
13   A       I believe it was my attorney.
14          MR. MORGAN:  Which one?
15          (Mr. Hostettler raises his hand.)
16   Q       Well, I want to make that an Exhibit 5,
17   and we'll make a copy so --
18   A       Aaron highlighted that one.
19   Q       So your counsel highlighted it for you?
20          (Said document is filed with this
21          deposition and marked as Plaintiff's
22          Exhibit No. 5 for purposes of
23          identification.)
24          MR. MORGAN:  And I think he's
25   indicating that it was Aaron Hostettler

Anand P. Lalaji, M.D.   4/3/2023

12 (Pages 45 to 48)

---

45

1        who highlighted that.
2    A        We went through it together, and he was
3    the one that had the highlighter.
4            MR. MACLIN:  Wait just a second.
5    Can we take a break?  I want to get a
6    highlighter because I want to --
7            (A brief break is taken, after
8        which Mr. Morgan and Mr. Schuette do
9        not rejoin the deposition.)
10   Q        So you're looking at what's been marked
11   as Exhibit 5, and I believe you said earlier, and
12   that's why I got confused, you said 3.2.4, but
13   you're looking at 3.2.3.4; correct?
14   A        Three-3-2-4.
15           (At this point Mr. Morgan rejoins
16       the deposition.)
17   Q        And it's captioned, signature
18   requirements; correct?
19   A        Correct.
20   Q        And tell me what your issue is that you
21   claim this is a violation by Dr. Patel and
22   Dr. Pampati.
23   A        Okay; so let me just read this first
24   paragraph.  For medical review purposes, Medicare
25   requires that services provided/ordered/certified

---

46

1    be authenticated by the persons responsible for the
2    care of the beneficiary in accordance with
3    Medicare's policies.
4            So services provided/ordered/certified
5    be authenticated by the persons responsible for the
6    care of the beneficiary.  Dr. Patel and Dr. Pampati
7    is responsible for the care of the beneficiary.
8    However, it was authenticated not by Dr. Patel and
9    Dr. Pampati.  It was authenticated by secretaries
10   posing as Dr. Patel and Pampati via an electronic
11   signature mechanism.  So that's the first place.
12   Q        Okay.  Well, let's stop right there.
13   It doesn't say, signed by Dr. Patel and Pampati.
14   It does say, authenticated by Dr. Patel and
15   Pampati; correct?
16   A        It says, authenticated by the persons
17   responsible for the care of the beneficiary.
18   Q        Well, you agree with me Dr. Patel and
19   Dr. Pampati authorized the staff person to place
20   their electronic signature on the report; correct?
21   A        That's correct.
22   Q        And you agree with me that when they
23   authorized -- Dr. Patel and Dr. Pampati authorized
24   their signature to be placed on a report, that that
25   constitutes an authentication of the report;

---

47

1    correct?
2    A        It does not.  It does not.  They can't
3    give their signature to a secretary to be
4    authenticated.  The report gets authenticated by
5    the physician.
6    Q        But Dr. Patel and Dr. Pampati did the
7    report.
8    A        They did the dictation.
9    Q        They dictated the report; correct?
10   A        They did the dictation.
11   Q        And they authorized somebody to place
12   their electronic signature on it for the purposes
13   of authenticating the accuracy of the report;
14   correct?
15   A        Yes.  That's against the law.
16   Q        Dr. Patel and Dr. Pampati authorized a
17   staff person to place their signature on the report
18   for the purposes of authenticating the report;
19   correct?
20           MR. HOSTETTLER:  Asked and
21       answered.
22           MR. MACLIN:  No, he didn't answer.
23   Q        Is that what they did?
24   A        I've answered it like the last hour,
25   but yes.

---

48

1    Q        Show me in here where it says that a
2    healthcare provider cannot authorize a staff person
3    to affix his signature to a report.
4    A        Okay.  Let's go to section E.
5    Q        Where are you right now, sir?
6    A        So it is under -- it's still under
7    3.3.2.4, and then go another four pages and it
8    should -- you should see something called,
9    electronic signatures, in section E.
10   Q        I see that.
11   A        Okay; let's read that paragraph.
12           Providers using electronic systems need
13   to recognize that there -- provider meaning
14   Dr. Patel and Pampati; okay? -- using electronic
15   systems need to recognize that there is a potential
16   for misuse or abuse with alternate signature
17   methods.  For example, providers need a system and
18   software products that are protected against
19   modification, et cetera, and should apply adequate
20   administrative procedures that correspond to
21   recognized standards and laws.  The individual
22   whose name is on the alternate signature method and
23   the provider bear the responsibility for the
24   authenticity of the information for which an
25   attestation has been provided.  Physicians are

---

Anand P. Lalaji, M.D.   4/3/2023

13 (Pages 49 to 52)

---

49

1  encouraged to check with their attorneys and
2  malpractice insurers concerning the use of
3  alternative signature methods, which is -- and
4  they're referring to an alternative signature
5  method as an electronic signature.
6  Q      Dr. Patel and Dr. Pampati accepted the
7  authenticity of each of the Mountain Comp reports
8  that they signed; correct?
9  A      By their secretary signing for them;
10 correct.
11 Q      So how is this section violated,
12 Doctor, if there is an acceptance of the
13 authenticity of the information for which their
14 electronic signature was affixed?
15 A      So when a physician provides their
16 alternative signature method, such as electronic
17 signature, to not someone who is the care provider
18 for that beneficiary, it violates CMS law.
19 Q      What law does it violate?
20 A      The False Claims Act.
21 Q      How does it violate the False Claims
22 Act?
23 A      So when Dr. Patel and Dr. Pampati, when
24 they gave their logins to secretaries, the
25 secretaries acted on their behalf to certify those

---

50

1  reports, then those patients got billed to the
2  Medicare CMS program. Dr. Patel and Pampati were
3  paid for those services, and that constitutes a
4  false act.
5          Now let's go back because --
6  Q      Wait a second. I want to break that
7  down. But you've already said that Dr. Patel and
8  Dr. Pampati did the studies.
9  A      No. I said that Dr. Patel and
10 Dr. Pampati viewed the studies and transcribed
11 them.
12 Q      You said they got paid for the
13 services. What services did Dr. Patel and
14 Dr. Pampati assert that they had done to get paid
15 for which weren't done?
16 A      They did not certify themselves the
17 authenticity of the report, and the secretaries
18 falsely represented Dr. Patel and Pampati on the
19 report that was submitted to Medicare for
20 reimbursement. It is a -- it is a -- you know, we
21 can keep going because there are other places in
22 this section and other sections and we can do this,
23 but it is standard and law that that is a false
24 claim. That is a hundred percent false claim.
25 Q      Where in the False Claims Act does it

---

51

1  say that authorizing or giving somebody a proxy --
2  and I know you didn't like that word, but you said
3  they authorized their secretary --
4  A      It's all over the False Claims Act.
5  Q      Let me finish. Where is it all over?
6  You haven't told me a specific section.
7  A      It is in this 3.3.2.4. You may not
8  agree with it, but it is a hundred percent in this
9  section. Let's keep going because there's more
10 spots in this section. There's three more pages.
11 Q      Now did Mr. Hostettler highlight that
12 section for you too?
13 A      That's correct.
14 Q      Any more sections in Exhibit 5 that
15 Mr. Hostettler --
16 A      We -- yeah. There are -- wherever it's
17 highlighted, we -- he highlighted it, basically.
18 Q      And told you that's the sections you
19 needed to look at?
20        MR. HOSTETTLER: Hold on.
21 A      No.
22        MR. HOSTETTLER: Hold on. You
23 don't get to talk about what I told
24 you; okay? That's privileged. You've
25 testified that I highlighted it. You

---

52

1  don't get to talk about what I told
2  you.
3         MR. MACLIN: So just make sure I
4  understand this. Your communications
5  with your expert are now privileged?
6  Because that's new to me under Kentucky
7  law. Is that what you're telling me?
8  Is that what you're telling me? I just
9  need to understand that.
10        Are your communications with your
11 expert protected, and that's the basis
12 for your objection?
13        MR. HOSTETTLER: Yes.
14        MR. MACLIN: Okay.
15        MR. HOSTETTLER: Yes, they are.
16        MR. MACLIN: Okay.
17        MR. HOSTETTLER: And if you want
18 the authority for that, I'll give it to
19 you. If you don't, you can proceed.
20        MR. MACLIN: Well, go ahead and
21 tell me the authority for it.
22        MR. HOSTETTLER: Well, the
23 authority for that starts under CR
24 26.02 subparts 3 and 4, and then you go
25 from there into the annotations,

---

Anand P. Lalaji, M.D.   4/3/2023

14 (Pages 53 to 56)

### 53

1  including Alliant Hospitals versus
2  Benham, 105 SW 3d 473 --
3       MR. MACLIN:  Okay.  We'll just see.
4       MR. HOSTETTLER: -- and -- and --
5       MR. MACLIN:  I'm not going to argue
6  about it with you.  I just wanted to
7  know your authority.  We'll address it
8  subsequently.
9       MR. HOSTETTLER:  Well, I'm not
10  done.  If you want me to keep going I
11  can.
12       MR. MACLIN:  Yeah.  Yeah, please
13  do.
14       MR. HOSTETTLER:  And then also
15  Sowders versus Lewis, 241 SW 3d 319,
16  Kentucky Supreme Court 2007.
17       MR. MACLIN:  Okay; thank you,
18  Mr. Hostettler.
19  Q       Dr. Lalaji, before Exhibit 3 was
20  prepared, had you ever reviewed in any detail or
21  highlighted in any detail the Medicare Program
22  Integrity Manual in the places which are
23  highlighted?
24  A       Yes.
25  Q       Had you ever highlighted those

### 54

1  provisions before?
2  A       I've read through them.
3  Q       Had you ever highlighted or referred to
4  those provisions specifically in any other matter?
5  A       Yes.
6  Q       Tell me what those were.
7  A       With review and meetings with our
8  Georgia attorneys.
9  Q       And that was for the purpose of the
10  Georgia lawsuit?
11  A       That's correct.
12  Q       And did you present those highlighted
13  sections to them or did they present them to you?
14  A       I read through the manual and went
15  directly to the signature page.  And then I
16  highlighted -- or not highlighted, but I made
17  reference to those sections.
18  Q       In connection with that litigation?
19  A       That's correct.
20       Turn back to the section on 3.3.2.4.
21  Do you see that, signature requirements?
22  A       Uh-huh.  (Affirmative)  Yes.
23  Q       Is there any specific direction as to
24  the providers that that section is directed at?
25  A       Can you ask the question again?

### 55

1  Q       Is there any specific provider that
2  that section is directed at?
3  A       Are you meaning type of provider?  What
4  do you mean, any specific provider?
5  Q       I'm trying to understand -- I mean, I'm
6  talking about healthcare provider, Doctor.
7  A       Okay.
8  Q       Is there any specific healthcare
9  provider that that section is directed at?
10  A       Not any specific one.  It's every one.
11  Q       Well, it says it's applicable to
12  Medicare administrative contractors; correct?
13  A       That's one of a few things; correct.
14  Q       Zone program integrity contractors;
15  correct?
16  A       Correct.
17  Q       Unified program integrity contractors;
18  correct?
19  A       Correct.
20  Q       Supplemental medical review
21  contractors; correct?
22  A       Correct.
23  Q       Comprehensive error rate testing and
24  recovery audit contractors; correct, as indicated?
25  A       That's correct.

### 56

1  Q       Okay.  What's a Medicare administrative
2  contractor?
3  A       So Medicare -- CMS basically delegates
4  to every state a MAC, Medicare administrative
5  contractor.  The MAC is responsible for approving
6  claims and distributing payments, so it's an
7  extension of CMS.
8  Q       There's no specific direction in this
9  section of its applicability to a radiologist, is
10  there?
11  A       In that section?
12  Q       Yes.
13  A       That section is specifically for
14  entities that distribute payments.
15  Q       It's not specifically directed to
16  radiologists, is it?
17  A       That section is not.
18  Q       There's nothing in this specific
19  section that requires a MAC or any of the other
20  subject parties to deny a provider's claim for
21  failing to comply with any authentication
22  requirements, is there?
23  A       Can you say that again, please?
24  Q       There's no specific authority in this
25  section that requires a MAC or any of these other

Anand P. Lalaji, M.D.   4/3/2023

57

1  specific persons that are identified to deny a
2  provider's claim for reimbursement because of
3  failure to comply with an authentication or
4  signature requirement, is there?
5      A       So the signature -- these groups and
6  these contractors, they would not deny -- they
7  would not -- they can deny claims based on
8  signature requirements in the table that is in the
9  next -- is in -- if they see these things for
10 denial of claims.  That's very different than a
11 false claim.
12     Q       There's no specific requirement that
13 they can deny a claim based on a failure to comply
14 with a signature requirement, is there?
15     A       It's right here.
16     Q       In that section?
17     A       In that particular three-sentence
18 section or -- they can deny claims based on the
19 table that is three pages down.
20     Q       And if it's authenticated by or on
21 behalf of the physician, there's no basis for that
22 denial, is there?
23     A       There is.  It's in this table.
24     Q       If it's properly authenticated by the
25 affixing of an electronic signature, the table says

58

1  it's okay.  It's not in that table.
2      A       Well, it --
3              MR. HOSTETTLER:  I object to the
4  argumentative.
5              You can answer if you can, Doctor.
6      A       Just because a doctor says it's been
7  authenticated and authenticated the right way, it
8  still has to go through the proper checks at that
9  MAC level.  So they can deny on number six, they
10 can deny on number nine, ten, 11, 12, 14.  You
11 know, like these are the things that will not pass
12 basically, regardless if the physician has,
13 quote/unquote, authenticated.
14     Q       The signature guidelines in section D
15 where the table is, they don't even address
16 electronic signatures, do they, Dr. Lalaji?  That's
17 actually in section E.
18     A       But section E is basically -- if you
19 look, it goes back; okay?  And essentially it's
20 applicable, essentially, to, you know, every type
21 of signature methodology because there's now
22 electronic signatures that a hundred percent of the
23 world uses.
24     Q       Dr. Lalaji, electronic signatures is
25 section E of this subsection, and D, which is the

59

1  table that you referred to --
2      A       Your first question did not ask me
3  specifically about electronic signatures.  You just
4  talked about authentication of the report.  So are
5  you talking specifically about electronic
6  signatures?
7      Q       Doctor, I'm not trying to argue with
8  you, but you kept referring to the table not being
9  compliant with, but the table -- isn't that what
10 you said, Doctor?  Excuse me if I misunderstood
11 you.
12     A       You asked me the question of whether
13 the MAC or any of those entities in that paragraph
14 can deny a claim based on the authentication.
15     Q       I did.
16     A       You did not specifically say e-
17 signature or electronic signature.
18     Q       For e-signature.
19     A       Okay.  So when you read through the
20 paragraph of the electronic signature, okay, it --
21 you know, so again, that table then does not apply
22 to electronic signatures because you're not
23 handwriting or typing out the signature.  You're
24 relying on the software application, and the
25 providers that are using the systems have to

60

1  maintain that they are the ones that are
2  authenticating those reports.
3      Q       And it's an authentication process;
4  correct, Doctor?
5      A       By the physician; correct.
6      Q       Well, doesn't 3.3.2.4 contain some cure
7  provisions?  Do you know that, Doctor?
8      A       So you can -- there are exceptions that
9  none of this applies to, but there also is a
10 signature attestation statement that a provider can
11 use.  But there is -- once a false claim has been
12 submitted and paid, the cure is -- there is no cure
13 basically except paying back all the money that was
14 obtained through that false claim.  So that's not
15 -- we're in the signature log; right?  There's
16 another thousand pages of the False Claims Act
17 litigation that shows the process of what to do
18 when you have discovered basically a potential or a
19 likely or a definitive false claim that has been
20 committed.
21     Q       Let's go back to what my basic question
22 was, Doctor.  Doesn't 3.3.2.4 contain an express
23 cure provision?
24     A       In 3.3.2.4 when you say a section for
25 cure, what are you specifically saying?  Because

Anand P. Lalaji, M.D.   4/3/2023

61

1    there are -- they have listed exceptions, you know,
2    to that -- they've listed exceptions, but, you
3    know, within the signature log or -- you know, they
4    talk about different examples, but there's not a
5    specific -- you know, there's an attestation that
6    providers can do for minimal mistakes if made, but
7    there's not like a clear-cut resolution process
8    for, you know, False Claims Act violations.
9    Q        Isn't what you're basically saying or
10   what I think I hear you saying, Doctor, is really
11   Dr. Pampati and Dr. Patel's signatures were
12   missing?
13   A        No.  Their signatures were there but
14   not applied by them.
15   Q        Well, so their signatures in reality
16   were missing.  If they weren't applied by them,
17   you're saying their signatures were missing.
18   A        The signature's there.  It's on the
19   report, so you can't say it's missing.
20   Q        Okay.  I'm not trying to argue with
21   you, Doctor.  I'm just trying to understand.
22   You're saying that signatures -- Dr. Patel and
23   Dr. Pampati, by allowing their signatures to be
24   placed on there, electronically placed on there,
25   they authenticated the report; correct?

62

1    A        No.
2    Q        Well, then was their signature -- okay;
3    you're -- I don't want to argue with you.
4    A        They did not authenticate the report.
5    The secretary did.
6    Q        So their signature was not in effect on
7    the report.
8    A        Their signature was on the report,
9    placed there by the secretary.
10   MR. HOSTETTLER:  I'll stipulate
11   with you that their signature was not
12   on the report.
13   Q        Okay.  So if their signature is
14   missing, then you can cure a signature that's not
15   on a report subsequently; correct?
16   A        If there's no signature.
17   Q        Well, your lawyer just stipulated that
18   it was missing.
19   A        No.  Look at the report.  Does it have
20   Dr. Pampati's signature on the report?  Signed by
21   who?
22   Q        It's an electronic signature.  Nobody
23   signs an electronic signature.  It's placed on the
24   report.
25   MR. HOSTETTLER:  I'll object to

63

1    your argument.
2    A        That is an electronic signature that
3    replaces and is exactly the same as signing a
4    report.  That is standard practice.  That's -- that
5    is -- the signature is -- the signature -- I don't
6    -- just go ahead and ask the question because I
7    don't understand.
8    Q        You can cure a missing signature;
9    correct?
10   A        If there's nothing, no signature at
11   all, no electronic signature, nothing on the
12   report, if it's just a report that has nothing
13   signed on it.
14   Q        You can cure that; correct?
15   A        You can cure that.
16   Q        Okay.  So you agree with your counsel's
17   stipulation that the signatures were missing from
18   the report?
19   MR. HOSTETTLER:  That the doctor's
20   signatures were missing.  That the
21   doctors did not sign the reports.
22   That's what I've stipulated to.
23   MR. MACLIN:  Are you going to also
24   stipulate that the reports are signed
25   on behalf of Lalaji and Pampati?

64

1    A        Not Lalaji.
2    MR. MACLIN:  I mean -- excuse me.
3    Thank you.  Pampati and Patel.
4    Q        Thank you, Doctor.
5    MR. HOSTETTLER:  Am I going to
6    what?
7    MR. MACLIN:  Also stipulate that
8    the Mountain Comp reports were signed
9    on behalf of Dr. Patel and Dr. Pampati?
10   MR. HOSTETTLER:  Well, I wasn't
11   there, Rob.  What I'm stipulating to is
12   that the physicians did not sign these
13   reports.  If you don't want to
14   stipulate to that, we don't have to.
15   MR. MACLIN:  I'm asking you if
16   you're going to stipulate that, you
17   know, that their electronic signatures
18   are affixed to these reports for
19   Mountain Comp.
20   MR. HOSTETTLER:  No.
21   Q        Let's go back to subparagraph E again,
22   Dr. Lalaji.  And I apologize for inadvertently
23   lumping you in with Patel and Pampati.  But you
24   agree with me it states that the individual -- you
25   find that section?

Anand P. Lalaji, M.D.   4/3/2023

65

1    A       Yep. Go ahead.
2    Q       You agree with me it states that the
3    individual whose name is on the alternate signature
4    method and the provider bear the responsibility for
5    the authenticity of the information for which the
6    attestation has been provided?
7    A       Yes.
8    Q       Okay. Let's look at the False Claims
9    Act. What section of the False Claims Act -- and I
10   believe that's in front of you -- are you saying
11   that Patel and Pampati violated?
12           MR. HOSTETTLER: Do you want him to
13           be looking at the False Claims Act
14           statute?
15           MR. MACLIN: Whatever section he
16           claims that they violated.
17   A       So it's under 3729, False Claims.
18   Q       Hang on a second; let me find that,
19   Doctor. I thought I had it in front of me. Here it
20   is, right here in front of me. Go ahead, Doctor.
21   A       So any person -- and it's under
22   subsection A-1, In General -- any person who
23   knowingly presents or causes to be presented a
24   false or fraudulent claim for payment or approval;
25   knowingly makes, uses, or causes to be made or used

66

1    a false record or statement material to a false or
2    fraudulent claim; conspires to commit a violation
3    of subparagraph A, B, D, E, F, G.
4            And then if you go to G, knowingly
5    makes, uses, or causes to be made or used a false
6    record or statement material to an obligation to
7    pay or transmit money or property to the
8    government.
9            And then the next paragraph, is liable
10   to the United States government for a civil penalty
11   of not less than 5,000 and not more than 10,000 as
12   adjusted by the Federal Civil Penalties Inflation
13   Adjustment, plus three times the amount of damages
14   which the government sustains because of the act of
15   that person.
16           And if you keep going, in section
17   three, a person violating this subsection shall be
18   liable to the United States government for the
19   costs of a civil action brought to recover any such
20   penalty or damages.
21           Now --
22   Q       Let's --
23   A       -- the definition is important too.
24   Okay; go ahead.
25   Q       What you're looking at is highlighted;

67

1    correct?
2    A       That's correct.
3    Q       And Mr. Hostettler highlighted those
4    for you as well?
5    A       After reviewing, yes; correct.
6    Q       Okay. Go ahead and continue.
7    A       The terms knowing and knowingly mean
8    that a person with respect to information has
9    actual knowledge of the information, acts in
10   deliberate ignorance of the truth or falsity of the
11   information, or acts in reckless disregard of the
12   truth or falsity of the information, and B is,
13   requires no proof of specific intent to defraud.
14           So in this particular page, there is a
15   deliberate act of providing highly secure specific
16   certifying authentication signature logins to
17   secretaries and having them sign off on all their
18   reports.
19   Q       Well, let's -- you used the word sign
20   off. All you told me is the secretaries never
21   reviewed it, they just affixed an electronic
22   signature; correct?
23   A       That's what sign off means. They
24   signed the reports.
25   Q       Well, they didn't sign off on it as

68

1    approving it. They just affixed the signature.
2            MR. HOSTETTLER: Objection. Hold
3            on. Objection. That calls for a legal
4            conclusion.
5            You can answer if you know.
6    A       When they sign the report utilizing
7    their electronic signature mechanism, they are
8    signing off on the report.
9    Q       Let's go back and look at Exhibit 3 to
10   the complaint, which is attached to Exhibit 3 to
11   this deposition, Doctor.
12   A       The Georgia complaint?
13   Q       Yes, sir.
14   A       Okay; which exhibit?
15   Q       The very last two pages of that Exhibit
16   3.
17   A       The report? Okay.
18   Q       This was an example that you picked as
19   some violation by in this case Dr. Pampati of the
20   False Claims Act. What's false in this report?
21   A       It says, signed by Pampati, Mahender.
22   Date signed 8/26/2021. Dr. Pampati did not approve
23   that study for signature by himself. He gave that
24   authority to a secretary to sign on his behalf.
25   That's the false claim.

Anand P. Lalaji, M.D.   4/3/2023

18 (Pages 69 to 72)

69

1  Q       Let's look on the first page of that
2  report. Anything on the interpretation and then
3  the impression that's false?
4  A       I have no idea. I'm not looking at the
5  images.
6  Q       And once again, you don't know whether
7  Dr. Pampati reviewed this or whether he said, go
8  ahead and put my signature and send it on; correct?
9  A       This particular report itself?
10 Q       Correct.
11 A       We don't know for a fact -- we will in
12 the future, but we don't know for a fact at this
13 moment in time if this particular report was he
14 actually did it the approved way, compliant way, or
15 if he did it the way that was instructed by him.
16 Q       Has any of your companies accepted or
17 been sued by any patients because of this
18 affixation of electronic signatures?
19 A       No.
20 Q       Have you had any claims made by any
21 patient of Mountain Comp who has had his or her
22 radiograph interpretation or other study made by
23 Dr. Patel or Dr. Pampati?
24 A       Not a malpractice claim, no. We have
25 received several -- in the act of operating in that

70

1  process during that period of time, our manager on
2  the ground communicated with the director of
3  radiology at Mountain Comp and did the act of
4  fixing dozens and dozens of reports that were not
5  making any sense. And, you know, that will be --
6  you know, that's clearly in the record and will be
7  presented, but we didn't get any claims.
8  Q       Who's the manager on the ground that
9  did the act of fixing reports?
10 A       Your client should know that. I don't
11 know the name of that exact -- the director of
12 radiology. It's a woman.
13 Q       And was she a medical doctor?
14 A       No. She would push back reports asking
15 them to be fixed by Dr. Patel and Pampati because
16 they didn't make any sense.
17 Q       Had they already been submitted to
18 Mountain Comp or they needed to be reviewed by
19 them?
20 A       No, they was already submitted and was
21 already out there, but the report may have come
22 back from the clinician that didn't make any sense,
23 and then that person would then go to -- you know,
24 back to Gram and Hazard saying, this report doesn't
25 make sense; can you have Dr. Patel and Pampati look

71

1  at that report? They knew about it. It's there.
2  We just have to -- you know, that was a process
3  that happened, you know, frequently.
4  Q       I'm trying to make sure I understand
5  what you're saying, Dr. Lalaji. You're saying that
6  -- who was this woman employed by?
7  A       MCHC.
8  Q       So some nonmedical person at Mountain
9  Comp would say the practitioner or treating
10 physician doesn't understand what Dr. Patel or
11 Dr. Pampati's study says and it needs to be fixed
12 somehow?
13 A       That's correct.
14 Q       And did they fix it? Did Dr. Patel or
15 Dr. Pampati fix it in each case?
16 A       I'm not a hundred percent sure.
17 Q       You don't know whether they fixed it or
18 not?
19 A       I'm sure they did, but I don't know a
20 hundred percent for a fact that they did.
21 Q       But in any event, whatever the issues
22 with the study were were corrected by Dr. Patel and
23 Dr. Pampati; correct?
24 A       I assume so.
25 Q       Well, setting aside Dr. Patel and

72

1  Dr. Pampati's interpretation of studies, it would
2  be a correct statement that treating physicians
3  often have individual conversations with the
4  radiologist that's interpreting a study for the
5  treating physician; correct?
6  A       In my understanding it wasn't related
7  to whether there was a question about the diagnosis
8  of the report. It was a nonsensical-type report,
9  meaning it had -- you know, just the report didn't
10 make sense because it had negatives and positives
11 and negatives and positives that were kind of
12 contradictory. So that's why they had to get that
13 fixed.
14 Q       Do treating physicians routinely have
15 conversations with the radiologist that's
16 interpreting a study that was requested by the
17 treating physician?
18 A       A certain percentage of time; correct.
19 Q       These communications that you've talked
20 about, are they in writing anywhere?
21 A       I am sure they are in relation to the
22 e-mail correspondences between that person at
23 Mountain Comp and Nancy Campbell and Crystal
24 Eversole and Tracy Gillum.
25 Q       Have you seen specifically any of these

Anand P. Lalaji, M.D.   4/3/2023

19 (Pages 73 to 76)

73

1    studies that were nonsensical, as you said?
2    A         In my individual capacity?
3    Q         Yes, sir.
4    A         No.
5    Q         Okay.  So you can't offer any opinions
6    on any harm to any patients of Mountain Comp that
7    have been caused by these complaints you're making
8    about Dr. Patel and Dr. Pampati having allowed the
9    secretary to affix their electronic signature to a
10   study; correct?
11   A         I personally cannot, no.
12   Q         Have you reported or have any of your
13   companies reported what you consider to be these
14   violations to any governmental agency or
15   instrumentality?
16   A         Yes.
17   Q         Who did you report these alleged claims
18   or violations to?
19   A         HHS.  Health and Human Services.
20   Q         When was that done?
21   A         Early around December, January --
22   December '21 to January of '22.
23   Q         So about a year ago at least, a year
24   and a half ago?
25   A         A year -- about 14 months.

74

1    Q         And how was the report to HHS made?
2    A         So when you want to self-report to
3    Medicare or CMS, it goes -- you have two options.
4    You can go through HHS or you can go through CMS,
5    the route of like a qui tam lawsuit being brought.
6    So what we wanted to do is -- the HHS has a on-line
7    sort of form submission that asks for a bunch of
8    documents and a write-up on the whole thing and et
9    cetera, so our general counsel, Chloe Dallaire,
10   with the help of a woman by the name of Selma
11   Tinnell, who is our director of administration at
12   TRG, submitted all of the on line together, and
13   then, you know, that's basically how it's done with
14   HHS.
15   Q         You weren't involved in this
16   submission?
17   A         I was not involved in the actual
18   submission.
19   Q         And you weren't involved in putting
20   together the instruments that were submitted?
21   A         I was involved.
22   Q         What was your involvement?
23   A         Doing consulting with Morris, Manning &
24   Martin, consulting with our general counsel,
25   reading through these materials and making sure

75

1    that our general counsel and our healthcare
2    compliance attorney were all on board and exactly
3    what the False Claim Act was.  So that was my
4    involvement.
5    Q         But they put together the package and
6    they submitted it; correct?
7    A         The actual act of doing it?  Correct.
8    Q         Well, I mean, they assembled the
9    documents?
10   A         That's correct.
11   Q         And they determined what documents
12   needed to be included; correct?
13   A         That's where my involvement with
14   Morris, Manning & Martin was.  We all determined
15   which documents and which provisions and sections
16   of all of these documents are applicable.
17   Q         Okay.  So you did this with lawyers;
18   correct?
19   A         We did this with our general counsel,
20   who's a lawyer, our counsel and our director of
21   administration.
22   Q         Did you tell your counsel and the other
23   lawyer at Morris, Manley --
24             MR. HOSTETTLER:  Manning.
25   Q         -- Manning; excuse me --

76

1             MR. MACLIN:  Thank you, Aaron.
2    Q         -- what to put in the report?
3             MR. HOSTETTLER:  Hold on.  The
4    question on the table is did you tell
5    your counsel what to put in the report;
6    is that correct?
7             MR. MACLIN:  Yes.  Or did they --
8    yes, that's the question.
9             MR. HOSTETTLER:  Yeah, I'm going to
10   let you answer that.  We'll just take
11   it question by question, but you can go
12   ahead and answer that.
13   A         Okay.  We both read through all of
14   these guidelines specific to the violation, and we
15   agreed together that -- with my input, that this is
16   what was going into the reporting into HHS.
17   Q         Did you send any money in?
18   A         You don't send money in until you get a
19   further -- you have to wait for them to go through
20   that process.
21   Q         Have you heard back from anybody on
22   this report?
23   A         We received confirmation that it was
24   received, and since that point we have not heard
25   back yet.

Anand P. Lalaji, M.D.   4/3/2023

20  (Pages 77 to 80)

---

**77**

1    Q        Any idea when any report will be back
2    or any response will be back?
3    A        No.  It could take up to six years.
4    Q        So as you sit here today, you don't
5    know if there's going to be any action taken by HHS
6    or whoever you reported to; correct?
7    A        We do not know.
8    Q        Going back to these Mountain Comp
9    reports, you're not offering any testimony that the
10   secretary changed anything on the reports, are you?
11   A        That's correct.
12   Q        You don't have any complaints about any
13   improper signing, if you will, on any reports or
14   studies other than the Mountain Comp reports by
15   Patel or Pampati, do you?
16   A        That's correct.  The Mountain Comp
17   PACS system is the one that that was transcribed.
18   They didn't have -- the ARH PACS system will not
19   allow you to do that.
20   Q        So the Mountain Comp system was --
21   basically what you're telling me is it's fairly
22   antiquated; correct?
23   A        The PACS system is not.  The reporting
24   is the old way that they were doing, which was
25   transcribing the report to a transcriptionist.

---

**78**

1    Q        And I think you said the old way
2    included manual signatures in a lot of cases, and
3    everybody uses I think you said a hundred percent
4    electronic signatures now; correct?
5    A        When you have a PACS system.
6    Q        And what percentage of the revenues of
7    Hazard and Gram came from Mountain Comp reading of
8    or preparing diagnostic studies?
9    A        At this moment I don't know.
10   Q        Well, you don't know what they were in
11   the past two years?
12   A        Well, I'm testifying as a Medicare CMS
13   violation expert; right?  So I know that it's a
14   percentage of their revenue.  So if it's in the
15   document, then it's in the document.  But I don't
16   know offhand right now exactly what that percentage
17   was.
18   Q        Well, let's go ahead and look at page
19   two of your expert witness disclosure.
20   A        Oh, page two.
21   Q        And you can read -- like I said,
22   whenever I ask you to look at something, Doctor,
23   you can look at the whole thing, but I'm going to
24   point you to the fifth line down where it says you
25   will testify as to the consequences of said actions

---

**79**

1    by plaintiffs.
2    A        Wait; I'm not -- am I on the right
3    page?
4    Q        Page two.
5             MR. HOSTETTLER:  Yeah, right here.
6    Q        Fourth and fifth line down.
7    A        Oh, okay.  Got it; okay.
8    Q        And so my question to you, Doctor, is
9    directed to consequences, which you've been
10   disclosed as an expert on.  And my question to you
11   is, you know, you've said it don't have anything
12   to do with revenues from ARH.
13   A        I didn't say that.
14   Q        You said the consequences that -- okay;
15   excuse me, Doctor.  I believe that you said that
16   there was no claims that Dr. Patel and Dr. Pampati
17   had, you know, inappropriately signed any studies
18   for anybody other than Mountain Comp.  Isn't that
19   what you said?
20   A        This was focused on the Mountain Comp
21   exams, no other facility.
22   Q        So what percentage of the revenues of
23   Gram and Hazard came from Mountain Comp?
24   A        I don't know the exact percentage.  I
25   do know that it was roughly about 25,000 to $30,000

---

**80**

1    a month from a revenue standpoint.
2    Q        But you can't tell me specifically what
3    the total amount of revenues for which there was
4    Medicaid/Medicare/CMS reimbursement for
5    radiological readings for Mountain Comp to Gram
6    Resources and Hazard Radiology during the period in
7    which your company owned those entities; correct?
8    A        So I don't know if you're aware of
9    this, but Mountain Comp is a 100 percent
10   Medicare/Medicaid facility.  It does not do
11   anything else except beneficiaries of CMS.  By
12   having that designation, they get funding, they get
13   subsidies, they get all of that stuff.  So they
14   particularly should be very sensitive to the fact
15   that -- you know, that this False Claims Act has
16   occurred because if they knew about it, then it
17   would put their license in jeopardy as well.  Well,
18   I said that because 100 percent of the revenues
19   from Mountain Comp are considered in this -- in the
20   False Claims Act violation.
21   Q        Believe it or not, Doctor, I've been
22   practicing law in Eastern Kentucky for 40 years.
23   I'm familiar with Mountain Comp.
24            So how much of the revenues -- what
25   revenues did Gram Resources and Hazard Radiology,

---

Anand P. Lalaji, M.D.   4/3/2023

21 (Pages 81 to 84)

81

1 during the period of time that you're complaining
2 of about the improper affixation of signatures, did
3 your company directly or through those entities
4 receive from Mountain Comp?
5 A      I don't know the exact percentage of
6 revenue.  All I know is that the revenue for
7 Mountain Comp was 25- to $30,000 a month.
8 Q      And you don't know, as you sit here
9 today, of that 25- to $30,000 a month of those
10 studies that Dr. Patel and Dr. Pampati read and
11 affixed their own signatures or a secretary on
12 their behalf at their direction affixed their
13 signature, do you?
14 A      We know that it was an overwhelming
15 majority of those dollars.
16 Q      And an overwhelming majority means more
17 than 50 percent in your mind; correct?
18 A      Seventy to 99 percent.
19 Q      But you don't know the percentage;
20 correct?
21 A      It's a very high percentage.
22 Q      And you can't say precisely any
23 consequences that have occurred or will have
24 occurred because of what you're saying was improper
25 affixation of electronic signatures; correct?

82

1 A      Have occurred, no.  Will occur?
2 There's several.  So the first one is, because we
3 are owners of that practice and discovered the
4 fraud nine months into or a year into the
5 ownership, not knowing exactly how far back the
6 fraud goes -- it could go back to the moment that
7 they signed the contract with Mountain Comp or when
8 they got the PACS system.  We know that it's at
9 least four years to five years of studies because
10 of the implementation of the PACS system and the
11 affidavit of Tracy Gillum, who was given all of
12 these logins and instructions to sign on their
13 behalf, and it was, you know, going on for every
14 single study.
15        So that's what -- so we as The
16 Radiology Group, because we are official owners of
17 -- because this was not disclosed in due diligence
18 and it was not -- and it was represented and
19 warranted to us that there are no processes of
20 regulatory matters occurring at the practice before
21 we acquired the practice, that, you know, we may be
22 responsible for the full amount of payback plus
23 damages plus, you know, whatever the government
24 decides to do as a, you know, methodology of
25 calculating damages.  So that is one effect in the

83

1 future we still don't know exactly, you know, what
2 the government is going to do.
3        Secondly, if we knew about this before
4 the closing in August of 2020, we would have never
5 bought the practice.  So that's another significant
6 detriment and effect how it will -- these are the
7 consequences that the plaintiffs have caused upon
8 the defendants in this paragraph that you -- that
9 you called out.
10 Q      I think you used the word may; correct?
11 May be?
12 A      In terms of whether the government goes
13 after Patel and Pampati directly or they go after
14 us because we are currently the owners of those
15 practices.
16 Q      You said these may be the consequences
17 and you meant may; correct?
18 A      In reference to whether the government
19 may go after the plaintiffs directly or they may go
20 after TRG directly.
21 Q      Yes.
22 A      We don't know which one.
23 Q      You don't know --
24 A      Which -- which one.
25 Q      You don't know if and when there will

84

1 be -- if there will be consequences, do you, from
2 the government?
3 A      Nobody knows.  Yeah, nobody knows.
4 Q      And what about Mountain Comp?  Have
5 they made any claims?
6 A      In terms of what?
7 Q      In terms of anything.  Has Mountain
8 Comp made a claim against you, Hazard Radiology,
9 Gram Resources?
10 A      Not -- not -- not as of this day, no.
11 Q      And you said Tracy Gillum had provided
12 some affidavit?
13 A      Yes.
14 Q      And what's her affidavit state?
15 A      That she was given the logins -- and
16 it's in Exhibit 4 [sic] -- she was given this list
17 by Patel and Pampati, and in number four, sign MCHC
18 reports for Patel and Pampati.  And Crystal
19 Eversole and Nancy Campbell say that's been going
20 on for years, that that's what they do.  They sign
21 all their reports.
22 Q      So Tracy Gillum has given an affidavit?
23 A      She gave an affidavit.
24 Q      And it says what exactly?
25 A      This was the list of things that had to

Anand P. Lalaji, M.D.   4/3/2023

22 (Pages 85 to 88)

---

**85**

1  be done in the practice and you must follow this.
2  Q        And you're looking at -- right now
3  you're looking at Exhibit 2 to the Georgia action;
4  correct?
5  A        Yes.
6  Q        And did you do some due diligence when
7  you were talking with Patel and/or Pampati about
8  the acquisition of Gram and Hazard?
9  A        Yes.
10  Q        Did you go down there --
11  A        Yes.
12  Q        -- and visit with them?
13  A        Yes.
14  Q        Did you talk to Tracy Gillum?
15  A        Tracy Gillum wasn't involved at that
16  time because --
17  Q        Did you talk to anybody in the offices
18  of Gram and Hazard when you went down there?
19  A        Yes.
20  Q        Did you interview and talk with
21  secretaries?
22  A        Yes.
23  Q        And was this checklist made available
24  to you?
25  A        No.

---

**86**

1  Q        If you'd asked for it would it have
2  been made available to you?
3  A        If we knew about its existence we would
4  have asked for it, and it would've been made
5  available.
6  Q        When did you first -- you, you, first
7  see this checklist, Doctor?
8  A        When your plaintiffs sued us in I
9  believe it was June or July of '21, not a hundred
10  percent sure exactly the date, but we had to start
11  gathering documents for the lawsuit, et cetera, and
12  so one of those mechanisms, Tracy Gillum was
13  involved because she's the manager on the ground
14  there, and so we were gathering, you know,
15  documents on all the things that are alleged in
16  your complaint.  And so when we did that, Tracy
17  Gillum -- Tracy Gillum told myself and a few of the
18  team members that, you know, is this lawsuit about
19  Mountain Comp or is it just about ARH?  And we said
20  that it's everything involved with Gram and Hazard.
21  So she said, well, she said sort of in passing, she
22  said, you know, Crystal Eversole and Nancy Campbell
23  gave me a whole list of duties, et cetera, that I
24  have to do.  We said, okay, send that to us.  And
25  that's when we saw number four, which says, sign

---

**87**

1  MCHC reports for Patel and Pampati.
2        So then we obviously sort of -- we took
3  that very seriously because we've never seen that
4  before, and she said -- and we asked her to
5  describe the procedure, which is what she did in
6  the affidavit.  And basically she said that she had
7  been given -- she had been given the login access
8  for Patel and Pampati and to sign off on all their
9  reports for MCHC.  And that has been done over the
10  course of several years by Nancy Campbell and
11  Crystal Eversole.  That's how we found out about
12  this.
13  Q        Who hired Tracy Gillum?
14  A        We did.
15  Q        And how long after your company
16  succeeded in the ownership in Hazard and Gram did
17  you hire Ms. Gillum?
18  A        About three to four months after the
19  acquisition.
20  Q        And who did Ms. Gillum report to?
21  A        She reported to the director of
22  operations at TRG.
23  Q        And who interviewed and eventually
24  hired Ms. Gillum personally, for your company?
25  A        It was I believe -- at the time the

---

**88**

1  director of operations was a woman by the name of
2  Racquel -- I forgot her last name.
3  Q        Somebody at your company in Atlanta
4  interviewed Ms. Gillum and hired her?
5  A        As well as Patel and Pampati.
6  Q        And what was Ms. Gillum's job when she
7  came on with Hazard and Gram?
8  A        Basically replace -- to do everything
9  that -- she was the operational manager, so she
10  basically was a jack of all trades.  You know, she
11  was watching the study inflow/outflow, she was --
12  you know, essentially Nancy Campbell retired -- was
13  retiring, and so she had to take on the duties of
14  what Nancy Campbell, you know, was doing.
15        MR. MACLIN:  Can you go ahead and
16  mark that, Marybeth?  What are we on,
17  6?
18        REPORTER:  Six.
19        (Said document is filed with this
20  deposition and marked as Plaintiff's
21  Exhibit No. 6 for purposes of
22  identification.)
23  Q        Take as long as you need to look at
24  that.  Let me know when you're through looking at
25  that, Doctor.

---

Anand P. Lalaji, M.D.   4/3/2023

23 (Pages 89 to 92)

89

1  A      Yes.
2  Q      So one of the things that I understood
3  you were complaining about as being inappropriate
4  was that Dr. Patel and Pampati had given a
5  secretary their login information; correct?
6  A      That's correct.
7  Q      Let's look at the bottom of page two --
8  A      Yes.
9  Q      -- physical page two. And there's a
10 bullet point which I understand is from you in an
11 e-mail: We still have heard no news from MCHC.
12 Can we use your logins to read the cases and put an
13 e-signature on the report --
14 A      Uh-huh. (Affirmative)
15 Q      -- for the rad that read it?
16 A      Yes.
17 Q      So you're asking Patel and Pampati for
18 their login information; correct?
19 A      Yes; correct.
20 Q      But you just told me that was improper,
21 that they shouldn't -- Patel and Pampati shouldn't
22 -- wait a second; let me finish.
23 A      I know.
24 Q      -- shouldn't have given their login
25 information to the secretary to affix their

90

1  signature.
2  A      That's correct. So --
3  Q      So why is -- go ahead.
4  A      No, no; finish.
5  Q      Why is it okay for you to ask for it if
6  it's not okay for them to use it?
7  A      In this context you've got to look at
8  the context. So here's the context. So when we --
9  MCHC wanted the cases to be read with Dr. Patel and
10 Pampati -- said that they only wanted the cases to
11 be read by Patel and Pampati. They did not want to
12 switch to our PACS system. And so -- now remember,
13 like this is one e-mail that you pulled out of
14 probably hundreds, so there's a lot of background
15 conversation between us, et cetera. So what this
16 refers to is that there are these piled-up studies
17 for MCHC. So we asked for their logins to view the
18 studies.
19       Nowhere -- but then if you look at the
20 next, and put an e-signature on the report for the
21 rad that read it. So I logged in just to the PACS
22 system to view the images, then I would use voice
23 recognition to dictate the report, see it, and then
24 approve the report with my signature on it as a
25 radiologist. So we were only using the logins to

91

1  view the images, not to affix signatures from a
2  secretary that represented themselves as an M.D.
3  This is all about, hey, since I know you guys can't
4  read it, and I know that, you know, so we have
5  dozens and dozens of radiologists that can read
6  those cases and catch them up for patient care,
7  that let's be able to view the images and then we
8  can -- we can affix -- we can authenticate the
9  reports basically in that manner instead of going
10 through a transcriptionist. And that is completely
11 compliant, completely compliant with False Claims
12 Act.
13 Q      But Mountain Comp didn't want anybody
14 to read but Patel and Pampati, and they wanted them
15 to be physically on site. So how is all that going
16 to work, Doctor?
17 A      Well, so we wanted them to convince
18 Mountain Comp that the only way that their studies
19 were going to get read -- because either Patel was
20 on vacation or somebody else was not available, we
21 have the radiologists, but if -- you know, that was
22 the only way that their studies were going to get
23 read. Now that never happened because basically
24 Mountain Comp had an IT issue that could not give
25 additional logins out. So it never happened.

92

1  Q      But isn't really what you're
2  complaining about is you wanted to lower the number
3  of reads that Patel and Pampati did?
4  A      Now hold on. We're talking about --
5  that's nothing to do with the Medicare CMS
6  regulation or anything like that. What does that
7  have to do with that?
8  Q      Well, consequences I guess because I'm
9  looking at what you say in the middle of this
10 following page, Dr Patel and Pampati must read very
11 little.
12 A      But that has nothing to do with the CMS
13 regulation or anything like that.
14 Q      You're not going to answer the
15 question, in other words?
16       MR. HOSTETTLER: Yeah, I mean, I
17       think that's outside the scope of this
18       deposition.
19 Q      I guess you agree with me that a
20 radiologist that's making reads for a hospital or a
21 clinic has to have privileges and be credentialed
22 at the hospital, don't you?
23 A      It's different for hospitals versus
24 clinics. It depends on the facility.
25 Q      Well, let's talk about Mountain Comp.

Anand P. Lalaji, M.D.   4/3/2023

24 (Pages 93 to 96)

93

```
1    A        So Mountain Comp required a Kentucky
2    license to read for Mountain Comp studies and for
3    them to have credentialing with Medicare, Kentucky
4    Medicare.
5    Q        You have never offered or given
6    opinions professionally on False Claims Act
7    violations or Medicaid/Medicare signature
8    requirements before; correct?
9    A        Correct.
10   Q        And you don't have any statistics or
11   statistical analysis that you've looked at or
12   been involved with concerning Medicaid signature
13   requirements or False Claims Act requirements;
14   correct?
15   A        No.
16   Q        What I said was correct?
17   A        I don't understand this statistical.
18   What do you mean by statistical analysis?
19   Q        Well, I mean, I'm trying to figure if
20   there's any kind of error rates or any kind of
21   analysis, you know, of error rates or mistake rates
22   or cure rates or signature requirement omissions or
23   violations that you've ever looked at in Medicaid
24   signature requirements.
25   A        Statistically, no.
```

94

```
1    Q        And part of what you cited and referred
2    to as part of Exhibit 4 were a couple of cases.
3    Why don't you pull those out if you would, Doctor?
4    They're in that stack that we've marked Exhibit 4.
5             See those, Doctor?
6    A        Yes.
7    Q        You're not a lawyer; correct?
8    A        I'm not a lawyer.
9    Q        And you've had no legal training;
10   correct?
11   A        That's correct.
12   Q        And you don't have Westlaw access, do
13   you?
14   A        I do not.
15   Q        You don't even know what Westlaw is, do
16   you?
17   A        I kind of have an idea, but I don't
18   know the exact specifics of it.
19   Q        And these cases were not printed out by
20   you, were they?
21   A        They were not.
22   Q        They were printed out by your lawyer;
23   correct?
24   A        That's correct.
25   Q        Let's look at the first case.
```

95

```
1    A        Which one is that?
2    Q        Well, it's United States of America,
3    Jane Doe versus Heart Solution, PC.
4    A        Okay.
5    Q        See that?  See that case, Doctor?
6    A        Yes.
7    Q        And on the second page there's
8    something that's highlighted.
9    A        Yes.
10   Q        You didn't highlight that, did you,
11   Doctor?
12   A        I did not highlight that, no.
13   Q        How's this case support your opinions
14   that are in Exhibit 3?
15   A        Okay.  So obviously this is not a
16   radiology case so you have to, you know, draw lines
17   between analogous circumstances.  So let's just
18   read that paragraph.
19            Defendant's false representations to
20   Medicare that the neurological testing being
21   performed at her husband's healthcare company was
22   being supervised by a licensed neurologist
23   satisfied materiality element of government's claim
24   against her under the False Claims Act.  Medicare
25   regulations precluded payment of diagnostic
```

96

```
1    neurological testing claims without certification
2    of a supervising neurologist, and there was no
3    evidence that Medicare generally paid such claims
4    despite knowing that the regulations were violated.
5             So the analogy that you can make and
6    how it relates is that in this particular case, the
7    defendant's false representation was the fact that
8    neurological testing was being supervised by a
9    licensed neurologist.  In the Patel and Pampati
10   matter, the report was being authenticated by a
11   licensed radiologist when in fact it was not.  It
12   was being authenticated by secretaries.
13   Q        What's the materiality element of the
14   False Claims Act?
15            MR. HOSTETTLER:  Objection; it
16   calls for a legal conclusion.
17            You can answer.
18            MR. MACLIN:  Well, he's read that
19   off as part of his opinion.  I want to
20   know -- if he doesn't know, he doesn't
21   know.
22            MR. HOSTETTLER:  I didn't say he
23   couldn't answer.  I didn't direct him
24   not to answer.
25   Q        What's the materiality element of the
```

Anand P. Lalaji, M.D.   4/3/2023

97

1    False Claims Act?
2    A        So the materiality of the False Claims
3    Act is the money that was paid that was falsely
4    disbursed based on that certification, but I don't
5    know by heart the materiality provision.
6    Q        When you're saying that Patel and
7    Pampati violated the False Claims Act, isn't that a
8    legal conclusion, Doctor?
9    A        It's a compliance conclusion.
10   Q        So they legally did not comply with the
11   duties of the False Claim Act?
12   A        Our job as -- our job as experts from a
13   Medicare CMS regulation standpoint have to
14   determine if they violated that provision in the
15   False Claims Act.  And so, you know, that is --
16   it's also -- it's partly a legal conclusion as
17   well.
18   Q        So what you're saying is that when
19   Patel and Pampati authorized the authentication by
20   the secretary even of a study that they dictated,
21   that was a material violation of the False Claims
22   Act?
23   A        Yes.
24   Q        That's your conclusion?
25   A        One of them, yes.

98

1    Q        Then let's look at the other case that
2    you've cited, the '75 case, 1975, Peterson versus
3    Caspar Weinberger.  And once again your lawyer
4    highlighted the sections of that case for you;
5    correct?
6    A        Correct.
7    Q        And how does this support your
8    conclusion that Patel and Pampati violated the
9    False Claims Act by their actions in allowing a
10   secretary to affix their signatures?
11   A        So in that highlighted section it says,
12   thereupon Peterson directed his employee -- so in
13   this case, Patel and Pampati directed their
14   employees -- to prepare Part B claims forms and get
15   them out as soon as possible so he could get the
16   money back in.  This necessitated the use of a form
17   different from that used for Part A in that it
18   required a physician's personalized provider number
19   and the physician's signature certifying that the
20   service had been rendered by him personally or
21   under his personal direction.  Morton and another
22   employee prepared the 120 Part B claims, signed
23   Dr. Peterson's name and provider number to them,
24   and put James Peterson's post office box number on
25   the forms rather than Dr. Peterson's address.

99

1    Morton testified that Mr. Peterson gave us the
2    instructions on all of the forms.
3    Q        So the analogy is, is the direction of
4    the list of things that the secretaries or
5    employees had to do was to basically represent
6    themselves as Dr. Patel and Pampati and sign those
7    reports when Dr. Pampati had an obligation when
8    rendering that radiology service to be rendered by
9    them personally or under direct personal -- under
10   personal direction.
11   Q        So Dr. Peterson did this work that he
12   was trying to get reimbursed for, but then he told
13   a staff person to fill out the form and turn it in?
14   A        And certify it.
15   Q        That's how you read this case, Doctor?
16   I just want to make sure you know what you're
17   talking about.    And the reason I want to make sure
18   is because if you read the case it says
19   Dr. Peterson didn't do any of the work that he
20   submitted the claim form for.  He didn't do the
21   services.
22         MR. HOSTETTLER:  Argumentative.
23   Q        So it's not at all applicable, is it,
24   Doctor?
25         MR. HOSTETTLER:  Objection;

100

1    argumentative.
2         MR. MACLIN:  Well, he's offering a
3    legal opinion once again and he doesn't
4    know his facts.
5         MR. HOSTETTLER:  Well, and you're
6    arguing with him.
7         MR. MACLIN:  Well, he just made a
8    factually incorrect statement.  He
9    doesn't know what he's talking about.
10        Let's take a break.
11        MR. HOSTETTLER:  The doctor needs
12   to leave at 1:00 to catch his flight.
13        MR. MACLIN:  I hear you.
14        (A brief break is taken.)
15   Q        Go back to Exhibit 6 if you would,
16   please, Doctor.
17   A        That was the Medicare program, this and
18   that.
19   Q        I think it's this one right here.
20   A        Oh, sorry; yeah.
21   Q        Wouldn't it be a HIPAA violation to use
22   Dr. Patel's and Pampati's logins to get into
23   medical records?
24        MR. HOSTETTLER:  Just show an
25   objection.  That's not within the field

Anand P. Lalaji, M.D.   4/3/2023

101

1          of his designated expertise.
2                You can answer if you know.
3     A     I don't know.
4     Q     **You would not consider yourself to have**
5  **any HIPAA expertise to offer opinions on violations**
6  **or lack of violations for HIPAA; correct?**
7     A     For HIPAA? No.
8     Q     **So what I said was correct?**
9     A     I am not testifying here as a HIPAA
10 expert. I'm testifying here as a CMS regulatory
11 False Claims Act-type expert for compliance.
12    Q     **And HIPAA's outside your -- I'm**
13 **permitted to inquire about other areas of**
14 **expertise.  Do you have HIPAA expertise, Doctor?**
15    A     I do not.
16    Q     **Okay.  Do you have expertise with**
17 **credentialing requirements of physicians?**
18    A     No.
19    Q     **And so you wouldn't know whether you**
20 **have to have credentialing requirements with**
21 **Mountain Comp to do radiologic studies for them;**
22 **correct?**
23    A     You asked if I was an expert.  I'm not.
24    Q     **What areas would you consider yourself**
25 **to be an expert on other than what you -- you know,**

102

1  **False Claims Act and Medicaid or Medicare**
2  **requirements?**
3     A     Musculoskeletal radiology.
4     Q     **That's it?**
5                MR. HOSTETTLER:  Let me just -- I'm
6          going to object to that.  Again, it's
7          outside the scope.
8                But if you have other areas that
9          you consider yourself to be an expert
10         you can answer.
11    A     No, I'm fellowship-trained in
12 orthopedic radiology, so I would say that could be
13 the only -- you know, that would be the -- I can
14 say that I'm an expert at that.
15    Q     **Do you have any certifications in**
16 **billing or any certifications in coding?**
17    A     No.
18    Q     **And make sure we're on the same page,**
19 **Doctor.  What is billing and coding for Medicaid**
20 **and Medicare and CMS purposes?**
21    A     So it's called RCM, revenue cycle
22 management, so billing and coding -- so every study
23 has a code.  Every study has a code according to
24 CMS, and then you use that code because you have
25 either performed or interpreted and, you know --

103

1          you know, reported on that particular study to get
2  paid.  So every study -- all I know is that every
3  study has a code.  And then the billing company
4  submits that code with a few other codes in terms
5  of medical necessity and certain things to get
6  submitted to the CMS system to get paid.
7     Q     **And you don't have any expertise on**
8  **that?  That's all delegated by your company, by**
9  **you; correct?**
10    A     That's correct.
11    Q     **Are you a member of the American Health**
12 **Information Management Association?**
13    A     No.
14    Q     **Do you know what that is?**
15    A     I know that it's an organization about
16 that specific area of expertise, but I don't know
17 anything else about it.
18    Q     **Did you talk with anybody other than**
19 **counsel as to your opinions?  Did you talk with any**
20 **other doctor, any other lawyer, third-party lawyer?**
21    A     Except for the Georgia attorneys.
22    Q     **And Mr. Hostettler; correct?**
23    A     That's correct.
24    Q     **And Ms. Gillum give an affidavit in --**
25 **was it in this case or in the Georgia case or both**

104

1  cases?
2     A     I'm not sure.
3     Q     **Have you ever heard about the buddy**
4  **system with radiologists?**
5     A     No.
6     Q     **That's a problem, I mean, to reduce**
7  **delays when one staff radiologist is out of town or**
8  **unavailable, then they then would be able to sign**
9  **electronically that -- the buddy system is**
10 **developed where the buddy signs by proxy.  Have you**
11 **ever heard of that before?**
12    A     No.
13    Q     **Never seen any kind of article by the**
14 **American Journal of Radiology to that effect?**
15    A     No.
16    Q     **Would you agree that the speed of a**
17 **report turnaround, radiology study report, is very**
18 **important?**
19    A     It depends on what type of study it is.
20    Q     **In some cases it's very important?**
21    A     Yes.
22    Q     **The principles that you relied upon in**
23 **providing the testimony that's -- or attempting to**
24 **provide or preparing to provide the testimony**
25 **that's in Exhibit 3 are what?  What kind of**

Anand P. Lalaji, M.D.   4/3/2023

Page 105

```
1    established principles?  Just your review of the
2    documents which comprise Exhibit --
3         MR. MACLIN:  Help me, Aaron.
4    Q    -- Exhibit 2?
5    A    So Exhibit 3 is the --
6    Q    Report.
7    A    Are we talking about this one?
8    Q    Yes.
9    A    This one?
10   Q    Yes.
11   A    So what's the question?  Sorry.
12   Q    The principles that you've relied upon
13   are what?
14   A    Are everything within the Medicare law
15   and guidelines and the False Claims Act
16   legislation.
17   Q    Which is comprised of Exhibit 4 I
18   believe; correct?
19   A    Hold on.  Some of these things --
20        MR. MACLIN:  Exhibit 4, Marybeth,
21   is --
22   Q    Here it is.
23   A    So this one says --
24   Q    Five?
25   A    -- 5.
```

Page 106

```
1    Q    Right.  So it's Exhibit 5 and Exhibit
2    4; correct?
3    A    I just want to make sure of that.
4    Okay; these are all just different versions.  Four
5    was -- there's 3 --
6    Q    Here.  This goes on top, Doctor, if
7    you --
8    A    Oh, there we go.  There we go.  Yeah.
9    Yeah, this was the e-mail and then the table --
10   yeah.  And then 5, and is this included in --
11   Q    Yes.
12   A    Okay; yes.  Yes, this --
13        MR. HOSTETTLER:  Do I understand
14   that Exhibit 5 comprises all of the
15   documents that I have sent you that he
16   had reviewed?
17        MR. MACLIN:  Exhibit 4 is all of
18   the documents.
19        MR. HOSTETTLER:  Okay.
20        MR. MACLIN:  Exhibit 5 is the one
21   that you marked for him the portion of
22   the --
23        MR. HOSTETTLER:  Okay.
24        MR. MACLIN:  -- of the Medicare --
25        MR. HOSTETTLER:  Okay.
```

Page 107

```
1         THE WITNESS:  That's the Integrity
2    one.
3         MR. MACLIN:  -- Program Integrity
4    Manual that you highlighted for him.
5    Q    And so let's make sure I understand
6    that.  Your opinions which are in Exhibit 3 are
7    based on your looking at the documents which are
8    Exhibit 4 and Exhibit 5 and interpreting those
9    documents in light of the law, the Medicaid law,
10   that's also part of Exhibit 3; correct?  I mean,
11   that's part of Exhibit 4; correct?
12   A    Yeah; all of the Medicare/Medicaid laws
13   that are part of everything that we have submitted
14   to you --
15   Q    As Exhibit 4.
16   A    -- as Exhibit 4 and Exhibit 5.
17   Q    And you took those documents which are
18   Exhibit 4 and Exhibit 5 and you applied those
19   documents to the facts which we've outlined, which
20   is the Mountain Comp submission of reports;
21   correct?
22   A    That's correct.
23   Q    And then you reached a conclusion,
24   which is in Exhibit 3, as a result of that
25   analysis; correct?
```

Page 108

```
1    A    That's correct.
2    Q    And you can't show me anybody else
3    that's also reached that same conclusion or
4    analysis based on similar facts other than those
5    two cases which you included in Exhibit 4; correct?
6    A    Right at this moment, no.
7    Q    So what I said was correct?
8    A    Right at this moment I can't give you
9    any other cases.
10   Q    And you're not aware of any other
11   circumstances?
12   A    I don't know.
13   Q    Okay.  Did you do any research other
14   than looking at what's Exhibit 4 to come up with
15   the opinions in Exhibit 3?
16   A    It's basically everything that's in
17   Exhibit 4 and 5 is the law that governs -- you
18   know, governs false claim acts, so I did review all
19   of those.
20   Q    But that's the extent of your research?
21   A    That's correct.  Other than all my
22   experience.
23   Q    Well, I talked about research.
24   A    Okay; yeah.
25   Q    Well, let's talk about experience.
```

Anand P. Lalaji, M.D.   4/3/2023

109

1   Have you ever had a False Claims Act claim having
2   been asserted against you or a company you're
3   affiliated with?
4   A       No.
5   Q       Have you ever presented one, self-
6   reported one before?
7   A       No.
8   Q       Have you ever had a signature omission
9   or violation requirement asserted or made against
10  you or one of your companies?
11  A       No.
12  Q       So you have no prior experience with
13  anything like you're testifying about in Exhibit 3
14  before, do you?
15  A       That's incorrect.
16  Q       You have some prior experience?
17  A       The experience that I'm referring to is
18  going through with every billing entity that we
19  have used at TRG in compliance review, knowing what
20  the CMS rules and laws are so that we can follow
21  them. So we have to -- we're in the same business
22  as Patel and Pampati, and so we have to follow the
23  Medicare guidelines. And that's why every single
24  radiologist at TRG approves their report, views it
25  and approves it.

110

1   Q       Has TRG ever had any other radiologist
2   that, quote, preliminarily reviewed a report?
3   A       Preliminarily, no. Not preliminarily,
4   no.
5   Q       Have there ever been two radiologists
6   involved in reading or performing a study?
7   A       That's correct.
8   Q       And tell me the circumstances under
9   which that happens.
10  A       So like almost 90 -- almost every
11  teleradiology company in the country uses or has a
12  subsidiary teleradiology company in either a -- in
13  a global capacity. So we have in the UK, in
14  London, and also in India where it's called -- it's
15  called prereading, not preliminary because
16  preliminary would be exposed to the hospital, and
17  this report does not go anywhere near that
18  hospital. So what happens is, is the study gets
19  templated by our India team, and then -- it's
20  called TRG Assist; it's on our website so you can
21  also download that if you'd like. We in certain
22  cases, complex cases, where we want to make sure
23  the diagnosis is correct, we have some of our
24  global radiologists certified in their country act
25  as support mechanisms for U.S. radiologists. And

111

1   the way that happens is, is they will look at a
2   complex CT, like a CTA, like an angiogram or
3   something like that, and deliver a preread that is
4   in the document viewer that can only be seen by the
5   U.S. board-certified radiologist and nobody else.
6   And they are -- they have to review the exam before
7   they're able to approve it, and so they can -- they
8   have two sets -- we have two sets of eyes looking
9   at complex cases. That is the process.
10  Q       So there's medical providers in Europe
11  or in India are looking at radiographs, CT scans,
12  MRIs from patients in the U.S. and they're doing
13  it's called -- you're calling it a template,
14  Doctor?
15  A       No. There's two parts. A template is
16  just placing the right template on the right exam,
17  like the format. The preread, which is the other
18  term, is the first opinion internally that is given
19  by one of our global radiologists.
20  Q       Okay. And what happens with the U.S.
21  radiologist when he sees the preliminary opinion --
22  or preread opinion?
23  A       Yeah, so he has to either agree with
24  it, he can modify it, he can change it, he can
25  disagree with it, he can do anything of the sort.

112

1   He has to be able to view the images before making
2   any changes to the report, and he has to view all
3   the series before making any changes to the report.
4   Q       What's the advantage to having this
5   non-U.S.-based radiologist review a report?
6   A       So radiology now is globalized, and so
7   all -- pretty much everyone has the same training,
8   so it provides -- because of the tremendous
9   shortage of radiologists, there's billions of
10  radiology exams that cannot be read in a timely
11  manner. And so this process allows radiologists,
12  with the stress of having to read a lot of exams,
13  actually have a second radiologist look to make
14  sure that there is -- you know, there's really
15  nothing that can be missed. And that is the
16  purpose of that is to make sure that the patient
17  and that the report is 100 percent accurate in that
18  setting.
19  Q       Is the non-U.S.-based radiologist
20  credentialed with the hospital or clinic from which
21  the patients' studies I guess originated?
22  A       Well, so first of all, all those
23  studies are anonymized and they don't have --
24  there's no patient information; it's just the
25  images. Secondly, they do not have to be

Anand P. Lalaji, M.D.   4/3/2023

29  (Pages 113 to 116)

113

1    credentialed because they're not delivering the
2    final report.  And we have -- we have been sort of
3    approved by our -- you know, our healthcare
4    compliance attorneys in Atlanta that the process is
5    sound, and almost every teleradiology company does
6    this.
7        Q       Okay.  So you relied on the opinion
8    that this was acceptable from the I guess counsel
9    in Atlanta?
10       A       Correct.
11       Q       You didn't reach that conclusion
12   yourself; correct?
13       A       That's correct.
14       Q       How does the billing work?  Which study
15   is billed for?
16       A       There are no multiple studies.  It's
17   just one study.
18       Q       So the only study that's billed for is
19   which one, the U.S.-based radiology?
20       A       That's correct.  They've reviewed the
21   images, they've modified the report, they've
22   certified that the report is accurate, and then
23   they, you know, hit approve and go to the next
24   study.
25       Q       But they relied upon the pread or

114

1    preliminary study of the non-U.S.-based radiology.
2        A       No.
3        Q       They didn't rely on it?
4        A       They relied on their knowledge; they
5    relied on their expertise in interpreting that
6    study.  That pread is essentially a way for them,
7    for the radiologist, to not have to say the
8    hundreds of words that are needed, that it's
9    already there, and that's the support mechanism.
10   But they don't rely on that pread.  They rely on
11   their expertise.
12       Q       I'm trying to understand what you're
13   saying, Doctor.  So they didn't rely on the pread
14   or prestudy at all?
15       A       No.  They relied -- they make the
16   ultimate decision.  They basically -- they see --
17   it's like -- it's like someone giving an opinion to
18   you, and you evaluate that opinion, your own
19   opinion.  You are the expert, and you are -- and so
20   you rely on your training and everything to
21   determine, you know, how you want that report to
22   look and what it says.
23       Q       So the ultimate decision of the report
24   was the U.S.-based radiologist?
25       A       That's correct.

115

1        Q       But he utilized or she utilized the
2    non-U.S.-based radiology in rendering his or her
3    report?
4        A       Potentially.  Potentially they
5    disagreed with it.  You know, it just depends upon,
6    you know, what the first opinion was.
7        Q       You get a fixed price under Medicaid
8    and Medicare for a radiology study; correct?
9    Depending on the type; right?
10       A       Correct.
11       Q       And so it's just one reimbursement;
12   correct?
13       A       That's correct.
14       Q       How is the reimbursement divided
15   between the preread radiology that's not in the
16   U.S. and the radiologist that is in the U.S. that's
17   credentialed with a hospital or clinic?
18       A       So the prereading radiology is just a
19   support mechanism.  It does not offer any type of
20   official reporting capacity or anything like that.
21   It has no bearing on -- it's the exact same payment
22   mechanism.
23       Q       Well, how is the payment divided
24   between the two professionals?
25       A       The payment is divided -- what do you

116

1    mean, like how much do we pay the prereaders?  Is
2    that what you're asking?
3        A       Well, I mean, if you get a fixed price,
4    which we've agreed upon, for the radiology read
5    from Medicaid but there was time spent by the
6    prereader, how is that divided between the two
7    different radiologists?
8            MR. HOSTETTLER:  Just show an
9        objection.  Your question assumes it is
10       divided.
11           You can answer as best you can.
12           MR. MACLIN:  Well, I'm assuming
13       that he's not doing it for free in the
14       UK.
15           MR. HOSTETTLER:  He's also paying
16       his admin staff, but their fee is not
17       divided.
18       Q       I'm trying to understand how the fees --
19       A       It's an administrative expense.
20       Q       Is the read fee that's paid to a
21   radiologist contractor that doesn't have a pread
22   fee lower than if there's a pread fee?
23       A       It's all the same.
24       Q       Having the prereads, does that improve
25   efficiency?

Anand P. Lalaji, M.D.   4/3/2023

30  (Pages 117 to 120)

117
1    A       A little bit.
2    Q       Trying to watch the time now.  Let's
3    look at this document right here that's part of
4    Exhibit 4.  You've got it in front of you, Doctor.
5    A       Yeah.
6    Q       Complying with Medicare Signature
7    Requirements.  And you've relied upon this in
8    support of your opinions which are in Exhibit 3.
9    Which part of this document supports those
10   opinions?
11   A       All of it.
12   Q       Is there a specific signature
13   requirement?
14          MR. HOSTETTLER:  Your copy's not
15   highlighted.  This one is.
16          MR. MACLIN:  We'll make that as
17   Exhibit 7.
18          (Said document is filed with this
19   deposition and marked as Plaintiff's
20   Exhibit No. 7 for purposes of
21   identification.)
22   Q       And once again on Exhibit 7, was that
23   highlighted by your counsel?
24   A       Yes.
25   Q       And what section are you referring to?

118
1    A       So, you know, so certification, I
2    believe it's the first several paragraphs of the
3    second page.
4    Q       What specifically?
5    A       So let's read it.  CMS implemented the
6    CERT program to measure improper payments in the
7    Medicare fee-for-service program.  Under the CERT
8    program, a random sample of all Medicare fee-for-
9    service claims -- that's FFS -- are reviewed to
10   determine if they were paid properly under the
11   Medicare coverage, coding, and billing rules.  Two
12   contractors manage the CERT program, the
13   statistical contractor and the review contractor.
14   The statistical contractor determines Medicare
15   claims sampling and calculates the improper
16   payment.
17          And then the you in that statement --
18   the you in that paragraph in the document is
19   referring to the ordering or prescribing provider
20   or nonphysician, like a nonphysician practitioner,
21   who must sign their medical documentation.
22          So it's just talking about how they
23   review and they random sample of all fee-for-
24   service claims.
25          And then so the next paragraph says,

119
1    documentation must meet Medicare's signature
2    requirements, which are in the Medicare Program
3    Integrity Manual.  If Medicare claims reviewers
4    cannot validate the signatures, the MAC, which is
5    who distributes the money, can deny the claim,
6    assess an error, and begin recouping overpayments.
7          And so then there's a bunch of
8    frequently asked questions.  There's that a mark or
9    sign by the ordering or prescribing physician.  Now
10   a lot of nonradiologists use scribes now, so they
11   actually don't type themselves into the patient
12   notes.  They actually have a scribe that they talk
13   to and the scribe actually, you know, puts the
14   notes into their system.  Regardless of who writes
15   a medical record entry, you, which is the provider,
16   must sign the entry to authenticate it adequately
17   documents the care you provided or ordered.
18          So that's the first big sign is that
19   the provider must sign the entry -- must sign the
20   entry, not give it to their secretary, but to sign
21   the entry to authenticate it adequately documents
22   the care you provided or ordered.
23          Then if you go to --
24   Q       Well, let's look on down.  It says,
25   what is required for a valid signature?  What does

120
1    that say?
2    A       For services you provided or ordered.
3    Q       Okay.  So we've got the radiology
4    services that were provided here in the case of
5    Patel and Pampati and Mountain Comp; correct?
6    A       Correct.  The services were provided
7    and ordered.
8    Q       Well, let's just look at the next
9    thing.  It says, handwritten or electronic.  Do you
10   see that?
11   A       Yes.
12   Q       So if Patel or Pampati had two broken
13   arms and they had their secretary stamp their
14   signature on a report because their arms were
15   broken, in your opinion would that be a violation?
16          MR. HOSTETTLER:  What page are you
17   on?
18   A       No, no.
19          THE WITNESS:  They're right here.
20   He's talking about if they have a
21   physical disability.
22          MR. HOSTETTLER:  Okay.
23   A       And so no.  If Patel and Pampati's arms
24   have been broken and they can't stamp with their
25   nose, then they can't -- you know, then they can't

Collins Sowards Lennon Reporting, LLC
859-402-0900

Anand P. Lalaji, M.D.   4/3/2023

31 (Pages 121 to 124)

121

1   do it and that's not a violation.
2   Q        So it's not a violation to have a
3   secretary stamp because of physical disability, but
4   in your opinion it is a violation to have a
5   secretary affix an electronic signature?
6   A        I think you're -- you're not reading
7   this paragraph correctly.  What it's saying is, is
8   that CMS will allow somebody else to stamp -- to
9   stamp signatures if Dr. Patel or Pampati can't
10  physically do it and they can prove to CMS that
11  that disability is not abling them to sign, which
12  is not what happened in this case.
13  Q        My question is really very simple.  If
14  Dr. Patel and/or Dr. Pampati had a physical
15  disability and they told their secretary, stamp all
16  these reports, that would be acceptable in your
17  opinion?
18  A        That's correct.
19  Q        But since they told their secretary to
20  affix my legal -- my electronic signature, that's
21  unacceptable?
22  A        That is not acceptable.
23  Q        Let's look at complying with Medicare
24  signature requirements, which is part -- and I'm
25  assuming -- and we'll make your attorney's version

122

1   as Exhibit --
2   A        Eight.
3   Q        -- 8.  Thank you, Doctor.
4            (Said document is filed with this
5            deposition and marked as Plaintiff's
6            Exhibit No. 8 for purposes of
7            identification.)
8            THE WITNESS:  That's your Exhibit 7
9   there.
10           MR. MACLIN:  Oh, I'm sorry,
11  Marybeth.  Thank you.
12  Q        And on Exhibit 8, that's your
13  attorney's highlighting?
14  A        That is the document that has
15  highlights on it; correct.
16  Q        And which sections did your attorney
17  highlight for you?
18  A        The document is -- so again it talks
19  about the random -- the two services; right?  So
20  identifying it and then calculating the
21  overpayment, et cetera, for fee-for-service claims.
22  So that's like basically the intro.  And then if
23  you look at the last, you know, paragraph there, it
24  says, you know, their goal and mission is to
25  eliminate improper payments to maintain the

123

1   Medicare trust fund while protecting patients from
2   medically unnecessary services, supplies, et
3   cetera.
4            So Table 1 are some frequently asked
5   questions.  So the first question is, what's
6   required for a valid signature?  So for a signature
7   to be valid, the following criteria must be met:
8   Services that are provided or ordered must be
9   authenticated by the ordering practitioner if they
10  are ordered or provided.  Not by secretaries.
11           The second question is, what should I
12  do if I have not signed --
13  Q        Let me stop you here, Doctor.
14  A        Yeah.
15  Q        You've told me the secretary didn't
16  review anything, so what services that were
17  provided were provided or ordered by a secretary
18  with respect to Mountain Comp?
19  A        So they're -- actually they're talking
20  about specifically in unnecessary services or
21  supplies in this particular matter.  So it relates
22  to the services being provided because of the
23  unnecessary services, you know, direction that CMS
24  is going in.
25           But services that are provided or

124

1   ordered must be authenticated by the ordering
2   practitioner.  So when like an orthopedic surgeon
3   wants to order an MRI on their patient, they have
4   to provide -- you know, that signature has to be
5   valid in order to provide that service.
6   Q        Okay, well --
7   A        Okay?
8   Q        -- you've said -- I'm just trying to
9   understand, Doctor, because you said somehow this
10  relates to Pampati and Patel, and you've agreed
11  that their signatures authenticated the services.
12  So I'm trying to understand what services were not
13  valid.
14  A        Reason why I bring this up is that the
15  clinician can't delegate that signature to a
16  secretary to order that study.  In order to order
17  that study, it has to be authenticated by the
18  ordering doctor.  So it's an analogous type of
19  situation.
20  Q        So this doesn't apply to Patel and
21  Pampati directly?
22  A        It's just a call-out that it applies to
23  all physicians, not just radiologists.
24  Q        So that's not specifically on point.
25  What's the next point that your lawyer's

Anand P. Lalaji, M.D.   4/3/2023

32 (Pages 125 to 128)

---

**125**

1    highlighted for you?
2    A         I would disagree with that, but we can
3    go on.
4              You may not add late signatures to
5    medical records.  Medicare does not accept
6    retroactive orders.  So these are -- again, this is
7    from a clinician standpoint in making that analogy.
8    So it's like you can order a hundred exams, but if
9    you didn't sign it you can't go back and
10   retroactively order them.
11   Q         So this once again is not directly on
12   point; correct?
13   A         The next one is, am I able to attest to
14   my signature?  You know, yes, you may attest that a
15   signature is yours.  A signature attestation is a
16   statement that must be signed and dated by the
17   author of the medical record entry and must contain
18   sufficient information to identify the beneficiary.
19             So in -- like again, this applies to
20   all -- you know, and it's referenced the Medicare
21   -- you know, this Program Integrity Manual, it
22   references that, and it relates to all
23   practitioners, not specifically to radiology.  But
24   in -- you know, there is no -- when Medicare
25   delivers its laws in regards to payments, every

---

**126**

1    provider falls under the same.  You know, it
2    doesn't matter if you're a radiologist or it
3    doesn't matter if you're an orthopedic doctor or
4    plastic surgeon, et cetera.  Everyone's the same.
5              So you have to sign an attestation,
6    but, you know, those are exceptions where you
7    realize, oh, crap, that there are six or seven
8    cases that I didn't have my signature on, here's an
9    attestation, here's the Medicare beneficiary
10   information, this is what happened, and they'll
11   accept that.  Not hundreds of thousands of claims.
12   Q         You agree with me, Doctor, that the
13   studies and the reports that Patel and Pampati
14   submitted to Mountain Comp, they were the authors
15   of those; correct?
16   A         I don't agree.
17   Q         Who authored them?
18   A         The secretary.
19   Q         She didn't review them.  She couldn't
20   have reviewed them.
21   A         I don't know if you're being
22   argumentative, but you're wrong.
23   Q         Well, isn't dictation and then the
24   transcription of a dictation, isn't the author of
25   the dictation Patel and Pampati?

---

**127**

1    A         No.  It's who fixes their signature to
2    that report.  That's why every single statement
3    here says -- every single statement says that the
4    provider is responsible to review whatever service
5    they've provided in that report and approve the
6    study personally.  Not their secretaries.
7    Q         Where does it say review in any of the
8    documents, Doctor?
9    A         It's in there.  I can't -- I mean, you
10   know, it's in -- it's in the Medicare Program
11   Integrity Manual, and it's in Exhibit 4 and 5.
12   Q         I read authentication means
13   responsibility.  I didn't read authentication means
14   review anywhere.
15             MR. HOSTETTLER:  Just object to the
16   argumentative.
17             MR. MACLIN:  I want to know where
18   the word review is used.
19             MR. HOSTETTLER:  If he knows, he
20   can answer.
21   A         I don't know.
22             MR. HOSTETTLER:  If he doesn't --
23   Q         You don't know?  Okay.
24   A         I don't know.  But authenticate is even
25   harsher.

---

**128**

1              MR. MACLIN:  I think we're out of
2    time.
3              MR. HOSTETTLER:  Did you want to
4    make that last document Exhibit 8?
5              MR. MACLIN:  Yes, it is.  I think
6    it is.  We agreed on that.
7    ------------------------
8              (DEPOSITION CONCLUDED)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Collins Sowards Lennon Reporting, LLC
859-402-0900

Anand P. Lalaji, M.D.   4/3/2023

129

1    STATE OF KENTUCKY )
     COUNTY OF FAYETTE )
2
             I, MARYBETH C. SOWARDS, Certified Court
3    Reporter and Notary Public, State of Kentucky at
     Large, certify that the facts stated in the caption
4    hereto are true; that at the time and place stated
     in said caption the witness named in the caption,
5    after being by me duly sworn, was examined by
     counsel for the parties; that said testimony was
6    taken down in shorthand by me and later reduced to
7    typewriting under my direction; and the foregoing
8    is a true and complete record of the testimony
9    given by said witness.
10           No party to said action nor counsel for
11   said parties requested that said deposition be
12   signed by the testifying witness.
13           My commission expires:  January 11, 2027.
14           In testimony whereof, I have hereunto set
15   my hand and seal of office on this, the 7th day of
16   April, 2023.
17
18
19
20
21           MARYBETH C. SOWARDS
22           Certified Court Reporter (KY)
23           Certification No. 20041D115
24           Notary Public, State-at-Large
25           Notary ID No. KYNP62884

Collins Sowards Lennon Reporting, LLC
859-402-0900

Anand P. Lalaji, M.D.   4/3/2023

130

| A | | | | |
|---|---|---|---|---|
| **A-1** 65:22 | 98:9 102:1 | 98:10 121:5,20 | 104:14 | 58:20 75:16 |
| **a.m** 1:17 | 105:15 109:1 | **affixation** 69:18 | **amount** 66:13 | 99:23 |
| **Aaron** 2:10 14:2 | 110:24 | 81:2,25 | 80:3 82:22 | **application** 59:24 |
| 32:1 44:18,25 | **Act-type** 101:11 | **affixed** 23:11 40:3 | **analogous** 95:17 | **applied** 61:14,16 |
| 76:1 105:3 | **acted** 49:25 | 40:13 42:7,14 | 124:18 | 107:18 |
| **ability** 4:15 | **action** 1:21 66:19 | 49:14 64:18 | **analogy** 96:5 99:3 | **applies** 60:9 |
| **able** 43:2 91:7 | 77:5 85:3 129:10 | 67:21 68:1 81:11 | 125:7 | 124:22 125:19 |
| 104:8 111:7 | **actions** 78:25 98:9 | 81:12 | **analysis** 93:11,18 | **apply** 48:19 59:21 |
| 112:1 125:13 | **activity** 9:6 | **affixing** 57:25 | 93:21 107:25 | 124:20 |
| **abling** 121:11 | **acts** 67:9,11 | **agency** 73:14 | 108:4 | **appropriate** 20:20 |
| **above-styled** 1:20 | 108:18 | **ago** 17:11,11 35:9 | **Anand** 1:10,12 | 20:22 |
| **Absolutely** 5:7 | **actual** 9:11 10:17 | 73:23,24 | 2:9 3:4 4:1,8 | **approval** 65:24 |
| **abuse** 48:16 | 18:3 27:1 36:15 | **agree** 4:23 41:20 | **and/or** 85:7 | **approve** 52:6,8,9 |
| **accept** 125:5 | 67:9 74:17 75:7 | 46:18,22 51:8 | 121:14 | 23:10 29:15 |
| 126:11 | **acute** 34:1 | 63:16 64:24 65:2 | **angiogram** 111:2 | 68:22 90:24 |
| **acceptable** 113:8 | **add** 125:4 | 92:19 104:16 | **angry** 15:15 | 111:7 113:23 |
| 121:16,22 | **additional** 91:25 | 111:23 126:12 | **annotations** 52:25 | 127:5 |
| **acceptance** 49:12 | **address** 15:19 | 126:16 | **annual** 18:4,24 | **approved** 22:7 |
| **accepted** 49:6 | 16:16 20:10,17 | **agreed** 42:21 | **anonymized** | 69:14 113:3 |
| 69:16 | 53:7 58:15 98:25 | 76:15 116:4 | 112:23 | **approves** 109:24 |
| **access** 22:9 27:19 | **adequate** 48:19 | 124:10 128:6 | **answer** 5:3,5 6:6 | 109:25 |
| 27:22 28:5 29:20 | **adequately** | **ahead** 10:12 52:20 | 25:10 26:18 | **approving** 56:5 |
| 87:7 94:12 | 119:16,21 | 63:6 65:1,20 | 31:10 34:17,23 | 68:1 |
| **accuracy** 22:17,21 | **adhering** 18:6 | 66:24 67:6 69:8 | 37:23 40:7 42:12 | **approximate** 1:17 |
| 39:21 40:1 47:13 | **adjusted** 66:12 | 76:12 78:18 | 43:2 47:22 58:5 | **April** 1:16 129:16 |
| **accurate** 4:14 | **Adjustment** 66:13 | 88:15 90:3 | 68:5 76:10,12 | **area** 103:16 |
| 23:13 27:17 34:4 | **admin** 116:16 | **AL** 1:4,9 | 92:14 96:17,23 | **areas** 101:13,24 |
| 37:19 112:17 | **administration** | **Allan** 10:22 | 96:24 101:2 | 102:8 |
| 113:22 | 74:11 75:21 | **alleged** 32:16 | 102:10 116:11 | **argue** 53:5 59:7 |
| **acquired** 82:21 | **administrative** | 73:17 86:15 | 127:20 | 61:20 62:3 |
| **acquisition** 85:8 | 48:20 55:12 56:1 | **Alliant** 53:1 | **answered** 47:21 | **arguing** 100:6 |
| 87:19 | 56:4 116:19 | **allow** 41:1 77:19 | 47:24 | **argument** 63:1 |
| **act** 15:2 16:10 | **administrative-...** | 121:8 | **anti-fraud** 16:10 | **argumentative** |
| 17:22 21:2 27:1 | 11:19 | **allowed** 27:15,15 | **anticipate** 32:14 | 58:4 99:22 100:1 |
| 31:22 42:2,4,6 | **advantage** 112:4 | 27:19 73:8 | **antiquated** 77:22 | 126:22 127:16 |
| 49:20,22 50:4,25 | **affidavit** 82:11 | **allowing** 61:23 | **anybody** 5:8 41:7 | **ARH** 77:18 79:12 |
| 51:4 60:16 61:8 | 84:12,14,22,23 | 98:9 | 76:21 79:18 | 86:19 |
| 65:9,9,13 66:14 | 87:6 103:24 | **allows** 112:11 | 85:17 91:13 | **arms** 120:13,14 |
| 67:15 68:20 | **affiliated** 109:3 | **alternate** 48:16,22 | 103:18 108:2 | 120:23 |
| 69:25 70:3,9 | **Affirmative** 13:16 | 65:3 | **apologize** 64:22 | **article** 15:24 16:2 |
| 75:3,7 80:15,20 | 15:5 27:6 28:20 | **alternative** 49:3,4 | **appear** 28:3 | 16:3 104:13 |
| 91:12 93:6,13 | 33:6 54:22 89:14 | 49:16 | **Appearances** 2:1 | **Ashokkumar** 1:3 |
| 95:24 96:14 97:1 | **affix** 37:9,14 | **America** 12:7 | 2:19 | 2:14 |
| 97:3,7,11,15,22 | 39:19 40:23 | 95:2 | **appears** 33:8 | **aside** 9:8 71:25 |
| | 41:13 48:3 73:9 | **American** 12:1 | **applicability** 56:9 | **asked** 6:7,9 38:14 |
| | 89:25 91:1,8 | 24:3 103:11 | **applicable** 55:11 | 47:20 59:12 86:1 |

Anand P. Lalaji, M.D.   4/3/2023

131

86:4 87:4 90:17
101:23 119:8
123:4
asking 26:21
30:10 36:21 40:5
64:15 70:14
89:17 116:2
asks 74:7
assembled 75:8
assert 50:14
asserted 109:2,9
assess 119:6
Assist 110:20
ASSOCIATES
2:9
Association
103:12
assume 71:24
assumes 116:9
assuming 116:12
121:25
athletes 11:15
Atlanta 10:2,7
17:18 88:3 113:4
113:9
attached 31:18,24
32:17 68:10
attempting
104:23
attended 16:8
attest 125:13,14
attestation 48:25
60:10 61:5 65:6
125:15 126:5,9
attorney 17:19,20
44:13 75:2
122:16
attorney's 121:25
122:13
attorneys 49:1
54:8 103:21
113:4
audit 55:24
audits 16:22 17:16
18:19,20,22
August 83:4

authenticate 62:4
91:8 119:16,21
127:24
authenticated
33:18 39:10 44:6
44:9 46:1,5,8,9
46:14,16 47:4,4
57:20,24 58:7,7
58:13 61:25
96:10,12 123:9
124:1,11,17
authenticating
47:13,18 60:2
authentication
22:11,17,20
46:25 56:21 57:3
59:4,14 60:3
67:16 97:19
127:12,13
authenticity 48:24
49:7,13 50:17
65:5
author 125:17
126:24
authored 126:17
authority 52:18
52:21,23 53:7
56:24 68:24
authorize 34:10
48:2
authorized 34:7
41:12 46:19,23
46:23 47:11,16
51:3 97:19
authorizing 51:1
authors 126:14
automatically
23:8
available 85:23
86:2,5 91:20
aware 80:8 108:10

B

B 66:3 67:12
98:14,22
back 16:13 17:9

23:23,23 24:21
36:7 40:7 50:5
54:20 58:19
60:13,21 64:21
68:9 70:14,22,24
76:21,25 77:1,2
77:8 82:5,6
98:16 100:15
125:9
background
90:14
base 26:13,13
based 57:7,13,18
59:14 97:4 107:7
108:4
basic 60:21
basically 7:6
29:21 35:13
39:14 41:11
51:17 56:3 58:12
58:18 60:13,18
61:9 74:13 77:21
87:6 88:8,10
91:9,23 99:5
108:16 114:16
122:22
basis 9:16,24 10:6
11:5 19:5 26:22
27:17 31:20,22
52:11 57:21
batch-sign 40:15
bear 48:23 65:4
bearing 115:21
beginning 17:9
behalf 1:3,13 2:2
2:8 31:5 49:25
57:21 63:25 64:9
68:24 81:12
82:13
believe 27:22
33:10,14,19
44:13 45:11
65:10 79:15
80:21 86:9 87:25
105:18 118:2
beneficiaries

80:11
beneficiary 44:7
46:2,6,7,17
49:18 125:18
126:9
Benham 53:2
best 4:15 116:11
big 32:1 119:18
billed 50:1 113:15
113:18
billing 17:14 21:5
102:16,19,22
103:3 109:18
113:14 118:11
billions 112:9
BIM 19:14
Biopsies 26:1
birth 33:15
bit 117:1
board 75:2
board-certified
7:7 8:10,11
111:5
board-eligible 7:8
8:11
book 15:23
bottom 89:7
bought 83:5
box 98:24
breadth 43:1
break 45:5,7 50:6
100:10,14
brief 45:7 100:14
bring 43:12
124:14
broad 15:20 26:17
broken 120:12,15
120:24
brought 66:19
74:5
buddy 104:3,9,10
bullet 89:10
bunch 36:19 74:7
119:7
business 19:14
109:21

business-related
11:18,21
button 23:3

C

C 1:13 10:21
129:2,21
calculates 118:15
calculating 82:25
122:20
call 35:25
call-out 124:22
called 48:8 83:9
102:21 110:14
110:15,20
111:13
calling 41:4
111:13
calls 15:9 68:3
96:16
Campbell 27:23
72:23 84:19
86:22 87:10
88:12,14
capacity 73:2
110:13 115:20
caption 2:18
129:3,4,4
captioned 45:17
care 28:16 44:7
46:2,6,7,17
49:17 91:6
119:17,22
case 1:2 4:11
12:10 13:7,25
24:2 25:15 31:22
36:24 37:22
68:19 71:15
94:25 95:5,13,16
96:6 98:1,2,4,13
99:15,18 103:25
103:25 120:4
121:12
cases 37:25 78:2
89:12 90:9,10
91:6 94:2,19

Anand P. Lalaji, M.D.   4/3/2023

104:1,20 108:5,9
110:22,22 111:9
126:8
Caspar 98:3
CAT 7:20
catch 91:6 100:12
categories 20:19
category 20:25
cause 27:12
caused 73:7 83:7
causes 65:23,25
66:5
center 25:22
CEO 7:9
CERT 118:6,7,12
certain 25:18
72:18 103:5
110:21
certainty 36:9
Certificate 2:22
certification
27:17 96:1 97:4
118:1 129:23
certifications
102:15,16
certified 1:13
37:17 41:2
110:24 113:22
129:2,22
certifies 24:22
certify 49:25
50:16 99:14
129:3
certifying 29:14
67:16 98:19
cetera 9:5 18:4,11
25:22 48:19 74:9
86:11,23 90:15
122:21 123:3
126:4
change 111:24
changed 77:10
changes 112:2,3
check 49:1
checklist 85:23
86:7

checks 58:8
chief 6:22 7:9,12
9:1,2,21,21,22
10:15,16,19,22
10:24 19:10,11
19:19,19
Chloe 10:23 74:9
choose 22:3 40:16
Circuit 1:1,21
circumstances
95:17 108:11
110:8
cited 94:1 98:2
civil 1:20 66:10,12
66:19
claim 35:13 42:2,4
42:5,16,18 45:21
50:24,24 56:20
57:2,11,13 59:14
60:11,14,19
65:24 66:2 68:25
69:24 75:3 84:8
95:23 97:11
98:14 99:20
108:18 109:1
119:5
claims 27:1 31:22
38:25 49:20,21
50:25 51:4 56:6
57:7,10,18 60:16
61:8 65:8,9,13
65:16,17 68:20
69:20 70:7 73:17
79:16 80:15,20
84:5 91:11 93:6
93:13 95:24 96:1
96:3,14 97:1,2,7
97:15,21 98:9,22
101:11 102:1
105:15 109:1
118:9,15,24
119:3 122:21
126:11
clarify 4:21 26:8
36:21
class 18:3

classes 16:9,14
17:25 18:13
classroom 18:4
clear 35:12 41:1
clear-cut 35:19
36:3 61:7
clearly 70:6
client 70:10
clinic 27:21 28:8
92:21 112:20
115:17
clinical 9:3,22
10:16,24 11:13
11:16 19:11,19
clinician 70:22
124:15 125:7
clinics 92:24
closing 83:4
CMS 14:24 16:19
16:21 17:17,22
18:8,21 21:4,8
21:12,14 26:24
30:14 31:21,21
34:16 35:7,10,19
38:25 41:24,24
41:25 49:18 50:2
56:3,7 74:3,4
78:12 80:11 92:5
92:12 97:13
101:10 102:20
102:24 103:6
109:20 118:5
121:8,10 123:23
CMS-related 32:7
CNN 5:1
code 102:23,23,24
103:3,4
codes 103:4
coding 102:16,19
102:22 118:11
collectively 13:18
College 12:2 24:3
come 39:3 70:21
108:14
comes 19:22
coming 27:3

commencing 1:16
commission 18:10
18:11 129:13
Commission-ce...
18:9
commit 66:2
committed 60:20
committee 19:2,3
19:7,16 20:5,7
commonly 7:14
COMMONWE...
1:1
communicated
70:2
communications
52:4,10 72:19
Comp 28:18,19
36:11,14,23
41:22 49:7 64:8
64:19 69:21 70:3
70:18 71:9 72:23
73:6 77:8,14,16
77:20 78:7 79:18
79:20,23 80:5,9
80:19,23 81:4,7
82:7 84:4,8
86:19 91:13,18
91:24 92:25 93:1
93:2 101:21
107:20 120:5
123:18 126:14
companies 69:16
73:13 109:10
company 7:10
8:22 18:1 31:6
80:7 81:3 87:15
87:24 88:3 95:21
103:3,8 109:2
110:11,12 113:5
complaining 81:1
89:3 92:2
complaint 31:5,15
32:3,7,11,16,22
33:1,3 34:6
68:10,12 86:16
complaints 73:7

77:12
complete 5:5 6:13
129:8
completely 41:5,5
91:10,11
complex 110:22
111:2,9
compliance 16:18
16:21,22,25
17:16 19:2,3,6,7
19:20,23 20:4,6
20:23 75:2 97:9
101:11 109:19
113:4
compliant 21:7
59:9 69:14 91:11
91:11
comply 56:21 57:3
57:13 97:10
complying 3:17
3:20 117:6
121:23
compound 26:8
Comprehensive
28:15 55:23
comprise 105:2
comprised 105:17
comprises 14:7
106:14
computer 23:3
concern 36:15
concerning 15:1
15:24 49:2 93:12
CONCLUDED
128:8
conclusion 68:4
96:16 97:8,9,16
97:24 98:8
107:23 108:3
113:11
conduct 19:18
conducted 16:22
confidential 31:1
confined 32:7
confirmation
76:23

Anand P. Lalaji, M.D.   4/3/2023

133

confirmed 22:21
confused 40:7
  45:12
conjunction 17:13
connection 54:18
consequences
  78:25 79:9,14
  81:23 83:7,16
  84:1 92:8
consider 73:13
  101:4,24 102:9
considered 42:2
  80:19
conspires 66:2
constitutes 46:25
  50:3
consulting 74:23
  74:24
consulting-type
  17:12
contain 60:6,22
  125:17
context 90:7,8,8
continue 67:6
contract 25:21
  82:7
contractor 8:2
  56:2,5 116:21
  118:13,13,14
contractors 55:12
  55:14,17,21,24
  57:6 118:12
contracts 25:2
contradictory
  72:12
conversation
  90:15
conversations
  72:3,15
convince 91:17
COO 10:15
copy 6:10,13
  32:17 44:17
copy's 117:14
corporation 7:11
correct 7:17,24

8:9,12 11:25
12:3,10 13:13
14:12,21 15:4
18:13,16,17,19
18:20,22 19:17
20:3,5,7 21:23
22:11,13,18 23:1
23:11,19 24:1,6
24:7 28:17,24
29:7,8,24 30:12
31:2,6,23 34:8,9
35:3 37:3 38:20
39:12,16,17,20
40:14,24 41:14
41:15,18,22
45:13,18,19
46:15,20,21 47:1
47:9,14,19 49:8
49:10 51:13
54:11,19 55:12
55:13,15,16,18
55:19,21,22,24
55:25 60:4,5
61:25 62:15 63:9
63:14 67:1,2,5
67:22 69:8,10
71:13,23 72:2,5
72:18 73:10 75:6
75:7,10,12,18
76:6 77:6,11,16
77:22 78:4 80:7
81:17,20,25
83:10,17 85:4
89:5,6,18,19
90:2 93:8,9,14
93:16 94:7,10,11
94:23,24 98:5,6
101:6,8,22 103:9
103:10,22,23
105:18 106:2
107:10,11,21,22
107:25 108:1,5,7
108:21 110:7,23
113:10,12,13,20
114:25 115:8,10
115:12,13 120:5

120:6 121:18
122:15 125:12
126:15
corrected 71:22
correction 20:15
correctly 121:7
correspond 48:20
correspondences
  72:22
corroborates
  44:10
costs 66:19
counsel 5:9,10
  9:23 10:16,24
  13:14 14:6 44:19
  74:9,24 75:1,19
  75:20,22 76:5
  103:19 113:8
  117:23 129:5,10
counsel's 63:16
country 8:15
  110:11,24
COUNTY 129:1
couple 21:16 94:2
course 30:19
  43:12 87:10
court 1:1,13,21
  15:15 53:16
  129:2,22
coverage 118:11
covers 7:2
CR 52:23
crap 126:7
credentialed
  92:21 112:20
  113:1 115:17
credentialing 9:3
  93:3 101:17,20
Crider 33:14
  34:12
criteria 20:23
  123:7
Crystal 27:23
  72:23 84:18
  86:22 87:11
CT 111:2,11

CTA 111:2
cure 60:6,12,12,23
  60:25 62:14 63:8
  63:14,15 93:22
current 43:22,23
currently 83:14
Curriculum 3:6
CV 6:10,13
cybersecurity
  20:24
cycle 102:21

D

D 2:4 58:14,25
  66:3
daily 9:24 11:5
Dallaire 10:23
  74:9
damages 66:13,20
  82:23,25
date 33:15 68:22
  86:10
dated 3:4,8,15
  125:16
day 10:10,11 11:5
  11:11,12 21:16
  35:12 84:10
  129:15
deal 22:14
dealing 11:20,21
  11:22,22
December 73:21
  73:22
decides 82:24
decision 114:16
  114:23
defendant's 95:19
  96:7
defendants 1:10
  2:8 32:13 83:8
Defendants' 3:8
definition 66:23
definitive 60:19
defraud 67:13
delays 104:7
delegate 124:15

delegated 103:8
delegates 56:3
deliberate 67:10
  67:15
deliver 111:3
delivering 113:1
delivers 125:25
denial 57:10,22
deny 56:20 57:1,6
  57:7,13,18 58:9
  58:10 59:14
  119:5
Depending 115:9
depends 24:24
  92:24 104:19
  115:5
deposition 1:3,12
  1:18 3:3 4:13
  5:9,14,20 6:15
  12:16 14:9 25:9
  44:21 45:9,16
  68:11 88:20
  92:18 117:19
  122:5 128:8
  129:11
describe 8:24 87:5
described 18:7
designated 101:1
designation 80:12
despite 96:4
detail 53:20,21
determine 97:14
  114:21 118:10
determined 75:11
  75:14
determines
  118:14
detriment 83:6
developed 104:10
development 9:22
  10:15,23
device 29:10
diagnosis 30:2
  33:17,23 34:5
  72:7 110:23
diagnostic 78:8

Anand P. Lalaji, M.D.   4/3/2023

134

95:25
**Dictaphone** 29:16
**dictate** 29:1,2,9
  90:23
**dictated** 22:23
  28:24 29:4,9
  33:19 39:15 47:9
  97:20
**dictation** 23:4,5
  36:16 38:9 47:8
  47:10 126:23,24
  126:25
**different** 8:16
  10:4 11:18 14:18
  20:19 21:8 30:9
  57:10 61:4 92:23
  98:17 106:4
  116:7
**diligence** 82:17
  85:6
**direct** 96:23 99:9
**directed** 54:24
  55:2,9 56:15
  79:9 98:12,13
**direction** 36:3
  54:23 56:8 81:12
  98:21 99:3,10
  123:23 129:7
**directly** 8:1 9:15
  54:15 81:3 83:13
  83:19,20 124:21
  125:11
**director** 19:12,13
  19:13 70:2,11
  74:11 75:20
  87:21 88:1
**directors** 9:3
**disability** 120:21
  121:3,11,15
**disagree** 111:25
  125:2
**disagreed** 115:5
**disbursed** 97:4
**disclosed** 12:12
  79:10 82:17
**disclosing** 34:19

**disclosure** 3:8
  31:13,16 34:11
  78:19
**discovered** 60:18
  82:3
**disregard** 67:11
**distribute** 56:14
**distributes** 119:5
**distributing** 56:6
**divided** 115:14,23
  115:25 116:6,10
  116:17
**doc** 22:12
**doctor** 7:5 8:3,5
  9:10 10:3 11:3
  12:21 14:5 15:25
  19:8 20:1 25:11
  26:5 27:9 29:14
  30:5,17 31:10,19
  32:4 34:6 36:21
  37:15 41:1,11
  42:12 44:12
  49:12 55:6 58:5
  58:6 59:7,10
  60:4,7,22 61:10
  61:21 64:4 65:19
  65:20 68:11
  70:13 78:22 79:8
  79:15 80:21 86:7
  88:25 91:16 94:3
  94:5 95:5,11
  97:8 99:15,24
  100:11,16
  101:14 102:19
  103:20 106:6
  111:14 114:13
  117:4 122:3
  123:13 124:9,18
  126:3,12 127:8
**doctor's** 63:19
**doctors** 8:7,14 9:9
  15:21 16:9 41:6
  63:21
**document** 3:20
  5:19,23 6:14
  12:15,21 14:8

22:5 43:15,18
  44:20 78:15,15
  88:19 111:4
  117:3,9,18
  118:18 122:4,14
  122:18 128:4
**documentation**
  44:9 118:21
  119:1
**documents** 3:10
  5:11 6:1 13:15
  13:23 27:11
  42:19 74:8 75:9
  75:11,15,16
  86:11,15 105:2
  106:15,18 107:7
  107:9,17,19
  119:17,21 127:8
**Doe** 95:3
**doing** 74:23 75:7
  77:24 88:14
  111:12 116:13
**dollars** 81:15
**DOs** 8:8
**double** 20:3
**download** 110:21
**dozens** 70:4,4
  91:5,5
**Dr** 2:14 3:6,10,15
  4:9 6:21 26:10
  27:14 28:1,1,6,6
  28:24 29:23,23
  32:14 33:5,9,18
  35:20 36:4,23,24
  37:8,8,12,13,20
  37:21,24,24 39:6
  39:6,8,11,11,12
  39:12,15,15,18
  39:19 40:5,13,13
  40:20,21 41:12
  41:12,18,18,20
  41:21 42:13,13
  45:21,22 46:6,6
  46:8,9,10,13,14
  46:18,19,23,23
  47:6,6,16,16

48:14 49:6,6,23
  49:23 50:2,7,8,9
  50:10,13,14,18
  53:19 58:16,24
  61:11,11,22,23
  62:20 64:9,9,22
  68:19,22 69:7,23
  69:23 70:15,25
  71:5,10,11,14,15
  71:22,23,25 72:1
  73:8,8 79:16,16
  81:10,10 89:4
  90:9 92:10 98:23
  98:25 99:6,7,11
  99:19 100:22
  121:9,14,14
**draw** 95:16
**dropdown** 22:3
**Drs** 3:15
**due** 82:17 85:6
**duly** 4:2 129:5
**duties** 9:20 15:20
  15:25 86:23
  88:13 97:11
**duty** 4:14

**E**

**e-** 59:16
**E** 2:3 48:4,9 58:17
  58:18,25 64:21
  66:3
**e-mail** 3:15 72:22
  89:11 90:13
  106:9
**e-signature** 59:18
  89:13 90:20
**earlier** 45:11
**Early** 73:21
**ease** 32:2
**easily** 33:25
**East** 1:15 2:6
**Eastern** 80:22
**education** 16:19
  17:5,13,17
**effect** 62:6 82:25
  83:6 104:14

**Effective** 43:21
**efficiency** 116:25
**eight** 19:9 122:2
**either** 8:1 15:15
  29:16 36:16
  91:19 102:25
  110:12 111:23
**elaborate** 12:11
**electronic** 22:7
  23:10 27:19 37:9
  39:20 40:23
  41:13 46:10,20
  47:12 48:9,12,14
  49:5,14,16 57:25
  58:16,22,24 59:3
  59:5,17,20,22
  62:22,23 63:2,11
  64:17 67:21 68:7
  69:18 73:9 78:4
  81:25 120:9
  121:5,20
**electronically**
  61:24 104:9
**element** 95:23
  96:13,25
**eliminate** 122:25
**employed** 8:1 71:6
**employee** 98:12
  98:22
**employees** 9:10,11
  98:14 99:5
**employment** 6:20
  6:20
**encouraged** 49:1
**enrollment** 9:5
**entities** 56:14
  59:13 80:7 81:3
**entitled** 3:17,20
**entity** 17:14 25:22
  109:18
**entry** 119:15,16
  119:19,20,21
  125:17
**ERAD** 27:20
**error** 55:23 93:20
  93:21 119:6

Anand P. Lalaji, M.D.   4/3/2023

135

especially 38:13
essentially 27:15
  58:19,20 88:12
  114:6
established 105:1
et 1:4,9 9:5 18:4
  18:11 25:22
  48:19 74:8 86:11
  86:23 90:15
  122:21 123:2
  126:4
Europe 111:10
evaluate 114:18
event 71:21
eventually 87:23
Eversole 27:23
  72:24 84:19
  86:22 87:11
everybody 78:3
Everyone's 126:4
evidence 96:3
exact 8:4 9:12
  17:10 41:19
  70:11 79:24 81:5
  94:18 115:21
exactly 33:21 38:4
  43:4 63:3 75:2
  78:16 82:5 83:1
  84:24 86:10
exam 22:2 111:6
  111:16
Examination 2:21
  4:4
examinations
  21:18
examined 4:3
  129:5
example 26:1
  33:10 44:8 48:17
  68:18
examples 61:4
exams 79:21
  112:10,12 125:8
exception 5:15
exceptions 60:8
  61:1,2 126:6

excuse 28:10
  59:10 64:2 75:25
  79:15
executive 6:22
  7:10,12 9:17
exhibit 3:2,5,7,9
  3:11,14,16,19
  5:13,21 6:11,16
  12:9,13,17,20
  13:8,11,12,19,20
  13:25 14:7,10,19
  26:3,4,7,14,22
  27:7,8,11,13
  31:4,7 32:2,3,4
  32:25 33:2 35:6
  35:23 42:21
  44:16,22 45:11
  51:14 53:19 68:9
  68:10,14,15
  84:16 85:3 88:21
  94:2,4 95:14
  100:15 104:25
  105:2,4,5,17,20
  106:1,1,14,17,20
  107:6,8,8,10,11
  107:15,16,16,18
  107:18,24 108:5
  108:14,15,17
  109:13 117:4,8
  117:17,20,22
  122:1,6,8,12
  127:11 128:4
Exhibits 2:20 3:1
existence 86:3
expense 116:19
experience 108:22
  108:25 109:12
  109:16,17
expert 3:8 12:14
  14:15 17:12
  30:14,16 34:16
  52:5,11 78:13,19
  79:10 101:10,11
  101:23,25 102:9
  102:14 114:19
expertise 101:1,5

101:14,14,16
  103:7,16 114:5
  114:11
experts 97:12
expires 129:13
exposed 110:16
express 60:22
extension 56:7
extent 108:20
eyes 111:8

F

F 66:3
facilities 25:1,18
facility 9:25 24:12
  24:16 79:21
  80:10 92:24
fact 3:17 5:15
  24:3 69:11,12
  71:20 80:14 96:7
  96:11
facts 26:5,12,15
  26:21 27:9 28:11
  100:4 107:19
  108:4 129:3
factually 100:8
failing 56:21
failure 57:3,13
fairly 77:21
falls 34:14 126:1
false 27:1 31:22
  35:13 41:5 42:2
  42:4,5,16,17
  49:20,21 50:4,23
  50:24,25 51:4
  57:11 60:11,14
  60:16,19 61:8
  65:8,9,13,17,24
  66:1,1,5 68:20
  68:20,25 69:3
  75:3 80:15,20
  91:11 93:6,13
  95:19,24 96:7,14
  97:1,2,7,11,15
  97:21 98:9
  101:11 102:1

105:15 108:18
  109:1
falsely 50:18 97:3
falsity 67:10,12
familiar 80:23
far 36:7 82:5
FAYETTE 129:1
federal 26:11 27:2
  66:12
fee 116:16,20,22
  116:22
fee-for- 118:8,23
fee-for-service
  118:7 122:21
fees 116:18
fellowship-train...
  102:11
FFS 118:9
field 100:25
fifth 78:24 79:6
figure 93:19
filed 1:19 5:19
  6:14 12:15 14:8
  34:7,8 44:20
  88:19 117:18
  122:4
filing 14:20
fill 99:13
final 113:2
finance 19:13
find 64:25 65:18
findings 22:4
fine 32:23
finish 5:2 22:14
  22:15 51:5 89:22
  90:4
firm 17:12
first 4:2 5:12 6:9
  26:4 29:22 45:23
  46:11 59:2 69:1
  82:2 86:6,6
  94:25 111:18
  112:22 115:6
  118:2 119:18
  123:5
five 36:8 82:9

105:24
five-year 16:17
fix 23:24 24:6
  71:14,15
fixed 70:15 71:11
  71:17 72:13
  115:7 116:3
fixes 127:1
fixing 37:16 70:4
  70:9
flight 100:12
focused 79:20
folks 7:22 8:13
  9:15,19 10:4,5
  10:14 18:1,18
  20:2
folks' 4:20
follow 19:1 85:1
  109:20,22
following 92:10
  123:7
follows 4:3
foregoing 129:7
forgot 88:2
form 17:5 74:7
  98:16 99:13,20
format 111:17
forms 98:14,25
  99:2
formula 18:2
forth 13:7,12
  14:19 26:14
  27:13 32:19
forthcoming
  38:13
found 87:11
four 9:18,18,19
  10:14 32:13
  35:23 48:7 82:9
  84:17 86:25
  87:18 106:4
fourth 5:16 31:17
  79:6
fraud 31:21 33:10
  37:10,12,13 82:4
  82:6

Anand P. Lalaji, M.D.   4/3/2023

136

fraudulent 37:5,7
41:6 65:24 66:2
free 116:13
frequently 71:3
119:8 123:4
front 5:11 6:11
13:18 65:10,19
65:20 117:4
full 82:22
fully 32:19
function 25:24
fund 123:1
funding 80:12
further 32:14
76:19
future 39:2 69:12
83:1

**G**

G 2:9 66:3,4
gather 6:1
gathering 86:11
86:14
general 9:23
10:16,23 11:24
30:4 65:22 74:9
74:24 75:1,19
generally 26:7,10
30:21,22 96:3
generated 33:9
Georgia 31:6,15
31:22 32:4,6,16
33:3 34:6 54:8
54:10 68:12 85:3
103:21,25
Gillum 27:25 36:1
72:24 82:11
84:11,22 85:14
85:15 86:12,17
86:17 87:13,17
87:20,24 88:4
103:24
Gillum's 88:6
give 4:14 5:4 8:5
12:21 43:3 47:3
52:18 91:24

103:24 108:8
119:20
given 36:1 82:11
84:15,16,22 87:7
87:7 89:4,24
93:5 111:18
129:9
giving 37:8 51:1
114:17
glasses 43:13
global 110:13,24
111:19
globalized 112:6
globally 24:17
go 4:12 10:10,11
10:12 13:19
16:23,24 19:5
23:15,23,23
35:23 37:19 40:7
44:1,3 48:4,7
50:5 52:20,24
58:8 60:21 63:6
64:21 65:1,20
66:4,24 67:6
68:9 69:7 70:23
74:4,4 76:11,19
78:18 82:6 83:13
83:19,19 85:10
88:15 90:3
100:15 106:8,8
110:17 113:23
119:23 125:3,9
goal 122:24
goes 18:5 24:20
36:7 58:19 74:3
82:6 83:12 106:6
going 4:11 5:4
12:8,9 13:6,24
14:17,19 20:1
26:13 28:19
31:18 50:21 51:9
53:5,10 63:23
64:5,16 66:16
76:9,16 77:5,8
78:23 82:13 83:2
84:19 91:9,15,19

91:22 92:14
102:6 109:18
123:24
government 66:8
66:10,14,18
82:23 83:2,12,18
84:2
government's
95:23
governmental
73:14
governs 108:17,18
Gram 1:9 2:8
70:24 78:7 79:23
80:5,25 84:9
85:8,18 86:20
87:16 88:7
ground 27:25
38:14 70:2,8
86:13
Group 2:9 6:23,24
7:23 8:2 9:10
10:7 24:11,13,15
24:25 82:16
groups 57:5
guess 7:13 10:12
14:18 17:4 24:12
92:8,19 112:21
113:8
guidance 17:17
20:9
guideline 16:22
guidelines 18:25
21:5,8 58:14
76:14 105:15
109:23
guys 91:3

**H**

H 2:9
half 73:24
Hamm 2:11
hand 44:15
129:15
handwriting
59:23

handwritten
120:9
Hang 65:18
happened 71:3
91:23,25 121:12
126:10
happens 110:9,18
111:1,20
harm 73:6
harsher 127:25
Hazard 2:8 70:24
78:7 79:23 80:6
80:25 84:8 85:8
85:18 86:20
87:16 88:7
head 19:12,13
headquarters
10:1,6
health 34:11,20
35:6 73:19
103:11
healthcare 17:16
28:7 48:2 55:6,8
75:1 95:21 113:3
hear 61:10 100:13
heard 76:21,24
89:11 104:3,11
heart 95:3 97:5
help 28:14 74:10
105:3
hereto 32:17
129:4
hereunto 129:14
hey 91:3
HHS 73:19 74:1,4
74:6,14 76:16
77:5
high 81:21
highlight 51:11
95:10,12 122:17
highlighted 43:6,7
43:9,11,14 44:11
44:18,19 45:1
51:17,17,25
53:21,23,25 54:3
54:12,16,16

66:25 67:3 95:8
98:4,11 107:4
117:15,23 125:1
highlighter 45:3,6
highlighting
122:13
highlights 122:15
highly 67:15
HIPAA 15:3,3,19
17:22 18:8,21
20:22 21:2 30:4
30:6,15,18 34:15
34:18 100:21
101:5,6,7,9,14
HIPAA's 101:12
hire 87:17
hired 87:13,24
88:4
hit 22:6 23:2,10
113:23
hold 25:6,7 26:16
51:20,22 68:2
76:3 92:4 105:19
HOLDINGS 2:9
hospital 24:12,23
25:21 92:20,22
110:16,18
112:20 115:17
hospitals 7:3 53:1
92:23
Hostettler 2:10
14:4 25:6 26:16
31:8 32:5,20
33:2 34:21 42:24
43:5,16,21 44:15
44:25 47:20
51:11,15,20,22
52:13,15,17,22
53:4,9,14,18
58:3 62:10,25
63:19 64:5,10,20
65:12 67:3 68:2
75:24 76:3,9
79:5 92:16 96:15
96:22 99:22,25
100:5,11,24

Collins Sowards Lennon Reporting, LLC
859-402-0900

Anand P. Lalaji, M.D.   4/3/2023

137

102:5 103:22
106:13,19,23,25
116:8,15 117:14
120:16,22
127:15,19,22
128:3
**hour** 1:17 47:24
**hours** 11:16 21:16
**How's** 95:13
**HR** 19:11,11
**Human** 73:19
**hundred** 37:3
40:16 42:17
50:24 51:8 58:22
71:16,20 78:3
86:9 125:8
**hundreds** 38:5
90:14 114:8
126:11
**husband's** 95:21

**I**

**ID** 129:25
**idea** 69:4 77:1
94:17
**identification**
5:22 6:17 12:18
14:11 44:23
88:22 117:21
122:7
**identified** 8:20 9:9
12:14 17:8 57:1
**identify** 9:19
125:18
**identifying** 122:20
**ignorance** 67:10
**III** 2:3
**image** 29:24,25
**images** 7:7 21:21
23:15,18,23,25
24:5,8,9,21
41:23 69:5 90:22
91:1,7 112:1,25
113:21
**imaging** 25:22
**immediately**

19:23
**implementation**
82:10
**implemented**
118:5
**important** 4:25
6:8 66:23 104:18
104:20
**impression** 69:3
**improper** 77:13
81:2,24 89:20
118:6,15 122:25
**improve** 116:24
**inadvertently**
64:22
**inappropriate**
89:3
**inappropriately**
79:17
**included** 75:12
78:2 106:10
108:5
**including** 4:20
53:1
**incorporated**
32:18
**incorrect** 100:8
109:15
**independent** 8:1
**Index** 2:17,19
**India** 110:14,19
111:11
**indicated** 55:24
**indicating** 44:25
**individual** 48:21
64:24 65:3 72:3
73:2
**individuals** 9:6
**Inflation** 66:12
**inflow/outflow**
88:11
**information** 19:14
21:3 30:12,24
31:2 34:11,20
35:6 48:24 49:13
65:5 67:8,9,11

67:12 89:5,18,25
103:12 112:24
125:18 126:10
**informations** 36:2
**informed** 19:23
**infrastructure**
8:21
**initiated** 31:5
**initiates** 18:24
**input** 76:15
**inquire** 101:13
**inserted** 5:17
**installed** 36:6
**instructed** 69:15
**instruction** 18:16
**instructions** 17:21
82:12 99:2
**instrument** 5:18
**instrumentality**
73:15
**instruments** 27:5
27:11 74:20
**insurers** 49:2
**integrity** 3:12
26:25 43:19
53:22 55:14,17
107:1,3 119:3
125:21 127:11
**intend** 13:11,17
**intent** 32:8 33:22
67:13
**intermediary** 23:8
**internal** 18:19,20
18:20
**internally** 16:23
111:18
**interpretation** 7:6
29:6 69:2,22
72:1
**interpretations**
11:14 21:25
41:21
**interpreted** 27:10
29:25 102:25
**interpreting**
21:19 72:4,16

107:8 114:5
**interventional**
25:20
**interview** 85:20
**interviewed** 87:23
88:4
**intro** 122:22
**involved** 74:15,17
74:19,21 85:15
86:13,20 93:12
110:6
**involvement**
74:22 75:4,13
**ish** 9:14
**issue** 29:22 40:25
42:13,14 45:20
91:24
**issues** 29:23 31:14
71:21
**it'll** 4:22

**J**

**jack** 88:10
**James** 98:24
**Jane** 95:3
**January** 73:21,22
129:13
**jeopardy** 80:17
**job** 9:20 88:6
97:12,12
**Joint** 18:9,10,10
**Journal** 104:14
**July** 86:9
**June** 86:9

**K**

**K** 10:21,22
**keep** 50:21 51:9
53:10 66:16
**Kentucky** 1:1,14
1:15,19,22 2:6
2:12 52:6 53:16
80:22 93:1,3
129:1,3
**kept** 59:8
**kind** 4:12 6:19

7:18 10:4 11:23
15:20 18:5 72:11
93:20,20 94:17
104:13,25
**knew** 71:1 80:16
83:3 86:3
**know** 4:9,13 5:2
8:4,16,17 9:4,12
11:15,18 15:3
16:15,24 17:10
18:5,9 19:10,24
20:24 21:3,4,6,7
21:17 23:21
24:15,19,22
25:19,21 26:10
26:19 27:18,24
28:11 29:11,13
30:23,24 31:1,11
32:21 33:21,24
33:25 34:1,2,3,4
34:18 35:1,11,20
36:6,7,7 37:20
37:24 38:3,6,7
38:12,13 39:2,3
39:22 40:2,10,11
40:13 41:16 43:6
50:20 51:2 53:7
58:11,20 59:21
60:7 61:1,3,3,5,8
64:17 68:5 69:6
69:11,12 70:5,6
70:10,11,23 71:2
71:3,17,19 72:9
74:13 77:5,7
78:9,10,13,16
79:11,17,24,25
80:8,15 81:5,6,8
81:14,19 82:8,13
82:21,23,24 83:1
83:1,22,23,25
86:14,18,22
88:10,12,14,24
89:23 91:3,4,4
91:21 93:21
94:15,18 95:16
96:20,20,21 97:5

Anand P. Lalaji, M.D.   4/3/2023

138

97:15 99:16
100:4,9 101:2,3
101:19,25
102:13,25 103:1
103:2,14,15,16
108:12,18
112:14 113:3,23
114:21 115:5,6
118:1 119:13
120:25 122:23
122:24 123:23
124:4 125:14,20
125:21,24 126:1
126:6,21 127:10
127:17,21,23,24
knowing 67:7
82:5 96:4 109:19
knowingly 65:23
65:25 66:4 67:7
knowledge 67:9
114:4
knows 20:25 84:3
84:3 127:19
Kramer 10:19
KY 129:22
KYNP62884
129:25

**L**

lack 101:6
Lalaji 1:10,12 2:9
3:4,6,15 4:1,8,9
6:21 10:24 32:14
33:5 39:8 53:19
58:16,24 63:25
64:1,22 71:5
Lalaji's 3:10
large 1:14 17:15
129:3
lastly 21:4
late 125:4
law 1:14 18:25
27:1 35:19 47:15
49:18,19 50:23
52:7 80:22
105:14 107:9,9

108:17
laws 26:12 27:2
48:21 107:12
109:20 125:25
lawsuit 54:10 74:5
86:11,18
lawyer 62:17
75:20,23 94:7,8
94:22 98:3
103:20,20
lawyer's 124:25
lawyers 75:17
layman's 7:14
leadership 9:17
learned 15:23,24
Learning 3:20
leave 100:12
left 31:25
legal 17:21 68:3
94:9 96:16 97:8
97:16 100:3
121:20
legally 97:10
legislation 105:16
length 32:19
let's 6:19 19:12
26:2 28:10 33:9
35:5 40:7 41:8
46:12 48:4,11
50:5 51:9 60:21
64:21 65:8 66:22
67:19 68:9 69:1
78:18 89:7 91:7
92:25 94:25
95:17 98:1
100:10 107:5
108:25 117:2
118:5 119:24
120:8 121:23
level 20:9 58:9
Lewis 53:15
Lexington 1:15
2:6
liable 66:9,18
license 80:17 93:2
licensed 95:22

96:9,11
licensing 9:4
light 107:9
line 5:16 39:4
74:12 78:24 79:6
lines 95:16
list 84:16,25 86:23
99:4
listed 61:1,2
litigation 54:18
60:17
little 40:6 92:11
117:1
live 10:3
LLC 2:9,9
located 1:14 8:14
log 60:15 61:3
logged 27:25
90:21
logging 38:10
login 36:2 39:5
87:7 89:5,18,24
logins 49:24 67:16
82:12 84:15
89:12 90:17,25
91:25 100:22
logs 39:4,5
London 2:12
110:14
long 12:24 13:4
87:15 88:23
look 5:13 6:12
12:13,22,23,24
26:2 35:5,22
51:19 58:19
62:19 65:8 68:9
69:1 70:25 78:18
78:22,23 88:23
89:7 90:7,19
94:25 98:1 111:1
112:13 114:22
117:3 119:24
120:8 121:23
122:23
looked 30:1 39:23
40:2 93:11,23

looking 43:18,25
45:10,13 65:13
66:25 69:4 85:2
85:3 88:24 92:9
107:7 108:14
111:8,11
lot 10:4 26:19
78:2 90:14
112:12 119:10
low 9:14
lower 92:2 116:22
Luke 2:4
lumping 64:23

**M**

M.D 1:10,12 2:9
3:4 4:1 29:14
91:2
MAC 56:4,5,19,25
58:9 59:13 119:4
Maclin 2:3,21 4:5
4:10 14:1 31:12
31:25 32:12,24
33:4 43:10 45:4
47:22 52:3,14,16
52:20 53:3,5,12
53:17 63:23 64:2
64:7,15 65:15
76:1,7 88:15
96:18 100:2,7,13
105:3,20 106:17
106:20,24 107:3
116:12 117:16
122:10 127:17
128:1,5
Madison 17:19,20
18:23 20:13,14
20:16 33:14
34:12
Mahender 33:11
35:14,18 68:21
main 1:15 2:6,11
10:1,6
maintain 60:1
122:25
majority 37:4,25

38:16 81:15,16
making 13:24
21:16 24:10 70:5
73:7 74:25 92:20
112:1,3 125:7
malpractice 49:2
69:24
man 34:12
manage 8:18
118:12
management
19:14 102:22
103:12
manager 27:24
36:1 38:14 70:1
70:8 86:13 88:9
managing 8:22
mandate 36:3
Manley 75:23
manner 91:9
112:11
Manning 17:18
18:24 20:8,11
74:23 75:14,24
75:25
manual 3:12
24:6,25,25 32:1
35:12 43:19
53:22 54:14 78:2
107:4 119:3
125:21 127:11
mark 88:16 119:8
marked 5:12,20
6:11,15 12:9,13
12:16 13:19,20
14:9 26:3 44:21
45:10 88:20 94:4
106:21 117:19
122:5
Martin 17:18
18:24 74:24
75:14
Marybeth 1:13
88:16 105:20
122:11 129:2,21
material 66:1,6

Anand P. Lalaji, M.D.   4/3/2023

97:21
materiality 95:23
  96:13,25 97:2,5
materials 6:2
  74:25
matter 41:25 54:4
  96:10 123:21
  126:2,3
matters 11:22
  32:8,10,15 82:20
McBrayer 1:14
  2:5
MCH 36:10
MCHC 27:21
  33:9 35:23 71:7
  84:17 87:1,9
  89:11 90:9,17
mean 8:15 21:19
  23:15 25:25 26:7
  36:10 38:21
  39:13 41:5 55:4
  55:5 64:2 67:7
  75:8 92:16 93:18
  93:19 104:6
  107:10 116:1,3
  127:9
meaning 30:1
  38:10 40:16
  48:13 55:3 72:9
meaningful 20:23
means 37:25
  67:23 81:16
  127:12,13
meant 83:17
measure 118:6
mechanism 27:20
  30:25 46:11 68:7
  114:9 115:19,22
mechanisms
  86:12 110:25
Medicaid 14:20
  14:22 15:1,19,19
  16:11,11 17:22
  21:5 30:15 93:12
  93:23 102:1,19
  107:9 115:7

116:5
Medicaid/Medi...
  18:21 35:7 93:7
Medicaid/Medi...
  80:4
medical 7:25 8:7
  8:14,19 9:8 11:3
  15:20,25 16:9,14
  16:15 19:12 21:3
  21:17 22:11
  24:12 30:11,11
  30:17 33:17 44:4
  45:24 55:20
  70:13 100:23
  103:5 111:10
  118:21 119:15
  125:5,17
medically 123:2
Medicare 3:12,18
  3:20,20 14:22
  15:2 16:11,11
  17:22 21:5 26:11
  26:25 30:14
  34:16 41:6 43:19
  44:4 45:24 50:2
  50:19 53:21
  55:12 56:1,3,4
  74:3 78:12 92:5
  93:3,4 95:20,24
  96:3 97:13
  100:17 102:1,20
  105:14 106:24
  109:23 115:8
  117:6 118:7,8,11
  118:14 119:2,3
  121:23 123:1
  125:5,20,24
  126:9 127:10
Medicare's 44:8
  46:3 119:1
Medicare/Medi...
  18:8 35:9,10
  80:10 107:12
medicine 11:14
meet 19:4 119:1
meeting 19:19,23

meetings 11:17,19
  18:4 54:7
member 12:1,6
  103:11
members 86:18
memberships
  12:4
memorialize
  21:24
menu 22:3
met 123:7
method 48:22
  49:5,16 65:4
methodology
  58:21 82:24
methods 48:17
  49:3
Michele 17:19,20
  18:23 20:12
middle 92:9
Milby 2:11
mind 81:17
minimal 61:6
minute 5:13 13:19
  14:13 25:6,7
minutes 43:3
missed 112:15
missing 33:25
  61:12,16,17,19
  62:14,18 63:8,17
  63:20
mission 122:24
mistake 93:21
mistakes 61:6
misunderstood
  59:10
misuse 48:16
MLN 3:17
modification
  48:19
modified 113:21
modify 111:24
moment 25:3,5
  69:13 78:9 82:6
  108:6,8
moments 35:8

Monday 1:16
money 60:13 66:7
  76:17,18 97:3
  98:16 119:5
month 80:1 81:7,9
monthly 19:5 20:6
months 73:25
  82:4 87:18
Morgan 2:4 44:14
  44:24 45:8,15
Morris 17:18
  18:23 74:23
  75:14,23
Morton 98:21
  99:1
Mountain 28:15
  28:18,19 36:11
  36:14,23 41:22
  49:7 64:8,19
  69:21 70:3,18
  71:8 72:23 73:6
  77:8,14,16,20
  78:7 79:18,20,23
  80:5,9,19,23
  81:4,7 82:7 84:4
  84:7 86:19 91:13
  91:18,24 92:25
  93:1,2 101:21
  107:20 120:5
  123:18 126:14
MRI 124:3
MRIs 7:19,20
  11:15 111:12
MSNBC 5:2
multiple 113:16
Musculoskeletal
  102:3

—————
N
—————
name 4:6 17:10
  28:3 33:13 48:22
  65:3 70:11 74:10
  88:1,2 98:23
name's 4:9
named 17:20
  34:12 129:4

names 10:17
Nancy 27:23
  72:23 84:19
  86:22 87:10
  88:12,14
national 7:1
near 39:2 110:17
necessitated 98:16
necessity 103:5
need 4:20 5:2
  12:24 13:2 18:6
  21:6 24:4,5,6,21
  43:5,15 48:12,15
  48:17 52:9 88:23
needed 51:19
  70:18 75:12
  114:8
needing 35:25
needs 71:11
  100:11
negatives 20:3
  72:10,11
Network 3:20
neurological
  95:20 96:1,8
neurologist 95:22
  96:2,9
never 18:12,14,15
  35:24 36:10,14
  36:23 67:20 83:4
  87:3 91:23,25
  93:5 104:13
new 52:6
news 89:11
nine 19:9 58:10
  82:4
nod 15:12
non-U.S.-based
  112:5,19 114:1
  115:2
nondoctors 27:16
nonmedical 27:15
  71:8
nonphysician
  118:20,20
nonradiologists

**Collins Sowards Lennon Reporting, LLC**
**859-402-0900**

Anand P. Lalaji, M.D.   4/3/2023

140

27:16 119:10
**nonsensical** 73:1
**nonsensical-type**
72:8
**North** 2:11 12:7
**nose** 120:25
**Notary** 1:14 129:3
129:24,25
**notes** 119:12,14
**noteworthy** 19:22
**notice** 1:4,19 3:3
5:14
**noting** 16:24
**number** 8:4 9:12
14:18 26:3 35:23
38:4 41:19 58:9
58:10 84:17
86:25 92:2 98:18
98:23,24

**O**

**oath** 4:2,13
**object** 25:7 26:16
31:8 42:24 58:3
62:25 102:6
127:15
**objection** 34:22
52:12 68:2,3
96:15 99:25
100:25 116:9
**obligation** 66:6
99:7
**obligations** 15:24
16:9 30:18,20
**obtain** 39:4,4
**obtained** 60:14
**obviously** 19:20
87:2 95:15
**occur** 25:17 82:1
**occurred** 80:16
81:23,24 82:1
**occurring** 82:20
**offer** 12:9 13:7,11
13:25 26:6 73:5
101:5 115:19
**offered** 93:5

**offering** 26:3 77:9
100:2
**offhand** 78:16
**office** 9:25 10:6
11:6,10 98:24
129:15
**officer** 6:22 7:10
7:12 9:1,2,21,22
9:22 10:15,16,20
10:23,25 19:11
19:11,19,20
**offices** 1:14 85:17
**official** 82:16
115:20
**oh** 11:13 20:14
78:20 79:7
100:20 106:8
122:10 126:7
**okay** 5:6 6:5 14:4
14:17,23 17:1,9
21:15 25:12
27:14 28:19
30:15 35:10
36:13 43:16,24
44:2 45:23 46:12
48:4,11,14 51:24
52:14,16 53:3,17
55:7 56:1 58:1
58:19 59:19,20
61:20 62:2,13
63:16 65:8 66:24
67:6 68:14,17
73:5 75:17 76:13
79:7,7,14 86:24
90:5,6 95:4,15
101:16 106:4,12
106:19,23,25
108:13,24
111:20 113:7
120:3,22 124:6,7
127:23
**old** 77:24 78:1
**omission** 109:8
**omissions** 93:22
**on-line** 74:6
**once** 12:21 22:6

23:12 41:25
60:11 69:6 98:3
100:3 117:22
125:11
**ones** 39:6 60:1
**operating** 9:1,2,21
10:19 19:10,20
69:25
**operational** 88:9
**operations** 8:22
9:3,6 19:13
87:22 88:1
**opinion** 30:10
34:24,25 35:2,4
96:19 100:3
111:18,21,22
113:7 114:17,18
114:19 115:6
120:15 121:4,17
**opinions** 3:10
12:10 13:6,11,24
26:4,6,14 27:12
73:5 93:6 95:13
101:5 103:19
107:6 108:15
117:8,10
**opportunity** 5:4
**opposed** 15:11
**options** 74:3
**order** 124:3,5,16
124:16,16 125:8
125:10
**ordered** 119:17,22
120:2,7 123:8,10
123:17 124:1
**ordering** 118:19
119:9 123:9
124:1,18
**orders** 125:6
**organization**
103:15
**originally** 23:22
**originated** 112:21
**orthopedic** 11:14
102:12 124:2
126:3

**outlined** 107:19
**outside** 25:8 92:17
101:12 102:7
**overall** 35:11
**overly** 26:17
**overpayment**
122:21
**overpayments**
119:6
**overwhelming**
37:4,25 38:16
81:14,16
**owned** 80:7
**owners** 82:3,16
83:14
**ownership** 82:5
87:16

**P**

**P** 1:10,12 4:1,8
**package** 75:5
**PACS** 20:21 24:14
24:23,23 27:20
36:6 77:17,18,23
78:5 82:8,10
90:12,21
**page** 31:18 32:13
54:15 67:14 69:1
78:18,20 79:3,4
89:7,9 92:10
95:7 102:18
118:3 120:16
**pages** 48:7 51:10
57:19 60:16
68:15
**paid** 50:3,12,14
60:12 96:3 97:3
103:2,6 116:20
118:10
**Pampati** 3:15
26:11 27:14 28:1
28:6,24 29:23
33:9,12,18 35:14
35:18,20,24 36:2
36:4,17,24 37:8
37:13,21,24 39:6

39:11,12,15,19
40:5,21 41:12,18
41:21 42:13
45:22 46:6,9,10
46:13,15,19,23
47:6,16 48:14
49:6,23 50:2,8
50:10,14,18
61:11,23 63:25
64:3,9,23 65:11
68:19,21,22 69:7
69:23 70:15,25
71:15,23 73:8
77:15 79:16
81:10 83:13
84:17,18 85:7
87:1,8 88:5 89:4
89:17,21 90:10
90:11 91:14 92:3
92:10 96:9 97:7
97:19 98:8,13
99:6,7 109:22
120:5,12 121:9
121:14 124:10
124:21 126:13
126:25
**Pampati's** 40:13
62:20 71:11 72:1
100:22 120:23
**paragraph** 32:12
44:3 45:24 48:11
59:13,20 66:9
83:8 95:18
118:18,25 121:7
122:23
**paragraphs** 118:2
**part** 21:12,12
24:10 27:7 31:6
31:12,15 32:4
94:1,2 96:19
98:14,17,22
107:10,11,13
117:3,9 121:24
**particular** 37:22
57:17 67:14 69:9
69:13 96:6 103:1

**Collins Sowards Lennon Reporting, LLC**
**859-402-0900**

Anand P. Lalaji, M.D.   4/3/2023

141

123:21
**particularly** 80:14
**parties** 19:4 56:20
  129:5,11
**partly** 97:16
**parts** 111:15
**party** 129:10
**pass** 58:11
**passing** 86:21
**Patel** 1:3 2:14
  3:15 26:10 27:14
  28:1,6,24 29:23
  35:24 36:2,4,17
  36:23 37:8,12,20
  37:24 39:6,11,12
  39:15,18 40:6,13
  40:20 41:12,18
  41:20 42:13
  45:21 46:6,8,10
  46:13,14,18,23
  47:6,16 48:14
  49:6,23 50:2,7,9
  50:13,18 61:22
  64:3,9,23 65:11
  69:23 70:15,25
  71:10,14,22,25
  73:8 77:15 79:16
  81:10 83:13
  84:17,18 85:7
  87:1,8 88:5 89:4
  89:17,21 90:9,11
  91:14,19 92:3,10
  96:9 97:6,19
  98:8,13 99:6
  109:22 120:5,12
  120:23 121:9,14
  124:10,20
  126:13,25
**Patel's** 61:11
  100:22
**patient** 33:24
  69:21 91:6
  112:16,24
  119:11 124:3
**patient's** 33:13
**patients** 30:12,24

31:2 50:1 69:17
  73:6 111:12
  123:1
**patients'** 112:21
**pay** 66:7 116:1
**payback** 82:22
**payer** 9:4
**paying** 60:13
  116:15
**payment** 65:24
  95:25 115:21,23
  115:25 118:16
**payments** 56:6,14
  118:6 122:25
  125:25
**PC** 95:3
**Penalties** 66:12
**penalty** 66:10,20
**pending** 1:21
**people** 6:6 9:18
  11:24 19:9,15
**percent** 24:16
  38:1,1,18,18,23
  42:3,17 50:24
  51:8 58:22 71:16
  71:20 78:3 80:9
  80:18 81:17,18
  86:10 112:17
**percentage** 39:9
  72:18 78:6,14,16
  79:22,24 81:5,19
  81:21
**performed** 95:21
  102:25
**performing** 110:6
**period** 25:3 35:25
  70:1 80:6 81:1
**permitted** 40:21
  40:22 101:13
**perpetuated**
  33:11
**Perry** 1:1,21
**person** 5:17 15:25
  17:10 41:2 46:19
  47:17 48:2 65:21
  65:22 66:15,17

67:8 70:23 71:8
  72:22 99:13
**personal** 98:21
  99:9,10
**personalized**
  98:18
**personally** 10:9
  18:16 22:20
  73:11 87:24
  98:20 99:9 127:6
**personnel** 11:21
  27:16
**persons** 44:6 46:1
  46:5,16 57:1
**Peterson** 98:2,12
  99:1,11,19
**Peterson's** 98:23
  98:24,25
**phone** 29:16
**physical** 31:17
  89:9 120:21
  121:3,14
**physically** 24:25
  91:15 121:10
**physician** 34:3
  41:2,3 47:5
  49:15 57:21
  58:12 60:5 71:10
  72:5,17 119:9
**physician's** 44:9
  98:18,19
**physicians** 48:25
  64:12 72:2,14
  101:17 124:23
**picked** 68:18
**piled-up** 90:16
**place** 46:11,19
  47:11,17 129:4
**placed** 4:2 46:24
  61:24,24 62:9,23
**places** 50:21 53:22
**placing** 111:16
**Plaintiff's** 3:2,5,7
  3:9,11,14,16,19
  5:20 6:15 12:16
  14:9 44:21 88:20

117:19 122:5
**plaintiffs** 1:4,5,13
  2:2 4:10 79:1
  83:7,19 86:8
**Plaintiffs'** 3:3
**plastic** 126:4
**please** 4:7 5:14
  8:24 42:12 53:12
  56:23 100:16
**PLLC** 1:14 2:5,11
**plus** 66:13 82:22
  82:23
**point** 45:15 76:24
  78:24 89:10
  124:24,25
  125:12
**policies** 44:8 46:3
**portion** 106:21
**posing** 46:10
**positions** 10:14
**positives** 72:10,11
**possible** 98:15
**Possibly** 23:17
**post** 98:24
**potential** 48:15
  60:18
**potentially** 30:25
  115:4,4
**PowerScribe**
  24:19
**practice** 7:1,2,4
  17:16 20:18 63:4
  82:3,20,21 83:5
  85:1
**practices** 83:15
**practicing** 80:22
**practitioner** 71:9
  118:20 123:9
  124:2
**practitioners**
  125:23
**precisely** 81:22
**precluded** 95:25
**preliminarily**
  110:2,3,3
**preliminary**

110:15,16
  111:21 114:1
**prepare** 5:8 98:14
**prepared** 26:6
  28:23 29:3 31:14
  32:22 53:20
  98:22
**preparing** 78:8
  104:24
**preread** 111:3,17
  111:22 113:25
  114:6,10,13
  115:15 116:21
  116:22
**prereader** 116:6
**prereaders** 116:1
**prereading**
  110:15 115:18
**prereads** 116:24
**prescribing**
  118:19 119:9
**present** 2:13 4:19
  6:20 54:12,13
**presented** 65:23
  70:7 109:5
**presents** 65:23
**president** 7:10
**prestudy** 114:14
**presume** 11:7,20
**presumed** 4:22
**presuming** 40:2
  40:11
**pretty** 112:7
**previous** 35:22
**previously** 1:19
**price** 115:7 116:3
**principles** 104:22
  105:1,12
**printed** 14:2
  94:19,22
**prior** 109:12,16
**private** 21:3 30:23
  30:23 31:1
**privileged** 51:24
  52:5
**privileges** 92:21

Anand P. Lalaji, M.D.   4/3/2023

142

probably 8:16
9:13 24:16,17
36:5 90:14
problem 104:6
procedure 1:20
87:5
procedures 25:19
25:20,24,25
48:20
proceed 23:24
52:19
process 21:13
24:18 60:3,17
61:7 70:1 71:2
76:20 111:9
112:11 113:4
processes 82:19
produce 6:3,10
products 48:18
professionally
93:6
professionals 7:25
8:19 115:24
program 3:12
26:25 43:19 50:2
53:21 55:14,17
100:17 107:3
118:6,7,8,12
119:2 125:21
127:10
proof 23:12,14
67:13
proofread 29:13
proofreading 34:2
35:17
proofs 24:20
proper 58:8
properly 13:3
57:24 118:10
property 66:7
protected 34:11
34:19 35:5 48:18
52:11
protecting 123:1
protective 30:25
protects 30:11

prove 121:10
provide 20:20,21
25:23 26:22
104:24,24 124:4
124:5
provided 13:14
14:6 18:15 27:21
48:25 65:6 84:11
119:17,22 120:2
120:4,6 123:8,10
123:17,17,22,25
127:5
provided/order...
44:5 45:25 46:4
provider 48:2,13
48:23 49:17 55:1
55:3,4,6,9 60:10
65:4 98:18,23
118:19 119:15
119:19 126:1
127:4
provider's 56:20
57:2
providers 28:8
48:12,17 54:24
59:25 61:6
111:10
provides 17:7,12
17:17,21 49:15
112:8
providing 20:9
67:15 104:23
provision 60:23
97:5,14
provisions 54:1,4
60:7 75:15
proxies 41:7
proxy 37:9,14
39:19 40:13,23
40:25 41:4,8
51:1 104:10
public 1:14 34:12
34:20 129:3,24
published 16:2
pull 94:3
pulled 90:13

purpose 25:8 30:4
54:9 112:16
purposes 5:21
6:16 12:17 14:10
44:4,22 45:24
47:12,18 88:21
102:20 117:20
122:6
pursuant 1:18,19
12:8 31:4
put 69:8 75:5 76:2
76:5 80:17 89:12
90:20 98:24
puts 119:13
putting 74:19

Q

quarterly 16:21
question 4:18,21
5:6 15:9 25:10
34:17 36:18,20
40:8 41:11 42:12
42:25 54:25 59:2
59:12 60:21 63:6
72:7 76:4,8,11
76:11 79:8,10
92:15 105:11
116:9 121:13
123:5,11
questions 4:11 5:3
6:6,7 26:9 29:23
119:8 123:5
queue 29:19
qui 74:5
quote 110:2
quote/unquote
58:13

R

R 1:3 2:10
Racquel 88:2
rad 89:15 90:21
radiograph 7:14
7:16 29:7 69:22
radiographic 7:7
radiographs

21:17 111:11
radiologic 7:7
101:21
radiological 12:6
80:5
radiologist 11:4
11:15 24:20
25:23 56:9 72:4
72:15 90:25
92:20 96:11
104:7 109:24
110:1 111:5,21
112:5,13,19
114:7,24 115:16
116:21 126:2
radiologists 7:8
8:23 9:7 24:4
25:1 28:5 56:11
91:5,21 104:4
110:5,24,25
111:19 112:9,11
116:7 124:23
radiology 2:8,9
6:23,24 7:1,2,4
7:23 8:2 9:10
10:7 12:2,5
20:18 21:21 24:4
24:11,13,15,25
70:3,12 80:6,25
82:16 84:8 95:16
99:8 102:3,12
104:14,17 112:6
112:10 113:19
114:1 115:2,8,15
115:18 116:4
120:3 125:23
raises 44:15
random 118:8,23
122:19
range 8:5 9:13
rate 55:23
rates 93:20,21,21
93:22
rays 7:21
RCM 102:21
reach 113:11

reached 107:23
108:3
read 7:18,22
11:15 45:23
48:11 54:2,14
59:19 76:13
78:21 81:10
89:12,15 90:9,11
90:21 91:4,5,14
91:19,23 92:10
93:2 95:18 96:18
99:15,18 112:10
112:12 116:4,20
118:5 127:12,13
reading 7:13
74:25 78:7 110:6
121:6
readings 80:5
readout 11:17
reads 92:3,20
reality 61:15
realize 10:3 126:7
really 61:10 92:1
112:14 121:13
reask 40:8
reason 6:8 38:7
99:17 124:14
receive 81:4
received 69:25
76:23,24
reckless 67:11
recognition 22:2,6
23:5 24:18 90:23
recognize 48:13
48:15
recognized 48:21
recognizes 24:4
record 4:7,22
34:13,20 66:1,6
70:6 119:15
125:17 129:8
recording 29:10
29:16
records 30:11
100:23 125:5
recouping 119:6

Anand P. Lalaji, M.D.   4/3/2023

143

recover 66:19
recovery 55:24
reduce 104:6
reduced 129:6
reference 32:18
    54:17 83:18
referenced 125:20
references 125:22
referred 6:2 7:15
    10:15 27:5 54:3
    59:1 94:1
referring 49:4
    59:8 109:17
    117:25 118:19
refers 90:16
regard 17:6
regardless 58:12
    119:14
regards 16:19
    125:25
regular 9:16 10:5
regularly 17:25
regulation 17:18
    30:14 92:6,13
    97:13
regulations 18:7
    19:5 21:1 95:25
    96:4
regulatory 26:24
    82:20 101:10
reimbursed 99:12
reimbursement
    50:20 57:2 80:4
    115:11,14
rejoin 45:9
rejoins 45:15
related 26:11 27:2
    33:24 72:6
relates 32:6 96:6
    123:21 124:10
    125:22
relation 11:1
    72:21
relationship 24:13
relevance 34:22
relevant 19:4

reliance 27:10
relied 13:17 42:20
    42:22 104:22
    105:12 113:7,25
    114:4,5,15 117:7
rely 13:18,24
    18:18 114:3,10
    114:10,13,20
relying 59:24
remember 19:15
    22:14 90:12
remote 34:1,2
remotely 10:5,10
rendered 98:20
    99:8
rendering 99:8
    115:2
repeat 4:21 36:18
rephrase 36:20
replace 88:8
replaces 63:3
report 9:15,24
    11:25 22:9,10,11
    22:16,17,19,22
    22:24 23:12,14
    23:21,24 24:10
    24:20,22 28:4,23
    29:2,4,9,18 33:8
    33:21,23 35:15
    35:16,17,17,21
    37:2,9,21 38:11
    39:20,21,23 40:1
    40:10,12,16,24
    41:14 46:20,24
    46:25 47:4,7,9
    47:13,17,18 48:3
    50:17,19 59:4
    61:19,25 62:4,7
    62:8,12,15,19,20
    62:24 63:4,12,12
    63:18 68:6,8,17
    68:20 69:2,9,13
    70:21,24 71:1
    72:8,8,9 73:17
    74:1 76:2,5,22
    77:1,25 87:20

89:13 90:20,23
    90:24 96:10
    104:17,17 105:6
    109:24 110:2,17
    112:2,3,5,17
    113:2,21,22
    114:21,23 115:3
    120:14 127:2,5
reported 73:12,13
    77:6 87:21 103:1
    109:6
reporter 1:13
    15:15 88:18
    129:3,22
Reporter's 2:22
reporting 14:20
    15:2 16:12 76:16
    77:23 115:20
reports 28:2,7,14
    28:16 29:21
    35:23 36:5,14
    37:3,4,18 38:2,5
    38:8,17,24 39:7
    40:17 41:16,22
    49:7 50:1 60:2
    63:21,24 64:8,13
    64:18 67:18,24
    70:4,9,14 77:9
    77:10,13,14
    84:18,21 87:1,9
    91:9 99:7 107:20
    121:16 126:13
represent 4:10
    99:5
representation
    96:7
representations
    27:18 95:19
represented 50:18
    82:18 91:2
representing 28:1
    28:4 35:16 41:3
requested 72:16
    129:11
require 25:18
required 93:1

98:18 119:25
    123:6
requirement
    18:21 57:4,12,14
    93:22 109:9
    117:13
requirements
    3:18,20 14:20
    15:2,3,20 16:10
    16:25 17:23
    18:10,25 21:11
    28:9 45:18 54:21
    56:22 57:8 93:8
    93:13,13,24
    101:17,20 102:2
    117:7 119:2
    121:24
requires 21:14
    44:4 45:25 56:19
    56:25 67:13
rereview 39:13
rereviewed 39:11
research 108:13
    108:20,23
residency 16:16
    16:17
resolution 19:24
    61:7
Resources 1:9 2:8
    80:6,25 84:9
respect 67:8
    123:18
response 15:11
    77:2
responses 4:15
responsibility
    48:23 65:4
    127:13
responsible 44:6
    46:1,5,7,17 56:5
    82:22 127:4
result 107:24
retired 88:12
retiring 88:13
retroactive 125:6
retroactively

125:10
revenue 78:14
    80:1 81:6,6
    102:21
revenues 78:6
    79:12,22 80:3,18
    80:24,25
review 23:15,18
    23:19,25 24:5,8
    28:6 29:19,20
    33:20,21 35:21
    37:18 38:8 39:21
    40:21 44:4 45:24
    54:7 55:20 105:1
    108:18 109:19
    111:6 112:5
    118:13,23
    123:16 126:19
    127:4,7,14,18
reviewed 22:21
    24:7 36:16,23
    37:21 38:17 40:1
    40:9,10,12,18
    41:17,17,23
    53:20 67:21 69:7
    70:18 106:16
    110:2 113:20
    118:9 126:20
reviewers 119:3
reviewing 24:9
    38:2 67:5
revised 3:13
Ridings 2:11
right 23:6,8,9 25:4
    34:15 36:11
    46:12 48:5 57:15
    58:7 60:15 65:20
    78:13,16 79:2,5
    85:2 100:19
    106:1 108:6,8
    111:16,16 115:9
    117:3 120:19
    122:19
Rob 4:9 64:11
Robert 2:3
roughly 9:11

79:25
**route** 74:5
**routinely** 21:16
 72:14
**RSNA** 12:6
**rule** 4:25
**rules** 1:20 4:12
 109:20 118:11
**running** 16:20

**S**

**safeguards** 20:22
**sample** 118:8,23
**sampling** 118:15
**satisfied** 95:23
**saw** 34:6 86:25
**saying** 37:7,7,15
 40:19,20,22
 42:15 60:25 61:9
 61:10,17,22
 65:10 70:24 71:5
 71:5 81:24 97:6
 97:18 114:13
 121:7
**says** 32:12 33:11
 33:14 35:13,17
 38:23 41:6 42:22
 43:4 46:16 48:1
 55:11 57:25 58:6
 68:21 71:11
 78:24 84:24
 86:25 98:11
 99:18 105:23
 114:22 118:25
 119:24 120:9
 122:24 127:3,3
**scans** 7:20 111:11
**scenario** 42:10
**schedule** 14:2,7
**school** 16:14,15
**Schroeder** 10:22
**Schuette** 2:4 45:8
**scope** 25:8 42:25
 92:17 102:7
**Scott** 2:4
**screen** 29:13

**scribe** 119:12,13
**scribes** 119:10
**seal** 129:15
**second** 21:2 44:3
 44:11 45:4 50:6
 65:18 89:22 95:7
 112:13 118:3
 123:11
**Secondly** 83:3
 112:25
**secretaries** 27:22
 29:20 36:4 37:17
 38:3,12 39:1
 40:6 46:9 49:24
 49:25 50:17
 67:17,20 85:21
 96:12 99:4
 123:10 127:6
**secretary** 35:15
 37:8,15 38:11
 39:19,22,25 40:9
 40:12,15,21,23
 41:12 47:3 49:9
 51:3 62:5,9
 68:24 73:9 77:10
 81:11 89:5,25
 91:2 97:20 98:10
 119:20 120:13
 121:3,5,15,19
 123:15,17
 124:16 126:18
**section** 44:1 48:4
 48:9 49:11 50:22
 51:6,9,10,12
 54:20,24 55:2,9
 56:9,11,13,17,19
 56:25 57:16,18
 58:14,17,18,25
 60:24 64:25 65:9
 65:15 66:16
 98:11 117:25
**sections** 50:22
 51:14,18 54:13
 54:17 75:15 98:4
 122:16
**secure** 67:15

**security** 20:22
**see** 19:12 22:5
 23:20 29:11 33:5
 33:9 48:8,10
 53:3 54:21 57:9
 86:7 90:23 94:5
 95:5,5 114:16
 120:10
**seen** 5:17 12:20
 72:25 87:3
 104:13 111:4
**sees** 111:21
**self-** 109:5
**self-report** 74:2
**Selma** 74:10
**semi-annual**
 19:18
**seminars** 16:8,14
**send** 29:19 69:8
 70:14 76:17,18
 86:24
**sense** 70:5,16,22
 70:25 72:10
**sensitive** 80:14
**sent** 28:7 29:17
 106:15
**series** 112:3
**seriously** 87:3
**service** 98:20 99:8
 118:9,24 124:5
 127:4
**services** 7:3 9:4
 16:19 44:5 45:25
 46:4 50:3,13,13
 73:19 99:21
 120:2,4,6 122:19
 123:2,8,16,20,22
 123:23,25
 124:11,12
**sessions** 39:5
**set** 13:7,12 14:18
 24:24 26:14
 27:12 32:18
 129:14
**sets** 111:8,8
**setting** 9:8 71:25

112:18
**seven** 126:7
**Seventy** 81:18
**shape** 17:5
**share** 30:22,23
 31:1
**Shawn** 10:19
**Sheet** 3:17
**shortage** 112:9
**shorthand** 129:6
**show** 34:21 39:5
 42:19,22 43:4
 48:1 100:24
 108:2 116:8
**shows** 38:9 60:17
**sic** 20:8 33:15
 84:16
**sign** 29:21 35:15
 35:23,24 38:11
 40:17 41:2 63:21
 64:12 67:17,19
 67:23,25 68:6,24
 82:12 84:17,20
 86:25 87:8 99:6
 104:8 118:21
 119:9,16,18,19
 119:19,20
 121:11 125:9
 126:5
**signature** 3:18,20
 21:10 22:8,10,16
 22:19 23:11
 27:20 28:8 37:9
 37:14,17 39:10
 39:20 40:3,14,24
 41:13,14 42:8,15
 45:17 46:11,20
 46:24 47:3,12,17
 48:3,16,22 49:3
 49:4,5,14,16,17
 54:15,21 57:4,5
 57:8,14,25 58:14
 58:21 59:17,17
 59:20,23 60:10
 60:15 61:3 62:2
 62:6,8,11,13,14

62:16,20,22,23
 63:2,5,5,8,10,11
 65:3 67:16,22
 68:1,7,23 69:8
 73:9 81:13 90:1
 90:24 93:7,12,22
 93:24 98:19
 109:8 117:6,12
 119:1,25 120:14
 121:5,20,24
 123:6,6 124:4,15
 125:14,15,15
 126:8 127:1
**signature's** 61:18
**signatures** 48:9
 58:16,22,24 59:3
 59:6,22 61:11,13
 61:15,17,22,23
 63:17,20 64:17
 69:18 78:2,4
 81:2,11,25 91:1
 98:10 119:4
 121:9 124:11
 125:4
**signed** 28:2 33:11
 35:14,16,18
 38:25 39:1 46:13
 49:8 62:20 63:13
 63:24 64:8 67:24
 68:21,22 79:17
 82:7 98:22
 123:12 125:16
 129:12
**significant** 83:5
**signing** 36:5 38:3
 39:6 49:9 63:3
 68:8 77:13
**signs** 62:23 104:10
**similar** 108:4
**simple** 121:13
**simply** 40:12
**single** 24:2 36:22
 82:14 109:23
 127:2,3
**sir** 4:16,23 5:24
 8:25 10:18 20:14

Anand P. Lalaji, M.D.   4/3/2023

145

30:7 48:5 68:13
73:3
sit 8:2 39:8 77:4
81:8
site 25:19,23
91:15
situation 124:19
six 36:8 58:9 77:3
88:18 126:7
sixth 31:17
sixties 9:14
Skeletal 12:5
skipped 10:13
society 12:4,5,6
software 48:18
59:24
Solution 95:3
somebody 42:7,14
47:11 51:1 88:3
91:20 121:8
soon 98:15
sorry 6:4 17:3
20:14 31:13
100:20 105:11
122:10
sort 16:5 17:11
18:24,25 24:13
27:1 74:7 86:21
87:2 111:25
113:2
sound 113:5
SOWARDS 1:13
129:2,21
Sowders 53:15
speaking 30:21,22
specific 16:16
21:6 25:24 35:12
51:6 54:23 55:1
55:4,8,10 56:8
56:18,24 57:1,12
61:5 67:13,15
76:14 103:16
117:12
specifically 20:10
20:16 28:9 32:21
32:25 54:4 56:13

56:15 59:3,5,16
60:25 72:25 80:2
118:4 123:20
124:24 125:23
specifics 94:18
speed 104:16
spend 21:15
spent 116:5
sports 11:14
spots 51:10
stack 94:4
staff 25:1 46:19
47:17 48:2 99:13
104:7 116:16
staffing 11:22
stamp 120:13,24
121:3,8,9,15
standard 50:23
63:4
standards 48:21
standpoint 80:1
97:13 125:7
Stark 15:2,19
16:10 17:22
18:21
start 5:5 16:13
86:10
starts 52:23
state 1:14 4:6 56:4
84:14 129:1,3
State-at-Large
129:24
stated 26:7,10
35:14 42:20
129:3,4
statement 20:4
60:10 66:1,6
72:2 100:8
118:17 125:16
127:2,3
statements 26:22
states 7:3 8:17
24:17 64:24 65:2
66:10,18 95:2
statistical 93:11
93:17,18 118:13

118:14
Statistically 93:25
statistics 38:22
93:10
statute 65:14
statutes 27:2
stipulate 62:10
63:24 64:7,14,16
stipulated 62:17
63:22
stipulating 64:11
stipulation 63:17
stop 46:12 123:13
strategizing 19:24
Street 1:15 2:6,11
stress 112:12
struck 5:16
structure 18:3
studies 7:19 21:16
39:9 50:8,10
72:1 73:1 77:14
78:8 79:17 81:10
82:9 90:16,18
91:18,22 93:2
101:21 112:21
112:23 113:16
126:13
study 22:7,21
24:10 29:24 30:1
33:18 36:23
37:13 39:15
40:22 41:24
68:23 69:22
71:11,22 72:4,16
73:10 82:14
88:11 97:20
102:22,23 103:1
103:2,3 104:17
104:19 110:6,18
113:14,17,18,24
114:1,6 115:8
124:16,17 127:6
stuff 11:23 36:19
80:13
subject 56:20
submission 74:7

74:16,18 107:20
submits 103:4
submitted 38:24
50:19 60:12
70:17,20 74:12
74:20 75:6 99:20
103:6 107:13
126:14
subparagraph
64:21 66:3
subparts 52:24
subpoenas 39:2
subsection 58:25
65:22 66:17
subsequently
36:16 53:8 62:15
subsidiary 110:12
subsidies 80:13
succeeded 87:16
sued 69:17 86:8
sufficient 125:18
suit 31:21
Suite 2:5
supervise 8:18
supervised 95:22
96:8
supervising 96:2
Supplemental 3:8
55:20
supplies 123:2,21
support 9:6 27:12
95:13 98:7
110:25 114:9
115:19 117:8
supporting 3:10
supports 117:9
supposed 31:4
Supreme 53:16
sure 6:12 13:21
14:5 15:10,17
19:6 20:2 23:13
26:9 28:12 37:6
37:18 40:9,20
52:3 71:4,16,19
72:21 74:25
86:10 99:16,17

102:18 104:2
106:3 107:5
110:22 112:14
112:16
surgeon 124:2
126:4
sustains 66:14
SW 53:2,15
switch 90:12
sworn 129:5
system 20:21 22:1
24:11,14,19,23
24:24 27:20 36:6
38:9 48:17 77:17
77:18,20,23 78:5
82:8,10 90:12,22
103:6 104:4,9
119:14
systems 48:12,15
59:25

**T**

table 57:8,19,23
57:25 58:1,15
59:1,8,9,21 76:4
106:9 123:4
take 5:13 6:12
12:23,24 13:19
42:9 45:5 76:10
77:3 88:13,23
100:10
taken 1:3,13,18
45:7 77:5 100:14
129:6
takes 13:4
talk 5:1,8 6:19
14:13,17,19 23:7
28:13 31:19
51:23 52:1 61:4
85:14,17,20
92:25 103:18,19
108:25 119:12
talked 7:13 20:8
21:15 59:4 72:19
108:23
talking 28:15 30:8

**Anand P. Lalaji, M.D.   4/3/2023**

146

| | | | | |
|---|---|---|---|---|
| 31:20 38:4 55:6 59:5 85:7 92:4 99:17 100:9 105:7 118:22 120:20 123:19 | testing 55:23 95:20 96:1,8 thank 20:14 36:20 53:17 64:3,4 76:1 122:3,11 | Tinnell 74:11 today 4:13 6:3 8:3 13:3 29:12 31:19 39:8 43:12 77:4 81:9 | tremendous 112:8 Trent's 35:24 TRG 2:9 16:20 17:15 18:19 19:2 19:3 74:12 83:20 87:22 109:19,24 | 111:12,20 115:16,16 U.S.-based 113:19 114:24 uh-huh 13:16 15:5 15:12 27:6 28:20 |
| talks 122:18 tam 74:5 taught 18:12,15 teach 21:10 teaches 17:25 team 9:17 86:18 110:19 Tejal 10:24 teleradiology 7:2 110:11,12 113:5 tell 6:24 10:13 33:23 34:4 39:9 45:20 52:21 54:6 75:22 76:4 80:2 110:8 telling 52:7,8 77:21 template 22:3 111:13,15,16 templated 110:19 ten 58:10 term 111:18 terms 7:14 16:24 18:6 19:24 20:22 21:6 38:10 67:7 83:12 84:6,7 103:4 testified 4:3 14:14 51:25 99:1 testify 31:4,14 32:15,23 78:25 testifying 30:13 30:15 32:9 38:6 78:12 101:9,10 109:13 129:12 testimony 32:6 34:15,16 36:9,13 36:22,25 37:1 38:12 77:9 104:23,24 129:5 129:8,14 | themself 28:4 thick 32:1 thing 6:6,9 15:8 26:4 30:9 74:8 78:23 120:9 things 14:18 18:6 20:25 21:6,9,13 25:19 31:3 37:16 38:9 39:3 55:13 57:9 58:11 84:25 86:15 89:2 99:4 103:5 105:19 think 14:1 18:8 19:9 34:14 35:8 38:19 43:8 44:24 61:10 78:1,3 83:10 92:17 100:19 121:6 128:1,5 third-party 103:20 thought 65:19 thousand 60:16 thousands 38:5 126:11 three 9:18 21:8 32:13 51:10 57:19 66:13,17 87:18 Three-3-2-4 45:14 three-sentence 57:17 time 11:10,13 12:23 13:2 17:15 25:3 36:1 42:3 69:13 70:1 72:18 81:1 85:16 87:25 116:5 117:2 128:2 129:4 timely 112:10 times 42:1,1 66:13 | token 5:4 told 51:6,18,23 52:1 67:20 86:17 89:20 99:12 121:15,19 123:15 tomorrow 13:3 top 106:6 topic 16:16 total 80:3 totality 32:10 totally 30:8 town 104:7 Tracy 27:25 36:1 72:24 82:11 84:11,22 85:14 85:15 86:12,16 86:17 87:13 trades 88:10 trail 4:20 training 16:24 17:7,21 94:9 112:7 114:20 transcribed 30:2 35:21 41:24 50:10 77:17 transcribing 77:25 transcription 126:24 transcriptionist 29:10,17,18 30:3 36:15 77:25 91:10 transition 27:24 transmit 66:7 treating 71:9 72:2 72:5,14,17 treatise 15:22,23 treatises 14:25 15:18 | 110:1,20 true 129:4,8 trust 123:1 truth 67:10,12 truthful 4:14 try 5:6 26:8 trying 55:5 59:7 61:20,21 71:4 93:19 99:12 114:12 116:18 117:2 124:8,12 turn 31:17 54:20 99:13 turnaround 104:17 twice 23:18,19 24:1,5,8 41:17 two 9:18 11:16 25:14,15 37:16 38:8,11 68:15 74:3 78:11,19,20 79:4 89:7,9 108:5 110:5 111:8,8,15 115:24 116:6 118:11 120:12 122:19 type 17:5 29:18 55:3 58:20 104:19 115:9,19 119:11 124:18 typed 29:12 types 20:24 21:17 23:7 typewriting 129:7 Typically 11:9 typing 59:23 | 33:6 54:22 89:14 UK 110:13 116:14 ultimate 114:16 114:23 ultrasounds 7:20 unacceptable 121:21 unavailable 104:8 unclear 4:19 undergo 16:21 underlying 27:9 understand 4:18 26:5,9,12 27:4,9 28:14 37:6 40:20 52:4,9 55:5 61:21 63:7 71:4 71:10 89:10 93:17 106:13 107:5 114:12 116:18 124:9,12 understanding 40:4 72:6 understood 4:23 89:2 unfold 11:6,11 Unified 55:17 United 24:17 66:10,18 95:2 unnecessary 123:2,20,23 use 20:21,23 22:1 41:7,8 49:2 60:11 89:12 90:6 90:22 98:16 100:21 102:24 119:10 uses 24:15 58:23 65:25 66:5 78:3 110:11 usually 11:16 |
| | | | **U** | |
| | | | U.S 110:25 111:5 | |

Anand P. Lalaji, M.D.   4/3/2023

147

| | | | | |
|---|---|---|---|---|
| 17:13 | **Vita** 3:6 | 44:17 53:3,7 | **writes** 119:14 | **10/1/2004** 33:16 |
| **utilized** 115:1,1 | **voice** 22:1,5 23:4 | 76:10 117:16 | **writing** 72:20 | **100** 80:9,18 |
| **utilizes** 24:17 | 23:4,5 24:18 | 121:25 | **written** 14:25 | 112:17 |
| **utilizing** 17:14 | 90:22 | **we're** 5:1 19:6 | 15:18 41:17 | **105** 53:2 |
| 29:15 68:6 | **voice-** 29:8 | 38:4 60:15 92:4 | **wrong** 126:22 | **11** 58:10 129:13 |
| | **voice-dictate** 22:4 | 102:18 109:21 | | **117** 3:16 |
| **V** | 22:25 | 128:1 | **X** | **12** 3:7 58:10 |
| **vacation** 91:20 | **voice-dictates** | **we've** 5:12 6:9 | **x-** 7:20 | **120** 2:11 98:22 |
| **valid** 119:25 123:6 | 24:20 | 12:9 13:2,20 | **x-ray** 7:15,16 | **122** 3:19 |
| 123:7 124:5,13 | **voice-dictating** | 87:3 94:4 107:19 | 29:24,25 | **128** 2:21 |
| **validate** 119:4 | 23:2 | 116:4 120:3 | | **129** 2:22 |
| **varies** 11:8 | **voices** 4:20 | **webinars** 16:15 | **Y** | **13** 17:10 |
| **verbatim** 32:19 | **VS** 1:7 | **website** 110:20 | **yeah** 7:12,16 | **14** 3:9 17:11 58:10 |
| **verify** 23:23 | | **Weinberger** 98:3 | 11:24 12:19 13:1 | 73:25 |
| **version** 43:6,11,22 | **W** | **weirdly** 23:21 | 14:12 15:10 | **18** 16:20 |
| 43:24 121:25 | **wait** 44:11 45:4 | **went** 38:2 45:2 | 23:12,17 30:7,13 | **1975** 98:2 |
| **versions** 106:4 | 50:6 76:19 79:2 | 54:14 85:18 | 30:19 32:5,5,20 | |
| **versus** 53:1,15 | 89:22 | **weren't** 50:15 | 33:10 43:9,14,16 | **2** |
| 92:23 95:3 98:2 | **want** 4:12 9:13 | 61:16 74:15,19 | 43:17 44:1 51:16 | **2** 2:19 3:5 6:11,16 |
| **videoconference** | 13:20 15:15 20:2 | **Westlaw** 94:12,15 | 53:12,12 76:9 | 32:3 85:3 105:4 |
| 5:16 | 26:5,9,12 27:8 | **whereof** 129:14 | 79:5 84:3 92:16 | **20** 8:16 43:22 |
| **view** 90:17,22 | 28:10 32:20,24 | **wife** 11:2 | 100:20 106:8,9 | **20041D115** |
| 91:1,7 112:1,2 | 37:6 44:16 45:5 | **witness** 1:10 3:8 | 106:10 107:12 | 129:23 |
| **viewed** 50:10 | 45:6 50:6 52:17 | 25:12 43:8,17,23 | 108:24 111:23 | **2007** 53:16 |
| **viewer** 22:5 111:4 | 53:10 62:3 64:13 | 78:19 107:1 | 117:5 123:14 | **201** 1:15 2:6 |
| **viewing** 22:2 | 65:12 74:2 90:11 | 120:19 122:8 | **year** 73:23,23,25 | **2020** 83:4 |
| **views** 109:24 | 91:13 96:19 | 129:4,9,12 | 82:4 | **2023** 1:16 129:16 |
| **violate** 49:19,21 | 99:16,17 106:3 | **woman** 70:12 71:6 | **yearly** 16:21 | **2027** 129:13 |
| **violated** 26:11 | 110:22 114:21 | 74:10 88:1 | **years** 16:18,20 | **21** 73:22 86:9 |
| 49:11 65:11,16 | 127:17 128:3 | **word** 33:25 40:25 | 17:11,11 25:14 | **21-CI-00221** 1:2 |
| 96:4 97:7,14 | **wanted** 33:22 53:6 | 41:8 51:2 67:19 | 25:15 36:8 77:3 | **22** 73:22 |
| 98:8 | 74:6 90:9,10 | 83:10 127:18 | 78:11 80:22 82:9 | **241** 53:15 |
| **violates** 49:18 | 91:14,17 92:2 | **worded** 23:21 | 82:9 84:20 87:10 | **25** 8:16 10:8 |
| **violating** 66:17 | **wants** 124:3 | **words** 23:16 29:11 | **Yep** 13:22 65:1 | **25-** 81:7,9 |
| **violation** 34:19 | **warranted** 82:19 | 29:12 92:15 | **young** 34:12 | **25,000** 79:25 |
| 35:8,9,11,19 | **wasn't** 29:2 64:10 | 114:8 | | **26.02** 52:24 |
| 42:4,5,7,16,18 | 72:6 85:15 | **work** 7:23 10:5,9 | **Z** | |
| 45:21 66:2 68:19 | **watch** 117:2 | 42:6,14 91:16 | **Zone** 55:14 | **3** |
| 76:14 78:13 | **watching** 88:11 | 99:11,19 113:14 | | **3** 1:16 2:20 3:7 |
| 80:20 97:21 | **way** 16:13 35:3 | **world** 10:4 34:10 | **0** | 12:9,13,17,20 |
| 100:21 109:9 | 37:4,5,7 58:7 | 58:23 | | 13:8,12,25 14:19 |
| 120:15 121:1,2,4 | 69:14,14,15 | **worst** 6:5 | **1** | 26:3,4,7,14,22 |
| **violations** 61:8 | 77:24 78:1 91:18 | **would've** 86:4 | **1** 2:18 3:2 5:13,21 | 27:13 31:4,7 |
| 73:14,18 93:7,23 | 91:22 111:1 | **wouldn't** 100:21 | 32:2 123:4 | 32:4,25 33:2 |
| 101:5,6 | 114:6 | 101:19 | **1:00** 100:12 | 35:6 52:24 53:19 |
| **visit** 85:12 | **we'll** 14:13 28:13 | **write-up** 74:8 | **10,000** 42:1 66:11 | 68:9,10,16 95:14 |

Collins Sowards Lennon Reporting, LLC
859-402-0900

Anand P. Lalaji, M.D.   4/3/2023

148

104:25 105:5
106:5 107:6,10
107:24 108:15
109:13 117:8
**3.2.3.4** 45:13
**3.2.4** 45:12
**3.3.2.4** 44:1 48:7
51:7 54:20 60:6
60:22,24
**3/10/23** 3:8
**3/29/23** 3:4
**30,000** 79:25 81:7
81:9
**319** 53:15
**35** 10:8
**3729** 65:17
**3d** 53:2,15

**4**
**4** 2:21 3:9 13:19
13:20 14:7,10
27:8,11 42:21
52:24 84:16 94:2
94:4 105:17,20
106:2,17 107:8
107:11,15,16,18
108:5,14,17
117:4 127:11
**40** 80:22
**40507** 2:6
**40741** 2:12
**44** 3:11
**473** 53:2

**5**
**5** 3:2,11 44:16,22
45:11 51:14
105:25 106:1,10
106:14,20 107:8
107:16,18
108:17 127:11
**5,000** 66:11
**5/21/21** 3:15
**50** 42:1,3 81:17
**55** 9:13

**6**
**6** 3:5,14 88:17,21
100:15
**6/19** 43:21,25
**6/19/20** 3:13
**60-** 9:13
**65** 8:6,13,19 9:8

**7**
**7** 3:16 117:17,20
117:22 122:8
**70** 38:1,18,23
**75** 8:6,14,19 9:8
98:2
**7th** 129:15

**8**
**8** 3:19 122:3,6,12
128:4
**8/26/2021** 68:22
**8:30** 11:7
**88** 3:14

**9**
**9:00** 11:7
**9:55** 1:17
**90** 110:10
**900** 2:5
**99** 38:1,18 81:18
**99.99** 24:16

**Collins Sowards Lennon Reporting, LLC**
**859-402-0900**

# EXHIBIT 4

Fulton County Superior Court
***EFILED***QW
Date: 10/25/2021 3:04 PM
Cathelene Robinson, Clerk

IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA
136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303

## SUMMONS

TRG Holdings G&H, LLC

) Case
) No.:   2021CV356141
)
)
)
)
**Plaintiff,**
)
)
vs.
)
Dr. Ashokkumar Patel; and
)
)
Dr. Mahender Pampati
)
)
**Defendant**
)
Defendant Dr. Ashokkumar Patel
)
3037 Bob White Trail
)
Lexington, Kentucky 40509
)

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at https://efilega.tylerhost.net/ofsweb (unless you are exempt from filing electronically) and serve upon plaintiff's attorney, whose name and address is:

Roy Banerjee
KPPB LAW
ONE LAKESIDE COMMONS, SUITE 800
990 HAMMOND DRIVE, ATLANTA, GA 30328

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed within five (5) business days of such service. Then time to answer shall not commence until such proof of service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This _____10/25/2021_____ day of_____, 20 _____

Honorable Cathelene "Tina" Robinson
Clerk of Superior Court
By _____
Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you _____10/31_____, 20 21

`Deputy Sherriff

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used

# EXHIBIT 5

Filed          21-CI-00221      03/10/2023          Charles Ira Patterson, Perry Circuit Clerk

COMMONWEALTH OF KENTUCKY
33rd JUDICIAL DISTRICT
PERRY CIRCUIT COURT
CIVIL ACTION NO. 21-CI-00221
*SPECIAL JUDGE HON. KIMBERLY CHILDERS*

### *ELECTRONICALLY FILED*

ASHOKKUMAR R. PATEL, M.D.
and MAHENDER PAMPATI, M.D.                                   PLAINTIFFS


VS.


GRAM RESOURCES, INC.;
HAZARD RADIOLOGY ASSOCIATES, INC.;
ANAND LALAJI, M.D.; TRG HOLDINGS G & H, LLC;
THE RADIOLOGY GROUP, LLC and WILLIAM CRENSHAW          DEFENDANTS

### DEFENDANTS' SUPPLEMENTAL EXPERT WITNESS DISCLOSURE
*** *** ***

Comes now the defendants, Gram Resources, Inc ("Gram"); Hazard Radiology Associates, Inc. ("Hazard Radiology"); Anand Lalaji, M.D.; TRG Holdings G & H, LLC; and The Radiology Group, LLC, by and through counsel, and in accordance with this Court's pretrial Order and consistent with Kentucky Civil Rule 26 and Civil Rule 15, herewith supplement their prior expert witness disclosures relative to Dr. Anand Lalaji.   Dr. Lalaji has been licensed to practice medicine for 25 years and is licensed in 16 states.  He is board certified in the field of radiology.   In addition to the matters previously disclosed, these defendants anticipate that Dr. Lalaji will testify based upon his years of experienced as a licensed medical doctor and radiologist and his knowledge of and familiarity with Medicare/Medicaid reporting and billing requirements and standards as follows:

Filed          21-CI-00221      03/10/2023          Charles Ira Patterson, Perry Circuit Clerk

That the actions of plaintiffs Ashokkumar Patel M.D. ("Patel") and Mehander Pampati, M.D. ("Pampati"), in failing to adhere to established Medicare/Medicaid regulations, requirements, standards, and dictates, both prior to and after the acquisition of the Gram and Hazard Radiology, constituted violations of Medicare and related federal laws. It is anticipated that Dr. Lalaji will testify as to the consequences of said actions by Plaintiffs and the reasonably likely consequences said actions including the effects of such actions upon Defendants and the parties' patients.

Prior to the closing, Dr. Patel and Dr. Pampati represented, warranted, and promised that they operated their practices in compliance with all related state and federal laws, rules, and regulations, including those rules and regulations promulgated by the Centers for Medicare and Medicaid Services and related agencies. Prior to and after the closing, Dr. Patel and Dr. Pampati knowingly permitted individuals other than themselves who were not licensed physicians to sign their respective names to medical reports, charts, diagnoses, findings, and opinions which were submitted to Medicare/Medicaid for payment of compensation. Dr. Patel and Dr. Pampati instructed other persons to access unsigned medical reports through the Novarad database using Dr. Patel and Dr. Pampati's respective login information and sign medical reports on their respective behalfs.

It is anticipated that Dr. Lalaji will offer expert testimony demonstrating that the actions of Drs. Patel and Dr. Pampati constituted violations of Medicare/Medicaid regulations and required operating procedures and related federal laws, statutes, and/or regulations including, but not limited to, Section 3.3.2.4 of the Medicare Program Integrity Manual and the False Claims Act, 31 USCA § 3729.

Filed      21-CI-00221   03/10/2023        Charles Ira Patterson, Perry Circuit Clerk

It is anticipated that Dr. Lalalji will testify that the actions of Drs. Patel and Dr. Pampati have resulted or are reasonably likely to result in significant adverse consequences to Defendants, including, but not limited to, potential medical malpractice liability, potential loss of Medicare/Medicaid certifications, and potentially substantial lost revenues. Dr. Lalaji is also expected to testify concerning the plaintiffs failure to timely, properly, and effectively bill for services which resulted in lost income to the defendants. It is anticipated that Dr. Lalaji will testify that the actions of Drs. Patel and Pampati posed a grave and serious risk of harm to the patients whose studies were the subject of review by Drs. Patel and Pampati.

It is further anticipated that Dr. Lalaji will further testify consistent with the following:

1.   Approximately 75% to 80 % of Gram and Hazard Radiology patients are CMS patients and/or recipients of Medicare or Medicaid;

2.   When treating patients at MCHC (Mountain Comp), Drs. Pampati and Patel dictated all the exams to a transcriptionist who was typically not certified, who would then prepare preliminary reports. Rather than review the preliminary reports, as is required by law, Drs. Patel and Pampati directed non-qualified employees to utilize the doctors' login information and security credentials to sign-off on and finalize the reports notwithstanding the fact that Drs. Patel and Pampati had not actually reviewed the final version of the report.

3.   Upon discovering the actions of Drs. Pampati and Patel, Defendants are required by law to report the violations to the proper authorities;

4.   The defendants further anticipate that Dr. Lalaji will testify in accordance with the matters alleged in the separate litigation filed in the Superior Court of Georgia, Fulton County, Civil Action no. 2021-CV-356141, a copy of which Complaint is attached hereto and incorporated by reference as if set forth fully at length verbatim.

Filed      21-CI-00221   03/10/2023        Charles Ira Patterson, Perry Circuit Clerk

These defendants reserve their right to amend these disclosures prior to trial in accordance with civil rules 26 and 15 and related authority that leave to amend shall be freely granted when the interests of justice so require.

Respectfully submitted,

HAMM, MILBY & RIDINGS, PLLC
120 NORTH MAIN STREET
LONDON, KY 40741
EMAIL: aaron@hmrkylaw.com
PHONE: 606-864-4126
FAX: 606-878-8144
*Counsel for defendants, Gram Resources, Inc; Hazard Radiology Associates, Inc.; Anand Lalaji, M.D.; TRG Holdings G & H, LLC; and The Radiology Group, LLC*

BY: /s/ R. Aaron Hostettler
        HON. R. AARON HOSTETTLER
        HON. JAMES MILBY RIDINGS
        HON. KELSEY LEE BRYANT

CERTIFICATE OF SERVICE:

I hereby certify that a copy of the foregoing Motion was electronically filed with the Clerk of the Court by using the E-filing system and that a true and accurate copy of the foregoing has been served via the E-filing system and/or via first class U.S. Mail on the following:

COPY TO:

Hon. Robert E. Maclin III
Hon. Lisa English Hinkle
Hon. Luke Morgan
McBrayer, PLLC
201 East Main Street, Suite 900
Lexington, KY 40507

Hon. Barry Hunter
Frost Brown Todd, LLC
250 W. Main Street, Suite 2800
Lexington, KY 40507

# EXHIBIT 6

**Anand Lalaji, M.D.   8/1/2022**

1 (Pages 1 to 4)

---

**Page 1**

```
                    COMMONWEALTH OF KENTUCKY
                       PERRY CIRCUIT COURT
                   CIVIL ACTION NO. 21-CI-00221

ASHOKKUMAR R. PATEL,      )DEPOSITION TAKEN ON BEHALF
ET AL.                    ) OF THE PLAINTIFFS
                          )       BY:  NOTICE
          PLAINTIFFS      )
                          )
                          )
                          )
VS.                       )
                          )
                          )
GRAM RESOURCES, INC.,     )
ET AL.                    )
                          )WITNESS:
          DEFENDANTS      )ANAND LALAJI, M.D.

          *  *  *  *           *  *  *  *

     The deposition of ANAND LALAJI, M.D., was
taken on behalf of the plaintiffs before MARYBETH
C. SOWARDS, Certified Court Reporter and Notary
Public in and for the State of Kentucky at Large,
at the law offices of Frost Brown Todd, LLC,
located at 250 West Main Street, Lexington,
Kentucky, on Monday, August 1, 2022, commencing at
the approximate hour of 9:00 a.m.
     Said deposition was taken pursuant to
notice previously filed, pursuant to the Kentucky
Rules of Civil Procedure, in the above-styled
action now pending before the Perry Circuit Court
of Kentucky.

          *  *  *  *           *  *  *  *
```

**Page 2**

```
                         APPEARANCES

            ON BEHALF OF THE PLAINTIFFS:

               Mr. D. Luke Morgan
                 McBrayer PLLC
                   Suite 900
               201 East Main Street
             Lexington, Kentucky  40507

ON BEHALF OF THE DEFENDANTS GRAM RESOURCES, INC.,
HAZARD RADIOLOGY ASSOCIATES, INC.; TRG HOLDINGS
    G&H, LLC; THE RADIOLOGY GROUP, LLC;
ANAND LALAJI, M.D.; AND WILLIAM CRENSHAW:

              Mr. Ethan F. Johnson
          Quintairos, Prieto, Wood & Boyer, PA
                   Suite 300
               2452 Sir Barton Way
             Lexington, Kentucky  40509

                    - and -

              (Via Videoconference)

              Mr. Donald L. Miller
          Quintairos, Prieto, Wood & Boyer, PA
                   Suite 300
               2452 Sir Barton Way
             Lexington, Kentucky  40509

ON BEHALF OF THE DEFENDANT WILLIAM CRENSHAW:
              Mr. Barry D. Hunter
              Frost Brown Todd, LLC
                   Suite 2800
               250 West Main Street
             Lexington, Kentucky  40507

               ALSO PRESENT:

             Ashokkumar R. Patel, M.D.

          *  *  *  *           *  *  *  *
```

**Page 3**

```
                         INDEX

Caption. . . . . . . . . . . . . . . . . . . .1
Appearances. . . . . . . . . . . . . . . . . .2
Index. . . . . . . . . . . . . . . . . . . . .3
Exhibits . . . . . . . . . . . . . . . . 3 -  5
Examination by Mr. Morgan. . . . . . . . .6 - 203
Examination by Mr. Hunter. . . . . . . .203 - 210
Re-Examination by Mr. Morgan . . . . . .210 - 214
Reporter's Certificate . . . . . . . . . . .215

                        EXHIBITS

Plaintiff's Exhibit No. 8. . . . . . . . . . .38

(Kentucky Secretary of State information
regarding Gram Resources, Inc.)
Plaintiff's Exhibit No. 9. . . . . . . . . . .41
(Defendant's Answer to Plaintiffs' Second
Amended Complaint filed 3/14/22)

Plaintiff's Exhibit No. 10 . . . . . . . . . .44

(Share Purchase Agreement dated 8/17/20)

Plaintiff's Exhibit No. 11 . . . . . . . . . .85

(Letters from The Radiology Group to
Drs. Patel and Pampati dated 10/28/21)
Plaintiff's Exhibit No. 12 . . . . . . . . . 109
(Guaranty Agreement dated 8/17/20)

Plaintiff's Exhibit No. 13 . . . . . . . . . 140

(E-mail chain re working dated 6/4-5/21)
```

**Page 4**

```
Plaintiff's Exhibit No. 14 . . . . . . . . . . . .151
(E-mail from Dr. Lalaji to Dr. Patel and
others dated 5/18)

Plaintiff's Exhibit No. 15 . . . . . . . . . . . .155

(E-mail chain re Gram/Hazard Calendar dated
4/27-28/21)
Plaintiff's Exhibit No. 16 . . . . . . . . . . . .157
(E-mail chain re DM and TRG next steps
dated 8/16/21)
Plaintiff's Exhibit No. 17 . . . . . . . . . . . .161

(E-mail from Dr. Lalaji to Drs. Patel and
Pampati dated 8/25/21)
Plaintiff's Exhibit No. 18 . . . . . . . . . . . .161
(E-mail chain re Operations challenges that
must be addressed for positive cash flow
dated 5/18-21/21)
Plaintiff's Exhibit No. 19 . . . . . . . . . . . .169
(Document Bates-stamped APATEL-D-000965)
Plaintiff's Exhibit No. 20 . . . . . . . . . . . .170
(Proposed Memorandum of Understanding re
Gram/Hazard Future Operations)

Plaintiff's Exhibit No. 21 . . . . . . . . . . . .187

(Letter from Mr. Stratton to Mr. Maclin
dated 12/2/21)
Plaintiff's Exhibit No. 22 . . . . . . . . . . . .194
(Letter from Mr. Stratton to Mr. Maclin
dated 2/22/22)
Plaintiff's Exhibit No. 23 . . . . . . . . . . . .198

(Letter of intent to Dr. Patel dated
3/31/20)
```

**Collins Sowards Lennon Reporting, LLC
859-402-0900**

Anand Lalaji, M.D.   8/1/2022

5

1    Plaintiff's Exhibit No. 24 . . . . . . . . . . . . . . 203
2
3    (Defendant's Answer to Plaintiffs' Complaint
4      and Counterclaim)
5
6
7                * * * *        * * * *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

6

1                    ANAND LALAJI, M.D.,
2    having been first duly placed under oath, was
3    examined and testified as follows:
4                    EXAMINATION
5    BY MR. MORGAN:
6    Q       Sir, for the record please state your
7    full name.
8    A       Anand Lalaji.
9    Q       Where do you live?
10   A       Atlanta, Georgia.
11   Q       How long have you lived in Atlanta?
12   A       Seventeen years.
13   Q       Where'd you live before that?
14   A       New York. New York City.
15   Q       And what did you do in New York City?
16   A       I was in residency.
17   Q       Before that?
18   A       Before residency lived in New York for
19   medical school.
20   Q       And where were you raised?
21   A       New York City.
22   Q       You have a business, TRG; is that
23   right?
24   A       That's correct.
25   Q       You own that with your wife?

7

1    A       Yes.
2    Q       And what's her name?
3    A       Tejal.
4    Q       How do you spell that?
5    A       T-e-j-a-l.
6    Q       Same last name?
7    A       Yes.
8    Q       How long have you and your wife owned
9    TRG?
10   A       Seventeen years.
11   Q       And has it always been headquartered in
12   Georgia?
13   A       Yes.
14   Q       Have you ever given a deposition
15   before?
16   A       Yes.
17   Q       How many times?
18   A       Not sure. Maybe -- less than four.
19   I'm not a hundred percent sure.
20   Q       Okay. And in what circumstances did
21   you give --
22   A       Med mal.
23   Q       Were you being sued --
24   A       Yes.
25   Q       -- in each of the circumstances?

8

1    A       Two of the circumstances.
2    Q       Where were those lawsuits?
3    A       New York.
4    Q       When were those lawsuits?
5    A       About ten years ago.
6    Q       Did they involve anything dealing with
7    TRG?
8    A       No.
9    Q       Has TRG ever been sued before?
10   A       Yes.
11   Q       When?
12   A       Whenever there's a med mal suit they
13   always sue the company, and then the company
14   usually gets taken out at some point, so yeah,
15   that's -- in that context, that's when TRG's been
16   sued.
17   Q       About how many times do you think it's
18   been sued?
19   A       Same time, same amount.
20   Q       Okay. So every time you've been sued
21   TRG was?
22   A       That's typically how it works, yeah.
23   Q       Any other occasions in which TRG was
24   sued?
25   A       Not that I can recall.

Anand Lalaji, M.D.   8/1/2022

3  (Pages 9 to 12)

**Page 9**

1  Q        Any times that TRG has been sued
2  involving a business dispute, something similar to
3  what we have in this case?
4  A        Not that I can recall.
5  Q        Well, I need to get better than not
6  that you can recall.  Is it possible that it has
7  been?
8  A        I mean, we've been in business for 17
9  years, so -- to this magnitude, no.  Not that I can
10  recall.
11  Q        I recall about a year ago when
12  Dr. Patel and Pampati were e-mailing with you and
13  you had sent them back an e-mail, something about
14  avoiding all the lawyers and the delay.  Do you
15  remember that?
16  A        No.
17  Q        Okay.
18  A        You'll have to refresh my memory on
19  that.
20  Q        What did you do to get ready for this
21  deposition?
22  A        Spoke with my attorneys.
23  Q        Did you review any documents?
24  A        Yes.
25  Q        When?

**Page 10**

1  A        When did I review the documents?
2  Q        (Counsel nods head affirmatively.)
3  A        The last few days.
4  Q        What documents did you go over?
5  A        Just the documents that are in place,
6  like the verified complaints and -- you know, I
7  think that was it.  Just some of the questions and
8  answers that are part of this case.
9  Q        Did you look at any of the documents
10  that were produced by TRG or by you?
11  A        Part -- yeah, maybe some of them.
12  Q        Which ones?
13  A        I don't know offhand right now.
14  Q        Give me an idea, please, about how much
15  time you spent getting ready for this deposition?
16  A        About three hours.
17  Q        All at once or spread out?
18  A        Spread out.
19  Q        And do you recall in those three hours
20  looking at e-mails?
21  A        I know our attorneys and I talked about
22  e-mails, but specifically looking at e-mails, I
23  don't think so, no.
24  Q        Do you remember -- it's been several
25  months now -- receiving a request for production of

**Page 11**

1  documents from the plaintiffs?
2  A        I do know that part of the procedure
3  was to produce documents that our -- my attorneys
4  -- that our attorneys mentioned, and so vaguely,
5  yes.  Yeah, production of documents.
6  Q        What did you do to assist in locating
7  those documents?
8  A        So we have a whole host of people
9  within the company that I put our attorneys in
10  touch with to basically query, gather, and grab all
11  of those documents.
12  Q        Did you review those documents prior to
13  them being sent to the lawyers?
14  A        No.
15  Q        And did you review them since they've
16  been sent to the lawyers?
17  A        Probably just some small few of those
18  e-mails that Ethan and Don, you know, brought to my
19  attention.
20  Q        You understand that you're here
21  testifying as a corporate representative --
22  A        Yes.
23  Q        -- for TRG and TRG Holdings and all
24  that?
25  A        Yes.

**Page 12**

1  Q        Tell me, please, about the corporate
2  structure of TRG, please.
3  A        So we have a board at the top, then the
4  CEO, who reports to the board.  Then underneath the
5  CEO we have a chief operating officer, we have a
6  chief financial officer, we have a chief growth
7  officer.  Underneath that, you know, we have the
8  different departments.
9          So under the CFO we have the finance
10  department.  Under the chief operating officer,
11  which is the largest department, we have director
12  of operations, and then we have director of
13  licensing and credentialing, we have director of
14  IT, and then we have director of BIM, which is
15  business information management.  And then
16  underneath that we have assistant directors, about
17  seven of them.  Underneath them we have managers,
18  underneath them we have supervisors, and then we
19  have the customer service agents and the workflow
20  people.
21          Under the chief growth officer we have
22  sales, we have director of implementation, and then
23  we also have a subsidiary in London that we have a
24  managing partner out there who is at the C-level as
25  well, but he runs our London subsidiary.  So that's

Anand Lalaji, M.D.   8/1/2022

13

1    kind of the corporate structure.
2    **Q        What's the name of the London**
3    **subsidiary?**
4    A        TRG Europe, Limited.
5    **Q        And is that an active entity?**
6    A        Yes.
7    **Q        How has the corporate structure of TRG**
8    **changed over the 17 years you've had it?**
9    A        It's gone through different variations
10   over time, but it's not really -- you know, it just
11   grew.  There's not really been -- it's only changed
12   by growth as opposed to a change in structure.
13   **Q        You mentioned that the board is at the**
14   **top.  How frequently does the board meet?**
15   A        Once a month.
16   **Q        And are minutes kept?**
17   A        Yes.
18   **Q        Where are those kept?**
19   A        As part of -- with our general counsel
20   in the legal aspect of the company.
21   **Q        Who's the general counsel?**
22   A        Chloe Delare.
23   **Q        Is that in -- does Chloe -- is that a**
24   **woman?**
25   A        Yes.

14

1    **Q        Does she work exclusively for TRG?**
2    A        No.  She's a fractional general
3    counsel.  She works part-time, but she is an in-
4    house general counsel.
5    **Q        How long has Chloe been with TRG?**
6    A        About a year.
7    **Q        Is that a little more or a little less?**
8    A        A little more, probably a little bit
9    more.  Maybe a year and one month.
10   **Q        Did she come on about the same time**
11   **this lawsuit was filed?**
12   A        No.
13   **Q        Before or after?**
14   A        I'm trying to remember, when was this
15   lawsuit filed?
16   **Q        In August.**
17   A        August of '21?
18   **Q        Yes.**
19   A        So she came on probably in -- no, so
20   it's definitely -- then it's less than a year.  So
21   then she came on in October or November of '21.
22   **Q        Where does she work?**
23   A        Atlanta.
24   **Q        Atlanta?**
25   A        Atlanta.

15

1    **Q        For a firm?**
2    A        No.
3    **Q        On her own?**
4    A        On her own.
5    **Q        And does she have other businesses for**
6    **whom she's general counsel?**
7    A        No.  I believe she has her own business
8    where she consults and does different types of
9    work, defense work.  She has her own company.
10   **Q        Defense work?**
11   A        Yeah.
12   **Q        What type of defense?**
13   A        Defense med mal.
14   **Q        Well, so she would be keeping those**
15   **records since the last eight months or thereabouts.**
16   **Who was keeping the records before Chloe came in of**
17   **board meetings?**
18   A        Prior to that I would have to get back
19   to you.  I don't know who specifically was keeping
20   it and where those documents are.
21   **Q        Are there in fact documents, though,**
22   **records of board meetings?**
23   A        There should be, yes.  I just don't
24   know where they are.
25   **Q        Would you please get back to your**

16

1    lawyer, tell Ethan on that, who that is --
2    A        Sure.
3    **Q        -- and where they are, and if I could**
4    **get a copy of them, of the minutes of these**
5    **meetings.**
6    A        Sure.
7    **Q        Who is on the board now at TRG?**
8    A        Myself, Tejal, and we have our chief
9    growth officer and our CFO.
10   **Q        And you are the chief executive**
11   **officer?**
12   A        Correct.
13   **Q        And what's -- does Tejal have a title?**
14   A        Chief clinical officer.
15   **Q        So everyone who's on the board are also**
16   **some C-level officer?**
17   A        Correct.
18   **Q        Any outside people?**
19   A        No.
20   **Q        Who owns TRG?**
21   A        Tejal and myself.
22   **Q        Is that 100 percent between the two of**
23   **you or you own 50 and she owns 50, or how's that**
24   **work?**
25   A        Combined we own 95-1/2 percent.  Four

Anand Lalaji, M.D.   8/1/2022

17

1  and a half percent is divided up into a vested
2  schedule between the CFO and the chief growth
3  officer.
4  Q        When did that arrangement begin?
5  A        For which one?
6  Q        Of the schedule -- the other three or
7  four percent ownership.
8  A        So our CFO just started in January of
9  this year, and so that just started then.  And then
10  our chief growth officer started in June of 2021.
11  Q        So this shared ownership of however
12  many percentages that is, that's just really
13  started in the last year --
14  A        Yeah.
15  Q        -- since June of '21?
16  A        Correct.
17          MR. HUNTER:  He said January '22
18          for the CFO.
19          MR. MORGAN:  Yes, he did, Barry.
20          Thanks, Barry.
21  Q        Well, let's be clear here.  January of
22  '22 for the CFO, but I think you said was the chief
23  growth officer, did that begin in June of '21?
24  A        Chief growth officer, June of '21; CFO,
25  January of '22.

18

1          MR. MORGAN:  Did you get that?
2          MR. HUNTER:  Got it.
3  Q        You mentioned that the chief financial
4  officer is over the accounting department at TRG?
5  A        Uh-huh.  (Affirmative)
6  Q        Has it always been that way?
7  A        Yes.
8  Q        Even during the time that William
9  Crenshaw was interim, he was in charge of
10  accounting?
11  A        No.  William Crenshaw was just a
12  consultant.  Even though his e-mail said interim
13  CFO, that was just pretty much for the benefit of
14  our clients so that -- you know, so that there
15  would be somebody in that role at least helping us
16  kind of organize and decipher, you know, the
17  different things that finance has to deal with.
18  But he was not -- he did not have any decision-
19  making in that regard.  He was there to just
20  basically show us an analysis and then give us all
21  of the pieces, make a suggestion, and then it was
22  ultimately, you know, at that point the sort of
23  board that decided certain things and, you know,
24  the C-level suite basically.
25  Q        What?  The C-level suite, they did

19

1  what?
2  A        Made certain decisions on, you know,
3  whatever William Crenshaw showed us was the
4  situation or whatever his analysis was.
5  Q        So you mentioned that the title interim
6  CFO was for your clients' benefit?
7  A        Uh-huh.  (Affirmative)
8  Q        Explain that, please.
9  A        Well, you know, consultants -- you
10  know, when you send an e-mail to a client from the
11  finance department or leadership in the finance
12  department, it just shows that there is leadership
13  in the finance department, so that's why his e-mail
14  showed interim CFO.  But he was not employed by
15  TRG, nor did he have any decision-making ability at
16  all.
17  Q        So that title there was to present
18  something that really wasn't the way it was;
19  correct?
20  A        Well, in business terms he was acting
21  like a CFO, yes, but not -- you know, he didn't
22  have any decision-making ability.  So it was
23  presenting the fact but not -- you know, basically
24  -- you know, it was presenting the facts basically.
25  So he was acting like an interim CFO, but he didn't

20

1  have any decision-making ability, and so he was
2  doing all of the functionalities that a CFO would
3  be doing except for having decision-making ability.
4  Q        And the decision-making ability was
5  mainly you and Tejal; is that right?
6  A        For the most part, yeah.
7  Q        And describe for me, please, the
8  decision-making process that you and Tejal would go
9  through.  And this would be last year, let's say
10  during the time that Crenshaw was interim.
11  A        Yeah, so, you know, he would show us,
12  you know, basically all these different reports,
13  especially -- the most important report was the
14  cash in -- sort of the revenue and cash intake
15  report versus cash out was -- that was the main
16  thing.
17  Q        Uh-huh.  (Affirmative)
18  A        And so presenting to us specifically in
19  this case, you know, with Gram and Hazard, he would
20  basically do a full analysis on all of the costs,
21  all of the revenue coming in versus all of the
22  outflows going out, and that's what he would
23  present to us basically.
24  Q        For you to do what?
25  A        To make an assessment to see why we

Anand Lalaji, M.D.   8/1/2022

6 (Pages 21 to 24)

21

1    were hemorrhaging all of this money in this
2    practice.
3    Q        And what did you determine?
4    A        We determined that cash and actual
5    receipts were way below the historical levels of
6    the practice in the last five years, and we
7    determined that the costs of the practice were way
8    over the cash that was coming in.  And so when we
9    first found that out, you know, we made the
10   decision of transferring money from TRG to cover
11   those costs.
12   Q        And you say we.  Is that you and Tejal?
13   A        Myself, Tejal, and sometimes our chief
14   growth officer at the time, because he was there,
15   sat in on those meetings as well.  And that's what
16   basically we decided, but, you know, Will was in
17   those meetings as well, yeah.
18   Q        And what's that -- you said the chief
19   growth officer at that time.  Who was that?
20   A        That was Allan Schroeder.
21   Q        Who is it now?
22   A        Same thing.
23   Q        Describe the TRG business model.  Let's
24   say -- you mentioned that it has grown --
25   A        Uh-huh.  (Affirmative)

22

1    Q        -- maybe not necessarily changed to do
2    different things but has expanded to accommodate
3    growth.  You said something along those lines; is
4    that right?
5    A        Yes.
6    Q        What's the business model?
7    A        I mean, the business model is a
8    teleradiology business model, so sign contracts
9    with hospitals, imaging centers, urgent cares on
10   office-based imaging.  You provide them with the
11   technology to interface with so that they can send
12   you exams and your radiologist can deliver reports.
13   And then you charge them a fee per study to
14   generate revenue, or, you know, if you have a deal
15   where you charge the insurance company and the
16   insurance company pays you basically.  So that's
17   basically the teleradiology business model.
18   Q        And who are the radiologists in --
19   unless I specify a different time period, I'm
20   talking here mainly 2020, 2021, and even into '22;
21   okay?
22   A        Sure.
23   Q        Where are the radiologists that you're
24   using to provide these examinations?
25   A        So all of our board-certified

23

1    radiologists are all in the United States.
2    Q        Where are they?
3    A        Different states.  Where they live.
4    Q        And how do they get the studies, the
5    things that they're examining?
6    A        It's all centralized, and so they log
7    into our central servers, you know, because all the
8    clients send to a central location.
9    Q        Okay.  And where is that central
10   location?
11   A        It's the cloud.  So it's on AWS, Amazon
12   Web Services, Eastern Virginia.
13   Q        And the radiologists, then, who -- how
14   is it determined that a study will go to one versus
15   another radiologist?
16   A        By subspecialty.  So we have a workflow
17   team that knows the ins and outs of every
18   radiologist's capabilities and subspecialty, so
19   they will assign subspecialized cases to them
20   across the country, but then they'll also --
21   there's also what's called a unified list where
22   kind of all of the studies are in one list, and
23   they start at the top of the list, and, you know,
24   it's kind of like a -- it's kind of like one list,
25   and they'll go down the list together basically.

24

1    Q        Do radiologists have to be licensed in
2    a particular state?
3    A        For the official interpretation of a
4    radiology exam that is sort of sent out to the
5    client or the end institution, the radiologist must
6    be licensed in that state.
7    Q        So will the study be sent to multiple
8    radiologists?
9    A        From a board certification standpoint
10   it goes to one radiologist.  There's one
11   radiologist that reads the study.
12   Q        I understand.  That's the one who signs
13   off on it; right?
14   A        That's the one that reads the study;
15   correct.
16   Q        But are there occasions in which the
17   studies will go to someone else, to a radiologist,
18   and then another one will sign off on it?
19   A        Oh, so you must be referring to TRG-
20   Assist then.  Okay.  So TRG-Assist is basically --
21   and a lot of companies around the country have
22   leveraged its offshore resources to basically
23   handle the volume of studies coming in essentially.
24   So TRG-Assist basically is a sort of conveyor belt
25   type of methodology that we use.  When a study

Anand Lalaji, M.D.  8/1/2022

25

1  comes in, you know, at first it's checked for
2  paperwork -- it's first checked for paperwork,
3  clinical history, prior studies, making sure
4  there's no DICOM corruption, making sure that the
5  imaging set is there.
6       Then it goes from that station to a
7  templating station because every report has to have
8  a template.  And so template means -- like if it's
9  a CAT scan of the abdomen and pelvis, then we have
10 templates for all the variations of a CAT scan of
11 an abdomen and pelvis.  So the template is put on
12 the exam, like with contrast, without contrast, the
13 radiation dosages are put on there, the history is
14 populated in there, prior study dates, et cetera.
15 If there's an ultrasound tech sheet, then the tech
16 sheet information is put into the template, et
17 cetera.  So then the template is there and set.
18      Then it moves to the next station,
19 which is a quality assurance station, which
20 basically checks for grammar and spacing, et
21 cetera; okay?  Then it gets to a status called
22 ready no prelim.  And so ready no prelim, it's
23 available for a radiologist.  A U.S. board-
24 certified radiologist will read that study
25 basically.

26

1       There's one more step after that called
2  the preliminary step for CTs and MRIs because, you
3  know, the emergency room and a lot of these other
4  clients that send cases in trauma, they expect to
5  have results back in ten, 15, 20 minutes.  A single
6  radiologist is not going to be capable to read that
7  type of speed without support, so we have satellite
8  back offices in the Phillippines and in India where
9  our global sort of team of radiologists support our
10 U.S. radiologists by doing an internal preliminary
11 first opinion that's not seen by anybody basically
12 as a first opinion.  So that way after that's done,
13 then it goes to another quality assurance station
14 which checks for grammar and everything, and then
15 it gets to the queue of the radiologist, U.S.
16 board-certified radiologist.
17      He or she will open up that study, look
18 at the exam, look at everything that's been done,
19 will voice-dictate their changes, modifications, et
20 cetera, then approve the report, and then move to
21 the next study.  What this does is two sets of eyes
22 will look at that exam, so it limits -- it prevents
23 misses, liability, burnout, et cetera.  And so
24 that's TRG-Assist.
25 Q      So what that sounds to me like is you

27

1  have a study, and under certain circumstances it
2  will get sent to the Phillippines or India.
3  A      It doesn't go anywhere.  It's all
4  centralized.  They access our system.
5  Q      They will.
6  A      Yeah.
7  Q      So these radiologists in the
8  Phillippines or India will go to the centralized
9  location.  That's all through AWS; right?
10 A      Yes.
11 Q      But they're in India or the
12 Phillippines --
13 A      Correct.  Yeah.
14 Q      -- or some other place?
15 A      Yes.
16 Q      And they dial it up on the computer,
17 look at it, they make their assessment; correct?
18 A      That's correct.
19 Q      Put that assessment in some kind of
20 documentation, and that gets into this same
21 centralized source or site; is that right?
22 A      Yeah.  It goes into -- there's a
23 document viewer.  And so they put their initial
24 internal preliminary opinion in the document viewer
25 that's associated with the study.

28

1  Q      And that's being done because under
2  some of these circumstances that you describe, the
3  client wants this very quick?  It could be an
4  emergency room or whatever that is, but they need
5  it quickly?
6  A      Absolutely.  And sometimes it could be
7  50 CTs in 20 minutes that we'll receive because
8  there's multiple traumas, et cetera.  And so having
9  the support of a team behind you will make sure
10 that the quality and sort of the accuracy of the
11 report is maintained.
12 Q      So this person is accessing it from
13 their location somewhere outside the United States,
14 making their findings, documenting these findings,
15 and then someone from the United States, a board-
16 certified radiologist who is in the United States,
17 then goes to this same location in the cloud --
18 A      Uh-huh.  (Affirmative)
19 Q      -- and looks at what that person
20 offshore had done and has the ability then to see
21 what the CTs or the other studies, whatever the
22 thing is, they have that ability to look at that;
23 correct?
24 A      Yes.
25 Q      And then that person, do they make

Anand Lalaji, M.D.   8/1/2022

---

29

1   their own independent findings, or do they sign
2   off on what the person from outside the U.S. has
3   done?
4        A        No.  So what happens typically is they
5   open up the study and they look at the study first
6   and make their finding, then look at the report
7   basically and see if the same finding matches
8   whatever's been done up to that point.  And then
9   they make a decision if they want to add, change,
10  modify, in terms of whatever their decision is.
11  And then they will basically then sign off on the
12  report and then move on to the next study.
13       Q        And I trust that there is some metadata
14  or some other tracking that would indicate whether
15  the U.S. person made any additions, changes, or
16  other modifications?
17       A        A hundred percent, yeah.  So we have
18  three levels of compliance, and we meet monthly as
19  a compliance meeting.  We make sure that -- not
20  only do we make sure that -- well, first of all, in
21  our system that document cannot be accessed unless
22  the radiologist opens the study, views the images.
23  That's one.  Two, we have all of these reports that
24  we run on approval times basically and from a
25  compliance standpoint in terms of what's called --

---

30

1   unfortunately, our chief medical officer is more
2   adept at this process than I am, but basically it's
3   to maintain and watch to make sure that all the
4   radiologists that are in the U.S. are maintaining
5   acceptable times to interpretation and they are
6   looking at the -- you know, that they're spending
7   enough time on each study, et cetera.  So there's
8   about three or four levels of compliance that we go
9   through, and that whole compliance program was set
10  up by Morris, Manning, & Martin in Atlanta about
11  eight years ago.
12       Q        So this analysis is performed by
13  someone outside the U.S.  Then someone within the
14  U.S. looks at this, they make whatever
15  modifications they do to this, and then --
16       A        They do their analysis.  The U.S. guys
17  do their analysis.  It's a full analysis.
18       Q        So it's a second analysis?
19       A        Yes, correct.
20       Q        And then that gets sent to the --
21       A        Client.
22       Q        -- client, the emergency room or
23  whatever?
24       A        Correct, yeah.
25       Q        And that's faster by having someone go

---

31

1        -- having two sets of eyes look at this, someone
2   from outside the U.S. and then someone in the
3   U.S. --
4        A        Yeah.  It takes --
5        Q        -- that's faster than just having
6   someone from the U.S. look at it?
7        A        It just takes -- it takes basically the
8   same time, but in our system it's not just the
9   second doctor.  It's also all the processes that
10  happen up to that point, so the quality check,
11  checking of the paperwork, and doing all of that
12  stuff, making sure that -- the choosing of the
13  template sometimes takes the radiologist four or
14  five minutes because there's ten different
15  variations of a CT abdomen and pelvis, and now with
16  all the regulatory stuff in the United States, like
17  you have to put the radiation dosages and
18  everything, you got to find that on the images and
19  do that.  These are all things that a radiologist
20  is not really meant to do, but yet in a normal
21  system like you described in which it just goes to
22  them, they would have to do all of this themselves.
23  So that's what would delay the interpretation of
24  the exam.
25            In Assist, it essentially takes care of

---

32

1   all of that stuff so they're doing what they've
2   been trained to do, which is look at the exam, make
3   a diagnosis, voice-dictate whatever findings they
4   want, and move forward.  So sometimes it's faster,
5   sometimes it's the same speed, sometimes it's a
6   little slower.  However, we know that that report
7   that comes in is a high-quality report without
8   errors.
9        Q        And when that work is submitted for
10  payment, when it's billed --
11       A        Uh-huh.  (Affirmative)
12       Q        -- are the persons who are reviewing
13  this offshore, is their work being billed?
14       A        Nope.
15       Q        Whose work is being billed?
16       A        The board-certified radiologist.
17       Q        In the United States?
18       A        Yes, correct.
19       Q        Are the physicians, the radiologists
20  that had worked for Gram and/or Hazard Radiology,
21  are they part of this -- like, for example,
22  Dr. George.  Do you know Dr. George, remember her?
23       A        Yes.
24       Q        Are they part of this TRG-Assist
25  process that you just described?

---

Anand Lalaji, M.D.   8/1/2022

---

33

1  A        The TRG-Assist process is on our
2  platform, so it's the RamSoft platform.  The
3  radiologists at Gram and Hazard read on the
4  McKesson platform, which is the hospital PACS
5  system.  And, you know, so part of the deal was
6  that we were going to get all of the radiologists
7  that were with Gram and Hazard onto the RamSoft
8  platform.
9         And so Dr. George -- you set an example
10  for Dr. George, but she was one particular doctor
11  that did not follow any of the guidance or
12  instructions, sort of process, protocol, et cetera,
13  that Gram and Hazard set forth, and so she was
14  never able to -- she decided on her own not to log
15  into that RamSoft portal and she read on the
16  McKesson system.
17  Q        This McKesson system that you are
18  talking about, that's the one ARH uses; correct?
19  A        Correct.  Uh-huh.  (Affirmative)
20  Q        And ARH never got on the RamSoft
21  system, did they?
22  A        No, ARH -- the whole system interfaced
23  with their RamSoft system.
24  Q        McKesson did?
25  A        When you say got on, what do you mean?

---

34

1  Q        Well, did ARH ever go utilize this TRG-
2  Assist process?
3  A        On their McKesson system?
4  Q        You tell me.
5  A        No, not on their McKesson system.  But
6  they did send studies, lots of studies, to our
7  RamSoft system, and then that's where the Assist
8  process happened.
9  Q        And when was it that ARH would have
10  sent the -- you said lots of studies to the
11  RamSoft, when did that start occurring?
12  A        Well, so that was probably seven, eight
13  years ago.
14  Q        ARH was sending to TRG-Assist?
15  A        Was sending to TRG, yes.
16  Q        And were they utilizing this RamSoft
17  and TRG-Assist seven years ago?
18  A        So we had a different PACS system
19  called Opal, and then in 2019 we switched to
20  RamSoft.
21  Q        Well, help me understand, please.  Did
22  ARH utilize this process that you're describing,
23  this TRG-Assist process?
24  A        ARH did -- you know, we utilized it.
25  It's a TRG process.

---

35

1  Q        Uh-huh.  (Affirmative)
2  A        So when you say ARH utilized it, what
3  do you mean specifically?
4  Q        When they had studies --
5  A        Did they get the benefit of it?  Yes.
6  Q        No, I'm not asking if they got the
7  benefit of it.  When they had studies that needed
8  to be done did they put this in the cloud and
9  utilize this process --
10  A        Yeah, they -- that's --
11  Q        -- that you just described?
12  A        -- that's teleradiology.  So they sent
13  the studies off to us, and we interpreted them
14  using our Assist platform.  And then the report
15  gets sent back to the hospital system, ARH.
16  Q        And did that occur as well with
17  Mountain Comp?
18  A        So in the beginning Mountain Comp was
19  being read on their own PACS system, and then --
20  you know, and so then they -- the goal is when, you
21  know, we -- whenever we bring on an organic new
22  client or acquire a business or anything like that,
23  you know, just like any acquisition that any
24  company does, it brings all of the end sort of
25  points onto one single platform; okay?  And so

---

36

1  Mountain Comp was going to be put onto the RamSoft
2  platform at some point.  So in the beginning it
3  wasn't, and then I think -- I'm not sure exactly
4  when, but they did switch and put everything on
5  RamSoft at some point.
6  Q        Was that in the last year?
7  A        Yes.
8  Q        What is the difference -- I'm going to
9  ask some more questions about corporate structure.
10  What's the difference between TRG and TRG Holdings
11  G&H?
12  A        TRG Holdings G&H is the entity that
13  owns and operates Gram and Hazard from an
14  acquisition standpoint.
15  Q        Was that developed for the purpose of
16  buying Gram and Hazard?
17  A        Yeah.  For all of our acquisitions that
18  we do, there's a holding company that's created
19  that all of our processes run through basically,
20  and that's what that company is.
21  Q        How many holding companies does TRG
22  have?
23  A        About -- between five and seven.
24  Q        Around the country?
25  A        Yes.

---

Collins Sowards Lennon Reporting, LLC
859-402-0900

Anand Lalaji, M.D.   8/1/2022

37

1  Q      Does it have holding companies in
2  Europe?
3  A      Yes.  For our TRG Europe, Limited,
4  business, there is a holding company, U.S.-based
5  entity, that owns and operates that entity.
6  Q      Is TRG the same as The Radiology Group?
7  A      Yes.
8  Q      When you bought Gram, for example, you
9  recall changing the registered agent to yourself;
10  is that right?
11  A      Can you be more specific?  Registered
12  agent in which state?
13  Q      Kentucky.
14  A      I'm sure that's part of the process of
15  acquisition, but you'd have to -- I'd have to be --
16  you have to be a little bit more specific.  What do
17  you mean, change the registered agent to myself in
18  Kentucky?  Right.  To me personally or TRG?
19  Q      When you bought Gram --
20  A      Yes.
21  Q      -- you changed the registered agent of
22  process to yourself for purposes of being sued and
23  other purposes of declaring to the world through
24  the Kentucky Secretary of State's office who they
25  need to -- who someone needs to contact if they

38

1  have any corporate questions regarding Gram.
2  A      I don't know offhand to answer that
3  question right now.  I'd have to see documentation
4  for that.
5  Q      I think we're on --
6         MR. MORGAN:  Marybeth, are we on 7?
7         REPORTER:  Are you doing continued?
8         Eight will be next.
9  Q      I'm going to show you what will be
10  marked as Exhibit 8, and this is a printout from
11  the --
12  A      Yeah.
13  Q      -- Kentucky Secretary of State's
14  website for Gram.  And on the first page here it
15  identifies what it is, Gram Resources, Inc., and
16  then it goes on to say principal office.  Do you
17  see that?  It's kind of --
18         (Said document is filed with this
19         deposition and marked as Plaintiff's
20         Exhibit No. 8 for purposes of
21         identification.)
22  A      Yeah.  Yeah.
23  Q      And then there's this Hazard address
24  and then registered agent --
25  A      Uh-huh.  (Affirmative)

39

1  Q      -- and that's you.
2  A      Yeah.
3  Q      Do you recall doing this or having this
4  done?
5  A      It was probably part of the process of
6  when we do an acquisition, I guess I become the
7  registered agent.
8  Q      And if you turn the page, on the second
9  page here you'll see registered agent name/address
10  change, and then there's a date and time next to
11  that.
12         MR. JOHNSON:  See the address
13         change?
14  A      Oh, here it is, yes.  On this page, the
15  third page.
16  Q      Second page, page two.
17  A      Yeah.
18  Q      Okay.  Are you aware that when a
19  registered agent proclaims -- when a person
20  proclaims theirself to be a registered agent,
21  they're saying that they reside in Kentucky?
22  A      I'm not aware if that's true or not.
23  Q      But you clearly don't reside in
24  Kentucky.  You reside in Georgia; right?
25  A      I don't.  Yeah.

40

1  Q      Do you recall talking with anybody
2  about the process of listing yourself as a
3  registered agent of process in Kentucky and what
4  kind of rules need to be followed?
5  A      No, I don't.
6         MR. MORGAN:  Can you grab Exhibit
7         1, please?
8  Q      You're being shown Exhibit No. 1 to
9  this deposition.
10         MR. MORGAN:  And by the way, we're
11         just going to keep the same exhibit
12         numbers through this whole thing.
13  Q      Have you seen that before, sir?
14  A      Yes.
15  Q      And there's several stapled documents
16  paper-clipped there.  If you'll take the paperclip
17  off, and the very top one there is really the one
18  I'm asking you to focus your attention to.  That is
19  the second amended complaint, and you've seen this
20  before; right?
21  A      Yes.
22  Q      I'm going to show you what will be
23  marked as the next exhibit.  And this is
24  Defendant's Answer to Plaintiffs' Second Amended
25  Complaint, although I think the defendant seems to

Anand Lalaji, M.D.   8/1/2022

41

1   be one defendant, but you agree with me there are
2   multiple defendants who are answering this
3   complaint.
4               (Said document is filed with this
5               deposition and marked as Defendant's
6               Exhibit No. 9 for purposes of
7               identification.)
8   A       Correct.
9   Q       So just a minor typo there in the
10  heading, in the title of this.  Have you seen this
11  before, sir?
12  A       Yes.
13          MR. HUNTER:  Is this 9, Exhibit 9?
14          MR. MORGAN:  Yes, sir.
15  Q       If you'll turn the page of Exhibit 9 to
16  the second page of the document, and at the very
17  bottom there's a paragraph number nine, if you'll
18  read that to yourself.  And for purposes of this it
19  may be beneficial then to refer to the complaint,
20  because in this one it talks about defendants deny
21  the allegations of paragraphs 15 and 16, so that's
22  something you may want to do in looking at these
23  things.  But my question is, you agree with me that
24  Drs. Pampati and Patel were employees of TRG after
25  TRG purchased Gram and Hazard?

42

1   A       They were employees of TRG Holdings
2   G&H.
3   Q       Not of Gram or Hazard?
4   A       They were also -- so in a stock
5   purchase agreement we sort of keep everything --
6   we keep everything the same, but they were
7   employees of Gram and Hazard.  The way it works is
8   that the governing entity was TRG Gram and Hazard
9   Holdings, but they remain employees of Gram and
10  Hazard through that as a subsidiary entity.
11  Q       So I hear -- are you saying, then, kind
12  of like on the books they're employees of TRG
13  Holdings, but in reality they're employees of Gram
14  and Hazard?
15  A       Yeah.  So they obtain new employment
16  agreements as part of the acquisition.  Do we have
17  a copy of the employment agreement?
18  Q       Yes.
19  A       Yeah, so whatever entity that they got
20  employed by, that's whatever -- whatever's in that
21  document.
22  Q       Okay.  And if you'll turn the page to
23  the third page of the answers, Exhibit 9, on the
24  top here is paragraph number ten, and it says in
25  the second line here, plaintiffs were paid by

43

1   defendants a total of $1,586,000 -- I'm sorry; let
2   me restart.  Plaintiffs were paid by defendants a
3   total of $1,586,599.60; correct?
4   A       Correct.
5   Q       And that is in response to in the
6   complaint here, the second amended complaint, on
7   paragraph number 19, it says that Patel and Pampati
8   were owed these various amounts, for the head fees,
9   for the daily fees, base salary, earnouts, all that
10  sort of stuff.  Does TRG disagree that Patel and
11  Pampati had these agreements and they're entitled
12  to these payments --
13  A       We disagree.
14  Q       -- under the terms of the employment
15  agreement?
16  A       Yeah, we disagree.
17  Q       Explain that.  Why do you disagree?
18  A       So the main issue at hand here, the
19  reason why we disagree is that as part of their
20  employment agreement, as part of the terms of their
21  share purchase agreement they were to conduct
22  certain items to maintain the viability of the
23  practice in terms of its patient collection
24  receipts.  If no money is coming into the practice
25  or very little is coming into the practice because

44

1   of things and actions that Patel and Pampati were
2   supposed to be doing predating the acquisition to
3   post-dating, you know, after the acquisition, then
4   they would've breached their fiduciary
5   responsibility to the practice.  And therefore, if
6   no money is coming into the practice or very
7   little, then they are not owed this money.
8   Q       And that's in the employment agreement
9   and/or the share purchase agreement?
10  A       In the share purchase agreement?  I
11  think it's more defined in the share purchase
12  agreement.
13  Q       Let me show you what'll be marked as
14  Exhibit No. 10 and ask you to show me where.  Why
15  don't you look through that first and verify
16  whether it's a true and accurate copy of the share
17  purchase agreement, and then please show me where
18  in this document is this requirement that Pampati
19  and Patel have a fiduciary duty and are required to
20  keep the money coming in.
21          MR. MILLER:  Object to the form of
22          the question, please.
23              (Said document is filed with this
24              deposition and marked as Plaintiffs'
25              Exhibit No. 10 for purposes of

Anand Lalaji, M.D.  8/1/2022

12 (Pages 45 to 48)

45

1           identification.)
2    A      Can I also have a copy of the
3    employment agreement as well?
4    Q      That's in Exhibit No. 2.
5           THE WITNESS:  So in order to speed
6    up this process, Ethan, can you help
7    there?
8    Q      I'm sorry; what?
9           MR. JOHNSON:  He and I are just
10   talking -- or looking at a copy of the
11   employment --
12   A      This is a -- it's a 30-page document,
13   so it's going to take some time to go through it
14   and find exactly where it is.
15   Q      Okay.  Well --
16          MR. JOHNSON:  Pardon my reach,
17   Doctor.
18          THE WITNESS:  Yeah, go ahead.
19          MR. MORGAN:  You know, Ethan, I
20   appreciate that, but let's let the
21   witness do his own stuff.
22          MR. JOHNSON:  Certainly.
23   A      Well, there are a few places, so you
24   want me to just start with like the first one and
25   then go to the next?

46

1    Q      Please.
2    A      Okay.  So on page two, termination for
3    cause, in the employment agreement.
4    Q      So this is Exhibit No. 2.
5    A      Right.
6    Q      Go ahead.
7    A      Your employment may be terminated by
8    the companies upon written notice to you in the
9    event of any of the following, cause:  habitual
10   neglect by you of your duties hereunder, which TRG
11   asserts that; your having been convicted of any
12   felony; your willful misconduct in connection with
13   the performance of any material portion of your
14   duties, we assert that; commission by you of any
15   act constituting a breach of fiduciary duty, fraud,
16   or misrepresentation, which we assert; and
17   obviously G, which is any other material breach
18   there.  Let me see.
19   Q      Let me hold off there for just a
20   second.  So these are reasons why the employment
21   may be terminated.
22   A      Correct.
23   Q      Right?
24   A      Yes.
25   Q      That's what this says.  My question is,

47

1    you said that Pampati and Patel had a fiduciary
2    duty to keep the money coming in.  I'm not asking
3    for reasons why they can be fired.  I'm asking
4    where -- let's start with Exhibit 2.  Where in
5    Exhibit 2 does TRG believe this fiduciary duty to
6    keep the money coming in is contained?  Not reasons
7    to fire them, but where does it say they got to
8    keep the resources coming in?
9           MR. MILLER:  Object to the form.
10   Q      Go ahead.
11          MR. MORGAN:  I take it Don's doing
12   this deposition; is that right?
13          MR. JOHNSON:  That's correct.
14   That's why he's appearing.
15          MR. MORGAN:  Okay; good.
16          MR. JOHNSON:  Yeah.
17          MR. MORGAN:  Well, like last week
18   you did some questions, but -- okay.
19          MR. JOHNSON:  Sure.
20   Q      Go ahead, Dr. Lalaji.  Where is it in
21   here in this Exhibit No. 2 that it says Pampati and
22   Patel have --
23   A      That's a termination for cause
24   provision, so that's the first time where we see,
25   you know, sort of all of the breaches that Patel

48

1    and Pampati have done, so I'm looking now for the
2    next section.
3    Q      Well, again, but this is reasons that
4    they can be fired.
5    A      I understand.  That's the termination
6    for cause provision.  So now I'm going to where it
7    states about fiduciary duty and about billing
8    collections.
9    Q      Please do.
10   A      And you said not to have my counsel
11   help me, so they're the ones that have looked
12   through this document.
13   Q      Well, this is your deposition, sir.
14   A      I understand.  But if you -- you know,
15   that's why my attorneys are here; right, to help?
16   Q      But not to testify.
17   A      They're not testifying.
18          MR. JOHNSON:  Not testifying.
19          MR. MORGAN:  Well, no, I'm not --
20   this is not -- I object to this, to
21   having you highlight it.
22   Q      Hold on just a second, Dr. Lalaji, if
23   you will.  Did you review Exhibit No. 2 prior to
24   today's deposition?
25   A      Yeah, probably a few months ago.  Yeah.

Anand Lalaji, M.D.   8/1/2022

13 (Pages 49 to 52)

49

```
1    Q       But not recently?
2    A       No.
3    Q       That's not part of your three-hour
4    primer for today?
5    A       No.
6    Q       Did you review the share purchase
7    agreement for today's deposition?
8    A       Pieces of it, yeah, but not the whole
9    document in totality.
10   Q       So I got some real problems with this
11   corporate rep being not prepared, but I'm asking
12   you as TRG's corporate representative, CFO -- are
13   you the board chair as well?
14   A       I'm not the CFO.
15   Q       I'm sorry; CEO.  Are you the board
16   chair?
17   A       Yes.
18   Q       Okay.  -- in all of these capacities as
19   well as the owner to go through Exhibit No. 2 and
20   show me where there is a fiduciary duty placed on
21   Pampati and Patel in billing.
22   A       So in Exhibit -- in Exhibit 2,
23   specifically it's the termination for cause; okay?
24   Q       Okay.
25   A       Now if you want to give me time I will
```

50

```
1    find the responsibilities of the owners of the
2    practice and of where they're responsible for
3    keeping the billing come in and as per the
4    responsibilities in the share purchase agreement
5    they do hold a fiduciary responsibility to the
6    practice.
7    Q       Let's stay on the -- you said a bunch
8    of stuff there, but let's stay on Exhibit 2, the
9    employment agreement.  You said something there
10   about the owners of the practice have a duty, and I
11   agree with you on that.
12   A       Previous owner.  Sorry; I misspoke.
13   Q       Okay.  Show me where in the employment
14   agreement, Exhibit No. 2, that it places this
15   fiduciary duty on Pampati and Patel.
16           MR. MILLER:  Excuse me.  I don't
17           mean to interrupt, but you're asking
18           for a legal conclusion there.  The
19           fiduciary duties apply --
20           MR. MORGAN:  Don, I appreciate your
21           chiming in here.
22   Q       Go ahead and answer, please,
23   Dr. Lalaji.
24   A       Okay.  So on the first page, second
25   paragraph, so it says, initially Dr. Anand Lalaji
```

51

```
1    will be responsible for your evaluation and
2    management, and you shall collaborate with him in
3    connection with your position for the companies.
4    Your duties shall include continuing to operate the
5    companies in accordance with best practices of the
6    industry as the business of the companies has been
7    operated prior to the sale to the buyer and in
8    accordance with the duties set forth in Exhibit A.
9           So prior to the sale they were supposed
10   to be making sure that the billing came in, making
11   sure the collections were there; otherwise we
12   would've never bought their practice.  And they
13   were to make sure that any type of credentialing
14   issue with payer enrollment, any type of, you know,
15   issue with the billing company where collections
16   had not come in -- in fact, I think somewhere
17   Dr. Patel stated in a previous matter that whenever
18   that happened they intimately got involved, and
19   they made sure that the collections were coming in
20   in the way that they're supposed to be operating
21   that company prior to the acquisition post
22   acquisition.  And so that's another section that --
23   that's a section that they breached, but I'll keep
24   looking and I'll find the other one.
25           Okay.  So Section L under MD Director
```

52

```
1    Duties, Exhibit A, ensure all appropriate measures
2    are in place to facilitate proper billing, which
3    they did not.
4    Q       What do you mean, they did not?
5    A       So in order to facilitate proper
6    billing, which they were doing prior, prior to when
7    we acquired the practice, they had consistent
8    meetings with the billing company in terms of
9    collections, all the charges, the transfer of that
10   billing information from ARH to the billing
11   company, so that they can get those charges billed
12   out and released.
13           So in order for a billing company to be
14   able to consistently submit claims to the insurers
15   and get paid, there has to be continuity in all of
16   these steps.  So data on a daily basis needs to go
17   from hospital to billing company, the billing
18   company has to ensure that the demographic and
19   insurance information for all of the patients that
20   are getting the reads are accurate and so that they
21   can check all the boxes so that they can file the
22   claim electronically.  If any of those steps are
23   broken, collection stops.
24           And so those stoppages of collections
25   prior to the acquisition of the practice and the
```

Anand Lalaji, M.D.   8/1/2022

53

1   way Patel and Pampati were running that practice
2   was they were on it in terms of talking to the
3   billing company all the time, making sure that
4   these claims were going through, any issue with
5   enrollment they brought it up and they fixed it
6   with their people that are on staff. You know, and
7   so all of those things were going through. After
8   we acquired the practice they did very little of
9   that. And even one example is 45 to 50 days went
10  by where the billing company did not get any data
11  from the hospital, which would clearly be under the
12  purview of Patel and Pampati to make sure that that
13  was occurring, and they just let 50 days go by
14  without getting any data to the billing company.
15  So that's an example.
16          So essentially, you know, that's the
17  third section in this exhibit that basically -- you
18  know, they did not facilitate proper billing.
19  Q    Why -- go ahead.
20  A    No, and then I would have to go to the
21  -- you know, I would have to find the fiduciary
22  responsibility section of the -- let me just see if
23  there's -- I know there's typically one in the
24  employee covenants, but if it's not there, then
25  it's in the share purchase agreement. Let's see

54

1   the share purchase -- I'm going to go to the share
2   purchase agreement.
3   Q        Hold on a second. Before you do that I
4   want to follow up on how it is that they failed to
5   do proper billing.
6   A        So in order for a normal typical
7   billing revenue cycle management practice -- they
8   did not obtain any money, very little, from a fee
9   per study arrangement with clients, maybe a few of
10  the small ones. But 99 percent of their revenue
11  was based on insurance receipts from payers. And
12  so in order for that to happen there's a third-
13  party billing company, there's the practice, and
14  then there's the main entity, like ARH, okay, where
15  all the studies are being read. So all of the
16  studies get read, there's a upload or like what's
17  called an ADT interface that goes from the ARH
18  system to the billing company.
19          The billing company prior -- the way
20  Patel and Pampati prior to the acquisition date,
21  almost every single week they were looking at the
22  numbers, making sure that, you know, any issues
23  that the billing company had were fixed and filled
24  with their administrative folks on the ground.
25  They were doing all of that basically. And so that

55

1   way, even if there was a gap, even if there was a
2   loss of temporary -- you know, we're supposed to
3   get 35,000 reports, insurance information of
4   patients, but we got 33,000, so where are those
5   2,000? They would have ongoing active
6   communication and engagement with the billing
7   company almost several days a week on a weekly
8   basis to make sure that at the end of the month
9   that they have captured the full amount of claims
10  that they needed to bill for in order to get that.
11         When we acquired the practice, almost
12  immediately Patel and Pampati stepped away from
13  that behavior and they did not participate in many
14  of these calls. There was times where there was no
15  incentive or no sort of -- in order for no data to
16  go from hospital to billing company for 50 days is
17  a clear example of there was basically no interest
18  in doing what this says, which is facilitate, which
19  is basically making sure that the billing was
20  occurring exactly the way their practice had been
21  functioning six months prior to the acquisition.
22         And so what happened was is that, you
23  know, we are relying on them in this acquisition to
24  basically run and maintain the business like they
25  have been doing for years before and at least six

56

1   months before. When this drops off and none of
2   this billing data gets to the billing company and
3   they can't -- you know, and they can't submit it,
4   and multiple, you know, reach-outs from the billing
5   company to us to them go, you know, basically to
6   them to get no answers, to get no progress,
7   collections of the company go down significantly.
8   So then when you don't have money coming into the
9   practice from a cash standpoint, then you have no
10  money to pay your physicians, and that's basically
11  what happened.
12  Q    Okay. You were going to look then into
13  the share purchase agreement --
14  A    Yeah.
15  Q    -- for this fiduciary duty.
16         Yeah.
17  Q    That's Exhibit No. 10.
18  A    I have it.
19  Q    Okay. Will you show me where in the
20  share purchase agreement is this fiduciary duty
21  expressed?
22         MR. JOHNSON: And my client will
23         provide his answer, but we just want
24         the record to show that we're objecting
25         to this line of questioning. That's

Anand Lalaji, M.D.   8/1/2022

15 (Pages 57 to 60)

**57**

1    really legal conclusion you're asking
2    him to give.
3         MR. MORGAN: Okay.
4         MR. JOHNSON: Does that need to go
5    on the record when you guys keep --
6         MR. MORGAN: No. I appreciate
7    that.
8         MR. JOHNSON: Okay.
9  A    I would have to look at this a little
10   bit more in detail. However --
11        MR. MORGAN: Doctor, just let me
12   hop in. We just want the record to
13   show that Dr. Lalaji is not an
14   attorney. He doesn't know all the
15   sources of fiduciary duty and --
16        MR. MORGAN: You can express this,
17   and I do not appreciate your standing
18   -- your monologue objection. You've
19   preserved your objection.
20  Q    So you were saying, Dr. Lalaji?
21  A    Yeah. So in the fiduciary
22   responsibility in Exhibit 2, which is the employee
23   covenants, that document, basically show all of the
24   responsibilities that Patel and Pampati basically
25   have in reference to the acquisition. I would

**58**

1    reserve that to find the fiduciary responsibility
2    built into our share purchase agreement that, you
3    know, in the course of this deposition that I'm not
4    able to identify right now, but we will get that to
5    you.
6  Q    Well, no, that's not -- this is the
7    time that we have to do that, and --
8  A    Well, no --
9  Q    Hold on just a second. Let me finish
10   here. -- because this has been noticed for months
11   now --
12  A    Sure.
13  Q    -- for this time and location for TRG
14   to come and answer these questions. And it is not
15   a curveball by any means to ask what is TRG's
16   position that Pampati and Patel have a fiduciary
17   duty. So now's the time to do it. We're not
18   reserving for something else. You're the corporate
19   rep. You tell me --
20  A    I just did.
21  Q    -- where in the share purchase
22   agreement --
23  A    No. I said it's in the employee
24   covenants and the contract, in the employee
25   contracts.

**59**

1  Q    Is it in the share purchase agreement?
2  A    In the course of this deposition right
3    now I cannot identify it.
4  Q    Let's go back to, then, the answers
5    that the defendants have provided to the second
6    amended complaint. And on the complaint, and
7    that's Exhibit No. 1, I'm looking at paragraph
8    number 19. That's where we had talked about how --
9  A    Yeah.
10  Q    -- the plaintiff's position of how much
11   they're owed. Number 20 talks about how Gram and
12   Hazard have received revenues by reason of and
13   based on the reading of images by Patel and
14   Pampati. You agree with that; correct?
15  A    So this is 20.
16  Q    Number 20 on the complaint.
17  A    And let's see. Our response -- let's
18   see. Do the numbers --
19  Q    Hold on just a second, sir. My
20   question is on number 20 of the complaint, does TRG
21   -- my question is, does TRG agree that Gram and
22   Hazard received revenues by reason of and based on
23   the reading of images by Patel and Pampati?
24  A    We deny that allegation.
25  Q    What's the basis -- you're saying that

**60**

1    you didn't get any money, that Gram and Hazard
2    didn't get money for work done by Patel and
3    Pampati?
4  A    Because we didn't collect basically
5    almost every single one of those collections. In
6    fact, we still haven't received those monies.
7    They're all held up and probably all in timely
8    filing now, and yeah, basically we just deny the
9    fact that you, know, whatever they have been
10   already compensated is what they -- we have been
11   paid by the insurance companies for their reads.
12  Q    And then in number 21 of the complaint
13   it says that Gram and Hazard received more than
14   $2,600,000 for the period of October 2020 through
15   June of 2021. Let's start with that. Do you
16   agree that Gram and Hazard received more than
17   $2,600,000 for that whatever, eight-month period of
18   time?
19  A    I can't confirm or deny that number.
20  Q    Why not?
21  A    And we deny that. Because I just --
22   you know, that's a number that, you know, I'm not
23   -- I don't know off the top of my head, so I deny
24   it.
25  Q    Well, I'm not asking for you to know

Anand Lalaji, M.D.   8/1/2022

16 (Pages 61 to 64)

61

1    off the top of your head.  You're the corporate
2    representative.  One of the topics that you were
3    asked to be responsible for in this deposition are
4    the statements made in pleadings, and you have been
5    -- are you saying that -- is TRG denying that Gram
6    and Hazard made more than $2,600,000 from October
7    '20 through June '21 in receipts?
8    A      We are denying that.
9    Q      What's the basis of that denial?
10   A      Because that number that you reflect in
11   pleading 21 is not reflective of the receipts that
12   Gram and Hazard received between those time dates.
13   Q      How do you know that?
14   A      Because it's part of information flow
15   within TRG as corporate representative.
16   Q      Okay.  And have you -- so if there are
17   bank records that you just simply add up the bank
18   records and it has this number, are you saying
19   those bank records are wrong?
20   A      What we say is that not all of the
21   money that came into the bank is all reflective of
22   readings by Dr. Patel and Pampati, because that's
23   what your 21 is asking.
24   Q      What I'm asking -- hold on just a sec,
25   Dr. Lalaji, if you'll focus here on me.  What I'm

62

1    asking is, did TRG through Gram and Hazard -- hold
2    on -- did it receive more than 2.6 million from
3    October of '20 through June of '21, period?  Did it
4    receive that?
5    A      And I'm saying that I'm denying that
6    based on the fact that that is not -- that is not
7    -- you know, that exact number, 2.6 million, less
8    than that it's a possibility and more than that is
9    a possibility.
10   Q      Well, then that's not really a denial.
11   That's sort of -- what is TRG's position?  Did Gram
12   and Hazard collect more than 2.6 million from
13   October of '20 through June of '21?
14          MR. MILLER: Excuse me.  Yes, he's
15          here as a corporate representative.
16          MR. MORGAN: I'm sorry, Don.  Are
17          you objecting?
18          MR. MILLER: Yes.  This particular
19          con --
20          MR. MORGAN: I will -- let's have
21          one person do objections; okay?  You
22          have two people here representing TRG,
23          and it's either going to be you or it's
24          Ethan, and I've heard both so far.  So
25          we're going to do one; all right?  Is

63

1    it you, Don, or is it Ethan?
2          MR. MILLER: We're not going to do
3          that, Luke.  Don't play that game.
4          MR. MORGAN: No.  Speaking of
5          games, we're not going to have these
6          long rambling speaking objections.  You
7          can object to the form, and if I want
8          to know what the basis is, I'll ask.
9          But you don't get to educate the
10         witness through some rambling speaking
11         objection.
12   Q      So, Dr. Lalaji --
13         MR. MILLER: It calls -- I object;
14         it calls for --
15         MR. MORGAN: I'm not asking for an
16         explanation, Don.  You can raise your
17         objection.  You got it in the record,
18         and I'm asking the witness for his
19         statement.
20   Q      So, Dr. Lalaji, my question was, what
21   is TRG's position on these receipts, just these
22   eight months here from October of '20 through June
23   of '21?
24   A      So can I clarify the question?  Because
25   I'm not understanding your question.

64

1    Q      Okay.
2    A      It's different than 21.
3    Q      Yeah.  That's why I'm saying listen to
4    me, look at me.  Don't be looking at 21.
5          My question is, did TRG get more than
6    2.6 million from October of '20 through June of
7    '21?
8    A      If the bank records show that TRG
9    received more than 2.6 million from the revenues
10   and receipts of Gram and Hazard based on not just
11   Patel and Pampati's reads but all of the
12   radiologists that we have to pay at Gram and
13   Hazard, then that statement is accurate.
14   Q      And historically where does that fit
15   for receipts at Gram and Hazard?
16   A      So another clarifying point; okay?  The
17   receipts during a period of time are from months
18   and months prior, right, to that work; correct?
19   So, you know, so that is how many months?  Let's
20   see.  So it's eight months?  Is that eight months?
21   October, November, December, January, February,
22   March, April, May, June.  So it's nine months
23   basically.  Yes, nine months.  It was nine months.
24   I'm not sure of the answer to that question because
25   I'm not sure of the historical revenue on an annual

Anand Lalaji, M.D.   8/1/2022

17 (Pages 65 to 68)

---

65

1  basis off the top of my head right now.
2  Q      Well, you performed -- you were
3  integrally involved in performing due diligence --
4  A      Uh-huh. (Affirmative)
5  Q      -- on Hazard and Gram prior to the
6  purchase; correct?
7  A      Correct.
8  Q      And one of the things that you would
9  want to know is how much they made on an annual
10  basis?
11  A      Yes, correct.
12  Q      And you don't know. So you don't know
13  right now where this fits in, a 2.6 --
14  A      Yeah, because you take eight months and
15  you take a small section of that time, it doesn't
16  represent the financial stability of that company.
17  You have to take a 12-month basically look at the
18  practice, from acquisition basically to -- from
19  acquisition to -- you know, in quarters, like three
20  months, six months, nine months, and then a year
21  basically.
22      So when you take this -- you may be
23  shaking your head, but it is true that you have to
24  basically look at it in that realm. Like did we
25  get all that money at the tail end? Did we get no

---

66

1  money in the beginning? You know, it has to really
2  look -- you have to look at the timing of these
3  payments.
4      So the nine months I think -- you know,
5  that's why we basically deny this because it's a
6  question of, you know, when did that reading take
7  place versus when it was received, and what did the
8  financial picture of the practice look like at
9  three, six, nine, and 12 months, and when did that
10  money come in.
11  Q      Are you back to denying this number
12  now?
13  A      Well, the number is 2.6 million, and so
14  off the top of my head I don't know if that number
15  is accurate or not, so that's why we're denying the
16  number.
17  Q      Now another thing to keep in mind is
18  October 2020 was right after you bought Gram and
19  Hazard; right?
20  A      Correct.
21  Q      So this would have been for work --
22  receipts received in October of 2020 would've been
23  work typically done for September, maybe August,
24  July, June of 2020; correct?
25  A      Correct, yeah.

---

67

1  Q      And that has that same lag for this
2  period of time; correct?
3  A      Say that again.
4  Q      There's the same 30- to 90-day lag and
5  can go up to 180 days, but typically these receipts
6  follow work that was done in the previous one to
7  three months?
8  A      That's usually the highest part of the
9  bell-shape curve, yes. It extends out to 120, 180,
10  like you said, days, sometimes a year.
11  Q      And so what I -- going back to this
12  fiduciary duty and what you were saying is that
13  Patel and Pampati just wouldn't do anything, here
14  we see that 2.6 has come in during this first nine
15  months of them being TRG employees; right?
16  A      Again, I'm not agreeing to that figure.
17  Q      To the number 2.6?
18  A      Yes. Right.
19  Q      Well, how do I get you to agree at
20  least to the number?
21  A      I don't think you can.
22  Q      All right. And one other thing I think
23  that's important that I would like to think that we
24  can get an agreement on this, that if in 2020
25  during the time period of this October to June, we

---

68

1  were dealing very much with the pandemic, and all
2  these -- many of these services, people weren't
3  going to the hospital like they were in the summer
4  of 2020 like they were in the summer of 2019;
5  correct?
6  A      Correct. However, many hospitals
7  rebounded after April and May of 2020. So the
8  summer of '20 I would have to look and compare the
9  billing records and the volume records. There was
10  an initial drop, but it recovered and rebounded
11  quite significantly in terms of ARH.
12  Q      If you'll turn the page of the
13  complaint, sir, and I'm looking at paragraph number
14  23 now. Well, you're certainly welcome to read
15  paragraph 22. That's where it talks about the
16  funds being deposited in the Peoples Bank in
17  Hazard, and then number 23 talks about the
18  temporary injunction that was issued in this case
19  preventing the defendants from dissipating or
20  distributing funds received by Gram and keeping
21  them in the Peoples Bank of Hazard. Do you
22  remember that?
23  A      I remember it.
24  Q      Do you admit -- does TRG, well, and
25  Anand Lalaji admit that the money that was being

---

Anand Lalaji, M.D.   8/1/2022

69

1  deposited into the bank after this injunction in
2  September of 2021, the money that was going into
3  the bank in the Peoples Bank of Hazard was being
4  withdrawn and placed into another bank in Georgia?
5           MR. MILLER: Object to the form.
6  A        After the injunction?
7  Q        Yeah.
8  A        Money was being deposited -- money was
9  going to in general -- let me take a step back.
10  When we acquire a practice, in order to pay all of
11  the -- no payments were being made from Gram and
12  Hazard to Peoples Bank anymore. All the payments
13  to operate the practice were being made now by our
14  central payroll and AP system. And so in order to
15  do that, in order to pay for the physicians and
16  everything at Gram and Hazard, money was going from
17  the Peoples Bank like it normally does to TRG
18  central operating payroll and AP bank account so
19  that it could pay all the expenses at Gram and
20  Hazard. And I believe -- I mean, there's been a
21  lot that's happened since this injunction that was
22  placed. And, you know, basically we followed -- in
23  order to keep the practice going we paid all of the
24  radiologists and all of the expenses and vendors
25  and everything. We kept it going from the TRG

70

1  system to all of those vendors.
2  Q        My question, sir, is, the money that
3  went into the Peoples Bank after September 9 of
4  2021, the money that went into the TRG or
5  Gram/Hazard bank account at the Peoples Bank, that
6  money was being taken out of the Peoples Bank and
7  put into this main account, the TRG account at a
8  different bank; correct?
9  A        In order to pay the expenses and
10  doctors of that practice; correct.
11  Q        Despite the injunction saying you pay
12  the money, you pay these vendors, you pay whatever
13  debts are owed from the Peoples Bank?
14  A        I believe that there was -- and again,
15  I believe that there was a stipulation for us to
16  continue payments to the practice because there was
17  no way to make those payments from the Gram and
18  Hazard bank.
19           MR. MORGAN: Will you give him
20  Exhibit No. 3, please?
21  Q        What's being handed to you is Exhibit
22  No. 3. This is a copy of the temporary injunction
23  that was issued on September 9. Why don't you flip
24  through the whole thing and tell me where it says
25  anything other than the money that gets into the

71

1  Peoples Bank is supposed to stay there, although
2  the money can be used to pay salaries?
3  A        Wasn't this injunction quashed or
4  lifted?
5  Q        It was dissolved.
6  A        It was dissolved; correct.
7  Q        And that was in January of 2022. So
8  from September of 2021 through January of 2022 this
9  was the law.
10           MR. JOHNSON: I would object to
11  that. It was retroactively dissolved.
12  Q        So I'm asking, Dr. Lalaji, where in
13  here does it say that you can take the funds out of
14  the Peoples Bank and send them to another bank?
15  A        So in this dissolved injunction it
16  doesn't.
17  Q        But that was done nonetheless; correct?
18  A        To keep the practice alive, correct.
19  Otherwise we would've -- that practice would've
20  folded at that exact time because there was no --
21  about, you know, 60 percent of the volume and the
22  radiologists were TRG radiologists that were
23  supporting the Gram and Hazard practice. And so
24  basically that injunction would've basically closed
25  the practice almost immediately and probably put a

72

1  lot of people out of business, employees would've
2  been let go, et cetera.
3  Q        You never asked -- no one from TRG
4  asked the judge to change this or said all these
5  people are going to lose their jobs?
6  A        I believe my attorneys at the time
7  stated that to the judge.
8  Q        And on this -- did you direct -- once
9  this injunction was signed off on, became a matter
10  of record, did TRG notify the judge that it was
11  going to take this money anyway from the Peoples
12  Bank and take it to Georgia?
13  A        I don't know if that was done or not.
14  Q        You did not?
15  A        I did not.
16  Q        If you'll look in the complaint here,
17  the next page, and specifically what I'm asking you
18  to look at are paragraphs number 28 and 29, and let
19  me know when you finish.
20  A        Yeah, I'm done.
21  Q        Paragraph 28 generally talks about the
22  termination letters that Drs. Patel and Pampati
23  received in October of 2021; correct?
24  A        Correct.
25  Q        And paragraph number 28 also talks

**Anand Lalaji, M.D.   8/1/2022**

73

1  about this lawsuit that was filed in Georgia by TRG
2  against Drs. Patel and Pampati; correct?
3  A       Correct.
4  Q       Tell me your understanding of the
5  purpose of filing this lawsuit in Fulton County,
6  Georgia.
7  A       The process?  What do you mean?
8  Q       No; the purpose.  Why?
9  A       Okay.  Yeah, so it's clear that Patel
10 and Pampati committed fraud, and based on the -- if
11 you read the complaint in the Georgia suit, the
12 fraud was perpetrated by the fact that radiologists
13 have to be the ones that are given the final say on
14 the report that goes out to patients.
15        Since about 75 to 80 percent of the
16 patients of Gram and Hazard are CMS patients,
17 Medicare or Medicaid, the process by which Patel
18 and Pampati -- this was their process:  For MCHC,
19 which is Mountain Comp, they basically were
20 dictating all the exams to a transcriptionist, who
21 is not a certified radiologist, not -- you know,
22 it's just a transcriptionist that basically takes
23 whatever they say and puts it on the report in a
24 preliminary status.  Then Patel and Pampati would
25 give their login information and security and

74

1  credentials to members of their staff to basically
2  sign off on these reports without Patel and Pampati
3  actually looking at the final version of the
4  report.  So these people do not have a radiology
5  license, they don't have a -- they didn't complete
6  a radiology residency, they do not know -- they do
7  not know nor do they look at each one of these
8  reports to make sure that what was going out was an
9  actual valid report.  And it's very clear in the
10 false claims act and CMS guidelines that that is a
11 false claim violation.
12        And so we were not aware of this
13 activity before we acquired the practice.  We asked
14 the question, we did our due diligence.  You know,
15 Patel and Pampati represented that we were, you
16 know, signing off -- they were reading the cases at
17 Mountain Comp, and they were signing off on the
18 reports after viewing them and modifying them, but
19 that was not happening.  So that puts TRG in a
20 grave amount of liability because, you know, this
21 was occurring prior to the practice -- prior to
22 acquisition of the practice.  And so this is a
23 regulatory issue that we were not aware of, and
24 hence, that was the purpose of the suit in Georgia
25 because it was very clear that Patel and Pampati

75

1  violated the CMS guidelines, CMS law, for a false
2  claim act and violation, so FCA violation
3  basically.
4         And so because we now own the practice,
5  we have to go through a number of steps.  One is,
6  is we have to make sure that -- you know, make sure
7  that we stop that practice almost immediately,
8  which we moved MCHC to the RamSoft system so that
9  way that cannot happen anymore.  Two, we filed the
10 suit in order to memorialize the fact of where
11 exactly the violations occurred within the CMS
12 doctrine; and then three, we have to self-report
13 ourselves to Medicare because of this sort of
14 breach, and so that's what we did.
15 Q       So that I'm clear, the allegations of
16 fraud involve only Mountain Comp claims?
17 A       That's correct.
18 Q       And that's because ARH wouldn't get
19 onto the RamSoft system?
20 A       No.  That's because as far as we know
21 Patel and Pampati did not give their login and
22 access credentials to secretaries and other people
23 to sign off on reports within the ARH system.  As
24 far as we could tell they were the ones signing off
25 on their reports.

76

1  Q       So in the Mountain Comp system the
2  allegation is that Patel and Pampati would look at
3  a study, dictate their findings, that gets
4  transcribed, and out the door it goes essentially;
5  correct?
6  A       Yeah.  In order for it to go out the
7  door it has to be approved and signed off by a
8  board-certified radiologist.
9  Q       And there's no dispute that Dr. Patel
10 or Pampati are board-certified; right?
11 A       Correct.
12 Q       And you're not disputing that they did
13 the read, that they looked at this image?
14 A       No, no.  We're not disputing that at
15 all.
16 Q       And there's no question that they did
17 do some dictation, they made findings, and they
18 sent them for transcribing to this person who also
19 had their login and credentials and all that;
20 correct?
21 A       I believe it was a different group of
22 people that had their login and credentials.  The
23 transcriptionist was a separate entity, a separate
24 person, and then -- that was employed by Mountain
25 Comp.  The people that had Patel and Pampati's

Anand Lalaji, M.D.   8/1/2022

20 (Pages 77 to 80)

---

77

1  signatures, meaning credentials, were employed by
2  Patel and Pampati.
3  **Q      Or Gram?**
4  A      I'm sorry; Gram.  Correct.
5  **Q      Gram and Hazard.**
6  A      (Witness nods head affirmatively.)
7  **Q      And so what I understand now is the**
8  **doctors would make their findings based on their**
9  **observations of the study.  It would go off to**
10 **someone to transcribe outside of Gram and Hazard;**
11 **right?**
12 A      I'm not sure.  Yeah, the
13 transcriptionist at Mountain Comp; correct.
14 **Q      Do you know that for sure?**
15 A      I'm pretty confident, yes.
16 **Q      Okay.  And do you know how long that**
17 **transcrivener had worked with Drs. Patel and**
18 **Pampati?**
19 A      No.
20 **Q      And so the transcrivener does their**
21 **thing, and it comes back to Gram and/or Hazard, and**
22 **then the allegation is someone there at the**
23 **business will then take the -- log the credentials**
24 **and electronically fix doctor's signature to that**
25 **report; is that right?**

---

78

1  A      Yeah.  It's all in the same system, so
2  whatever their PACS system is, once the transcribed
3  report is there, the radiologist's credentials is
4  the highest level of credentials, so that way the
5  radiologist can fix whatever mistakes that the
6  transcriptionist made, approve and verify that this
7  is exactly what the findings are on this report,
8  and then they put their signature at the bottom of
9  it by hitting approve and finalize.  The allegation
10 is that Patel and Pampati were not doing that
11 themselves; the secretaries were doing that for
12 them.
13 **Q      But there's no claim that the reports**
14 **were not -- the studies were not being read;**
15 **correct?**
16 A      The studies were being looked at by
17 Patel and Pampati.
18 **Q      Yeah, right.  And there's no claim in**
19 **the Georgia suit or anywhere else that this has**
20 **affected patient care; right?**
21 A      Right now there's -- right now the
22 claim is -- the CMS and the FCA violation will say
23 that it affected patient care, plus we do have
24 several examples in the reports of MCHC at least
25 catching reports before they go out to the patient

---

79

1  of massive mistakes in these reports that Patel and
2  Pampati had, where it would say there's cancer but
3  no cancer or there's gallstones and no gallstones,
4  there's a fracture and there's no fracture, because
5  the transcriptionist can't -- is not a radiologist;
6  if they're dictating very fast and words like the
7  and no and certain things may be left out, which
8  is why you have a radiologist that verifies the
9  report and looks at the images while they're
10 verifying that transcribed report so that they know
11 that the authenticity and the certification of that
12 report is from the radiologist and not from someone
13 else.
14 **Q      So you have instances that you allege**
15 **where these reads did affect patient care?**
16 A      Well, that did affect -- that were
17 significant mistakes that were thankfully caught by
18 MCHC and then given back to Patel and Pampati to
19 fix.  Now remember --
20 **Q      And they did.  And Patel and Pampati**
21 **did make these --**
22 A      Yeah.
23 **Q      Hold on a second.  You're aware that**
24 **there are instances in which I guess the**
25 **transcrivener or whoever at MCHC would have**

---

80

1  questions for Patel and Pampati and contact them
2  and ask them?  Are you aware of that?
3  A      It could happen, but I'm not aware of
4  it.
5  **Q      But you're saying that someone, whoever**
6  **at MCHC, caught these mistakes and sent them to**
7  **Patel and Pampati to correct.**
8  A      Whatever mistakes that they did catch,
9  which doesn't mean that's the totality of all the
10 mistakes; correct.
11 **Q      How would MCHC be aware that this was a**
12 **mistake?**
13 A      Various mechanisms.  One, the referring
14 physician would get the report and say, this
15 doesn't make any sense, please get this fixed.
16 Sometimes MCHC, when Patel and Pampati were reading
17 for them, just scanned through the reports because
18 it was known that, you know, a lot of their reports
19 would have these types of mistakes on them.  And
20 we're learning this retroactively.  I mean, we
21 didn't know any of this was going on.  And so that
22 would be the other way, that they would just scan
23 the reports to make sure that there's nothing weird
24 or missing or something, et cetera.
25        But, you know, it would basically come

---

Anand Lalaji, M.D.  8/1/2022

21 (Pages 81 to 84)

81

1  by one of those two mechanisms, but usually that's
2  not the full gamut of the potential harm that can
3  be done because, you know, sometimes when you tell
4  a patient that he or she has got nothing in the
5  report, but yet there's something there, then that
6  patient may go on thinking that nothing is wrong.
7  And so we wouldn't pick up those particular issues
8  because, you know, we wouldn't know about them.
9  That's what a full-scale investigation would do.
10  Q        But you have instances now in which
11  mistakes have been identified?
12  A        When Patel and Pampati were reading in
13  this manner, yes.
14  Q        I need copies of that material. Have
15  you provided that to your lawyers?
16  A        I'm not sure, but we will send you
17  that. Yes, for sure. And it's also through
18  witnesses. You know, the people that now are
19  employed by us state that, and the people that are
20  working at MCHC currently also state that.
21  Q        And are these recorded statements?
22  A        I believe some of them are e-mails,
23  some of them are verbal statements. But if you're
24  asking if they're under oath and that sort of
25  thing, no, not yet.

82

1  Q        Well, have you provided any of that to
2  your lawyers, the e-mails, the statements?
3  A        Yeah, yeah. For sure.
4  Q        Oh, you have?
5  A        Uh-huh. (Affirmative)
6  Q        Then I need that information. That
7  should've been produced long ago. When did you
8  provide it to your lawyers?
9  A        I mean, it was just during, you know,
10  all of the normal discovery that we did internally
11  in terms of all of our communication. And
12  especially when -- you know, with our Georgia
13  attorneys basically wanting to know all of the
14  communications with Patel and Pampati during the
15  fraud investigation.
16  Q        Are you familiar with the signature
17  requirement within CMS of the attestation rule?
18  A        I know what it is, but I'm not
19  intimately familiar with it.
20  Q        What's your understanding of it?
21  A        Well, the physician attests to that
22  report being accurate and associated with that
23  patient, and it's their findings that they are
24  basically signing -- that they are signing off on.
25  But I would have to research the -- our Georgia

83

1  counsel can basically state it, you know, a little
2  bit better than I.
3  Q        I'm just asking what your understanding
4  is. And then what is your understanding of whether
5  CMS has contacted TRG about any of these allegedly
6  fraudulent reports?
7  A        So my understanding is that as a
8  radiologist you have to make sure that the report
9  that goes out has got all the words, everything
10  that you want on the report. You are taking
11  responsibility for that read; okay? Nobody else
12  is. And you are certifying it. When you log in
13  with your credentials, you are certifying and
14  officially attesting to the fact that you have
15  looked at this report, you've looked at the images,
16  and this is the report and the findings that are
17  associated with that patient. And in this
18  particular case that did not happen, and hence the
19  fraud that's being alleged that was performed.
20          In terms of us contacting CMS, all I
21  can tell you is that we have submitted -- we have
22  to self-report. So we have submitted all of the
23  sort of information, we followed their process, and
24  we've submitted it, and they usually have anywhere
25  from -- you know, it could take them up to a year

84

1  to a year and a half to basically respond, you
2  know, because they just move very slow and they're
3  backlogged. So we've got confirmation that all of
4  that has been received and that an investigator
5  will be contacting us, and that's where we're at
6  right now.
7  Q        Has CMS or a MAC or anybody associated
8  with this process presented TRG with a billing that
9  they feel is improper?
10  A        No.
11          MR. MILLER: Luke, excuse me.
12  We've been at this almost two hours.
13  Can we take a short break?
14          MR. MORGAN: Yeah, let's take a
15  short break here. We'll go off the
16  record.
17          (A brief break is taken.)
18  Q        We're back on the record, and you're
19  still under oath.
20          We were talking about the termination
21  of Drs. Pampati and Patel's employment. I'll show
22  you what'll be collectively marked as Exhibit 11.
23  And these are I think identical almost. So one is
24  addressed to Dr. Patel, and the other is addressed
25  to Dr. Pampati. These, like I say, are mostly -- I

Anand Lalaji, M.D.   8/1/2022

85

1     think these are the same except the one to
2     Dr. Patel is not signed, but the one to Dr. Pampati
3     is.  Do you have any explanation for why Akira
4     LeBlanc did not sign one?
5                 (Said documents are filed with this
6                 deposition and marked as Plaintiff's
7                 Exhibit No. 11 for purposes of
8                 identification.)
9     A         No.
10    Q         Nevertheless, they're both fired;
11    right, for the reasons expressed in this?
12    A         Correct.
13    Q         And they had not been paid their
14    salaries since being fired to this date, have
15    they?
16    A         I'm not sure when the last payment was
17    made to them.
18    Q         Well, who would know that?
19    A         Probably our current CFO.  He can pull
20    the records and see.
21    Q         What did you do to prepare for this
22    deposition to find out when the last time that
23    these men had been paid, which underlies at least
24    two separate counts of this complaint?
25    A         I mean, I prepared by looking at

86

1     whatever the documents that are associated in this
2     case and the issues that are in there.
3     Q         But you didn't look up when they last
4     got paid?
5     A         No.  That's a specific item.  I mean,
6     it's been stated in the past, but I'm not sure
7     exactly at this moment.
8     Q         Well, are you saying that they have
9     been paid?
10    A         I'm not saying that.  I'm not sure
11    exactly when the last time they were paid.
12    Q         Let's go back to the complaint, which
13    is Exhibit No. 1, and on paragraphs 29, 30, 31, and
14    32.  Why don't you read those, please?  Let me know
15    when you're done.
16    A         Okay.
17    Q         In the answers TRG just flatly denies
18    these paragraphs.  It just says, defendants deny
19    the allegations contained in these paragraphs.  So
20    what I want to ask you about specifically is in
21    these paragraphs the plaintiffs have said they
22    haven't been paid their salaries, wages, leave
23    balances, and I need to know what is TRG's basis
24    for denying that Patel and Pampati have not been
25    paid.

87

1     A         Well, we believe we have been paid.
2     That's the basis of the denial.
3     Q         They've been paid all that they're
4     owed?
5     A         In our estimation they have been paid,
6     and we disagree with these allegations in 29 to 32.
7     Q         Well, are you saying, though, then -- I
8     mean, you don't know when they were last paid;
9     right?
10    A         I know they were paid about 1.6
11    million.
12    Q         I asked when they were paid.  You don't
13    know when they were last paid?
14    A         No, not exactly, no.
15    Q         So how do you know that they have not
16    been paid for what they were owed before they were
17    fired?
18    A         So you're asking if I know or do not
19    know?  Do I know or do not know?  I don't -- can
20    you repeat the question?
21    Q         Do you know -- let me rephrase it this
22    way:  What is TRG's basis for saying the plaintiffs
23    have been paid all that they're owed?
24    A         I guess whatever the -- all of the
25    things that go into whatever they -- whatever Patel

88

1     and Pampati did in this time period based on what
2     they have been paid, I assume that TRG's denial of
3     these allegations is based on the fact that they
4     are -- you know, that they believe that Patel and
5     Pampati are not owed these sums.
6     Q         Why?  What's the basis for that?
7     A         Everything else that we have talked
8     about.
9     Q         You need to be more specific.
10    A         Fiduciary responsibility, they --
11    they --
12    Q         Well, oh, so because they violated the
13    fiduciary responsibility they don't need to be paid
14    for their salaries?
15    A         No, that's not what I said.  What I
16    said is, is that we are denying these paragraphs
17    because we disagree with your assertion that they
18    are owed this money.
19    Q         I get that.  Why?  What is the basis
20    for disagreeing with that assertion?
21    A         The basis is, again, the fact that our
22    calculations show, based on all of the information,
23    that defendants have been -- I mean, plaintiffs
24    have been paid accordingly.
25    Q         So if Patel and Pampati have not been

Anand Lalaji, M.D.   8/1/2022

89

1  -- did not receive any payments for reads since --
2  let's say since August of 2021 -- and they were
3  clearly doing work for TRG in August and September
4  of 2021; correct?
5  A       I would have to look at the records.
6  I'm not sure of the time period.
7  Q       You don't know if they were?
8  A       I don't know. I mean --
9  Q       How am I supposed to ask these
10 questions? You're not prepared.
11 A       I am prepared, but Gram and Hazard is
12 not TRG's only client; right? It's got hundreds
13 and hundreds of clients, and when you ask me for a
14 specific time of a specific dollar amount in a
15 specific period of time that was a year ago, then
16 I'm telling you that I'm not sure if that exact
17 dollar amount is -- and exact time period I'm not
18 going to attest to because of the fact that it may
19 or may not be accurate. And so that is what I'm
20 saying. And I'm definitely prepared because I've
21 answered all your questions.
22 Q       Sir, I'm asking when were Patel and
23 Pampati last paid for their work, and you don't
24 know.
25 A       I don't know.

90

1  Q       So how are you going to be able to say
2  that they were paid for the work that they had done
3  since the last time they were paid and before they
4  got fired?
5  A       Well, they weren't fired because of
6  their work. They were fired because of the fraud.
7  Q       You're not answering my question.
8  A       The question is, is that TRG asserts
9  that plaintiffs have been paid and TRG owes no sums
10 of money for that.
11 Q       And you don't know when they were last
12 paid?
13 A       I don't.
14 Q       Much less how much?
15 A       Correct.
16 Q       So are you saying that these guys were
17 fired on October 28th, and at that point in time
18 they were owed nothing?
19 A       Correct.
20 Q       So they had been working for free on
21 October 27, October 28?
22 A       Yeah, we'd have to see if they were
23 actually working or not. From my understanding,
24 they were really not working. In fact, I believe
25 that Dr. Pampati took a six-week hiatus or

91

1  something. He went to India, and so he didn't do
2  any work. So we'd have to look at the records to
3  see what they actually were working as, in what
4  capacity.
5  Q       And you did not look at any records --
6  A       I did not specifically.
7  Q       -- before coming here?
8  A       Well, no, not those particular records,
9  no. I looked at --
10 Q       Records dealing with damages, records
11 that deal with claims?
12 A       I didn't look at those specific records
13 right before I came here, no.
14 Q       Have you ever?
15 A       Sure. A year ago I did, yes.
16 Q       And you don't have any recollection of
17 what you remembered then?
18 A       I don't.
19 Q       The process of TRG-Assist and sending
20 the studies to a cloud and people being in other
21 countries other than the United States looking at
22 this information, and you said that there would be
23 radiologists who would conduct reviews on that and
24 put down their observations; correct?
25 A       Internally, correct.

92

1  Q       And those persons, you said they were
2  not billed for their work?
3  A       Correct.
4  Q       Those persons, when they did that type
5  of work, though, in the Phillippines or India,
6  their names would appear on those bills as the
7  transcriptionist; correct?
8  A       Their initials or -- it depends. The
9  transcriptionists, which are the templaters, names
10 would appear on them. Remember there's a whole --
11 there's like seven steps. So their initials would
12 appear, the person that templated the exam.
13 Q       Let me try and ask this clearly. The
14 person in the Phillippines who's looking up on --
15 A       It's not that simple. Let me explain.
16 I went through this whole process, so let me go
17 through it again. So there's a whole series of
18 steps.
19 Q       Actually, I'm sorry; let me interrupt
20 you because I don't need all these words just
21 thrown around. So let me make sure that I
22 understand --
23 A       Sure.
24 Q       -- and then you correct me. In this
25 process in which a radiologist outside the United

**Anand Lalaji, M.D.   8/1/2022**

---

93

1   States is looking at this study -- okay?  With me
2   so far?
3   A        Yes.
4   Q        Am I understanding this?
5   A        Yes.
6   Q        Okay.  They make their observations,
7   and then someone board-certified in the United
8   States will also then later look at those
9   observations; correct?
10   A        And the images and the exam; correct.
11   Q        And then that person who's board-
12   certified in the United States, that's what is sent
13   off to the insurer for billing?
14   A        To the client; correct.
15   Q        And when that goes to the client for
16   billing, the person who is offshore who makes this
17   initial examination, their name or initials appear
18   on that form as the transcriptionist?
19   A        No.
20   Q        Would there ever be some occasion in
21   which that would occur like that?
22   A        No.
23   Q        Okay.  Did you see an e-mail that I
24   sent to your lawyers on October 20 of 2021 alerting
25   them to concerns that Patel and Pampati had about

---

94

1   doctors outside the United States looking at
2   images?
3   A        My attorneys showed me that e-mail.
4   Q        And that was prior to their
5   termination; correct?
6   A        Correct.
7   Q        If you'll look at the answer, which is
8   Exhibit No. 9.  You got that, sir?
9   A        Uh-huh.  (Affirmative)
10   Q        If you'll go towards -- if you go to
11   page 12 of that and you'll see a heading there,
12   thirty-first defense.  Let me know when you got
13   there.
14   A        I'm here.
15   Q        It says that defendant, and I think
16   that you agree with me that's a typo; it should say
17   defendants, exercised reasonable care to prevent
18   and correct promptly any behavior or activity in
19   violation of plaintiffs' respective employment
20   agreements.  What are you referring to here?
21   A        Defendant exercised -- or defendants
22   exercised reasonable care to prevent and correct
23   promptly any behavior or activity in violation of
24   plaintiffs' respective employment agreements.
25   Well, you're only taking half of that sentence.

---

95

1   There's the other half.
2   Q        Okay; well, look at it all.
3   A        And plaintiffs unreasonably failed to
4   disclose or take part in corrective opportunities
5   provided by defendants or to avoid violative
6   behaviors or activities otherwise.
7   Q        That's what it says.
8   A        It basically means that whatever
9   business dispute that was happening or whatever --
10   you know, clearly their position on things were
11   different than ours.  We did everything in our
12   power to try to resolve it.  However, they -- I
13   believe this said that they unreasonably failed to
14   take part in any of those corrective opportunities.
15   Q        So the first part of this -- do you
16   agree with me that this first part of this
17   statement suggests that defendants exercised
18   reasonable care to prevent and correct promptly any
19   behavior or activity in violation of plaintiffs'
20   employment agreement, so that says to me that the
21   defendants corrected whatever they did in violation
22   of the plaintiffs' employment agreements.  Do you
23   agree with me on that?
24   A        Defendant exercised reasonable care;
25   right.  So we within reason to prevent and

---

96

1   correctly prompt [sic] anything that was in
2   violation of the employment agreement.
3   Q        So what I'm asking is, what did you
4   correct promptly or otherwise?  What behavior of
5   the defendants in violation of the plaintiffs'
6   employment agreements were corrected?
7   A        This would refer to things where, for
8   example, if we were -- if there was an issue
9   brought to us -- if the plaintiffs brought an issue
10   to us revolving around whatever is happening in the
11   practice, and could be clinically as well, we
12   didn't wait.  We immediately assessed the situation
13   and then took reasonable care to correct promptly
14   that issue basically.  So if they're saying that a
15   physician is upset about something, then our team
16   would go look at that.  If they say that there's
17   something going on with the turnaround time, if
18   they say that -- basically any issue that was
19   brought to the table we jumped on it, and we
20   basically were highly communicative and we tried to
21   solve whatever that issue was.  But what we quickly
22   found out is that the plaintiffs were the number
23   one reason why some of those issues did not get
24   resolved.
25   Q        The plaintiffs were the number one

---

Anand Lalaji, M.D.   8/1/2022

97

1    reason why?
2    A        Yeah, because they unreasonably failed
3    to disclose or take part in any corrective
4    opportunities.
5    Q        So what I hear you saying is defendants
6    were blameless in any kind of problems or the
7    problems that occurred here with Gram and Hazard,
8    defendants had no part of that?
9    A        That's not what it's saying here.  What
10   it's saying here is that we exhibited reasonable
11   care to try and prevent -- because any business
12   relationship will have its ups and downs and have
13   its issues, and so usually the parties work them
14   out.  However, in this particular case when we
15   tried to promptly correct anything, the plaintiffs
16   were the number one reason why things did not get
17   resolved, and that's what this sentence is saying.
18   Q        Have you ever heard the accounting
19   department at TRG referred to as a fire drill?
20   A        Yeah.  I mean, when things are busy
21   kind of a little chaotic, yeah.
22   Q        And in fact, in '21 there was one
23   person, the person who had been there for a long
24   time at TRG's accounting, she just quit; correct?
25   A        Yeah.  She had stayed -- she wanted to

98

1    retire two years earlier, and so we asked that she
2    stay on as long as she possibly can.  But then
3    obviously she then moved on once we got bigger and
4    busier, and, you know, there was a lot of movement,
5    so --
6    Q        And that was part of what William
7    Crenshaw was -- he was helping at least to oversee
8    some of the aspects of the accounting department;
9    correct?
10   A        Correct.
11   Q        And he was there during this period of
12   time that she quit, resigned?
13   A        Correct, yes.
14   Q        And when she was gone there was only
15   one person left in accounting; right?
16   A        No.
17   Q        Who else was there?
18   A        We had brought in an interim
19   controller.  We also had brought in a few
20   receivables and AP management folks, so there was
21   about four -- there were about three to four people
22   in the accounting department.
23   Q        And it's fair to say that there was a
24   lot of -- there were bills not getting paid during
25   the spring of 2021 for Gram and Hazard and its

99

1    various entities, like the water bill for example.
2    Remember that?
3    A        Yeah, when the bill went to a different
4    location, and then we realized it two months later;
5    correct.  Yes.
6    Q        Is that part of these correctly prompt
7    [sic] any behavior in violation of the plaintiffs'
8    employment agreement?
9    A        I don't think -- I'm not sure if that
10   particular -- the water bill thing, I'm not sure.
11   Maybe it could be, but I don't think it really
12   emphasizes that to that sort of degree.
13   Q        Going back to the termination letter
14   here, Exhibit 11, like I say, they're the same.
15   I'm on the first page here with the letterhead.
16   The last paragraph, it says, in addition to your
17   fraudulent activity, you breached your fiduciary
18   duty to the companies, violated the noncompete
19   clause of your offer letter, and disparaged the
20   companies.
21            I think you've talked a little bit
22   about the fraudulent activity and your allegations
23   of breaching fiduciary duties.  What's the basis
24   for saying that Drs. Patel and Pampati violated the
25   noncompete?

100

1    A        So we have reason to believe that they
2    violated their noncompete.
3    Q        Well, that's -- you know, we got to
4    have a little bit more information than that, sir.
5    What's your basis for saying that?
6    A        We believe that they have read
7    radiology studies in the state of Kentucky, which
8    is a violation of their noncompete.
9    Q        And when would those reads have
10   occurred?
11   A        After they were terminated.
12   Q        Well, the letter here is dated October
13   28th.
14   A        Sorry, sorry.  Before they were
15   terminated, during the period basically prior to
16   October the 28th, 2021.
17   Q        That they were doing readings for other
18   practice groups or something?  Is that what you're
19   saying?
20   A        Yeah.  Doing reads for other entities
21   within the state of Kentucky.
22   Q        Who?
23   A        I don't know off the top of my head.
24   Q        When?
25   A        At some point in their arrangement with

Anand Lalaji, M.D.  8/1/2022

26 (Pages 101 to 104)

101

1   us before October the 28th.
2   Q        And what's the proof of that?
3   A        From information that we received from
4   people that we know in and around ARH and people
5   that are employed that are not -- I don't know
6   offhand exactly.
7   Q        So you don't know why -- you don't know
8   the basis of these claims that they have violated
9   the noncompete?
10  A        The basis of these claims is that they
11  read studies in the state of Kentucky.
12  Q        But you don't know for whom or when;
13  correct?
14  A        Not at this moment, no.
15  Q        Did you at some point in time?
16  A        At some point in time I did, but I
17  don't recall.
18  Q        This isn't even a year ago, and you
19  don't know that now?
20  A        That's correct.
21  Q        And you did nothing to -- did you look
22  at this letter before you testified today, in
23  preparation for today's testimony?
24  A        I did.
25  Q        When?

102

1   A        Last week maybe, Wednesday or Thursday.
2   Q        That was part of the three-hour primer?
3   A        Yeah. Well, I didn't do three hours
4   straight.
5   Q        Yeah.
6   A        So I did like kind of 20 minutes here
7   and 20 minutes there.
8   Q        And when you saw the claim in here that
9   they had violated the noncompete, you did nothing
10  to refresh your recollection of the claim of that?
11  A        Nope. I would assume that our
12  investigative individuals and our attorneys and our
13  general counsel or whatever, they wouldn't -- they
14  would've put -- they wouldn't have put something in
15  here unless they knew that this type of activity
16  had occurred.
17  Q        Well, that's a fair assumption, but
18  it's also part of your responsibility here to
19  testify about the bases of these claims, and you
20  don't know, do you?
21  A        Not right now at this moment, no.
22  Q        Tell me about the allegation that they
23  had disparaged the companies.
24  A        So I don't know specifically, but I do
25  know at a high level in speaking with radiologists

103

1   that worked for TRG that worked for Gram and --
2   that did reads for ARH and that read for Gram and
3   Hazard of things that they had mentioned about TRG
4   to other physicians and other radiologists that
5   were incorrect, not true, and, again, were items of
6   a disparaging quality, and that's why I guess our
7   team put that in there.
8   Q        What'd they say that was disparaging to
9   TRG?
10  A        Again, right at this moment I don't
11  know the exact content of that.
12  Q        And you didn't do anything to try and
13  figure that out in preparation of this deposition,
14  did you?
15  A        No.
16  Q        You have no information that after
17  October 28, 2021, either Drs. Patel or Pampati have
18  done reads for anyone within the state of Kentucky?
19  A        I don't know that. I don't know that
20  off the top of my head, but -- I don't know that.
21  I do know that they were communicating with some of
22  the existing customers of Gram and Hazard after
23  their termination.
24  Q        What do you mean by that?
25  A        There's a few e-mails, in fact that you

104

1   produced to us, that show that Patel and Pampati
2   were communicating with Mountain Comp, for example,
3   after they were terminated.
4   Q        Communicating about what?
5   A        About the sort of relationship and
6   about the -- you know, about providing information
7   about TRG in a negative light with Mountain Comp.
8   I don't have that e-mail, and I'm not sure exactly
9   where that is, but they were -- there was -- I
10  don't know specifically about any reads, but I do
11  know that there was communication between Patel and
12  Pampati with existing accounts of TRG.
13  Q        What's going to happen to Gram and
14  Hazard?
15  A        I don't know.
16  Q        You didn't get the account -- or the
17  contract with ARH, did you?
18  A        No. ARH's contract is gone.
19  Q        And that occurred this year? When did
20  that occur?
21  A        This year. June 1st.
22  Q        And part of the reason that ARH did not
23  renew its contract is because of poor performance?
24  A        No.
25  Q        Bad quality by TRG?

Anand Lalaji, M.D.  8/1/2022

27 (Pages 105 to 108)

**105**

1 A    No.
2 Q    Missed reads?
3 A    Nope.
4 Q    What was the reason?
5 A    One specific reason, and one specific
6 reason only, is the on-site radiology
7 representation at one of their facilities.
8 Q    What does that mean?
9 A    On site.  On-site radiologists.
10 Q    I know what on -- why did they not
11 renew their contract?
12 A    Because we were not providing on-site
13 radiologist services at one of their facilities
14 because the volume of those facilities does not
15 warrant to have an on-site radiologist there.
16 Q    And was that in Harlan?
17 A    No.
18 Q    Where?
19 A    Whitesburg.
20 Q    And that's the only reason why they
21 didn't renew the contract?
22 A    It's the main reason.  And it wasn't a
23 renewal of the contract.  We just mutually decided
24 that they were not going to go with our -- we
25 created a mechanism of covering everything, and

**106**

1 they decided they wanted to go in a different
2 direction in that regard.  So it had nothing to do
3 with renewal of a contract or not.
4 Q    Well, the upshot is it wasn't renewed.
5 A    Well, it wasn't up for renewal.
6 Q    So they terminated it?
7 A    It was a mutual separation.  It was a
8 mutual parting of the ways.
9 Q    And Pampati and Patel had nothing to do
10 with that?
11 A    We don't know, but yeah.  Right now we
12 don't have any indicators that they had anything to
13 do with that.
14 Q    TRG mutually agreed to go a separate
15 way from ARH; right?  Pampati and Patel had nothing
16 to do with --
17 A    That's correct.
18 Q    -- TRG's mutual agreement.  And as a
19 result, as I understand it, this has created a
20 significant problem for the operations of Gram and
21 Hazard, this loss of the ARH contract?
22 A    What do you mean, problems?
23 Q    I mean you don't have money coming in.
24 A    Correct, yeah.  ARH -- that 90-
25 something percent of the revenue of Gram and Hazard

**107**

1 is no longer there.
2 Q    And to the point that I think the
3 statement's been made to the court by TRG counsel
4 that TRG is going to file -- or that Gram and
5 Hazard are going to file bankruptcy.
6 A    That's an option that we are
7 considering.
8 Q    What goes into that consideration?
9 A    You know, just in terms of, you know,
10 doing the analysis.  Just like any company, it's
11 the analysis of, you know, what all the other
12 accounts at Gram and Hazard are we servicing,
13 what's coming in as a result of that, who do we
14 have to pay, you know, doing basically sort of
15 financial analysis without ARH and then determining
16 if we can make those companies work without ARH and
17 if there's anything else that we can give Gram and
18 Hazard to bolster its revenue in that regard.  So
19 that process is ongoing.
20 Q    But as of June 1 ARH is no longer doing
21 work with Gram and Hazard; right?
22 A    Correct.
23 Q    And that was known for some time that
24 you weren't -- you knew at least in May if not
25 April or even March that you had made this mutual

**108**

1 agreed decision to go separate ways.
2 A    No.  That actually was almost done with
3 our general counsel and their general counsel
4 almost in a few days.  So we were meeting with
5 them, we were, you know, trying to, you know, work
6 things out and get things going, et cetera, but,
7 you know, that was basically made between both
8 counsels at the end.
9 Q    When?
10 A    Probably like the last week of May.
11 Q    And the decisions that you're talking
12 about just a second ago that go into whether to
13 stay in business, you haven't had an opportunity in
14 the last 60 days or so to conduct that analysis?
15 A    It's not done yet, no.
16 Q    What effect does this lawsuit have on
17 those decisions?
18 A    None.
19 Q    What other entities of TRG's have filed
20 bankruptcy previously?
21 A    None.
22 Q    So this would be the first?
23 A    Yeah, if --
24 Q    If it happens.
25 A    -- if it's decided, yeah.

Anand Lalaji, M.D.   8/1/2022

28  (Pages 109 to 112)

---

109

1    Q        Before you bought Gram and Hazard,
2    there was some discussion about having a guarantee
3    for -- that TRG would guarantee the contract for
4    the purchase of Gram and Hazard, wasn't there?
5    A        I'm not understanding.  That TRG would
6    guarantee the contract?
7    Q        Uh-huh.  (Affirmative)
8    A        I don't recall.
9            MR. MORGAN:  Is this 12?
10           REPORTER:  Yes.
11           (Said document is filed with this
12           deposition and marked as Plaintiff's
13           Exhibit No. 12 for purposes of
14           identification.)
15   Q        I'll show you what we marked as Exhibit
16   No. 12. And this is entitled, Guaranty Agreement.
17   If you would like to flip to the last page, you can see
18   back here that appears to be your signature on page
19   three.  Have you seen this before?
20   A        Yes, I think so.
21   Q        What do you recall about this document?
22   A        It was part of the documents in the
23   purchase of Gram and Hazard.
24   Q        And in here, as I read at the top of
25   the first page here, it says that this agreement's

---

110

1    between The Radiology Group, the guarantor, and you
2    had confirmed for me earlier that The Radiology
3    Group is the same as TRG; right?
4    A        Yes.
5    Q        And then you've got TRG Holdings as the
6    purchaser, and then you've got Drs. Patel and
7    Pampati as shareholders, and then you've got these
8    various recitals underneath there.  What was your
9    understanding of the purpose of this agreement?
10   A        Give me one second.
11   Q        Sure.
12           MR. JOHNSON:  Just a question about
13           the Bates numbers.  Is that signifying
14           that it came from both disclosures?
15           MR. MORGAN:  No, no.  This is from
16           you-all.
17   A        Yeah, so my understanding is that it
18   makes references to certain sections in the SPA
19   that if -- you know, if those sections are valid
20   and active, then there is a guarantee of
21   liabilities or obligations that the purchaser
22   guarantee to the shareholders.
23   Q        And I'm on page one still on the
24   recitals.  Third one down, whereas further,
25   guarantor is the sole owner of purchaser and will

---

111

1    benefit from the transaction under the SPA.  That's
2    what it says; right?
3    A        That's what it says.
4    Q        And then the next whereas is, the
5    shareholders would not have agreed to enter into
6    the APA unless purchaser and guarantor executed and
7    delivered this agreement.  That's what it says;
8    right?
9    A        Yes.
10   Q        Do you agree with me that APA is
11   another typo, that that should be the SPA?
12   A        Yes.
13   Q        And what does that mean to you when it
14   says, shareholders would not have agreed to enter
15   into this purchase unless purchaser and guarantor
16   executed this agreement?
17   A        Yeah, that they wanted this guarantee
18   agreement in place to execute on the deal.
19   Q        So now you remember this?
20   A        What do you mean?
21   Q        Well, a minute ago you didn't recall
22   whether anything like this had occurred, but do you
23   agree that this guaranty --
24   A        No, that's incorrect.  I said that I
25   did see this agreement in the collection of

---

112

1    documents of the purchase.
2    Q        Oh, you did.
3    A        I did.  We can read it.  I mean, I said
4    that.
5    Q        Okay.  And when did you see this
6    agreement?  You said you saw it in a collection of
7    documents.  In preparation --
8    A        Yeah, at the time of the closing.
9    Q        Okay.  Did you see it in preparation
10   for this deposition?
11   A        No.
12   Q        What does it mean to you on the sixth
13   whereas, the last one there on page one?  It says,
14   guarantor has agreed to guarantee the obligations
15   of purchaser.  What's that mean to you?
16   A        It means that based on a certain set of
17   stipulations that the obligations of the purchaser
18   are guaranteed by the guarantor.
19   Q        And what does that mean?
20   A        That's what that means.
21   Q        To do what?
22   A        Whatever the obligations are, to
23   execute on those obligations, correct.
24   Q        How about pay the earnouts?
25   A        Yeah, I believe this was in reference

---

Collins Sowards Lennon Reporting, LLC
859-402-0900

Anand Lalaji, M.D.   8/1/2022

113

1  to the earnout. But these are just in the recitals
2  obviously, but then the guaranty is below
3  specifically; right.
4  Q       So do you agree with me that this
5  guaranty is designed to assure the shareholders
6  that TRG, LLC, was going to make good on the share
7  purchase agreement?
8  A       Based on performance of several
9  sections in the SPA, correct.
10  Q      On the guaranty section, page one, it's
11  2.2, it says, obligations of guarantor hereunder
12  are independent of the obligations and of any other
13  persons who may become liable with respect to the
14  obligations.  What's that mean to you?
15  A       Any other person that may become
16  liable, that this agreement is independent of that.
17  Q      Would that include you?
18  A       I'm not sure.
19  Q      And then the next sentence says,
20  guarantor is jointly and severally liable with
21  purchaser and with any other guarantor for the full
22  and timely payment and performance of all of the
23  obligations.  Who were the other guarantors?
24  A       I would have to assume that it's TRG
25  Holdings and -- yeah, it would be -- the other one

114

1  would be -- it says up here, whatever it says up
2  here.
3  Q       Well, what it says up there is only one
4  guarantor, and that's TRG.
5  A       Right.
6  Q       Holdings is listed as purchaser.
7  A       Correct.
8  Q       And so when we come down to 2.2 it
9  says, guarantor is jointly and severally liable
10  with purchaser and any other guarantor.  I'm asking
11  who is that?
12  A       I don't know.
13  Q       Could that be you?
14  A       I don't know.
15  Q       Then on the next page, 2.4, if you'll
16  read that to yourself and let me know when you're
17  ready.
18  A       Okay.
19  Q       What does this mean to you, this
20  paragraph?
21  A       It just lays out the stipulations of
22  what the guarantor -- what the guarantor's
23  responsibilities are.
24  Q       Where does it say anything about
25  guarantor's responsibilities?

115

1  A       Well, it says, guarantor hereby, so
2  it's giving a list of things that the guarantor
3  does.
4  Q       Well, the first one is the guarantor
5  waives acceptance of this agreement and the
6  guaranty by the shareholders, notice of acceptance,
7  notice of default, and notices of any kind.  What's
8  that mean to you?
9  A       It means that -- let's see.  I'm not an
10  attorney, so I'm not a hundred percent sure what
11  that particular sentence means.
12  Q       But you're here to talk on behalf of
13  TRG; right?
14  A       Yeah, but you're asking me specific
15  language in a specific contract that has legal
16  language in it, which would be best answered by an
17  attorney.
18  Q       And you signed this?
19  A       Yes.  I believe everyone did.
20  Q       Well, let's look at the next, B, waives
21  all defenses of suretyship and the defense of
22  impairment of collateral.  What's that mean to you?
23  A       I don't know.
24  Q       Letter C, agrees that the shareholders
25  and purchaser, without notice and without affecting

116

1  any of guarantor's liability hereunder, may from
2  time to time renew, extend, or modify or otherwise
3  change the terms of the obligations, take and hold
4  security for payment of the obligations -- I'm
5  sorry; were you --
6  A       I'm looking at it.
7  Q       No, I think you were going through the
8  other pages here.
9          What does this mean to you, the Section
10  C?
11  A       I'm not sure.
12  Q       How about letter E, agrees that
13  nothing, including, without limitation, discharge
14  of purchaser in bankruptcy, will discharge or
15  satisfy the obligations of purchaser and guarantor
16  hereunder except the full unavoidable payment and
17  performance of all obligations of purchaser to the
18  shareholders?
19  A       From what I understand is that
20  everything that's in that sentence and in this
21  paragraph applies if, you know, there is
22  performance of sections within the SPA which were
23  not adhered to or performed.  So even though you're
24  stating all these things here, they do not apply to
25  the issue at hand.

Anand Lalaji, M.D.   8/1/2022

117

1    Q       Why not?
2    A       Because of violations in the SPA
3    agreement.
4    Q       What violations?
5    A       Every one that -- all of the ones that
6    we have stated in the complaint and in the
7    counterclaim and et cetera.
8    Q       Well, and what are those?
9    A       So we --
10   Q       Tell me about the counterclaim.  What
11   bases here are expressed in the counterclaim that
12   you're talking about?
13   A       The counterclaim is --
14           MR. MILLER:  Object to form.  Go
15   ahead.
16   Q       Go ahead.
17   A       The counterclaim is based upon all of
18   the breaches of fiduciary duty and all of the
19   breaches against, you know, violations of their
20   employment agreement, employee covenants, and the
21   SPA.  And so that's what the basis of the
22   counterclaim is in terms of all of those breaches
23   that we had talked about earlier in the employment
24   agreements and in the SPA.
25   Q       So you're saying that if it wasn't for

118

1    all those other violations, this -- do you feel
2    that this guaranty agreement would obligate TRG to
3    the terms of the share purchase agreement and
4    follow through with the earnout?
5    A       That's not what I'm saying.  I'm saying
6    that this document does not -- or this paragraph of
7    this document does not apply based on all the
8    violations of all the other documents that have
9    occurred.
10   Q       And where does it say there's an
11   exception for these violations?
12   A       In this particular agreement, I don't
13   -- what do you mean, exceptions?
14   Q       You said that this would apply but for
15   these other -- these actions taken by the
16   plaintiffs, so I'm asking, where does it say that?
17   A       In this particular document I don't see
18   an exception section.  However, I would have to
19   defer to my attorneys in terms of other sections of
20   other documents.
21           MR. MORGAN:  Let's take a break
22   now, and I got 12 -- we can go off the
23   record here.
24           (A lunch break is taken, after
25   which Mr. Hunter does not rejoin the

119

1    deposition.)
2    Q       We're back on the record; you're still
3    under oath.
4            You had mentioned the counterclaim.
5    Have you looked at the counterclaim?
6    A       Yes.
7    Q       And as I understand it there was one
8    occasion in which a counterclaim was filed.  That
9    sound right to you?
10   A       I'm not sure.
11   Q       Okay.  And it would've been in August
12   of last year.  That sound about right to you?  It
13   was filed in federal court in Kentucky.
14   A       Again, I don't know the details or
15   specifics, but if that's what you're saying it is,
16   all right.
17   Q       This was during that week or so that
18   this case had been moved from Hazard state court to
19   federal court in Eastern Kentucky and then came
20   back, and the judge awarded attorney fees,
21   penalized the defendants for doing that.  Do you
22   recall this?
23   A       Yes, I do.
24   Q       Well, in that period there was a
25   counterclaim filed, and one of the counts deals

120

1    with interference with a contract.  You know that?
2    A       Okay.
3    Q       Do you know that?
4    A       Yes.
5    Q       Explain to me what the interference --
6    what that's about.
7    A       So Gram and Hazard did not -- had the
8    ARH contracts.  Now Gram had some of the contracts
9    and Hazard had some of the contracts; okay?  It was
10   different.  And then also there was other accounts
11   and other clients that were associated with Gram
12   and Hazard, not just ARH.  And so I believe that
13   there was interference in terms of our methodology
14   and our process and our guidance for all of these
15   contracts, and Patel and Pampati were interfering
16   and actually being sort of a blockade to certain
17   things as well as saying falsities versus the
18   things that we were saying to the radiologists that
19   are associated with those contracts.
20   Q       And when were these falsities allegedly
21   made?
22   A       I think the whole period of time from
23   the moment that we acquired the practice to, you
24   know, throughout the whole relationship until they
25   were terminated.

Anand Lalaji, M.D.   8/1/2022

31  (Pages 121 to 124)

121

1    Q        So from August of 2020 --
2    A        Uh-huh.  (Affirmative)
3    Q        -- through October of 2021 they were
4    making false statements about TRG and the other
5    defendants?
6    A        They were saying -- we would have a
7    message together, and then separately they were
8    making a different message to particular
9    radiologists and accounts.
10   Q        But that's not necessarily false.
11   A        Yeah, yeah.  It's false, false
12   statements.
13   Q        How is it false?
14   A        Because it's not true.
15   Q        What's true and what's not -- the truth
16   was what TRG was saying to these accounts?
17   A        Yeah, absolutely.
18   Q        About what?
19   A        Just in general how our processes are
20   and why they're successful, et cetera, and
21   Dr. Patel and Pampati made false statements or made
22   -- like again in our other assertions made
23   disparaging comments about TRG to clients and
24   radiologists and personnel at the ARH facilities
25   and several other facilities that Gram and Hazard

123

1    here.
2    A        I'm here to answer your questions, and
3    I'm answering.
4    Q        And my question is specifically when
5    were these made, and you don't know.
6    A        I don't know specifically, but they
7    were made.
8    Q        To whom?
9    A        They were -- again, I said that our
10   radiologists --
11   Q        You say, our radiologist.  Who?  Give
12   me names of people who were told disparaging
13   things.
14   A        I don't know off the top of my head.
15   Q        You don't know names of people?
16   A        I know names of people.
17   Q        You don't know the names of the people
18   who allegedly received these disparaging comments?
19   A        Not that I could accurately say
20   specifically this one versus that one.
21   Q        What did you do to prepare for
22   testimony about the counterclaim?
23   A        I read through the counter -- I read
24   through the documents that were associated with
25   this case.

122

1    services.
2    Q        What were the false statements they
3    were making?
4    A        You know, about the quality of our
5    business, about -- in general just about whether we
6    can operate, whether we can take over this
7    contract, you know, just very general statements
8    that were negative and disparaging against TRG.
9    Q        Were these in writing?
10   A        I don't believe so, no.
11   Q        When would they have been verbally
12   made?
13   A        When our radiologist would speak to
14   other physicians and clinicians on the ground at
15   ARH, it would be that same time period.
16   Q        When's that?
17   A        Between August 2020 and October '21.
18   Q        You don't have any specific instances?
19   A        Not off the top of my head, no.
20   Q        Well, again, this is the opportunity
21   for you to be speaking on behalf of TRG and
22   providing this information, because this is one of
23   the counts of your counterclaim against the
24   plaintiffs, and we are entitled to know of the
25   specifics, specific allegations.  That's why you're

124

1    Q        Does that include the counterclaim?
2    A        That does.
3    Q        When?
4    A        In that three-hour time period.
5    Q        But you don't know when the
6    counterclaim was filed?
7    A        Not off the top of my head, no.
8    Q        What other claims were brought in this
9    counterclaim?
10   A        Is this a quiz or what is it?
11   Q        Yeah, it is.
12   A        Oh, it's a quiz?
13   Q        Because I don't believe you that you
14   looked at the counterclaim.
15   A        Okay, I don't believe you either, but
16   what's the question again?
17   Q        What were the other claims in your
18   counterclaim?
19   A        That they breached fiduciary duty, that
20   they disparaged, that they broke their noncompete.
21   I can't think of the others, but, you know, it's
22   obviously -- it's clearly in the document, so we
23   can pull it up and bring it.  I don't think it adds
24   anything to quiz me.
25   Q        Well, no, but I -- well, indeed, the

Anand Lalaji, M.D.   8/1/2022

32 (Pages 125 to 128)

125

1  second claim is entitled, Interference with the
2  Contract, and it says that the defendants entered
3  into respective employment agreements with
4  plaintiffs. It says, plaintiffs were aware of the
5  terms and requirements of these respective
6  contracts to which they assented via signature. Do
7  you remember that? Do you remember those comments?
8  A       Remember that statement in the
9  counterclaim?
10  Q       Uh-huh. (Affirmative)
11  A       When you read it, yeah, it brings up --
12  you know, refreshes the memory.
13  Q       Then it says, plaintiffs tortiously
14  interfered with a separate similar contracts --
15  that's a typo again -- arranged by defendants, and
16  the plaintiffs' actions in fact caused a breach of
17  the contract.
18          It says nothing here about
19  disparagement or anything like that. What are you
20  talking about here when you say, plaintiffs
21  tortiously interfered with a separate similar
22  contracts arranged by defendants?
23  A       Must've been with one of the contracts
24  that Gram and Hazard held and that they basically
25  tortiously interfered with it because they were not

126

1  following our processes, and in fact, they were
2  doing everything they possibly can to go against
3  our practices for those sites. They would tell us
4  that they would do these things, and then they
5  wound up not happening.
6          And then again, with radiologists that
7  I don't know exactly during that time period it was
8  discovered that they were in fact making -- to
9  clients they were making bad outcome statements to
10  them, which effectively ruined our relationship and
11  credibility with that contract.
12  Q       Who? What contract?
13  A       You know, the first one probably was
14  their biggest outpatient one, which was Mountain
15  Comp.
16  Q       So they ruined -- are you saying that
17  they interfered with TRG's contract with Mountain
18  Comp?
19  A       Yes.
20  Q       And when was that endeavor?
21  A       I don't know the exact date.
22  Q       And who did they contact at Mountain
23  Comp to interfere with this contract?
24  A       Well, I know that they had ongoing
25  conversations with the CEO there and their

127

1  radiology director and their attorney, so I'm not
2  sure exact -- I think Mike Caudill was the CEO
3  there, and I'm not sure of the other gentleman's
4  name, but I know that Mike Caudill was communicated
5  to in this regard that you're talking about.
6  Q       When?
7  A       Between that time period.
8  Q       Well, there's no time period listed on
9  here, but this was filed on August the 20th of
10  2021, so presumably it was before that.
11  A       Correct.
12  Q       So when?
13  A       It was before that.
14  Q       When?
15  A       I don't know exactly the date.
16  Q       And what's the proof other than you've
17  heard that this occurred, that Patel or Pampati
18  said something to Mike Caudill?
19  A       I believe there is some correspondence
20  that -- or e-mails that have been in discovery, but
21  I'm going to have to go back and look at it
22  specifically, but most of it is verbal; correct.
23  Q       And how do you know that?
24  A       How do I know what?
25  Q       If it was some verbal comments made?

128

1  You weren't there; right?
2  A       No, I was not there.
3  Q       So how do you know -- how are you going
4  to prove this? It's just that simple.
5  A       Are you asking me on a deposition how
6  am I going to prove my case?
7  Q       Uh-huh. (Affirmative)
8  A       Because we have enough to prove the
9  case.
10  Q       Well, saying that, then now's the time
11  to say, and here it is.
12  A       That's not time of deposition, that's
13  time at the trial. So, you know, we can -- you
14  know, you're asking me general questions, I'm
15  giving you answers, and you're asking me specific
16  times that happened a year and a half ago that I
17  don't have exact memory of, and so that's where
18  we're at.
19  Q       And then this count says, defendants
20  suffered damages as a result of plaintiffs' breach,
21  and plaintiffs have failed to prove or present
22  privilege or justification for their conduct.
23          Do you recall that being in the
24  counterclaim, Count II of your counterclaim?
25  A       Yes.

Anand Lalaji, M.D.   8/1/2022

33  (Pages 129 to 132)

129

1    Q       What are the damages?
2    A       Credibility, reputation, and a loss of
3    revenue.
4    Q       So on August 19 and before, how is this
5    a loss of revenue for Dr. Patel to talk to Mike
6    Caudill?
7    A       I don't understand the question.
8    Q       Well, you're saying here that defendant
9    suffered damages as a result of plaintiffs' breach,
10   and I'm asking what were those damages.  And you
11   said loss of reputation, credibility, and, what,
12   contracts?
13   A       Loss of contracts, yes.
14   Q       So in August, on August 19th, what
15   contract had been lost?
16   A       I believe the Primary Care Centers of
17   Eastern Kentucky were lost before August 21st.
18   Q       Haven't heard about them.
19   A       Well, there are many contracts that
20   Gram and Hazard had, so --
21   Q       So you think that Patel and Pampati
22   said something to Primary Care, and that's what
23   caused the loss of that contract?
24   A       Well, it's certainly a possibility for
25   sure.

130

1    Q       Now's the time to show your hand, to
2    show --
3    A       No, that is not the time.  I'm under
4    deposition, you're asking me questions.  That's not
5    the time to do it.  I'm answering your questions.
6    We lost the contract to Primary Care, and we
7    believe and we will be proving the fact that they
8    interfered with that contract and we lost that
9    contract.
10   Q       Well, when are you going to prove it?
11   A       Well, that's up to our attorneys.
12   Q       Well, you've been asked before to
13   present this information that supports your
14   counterclaims, and I'm asking you to show me where
15   in any of the information that's been provided that
16   supports these counterclaims.
17   A       I don't think that was the --
18           MR. MILLER:  I object to the form
19   of the question.  Go ahead.
20   Q       Go ahead.
21   A       Yeah, that's not what -- that's not
22   what we've been asked to do, to prove our case in a
23   deposition basically.  I'm answering your
24   questions, but, you know, there's still several
25   time period to go in terms of proving our case.  So

131

1    it's not -- I'm not trying to prove a case to you
2    today.
3    Q       When do I get the chance to ask you
4    about your proof for your case?
5    A       It's probably you got to talk to my
6    attorneys.
7    Q       Are you saying I have to wait till
8    trial?
9    A       I don't know.
10   Q       What do you think discovery is?
11           MR. MILLER:  Object to the form.
12   Go ahead.
13   A       Yeah.  It's just trying to get as much
14   as possible between both parties, yeah.
15   Q       That's kind of what we're doing right
16   now, trying to do.
17           So are you saying that the contract --
18   let me ask, what is the contract that was
19   interfered with that underlies this claim in your
20   counterclaim?
21   A       Right at this moment I can think of
22   PCCEK, Primary Care Centers of Eastern Kentucky; we
23   retained the MC -- TRG retained the MCHC agreement
24   only because we were able to show them a pathway
25   forward.  However, we were about to lose that

132

1    contract based on information that Mike Caudill had
2    about this case and all of the negative
3    defamations, and if you depose him you'll find that
4    out.
5            So we almost lost the MCHC contract,
6    but we really took a hit to our reputation because
7    of this, which is a big -- reputation is sort of
8    the biggest sort of interference with a contract
9    that hurt us.  That was the damages associated.
10   Q       So when you say you suffered from this,
11   you mean the lawsuit?
12   A       No.  Suffered from Patel and Pampati's
13   interference.
14   Q       And what is that interference?
15   A       When you say -- you know, when you
16   actively go against the process of protocol to
17   assimilate all these accounts of Gram and Hazard.
18   The goal is -- I mean, you buy a car, you expect it
19   to work; right?  So we buy a practice and we
20   expected -- you know, we put it into a system that
21   makes sense for us to buy the practice.  Patel and
22   Pampati were on board with it, and then they
23   actively went against it almost at every turn, with
24   ARH, with MCHC, with Primary Care, and all these
25   other accounts basically.

Anand Lalaji, M.D.   8/1/2022

34  (Pages 133 to 136)

---

133

1     And that's basically what led to, you
2  know, significant harm to TRG's reputation, because
3  not only did they -- not only did they not follow
4  and actively work against us, they disparaged us,
5  talked negatively about us. We have heard from
6  other radiologists in the system that were working
7  at Hazard at the time between locums, radiologists,
8  doctor -- you know, I can list all of the doctors
9  that were on the ground there, but it's various
10  sorts of them.
11     Q     No, I need to know who you are saying
12  was told by Pampati and Patel these disparaging
13  comments, and you a minute ago didn't know.
14     A     I didn't know specifically, but we will
15  get --
16     Q     Do you know now?
17     A     From three minutes ago, no, I don't.
18     Q     So what I hear you saying is that Patel
19  and Pampati sell the practice, and then they
20  immediately start working against you?
21     A     Absolutely.
22     Q     And that makes no sense.
23     A     Is that a question?
24     Q     No. That's a statement.
25     A     Okay. But I think you're supposed to

---

134

1  ask me questions.
2     Q     How does that make sense?
3     A     Well, if you really want me to tell you
4  exactly why it makes sense?
5     Q     Uh-huh. (Affirmative)
6     A     Okay. So here we go. So your clients,
7  Patel and Pampati, tried to basically milk the
8  practice as much as possible from the moment that
9  we bought the practice. So they stopped -- they
10  breached fiduciary duty, they stopped doing every
11  one of their processes, they asked us to hire all
12  these locums, and then they read all the studies
13  for the locums. They read 50 percent more than
14  normal so that the locums radiologists didn't have
15  anything to read. They read everything in the
16  practice basically.
17     They did not follow the process of
18  switching over PACS systems. They told us that
19  they were talking to certain individuals, but they
20  never talked to them or they told them something
21  different. So right from the get-go collections
22  dropped immediately. We weren't able to get our
23  processes and our software and all of the stuff
24  that we do around the country into the practice at
25  Gram and Hazard. So from the moment that we bought

---

135

1  this practice, you know, we were sort of up against
2  the previous owners of the practice from the very
3  beginning.
4     (At this point Mr. Hunter rejoins
5     the deposition.)
6     Q     And they stand to make more money on
7  these earnouts if more money comes into Gram and
8  Hazard; right?
9     A     Yeah, hundred percent, which is what
10  puzzled us as why would they be doing all this.
11     Q     I'm still trying to figure out the why.
12  You've said what your observations are.
13     A     Uh-huh. (Affirmative)
14     Q     But I'm asking why would they have done
15  that.
16     A     You have to ask your clients. I don't
17  -- I'm not -- I don't --
18     Q     Because that doesn't make any sense,
19  does it?
20     A     It does if you're greedy.
21     Q     How does that help a greedy person?
22     A     Well, so they were not -- and you
23  should ask them between, you know, whether one
24  partner wanted to do this or not, et cetera, but I
25  will tell you that what happens is that if they

---

136

1  read a lot more, if they read more than they're
2  supposed to, if they don't follow -- the procedure
3  was that they were not supposed to be reading and
4  allowing the radiologists that we had hired to read
5  those cases. Throughout the whole process they
6  read a lot more than they were supposed to be
7  doing, and, you know, they were -- and that would
8  entail get them more money, essentially.
9     Then as the revenue of the practice
10  theoretically would've been the same in
11  collections, then they would get their earnout on
12  top of additional income. So they were trying to
13  get additional income on top of the earnout and on
14  top of the buyout and everything. That's what
15  their goal was essentially.
16     Q     Did they tell you that?
17     A     It was the analysis done by William
18  Crenshaw and I when he put -- numbers don't lie.
19  As soon as we bought the practice it is clear. You
20  can see both of their reads started to go up
21  significantly.
22     Q     Why didn't you stop it?
23     A     We tried.
24     Q     They're your employees.
25     A     There's plenty of -- well, that's the

---

Anand Lalaji, M.D.   8/1/2022

35  (Pages 137 to 140)

137

1 biggest problem.  These employees were not
2 listening to their bosses, and so there was plenty
3 of e-mails going back and forth saying, you have to
4 slow down reading, you can't do this because we
5 can't -- then how are we going to get all the
6 radiologists on the ground that the hospital
7 requires for us to put them on the ground to get
8 read, so then if they don't read, we lose hundreds
9 of thousands of dollars on those radiologists,
10 these guys make three, four times more, and that's
11 how the contract basically blew up.  And so there's
12 e-mails, there's text exchanges with Patel and
13 Pampati on all of these matters.  They didn't
14 listen.  They refused basically.  They continued to
15 read at that clip.
16 Q      Tell me about TRG's failure to put a
17 radiologist at the Tug Valley branch of ARH.
18 A      So Dr. Singh was our radiologist at Tug
19 Valley who was hired by Dr. Patel and Dr. Pampati.
20 We did not hire Dr. Singh.  You know, he was
21 supposed to be there as part of the practice, he's
22 always been there, et cetera.  Well, unfortunately,
23 Dr. Singh made -- and we did not know this about
24 him.  He made a terrible sexual harassment claim
25 against several young technologists at Tug Valley,

138

1 whereas the CEO of the hospital told me we had to
2 fire him immediately on that day.  We didn't hire
3 Dr. Singh; Patel and Pampati hired Dr. Singh.  So
4 we had to fire him, and basically we told the
5 hospital it'll take a couple of years for us to
6 fulfill that slot, and they understood.  And then
7 that's basically, you know, where we went from
8 there.
9 Q      What about TRG's failure to have an
10 interventional radiologist at Hazard?
11 A      So specifically can you tell me which
12 time?  Because about 99 percent of the time there
13 was an interventional radiologist at Hazard.
14 Q      I'm talking about the time frame here
15 of August 20 through the present.
16 A      Yeah, so I don't recall a failure of us
17 not putting interventional radiology there.
18 Q      What about just a radiologist at the
19 Hazard medical mall?
20 A      Yes, we had a radiologist at the Hazard
21 medical mall.
22 Q      But that person's no longer there;
23 right?
24 A      Well, eventually, no.
25 Q      When did that person leave, and who was

139

1 this?
2 A      It's different people, like maybe a
3 group of 12 to 15 different doctors.
4 Q      Were these locums?
5 A      Most of them, yeah.
6 Q      Was that a decision by Pampati and
7 Patel to have these locums?
8 A      That was what they were doing before as
9 well.
10 Q      But did you bring in -- did TRG bring
11 in a radiologist for the medical mall?
12 A      Yes.  A locum radiologist, yeah.
13 Q      So you continued that practice?
14 A      Yes.
15 Q      And then what about a radiologist at
16 Harlan, Harlan Regional Medical Center?
17 A      Yes, we continued that as well.  There
18 was a rotation.
19 Q      Using locums?
20 A      Locums; correct.
21 Q      Do you believe, then, that having a
22 full-time radiologist at either Harlan or the
23 medical mall in Hazard, that that would've helped
24 reduce this overhead?
25 A      Say that again.  Sorry.

140

1 Q      Would having a full-time radiologist
2 have helped reduce these costs?
3 A      No.
4 Q      I'm going to show you what will be
5 marked as Exhibit 13, if you'll review that front
6 and back, please.  The way these e-mails are
7 printed is that the most recent one is going to be
8 at the top of the first page.  So this e-mail
9 begins on the back of page two, and it appears to
10 be an e-mail dated June 4, 2021, from you to team.
11 Do you recall this e-mail?
12         (Said document is filed with this
13         deposition and marked as Plaintiff's
14         Exhibit No. 13 for purposes of
15         identification.)
16 A      I see that it's from me yes.
17 Q      Who's team?
18 A      I don't know.  It doesn't say who I
19 sent it to, so I don't know which team this is.
20 Q      Yeah.  Would you think that this would
21 include Patel and Crenshaw and Pampati?
22 A      Maybe.  I'm not sure.
23 Q      In any event, it says, this relates to
24 P and P -- and that's Pampati and Patel; right?
25 A      Yes.

Anand Lalaji, M.D.   8/1/2022

141

1   Q      -- working on getting paid for the work
2   they do. So at this point in time, this is June of
3   last year, there were already complaints from
4   Pampati and Patel about not getting paid; correct?
5   A      I do believe that there were e-mails
6   coming from them; correct. Yes.
7   Q      In fact, even in May of last year you
8   enlisted -- tried to enlist the help of Dana --
9          MR. JOHNSON:  Holmes.
10  Q      -- Holmes -- Dana Holmes to help work
11  with the plaintiffs; correct?
12  A      Well, like I said, Dana and Will are
13  part of the same consulting company --
14  Q      Right.
15  A      -- so it's not like I hired them
16  separately to do this task. It's just that's what
17  the consulting company does.
18  Q      Okay. But there were problems already
19  by June?
20  A      On both sides. Or, you know, problems
21  that we've identified with Patel and Pampati.
22  Q      Here's these bullet points. It says,
23  the work that is done needs to be in replacement of
24  someone on the payroll already so we are saving
25  cost, for example, an IR doctor -- and that's an

142

1   interventional radiologist; right? Is that
2   correct?
3   A      Correct.
4   Q      For example, an IR doctor or an on-site
5   doctor. What are you talking about there?
6   A      So I believe this sentence is related
7   to the fact that if there's -- you know, whenever
8   you're evaluating the efficacy of a radiologist and
9   their efficiency on reads, you have to identify the
10  people that are not efficient and that are costing
11  you more money, you know, than what you're bringing
12  in. It's just the nature of business. So the work
13  that is done needs to be in replacement of someone
14  on the payroll already so we are saving cost. So
15  it's someone that -- you know, it's basically we're
16  replacing someone's reads on the payroll with an IR
17  doctor that can do diagnostics or another -- an on-
18  site doctor that would be much more efficient in
19  that role.
20  Q      Next bullet point says, the readout
21  must justify cost, for example, 1500 a day would
22  need to generate 3200 in revenue. What do you
23  mean?
24  A      So radiologists across the country are
25  paid 45 percent of net revenue in TRG. So in order

143

1   for them to get paid 1500 a day, they need to
2   generate 3200 in revenue by their reads.
3   Q      Is that something separate from the
4   read fee, though, that they get, that Pampati and
5   Patel get?
6   A      This is just talking about like, you
7   know, how it would justify the pay for a particular
8   radiologist. I don't think it makes assertion to
9   any particular read fee or anything like that.
10  This is just how --
11  Q      And that's what I was making sure
12  because as I understand in looking at the
13  employment agreement, plaintiffs are entitled to
14  $1,500 a day if they're on call; right?
15  A      On call or maybe it was a -- maybe it's
16  1500 a day if they have to do a shift on site
17  somewhere.
18  Q      Well, here it says if you're required
19  to assist in any scheduling gaps you'll be
20  compensated at the rate of 1,500 a day.
21  A      Yeah, scheduling gaps are really
22  related to the on-site.
23  Q      So that's what we're talking about?
24  A      Yeah.
25  Q      But this example, 1,500 a day, on this

144

1   bullet dealing with the readout must justify,
2   that's something different. That just happens to
3   be a coincidence that we're talking 1500 a day?
4   A      No. Whenever we pay a radiologist any
5   type of fee, in order for our financial sort of
6   waterfall to flow down in the cost of goods sold
7   and then into SG&A, the radiologist needs to read
8   -- like if we pay someone 1500 a day and they read
9   five cases it doesn't work; right? Like if you
10  hire a lawyer and they don't generate any fees,
11  then that's the issue. You're paying a salary and
12  they're not generating revenue for you. So in this
13  particular case if we pay a radiologist 1500 a day,
14  then we would want them to generate 3200 in revenue
15  by their reads.
16  Q      Understand. Do you agree with me that
17  under the terms of the employment agreement,
18  though, Drs. Pampati and Patel were entitled to a
19  read fee of 55 percent of the revenue collected for
20  such reads?
21  A      Yeah, correct.
22  Q      And that would be in addition to this
23  $1500 a day as needed; right?
24  A      I don't think so.
25  Q      Oh, okay. You think those are

Anand Lalaji, M.D.   8/1/2022

37 (Pages 145 to 148)

145

1  exclusive?
2  A        Yeah. I think --
3  Q        Can't have both?
4  A        No. If they get paid for the 1500 a
5  day.
6  Q        What do you mean by that?
7  A        To be on site. So when they get paid
8  the 1500 a day to be covering a schedule gap, when
9  they're on site in a reading room at a hospital and
10 they're reading, that 55 percent, that's not
11 associated with that. That's basically 1500 a day,
12 you know, that we're paying them as a fee so that
13 they can sit there and read cases to generate
14 basically. That is separate from the 55 percent
15 and the other thing in their compensation.
16 Q        Well, let me ask, do you feel that the
17 daily fees are in addition to the 55 percent read
18 fees?
19 A        Well, they are -- this is not a normal
20 happenstance; okay? This only happens when they
21 physically go to a hospital location and sit there
22 and fulfill a scheduling gap. So that's basically
23 what that is talking about.
24 Q        My question, sir, is, do you feel that
25 under the employment agreement plaintiffs are

146

1  entitled to the daily fees in addition to their 55
2  percent read fee?
3  A        No.
4  Q        Why don't you grab Exhibit No. 2,
5  please? It's by your right hand. Turn to page
6  two. The first box there, it says, as-needed
7  services. Go to the right. The last sentence
8  there says, the daily fees will be in addition to
9  your base salary and the 55 percent read fees. Do
10 you disagree with what's written there?
11 A        So it says, after da da da da, will be
12 compensated for such services at the rate of 1500
13 per day to be paid by such company. The daily fees
14 will be in addition to your base salary and the 50
15 -- yeah, yeah. Okay. All right. So let me
16 clarify; okay?
17       So when you're talking about this
18 bullet point, so I'm specifically relating it to
19 the $1500 a day. For us to not significantly --
20 for us in order to be creating margin, this is the
21 number that we are hoping that Patel and Pampati
22 can get to, which is 3200 in revenue. But yes, you
23 are correct. They would be paid $1500 for that
24 day, they would read those studies, and they would
25 be getting their base salary plus the 55 percent

147

1  read fee.
2  Q        Right. And, I mean, I just asked you,
3  was this in addition to, and you said no. I
4  wasn't referring to this e-mail. I was just simply
5  asking --
6  A        I thought you were referring to this e-
7  mail.
8  Q        No. Okay. So Dr. Pampati responds to
9  your e-mail the next day, says, good afternoon,
10 Anand. I do not accept your proposition and said
11 the same earlier too. I need to be paid for my set
12 as per contract. I need full payment for AR and
13 reads. That's real labor and time I'm spending
14 that's my source of income. You are behind by four
15 months for earnout.
16       Were you behind by four months on earn-
17 out at this point in June of '21?
18 A        I don't know. I don't know
19 specifically.
20 Q        Would you say you could be?
21 A        I don't know.
22 Q        Well, that's a big chunk of money
23 possibly, isn't it? I mean, earnouts, that's where
24 the real money in this contract is; right? Because
25 that's paying. You were using an 8X EBITDA for the

148

1  purposes of this company; right?
2  A        Well, yeah. I don't know. If you're
3  asking me, I don't know. We could've been caught
4  up by that time. I'm not sure.
5  Q        Well, the fact that you really don't
6  know, though, says you just -- a whole quarter
7  you're -- I mean, that's more than a quarter, you
8  just don't know; right?
9  A        I don't know.
10 Q        When he said, it's not my problem
11 whether you make or lose money, I didn't buy your
12 company, was this kind of a common refrain that you
13 had with plaintiffs?
14 A        That was a very troubling statement
15 that he made because it is absolutely his problem
16 if Gram and Hazard is financially solvent because
17 that's why we have a fiduciary responsibility.
18 That's why we have all of the stuff that's coming
19 in in that regard. The fact that he didn't care if
20 Gram and Hazard made money or not is a very
21 concerning statement because it showed that he's
22 not -- he's basically -- from the moment that we
23 signed the contract, you know, he's not -- he
24 doesn't care. He doesn't care if Gram and Hazard
25 makes money or not, which absolutely he should

Anand Lalaji, M.D.   8/1/2022

38  (Pages 149 to 152)

149

1   care.
2   Q        You know, I don't see the word care in
3   here.  He says, it's not my problem whether you
4   make or lose money; I didn't buy your company.  He
5   doesn't say in here, I don't care.
6   A        But it is his problem if he caused it.
7   And regardless of who caused it or not, it's his
8   problem too.
9   Q        If you'll flip the page to the first
10  part here, and you say, this is the only way -- I'm
11  sorry.  Below these bullet points you say, we have
12  no other choice to -- we have no other choice to
13  but to do it this way in person, which you agreed
14  to.  What do you mean by that?
15  A        We met in Lexington at a restaurant,
16  myself, Pampati, and Patel, where we -- I showed
17  them all of the cash in, all of the cash out, and
18  showed how the company was losing money every
19  single month because we were getting only a third
20  of the collections, et cetera.  And so I told them
21  that in order for us -- and which is disappointing
22  because, you know, we didn't have to go through
23  attorneys, it would've probably been fine by this
24  time anyway, but neither here nor there.  We showed
25  them exactly what was happening, what was coming

150

1   in, what was going out, why this was happening, and
2   we all agreed that -- we all agreed that in order
3   for us to save this practice in terms of turning
4   the corner, we needed to do certain things, which
5   is what I outlined basically in our conversation.
6   And they agreed to it in person with me in
7   Lexington at a restaurant after two hours of going
8   through everything.
9   Q        Who else was there?
10  A        Just the three of us.
11  Q        That same sentence you say, the only
12  other option is to sell the practice back to you.
13  What do you mean by that?
14  A        Well, we were giving them an out to
15  say, look, you can have it back and you can take
16  everything back.  Just pay back our money and we
17  can all part, and you can have your practice back,
18  which they vehemently just said no to.  They said,
19  no, I don't want the practice back.
20  Q        Isn't it true that when they sold this
21  to you, this was something of a retirement thing
22  for them?  They were -- they're a bit older than
23  you; right?
24  A        Yes.
25  Q        And they told you that this was -- they

151

1   were planning to retire, and that's part of the
2   reason they were selling the practice; correct?
3   A        Correct.
4   Q        Let me show you what will be marked as
5   Exhibit No. 14.  If you'll look over that, please,
6   let me know when you're ready.
7            (Said document is filed with this
8            deposition and marked as Plaintiff's
9            Exhibit No. 14 for purposes of
10           identification.)
11  A        I'm ready.
12  Q        This is an e-mail from you to
13  plaintiffs and Crenshaw and Holmes copying your
14  wife, May 18.  What's the basis of you sending this
15  e-mail?  Why'd you send it?
16  A        We needed to get everybody on the same
17  page in terms of the grave situation that Gram and
18  Hazard is in financially because of no collections,
19  very few collections.
20  Q        And this would've been approximately
21  nine months into the deal?
22  A        Let's see.  Yes.  August to May.
23  Q        So nine, maybe ten.  This first bullet
24  point, explain what you're saying here, please.
25  Q        So when a radiologist gets credentialed

152

1   with ARH, you know, they should have access to read
2   on the ARH system, the PACS system.  They get a
3   code and access to the PACS system.  And the
4   problem is, is that because of a massive
5   cybersecurity incident that happened four or five
6   years ago, ARH will not allow anybody to read on
7   their system if they don't -- if they are not
8   working at the hospital in that capacity, which is
9   totally not normal from every other hospital in the
10  country, because you do teleradiology, that's like
11  70 percent of the practices now.
12           And so that's why I say, who in IT has
13  said no one can have access except an on-site rad?
14  This is the only hospital that we have ever seen
15  that happen in; we must have access to the hospital
16  PACS system.
17           So your main radiology partner always
18  gets access to the hospital PACS system, but
19  because of that massive ransomware that happened to
20  ARH, this is sort of that stipulation that they
21  have, and so that sort of also -- you know, that's
22  just a little hurdle that we, you know, kind of had
23  to go around.
24  Q        Go to the third bullet point.  It says,
25  we have still heard no news from MCHC.  Can we use

Anand Lalaji, M.D.  8/1/2022

153

1   your logins to read the cases and put an
2   e-signature on the report for the rad that read it,
3   or can we get immediate access to the Novarad
4   system?
5   A        So this is really -- Patel and Pampati
6   know exactly what this is about.  MCHC for years
7   were refusing to give access to their system for
8   reads except for Patel and Pampati.  And Patel and
9   Pampati always said that those folks are weird,
10  they just don't want -- they don't know what they
11  want, and they're just slow to react, et cetera.
12  However, the goal is after we -- you know, it does
13  not make sense, again, for two guys that are
14  needing or going to be in retirement to read all of
15  the MCHC cases.  Nobody else can get access to
16  them, nor were they, you know, in our estimation
17  helping to do that significantly.  And so they were
18  reading all the MCHC cases.  This is an effort for
19  our radiologists to log on to -- to go onto Novarad
20  and read the cases, but we were not able to do it
21  because we were not able to get access to their
22  system.
23  Q        Isn't this what you're asking, for
24  their permission to get their logins and put e-
25  signatures on reports, which is your complaint --

154

1   A        No.
2   Q        -- in your allegation of fraud?
3   A        Totally different.  Totally different.
4   E-signature is for the radiologist.  See, it says,
5   an e-signature on the report for the rad that read
6   it.  So if I get access to Patel's login, I'll
7   basically look at the case, read the study, put my
8   e-signature on it because I read the case and
9   looked at the study and not use a transcriptionist
10  and voice-dictate, and then approve the case.
11  That's what that means.
12          So it's not about a transcriptionist,
13  it's not about giving logins to secretaries to
14  falsify reports.  It's basically just getting
15  radiologists to read on the MCHC system.  That was
16  -- you know, that was a big problem because MCHC
17  was 30 percent of their practice, 25 to 30 percent
18  of their practice, and basically Patel and Pampati
19  knew it and they were hoarding it.
20  Q        Let me show you what will be marked as
21  Exhibit No. 15.  Again, this is easier for me to
22  read from the very back.  I see an e-mail from
23  Tracy Gillum, she's at TRG, in April, and she's
24  trying to put together calendars for the
25  radiologists.  Is that a fair summary of this?

155

1            (Said document is filed with this
2        deposition and marked as Plaintiff's
3        Exhibit No. 15 for purposes of
4        identification.)
5   A        Yeah.  Which one are you on, which --
6   Q        Page four, this one here.
7   A        Okay.  Yes.
8   Q        And then you respond two minutes later
9   saying, we need to hire a locum and see if any
10  of the normal rads can work.  Have we looked at
11  that?  And Tracy responds a little bit later, would
12  it be possible for us to have someone from TRG come
13  that week and work the medical mall?  This way we
14  can get them credentialed and set with the PACS
15  system like Dr. Pampati had spoke about in the
16  meeting and have a connection with the location.
17  Do you remember this conversation?
18  A        Vaguely, yes.
19  Q        And then your wife says, we can look at
20  the calendar.  You chime in a little bit later,
21  also the idea that we bring someone that is a
22  telerad from TRG to live and work for a holiday
23  week in Hazard will likely be costlier than the
24  locum.  This shouldn't unfortunately be the
25  requirement for a credentialed rad to get access to

156

1   read studies.  The 5th is the observed holiday.
2   Can we see if part of that week can be remote?
3   Tracy says, understand.  Let me get with the
4   director.
5            And then Dr. Patel says, you can't do
6   any of this.  This is an imaging center, and a
7   radiologist has to be present on site to cover
8   contrast studies.  So did you disagree with his
9   comment there?
10  A        Yeah, but it's not explanatory.
11  Q        Do you disagree -- my question is, do
12  you disagree with his comment?
13  A        I do not disagree.
14  Q        So you agree that there has to be a
15  radiologist present, and you can't do this by
16  telerad?
17  A        Okay.  No.  No, no, no.  I don't
18  disagree with that comment.  What he fails to
19  mention is that in contrast studies, CMS requires
20  for Medicare patients to be on site for those
21  contrast studies.  When we do cover remotely it is
22  possible that they'll just schedule all the
23  Medicare patients for the time that the radiologist
24  is on site.  So we're not asking -- you know, we're
25  not going to say forever it's going to be remote.

Anand Lalaji, M.D.   8/1/2022

157

1    Just don't schedule those patients.
2              It's a medical mall.  There's
3    physicians everywhere, so contrast reactions do not
4    -- are not covered solely by the radiologist.  It's
5    also covered by all the clinicians in that site.
6    So it's not explanatory that you can cover the
7    medical mall remotely as long as you schedule the
8    Medicare patients at the time when the radiologist
9    is on the ground.
10   Q        Regardless of whether that radiologist
11   looks at those studies?
12   A        Yeah.  The radiologist does not need to
13   look at those studies.
14   Q        I'll show you what's marked as Exhibit
15   16.  This is e-mail correspondence that appears to
16   have been started August 15 of 2021 from you to a
17   person at Data Marshall.  And Data Marshall was the
18   billing company that Gram and Hazard used before
19   you bought them; right?
20              (Said document is filed with this
21              deposition and marked as Plaintiff's
22              Exhibit No. 16 for purposes of
23              identification.)
24   A        Correct.
25   Q        And you make the comment here, it's on

158

1    page two, when we took over the G & H practice in
2    August of 2020, you told Raju and Data Marshall
3    that you would give Data Marshall six months before
4    we had to switch over to Advocate.  And Advocate is
5    TRG's national biller; right?
6    A        Correct.
7    Q        So this was something you were already
8    going to do?
9    A        Yeah, eventually it had to be done;
10   correct.
11   Q        And then here at the very end you say,
12   frankly, this is likely the best thing for all
13   parties as this was an inevitable outcome and the
14   focus should be really on the massive existing
15   inventory that we need to collect on.  Then you go
16   on to say, by no means is this a reflection on you.
17   You have been very communicative over the last
18   several months.
19              Did you mean that?
20   A        That's to Kim Collins Skinner.
21   Q        Did you mean that?
22   A        Kim has been communicative; correct.
23   Q        And she's the vice president of client
24   services at Data Marshall; right?
25   A        Yeah.  I think she started probably --

159

1    she wasn't -- for the first six months she wasn't
2    our contact, and then she came in later.
3    Q        But in any event, you're saying here,
4    you've been very communicative over the last
5    several months.  And at this point you would have
6    owned the business for less than a year; right?
7    A        It was about a year.  August of 2021.
8    Q        Okay.
9    A        So what was the question again?
10   Q        You're telling Kim that she's -- and
11   you don't differentiate in here whether you're
12   talking about Kim or Kim and Data Marshall or who.
13   You just say to Kim at Data Marshall she's been --
14   that you have been very communicative.
15   A        Yeah.  We're trying to tell her that
16   personally it's not -- you know, she's not the
17   reason why we are moving away from Data Marshall
18   after 12 months.  I mean, when you have to
19   terminate services with someone, you want -- if
20   someone's been at least trying, then, you know, you
21   don't want them to feel bad about the whole thing.
22   So that's that statement.
23   Q        And a few months ago, though, you --
24   one thing that I understand you to say is that this
25   -- Drs. Patel and Pampati just refuse to assist

160

1    with the billing, and billing went -- I think you
2    said something about no one did anything for 50
3    days, almost two months.
4    A        No.  The data from ARH that normally
5    flows for billing -- you can't bill claims without
6    actual demographic information.  So that's --
7    that's -- before -- you know, before we bought the
8    practice, that was being monitored all the time.
9    And lo and behold, from I think it was like
10   September through the end of October or early
11   November no data had made it from ARH to Data
12   Marshall when we came in and started investigating
13   what was happening due to the low collections.
14   Q        This will be marked as Exhibit No. 17,
15   and this is an e-mail from you to Drs. Patel and
16   Pampati on August 25 of 2021 in which you have no
17   difficulty telling them what they need to do and
18   how to do it; right?  I mean, you say here, you do
19   not have the authority to log into Novarad and read
20   for MCHC post 8/31/21.  If contacted to read for
21   MCHC post 8/31/21, please forward those calls to
22   myself and the TRG team.  You go on to -- you say
23   before that, if TRG and MCHC are unable to come to
24   an agreement, Gram Resources is not permitted to
25   read for MCHC post 8/31/21.  As per your employment

Anand Lalaji, M.D.   8/1/2022

41  (Pages 161 to 164)

161

1  agreement please follow the below stipulations.
2           You had no problem telling these guys
3  how to act, did you?
4           (Said document is filed with this
5           deposition and marked as Plaintiff's
6           Exhibit No. 17 for purposes of
7           identification.)
8  A        Telling them how to act, no.  It's just
9  this is exactly -- this is exactly the process that
10 they should be following as per the terms of their
11 employment agreement.
12 Q        And you make no comment in here about
13 you've heard or there are some allegations that
14 they're bad-mouthing or disparaging TRG with MCHC.
15 A        In this e-mail, no.
16 Q        I'll show you what will be marked as
17 Exhibit 18.  And do you remember this e-mail
18 exchange with you and Dr. Patel in May of '21?
19          (Said document is filed with this
20           deposition and marked as Plaintiff's
21           Exhibit No. 18 for purposes of
22           identification.)
23 A        Vaguely, yes.
24 Q        And I noticed that in many instances at
25 least in fall of '20, spring of 2021, you refer to

162

1  Dr. Patel as Ashok uncle.
2  A        Yes.
3  Q        Why do you do that?
4  A        Well, Dr. Patel has been a long-time
5  family friend, which makes all of this legal very
6  surprising, but yeah, he's known our family for
7  years, my wife's family, all of that.  And, you
8  know, unfortunately, you know, that all has been
9  kind of thrown away a little bit.  But yeah, that's
10 why.  In our tradition we refer to our elders as
11 uncle.
12 Q        But this very bottom of page one is an
13 e-mail from you dated May 18, 10:25 a.m., in which
14 you have laid out what appears here in the black to
15 be directions.  And then Dr. Patel responded to
16 that later that same day, at 7:16 p.m., where he
17 says, our responses, and those are in the red
18 underlined italics.  Do you recall that?
19 A        Yes.  So our responses -- hold on.  So
20 these are the responses I believe to the other e-
21 mail that you referred to me -- okay; no.  So
22 the ones that are in red and underlined is --
23 Q        Are these from -- these are your
24 responses.
25 A        These are my responses.

163

1  Q        Gotcha.  Okay.  Because up above here
2  you say, see below in red, all caps.
3  A        Yes.  So I know their responses are in
4  here somewhere, but I'm not sure which ones are
5  theirs.
6  Q        Well, what you can do is you can grab
7  Exhibit 14, because that has this laid out.
8  A        Yes.  Fifteen, 14.  Okay.  I'm here.
9  Q        So Heather in credentialing stated
10 blah, blah, blah.  And then it appears that
11 Dr. Patel's response was, yes, they get it to read
12 on site.  They will not get McKesson software
13 installed on their home workstation to read off
14 site.  I recall Dr. A and T both have logins set
15 up.
16          And then this is your response after;
17 correct?
18 A        Uh-huh.  (Affirmative)  Yes.
19 Q        And you say here, can you have a heart-
20 to-heart with Joe or whoever that all of this is so
21 out of the norm and they need to work together with
22 us, not be a complete blockade.
23          What you're talking about here is --
24 what are you talking about here?  Who's being a
25 complete blockade?

164

1  A        So they were not allowing --
2  Q        Who's they?
3  A        ARH; sorry.
4  Q        All right.
5  A        ARH was not allowing any credentialed
6  radiologist that had passed through all of their
7  months of committee that are set up and can read
8  for ARH, they were not allowing them to read
9  remotely directly into the McKesson system because
10 they had a massive -- this was a massive sort of
11 cybersecurity event several years ago, which is not
12 the norm in the country.  Every hospital in the
13 country that we deal with always gives access to
14 their credentialed radiologists to read remotely,
15 and they were not giving it to us.
16 Q        This had nothing to do with Dr. Patel
17 and Pampati; right?  This was an ARH problem?
18 A        This, that was an ARH problem; correct.
19 Q        Next bullet says, ER stats during the
20 day have been a problem.  And then Dr. Patel's
21 response, we checked again today with the directors
22 and they want it read locally.  We now have two
23 extra monitors in Tracy's office with the stats
24 showing, and they are monitoring and getting them
25 read.  It's working well.

Anand Lalaji, M.D.   8/1/2022

42  (Pages 165 to 168)

165

1           So you don't really have a problem with
2   that; right?
3       A      No.  The only issue in place is that
4   they are sending -- they're not sending cases to
5   TRG throughout the day.  So we're getting less
6   cases, and when they do send to us, they send it
7   into us as a batch and a bolus.  And that is not
8   the normal way of doing things, so I suggested to
9   have our managers on site be able to send cases
10  throughout the day from their access so the
11  departments don't have to do it.
12      Q      Do you disagree with Dr. Patel's
13  statement here about it working well?
14      A      I'm not sure at that time.  I think
15  that that was a battle that we -- you know, we were
16  reading cases fast when they just sent them to TRG,
17  so we didn't understand.  I think a lot of the team
18  didn't believe Dr. Patel when he said that it was
19  working well and they want it read locally, because
20  if it's read locally then Dr. Patel and Pampati
21  would be reading all those cases.  So I think there
22  was some back and forth there in that regard.
23          Our team felt that by sending the cases
24  to TRG they get read immediately because we've got
25  35 radiologists reading for that facility.  And so

166

1   it would delay it if they left it locally for
2   Dr. Patel and Pampati.  So I don't necessarily
3   agree that it was working well.
4       Q      You got a bullet here, it says, we need
5   Dr. Ayos to move to the medical mall, we need
6   Dr. Kirkpatrick to move to the rotation, and
7   Dr. Ayos' shift pay has to go to productivity only.
8   Dr. Marks and Herron must read.  Locums must be
9   pushed to read what we are paying them.
10          And then Dr. Patel responds, we had
11  planned Kirkpatrick to read mammos at the mall when
12  Dr. George is not working.  Rest of the time we are
13  rotate him and have Ayos at the mall and change her
14  to productivity base.  We need her to do fluoro
15  till we recruit someone.  And your response, okay,
16  I will inform her effective 6/1.  So you seemed
17  okay with this.
18      A      Yeah.  The only thing he didn't comment
19  on was Marks and Herron and the locums.
20      Q      Next item that you brought up was,
21  Dr. Patel and Pampati must read very little.  Patel
22  responds, we are not reading anything but mall and
23  MCHC and a few that we are pulled in or to assure
24  TAT.  What did you take him to mean by that?
25      A      That he's saying that they are reading

167

1   very little, but when you take all the mall, all
2   the MCHC, and whatever else that they were reading,
3   when you look at the actual numbers, they were
4   reading a lot.
5       Q      Then the next bullet -- but there's --
6   you make no response to that; right?
7       A      Right.
8       Q      So the next bullet is, our plan is to
9   put a RS and McKesson workstation across the street
10  and hire yet another doctor that can read on both
11  systems and be productive.  Dr. Patel says, if
12  they are not sending any to RS during daytime, this
13  will add additional cost of another doctor.  You
14  respond, okay.
15          You seemed satisfied at least with his
16  response; correct?
17      A      Well, we didn't put a doctor there
18  because they're not sending any studies, which has
19  been another big issue that we had that Patel and
20  Pampati were basically keeping all the studies
21  there during the day and only sending us the
22  overflows and after hours, et cetera.  So we were
23  just trying to figure out in any way, shape, or
24  form to try to get efficiency into the system based
25  on all of the blockades that we had.  So the fact

168

1   that this will add another cost if they are -- the
2   problem is that they are not sending anything to
3   RamSoft during the day.  That's the problem.  So I
4   just said okay, because if they're not -- if you're
5   not sending cases to us during the day, then it
6   doesn't matter if we put someone there or not.
7       Q      Your response here is, okay; correct?
8   It wasn't all that other stuff that you just said.
9   It's simply, okay.
10      A      Why can't it be -- all right.  Okay.
11      Q      It is.
12      A      I mean, you're asking me about a word,
13  so --
14      Q      Uh-huh.  (Affirmative)  And then
15  Dr. Patel says, if we can do this, then GH will be
16  profitable and healthy moving forward.  The goal is
17  to have all of this in place by 7/1/2021.  I'm
18  sorry; that's not -- that was your comment earlier.
19      A      That's me.
20      Q      Yeah.  But Dr. Patel says, we will work
21  hard to achieve for best results.  Key factor is to
22  recruit a rad at Harlan, the mall, and Hazard
23  hospital to take charge and be part of the medical
24  staff and be in the community.  And you say, we
25  have three new doctors coming in.  Did those three

Anand Lalaji, M.D.   8/1/2022

43   (Pages 169 to 172)

169

1  new doctors come in?
2  A         We proposed them to the medical staff,
3  and they -- because of COVID ARH lost all of their
4  credentialing people except for Heather and maybe
5  one other person, so they were behind like 12
6  months on credentialing.  So I signed those
7  doctors, they visited, came in, and it took too
8  long for them to credential, and then they left.
9  So they did come, but they left.
10  Q         So the answer -- okay.
11  A         They did come, but they left.
12  Q         And they left.
13  A         The other thing is I'm not sure if they
14  made you aware of the radiologist -- massive
15  radiologist shortage in the United States.  Thirty
16  percent of the field is gone.  And so recruiting
17  radiologists to that rural part of Kentucky is a
18  virtual impossible task, and that's why a lot of
19  stuff is being done by teleradiology.
20  Q         I'll show you what's going to be marked
21  as Exhibit 19, and I'm trying to figure out what
22  this is.  This was produced by your lawyers, and
23  the highlights on it I will tell you were on the
24  original.  Does this look familiar?
25            (Said document is filed with this

170

1            deposition and marked as Plaintiff's
2            Exhibit No. 19 for purposes of
3            identification.)
4  A         It actually does not.  I can't
5  recollect this document.  Is this an e-mail?
6  Q         This is just a single page, 965.
7  A         Yeah, I don't know what this is.
8  Q         Okay.  We'll come back to that.  Let me
9  show you what will be marked as Exhibit 20.  And
10  again this is the production that your lawyers
11  made.  There are numbers at the bottom right that
12  help keep track of pages, but you'll notice that
13  there are some of these that repeat.  Have you seen
14  this before?
15            (Said document is filed with this
16            deposition and marked as Plaintiff's
17            Exhibit No. 20 for purposes of
18            identification.)
19  A         Yeah, this type of format I've seen
20  before.  I think it was the -- let's see.  Yeah,
21  this vaguely looks familiar.  I'm just trying to
22  see how -- let's see.  This looks like -- this
23  looks like it's something from -- oh, okay.  Yeah,
24  this is something that Dana Holmes and Will
25  Crenshaw -- I think their analysis of what

171

1  produced, et cetera, what their initial or at some
2  level, you know, what their assessment was or kind
3  of informational gathering, et cetera.  Oh, yeah.
4  I think they sent this to Patel and Pampati as sort
5  of our finance consulting arm, you know, so that we
6  both are seeing everything that's happening,
7  something like that.  I vaguely remember.
8  Q         Did you prepare this?
9  A         No.
10  Q         But somebody did on behalf of TRG?
11  A         Correct.
12  Q         About when would this have been made?
13  A         I have no idea.
14  Q         Okay.  This is 941, and it's the first
15  page 941.  Situational update -- well, I'm going to
16  start at the very top here, Proposed Memorandum of
17  Understanding re Gram/Hazard Future Operations.
18  What is this -- who's making this proposal?
19  A         I believe it's -- let's see.  2nd
20  Generation has compiled this I believe to bridge
21  the gap and to make everything sort of
22  understandable for Patel and Pampati as to what is
23  occurring.  So it's obviously TRG and Patel and
24  Pampati with the 2nd Generation consultants acting
25  as a sort of buffer in a sense to kind of talk

172

1  about the issues that are happening and what the
2  proposed solutions are.
3  Q         And then these proposed solutions, was
4  TRG fine with these proposed solutions?
5  A         I believe -- I mean, yeah, I believe
6  so.
7  Q         So this is a correct statement:  TRG is
8  working to hire more FTE -- and what's FTE mean?
9  A         Full-time equivalent.
10  Q         -- hire more FTE radiologists for in-
11  hospital commitments.  This will reduce the need
12  for locums, reduce the reads needed by Drs. P and
13  P, improve the service visibility with the hospital
14  physicians, et cetera.
15            Do you know whether Pampati and Patel
16  had any objection to this proposed solution number
17  one, hiring more radiologists?
18  A         I don't know.
19  Q         Did you ever hear them express any
20  objection to that?
21  A         No.  I think in general we -- you know,
22  in general they -- you know, bringing in -- like I
23  said, in the typical recruiting time that bringing
24  in FTE radiologists was accepted kind of as an
25  overall process by all parties.

Anand Lalaji, M.D.   8/1/2022

44   (Pages 173 to 176)

173

1    Q         Item number three of the proposed
2    solutions, TRG is working on its relationship with
3    Data Marshall to press for better service and
4    targeted collection of the old AR.  So it seems
5    like there was efforts being made here.  Do you
6    agree with that, that TRG was trying to do this
7    with Data Marshall?
8    A         Yeah.  Trying is different than actual
9    results.  It didn't yield much, but yeah.
10   Q         It didn't yield much for you; it didn't
11   yield much if Pampati and Patel tried either?
12   A         No, that's not true.
13   Q         Oh, they got results?
14   A         Yeah, for the last five years they
15   operated their practice.  We didn't change a
16   thing.
17   Q         If you'll turn the page, again it's
18   number 941.  Do you know what this is?
19   A         I have no idea.
20   Q         The next page I think is the first 942.
21   This appears to be some kind of a spreadsheet.
22   What does that appear to you to be?
23   A         So it looks like -- I don't know.  It's
24   like something of payments with some -- the units
25   that were paid, and then on the right side it's

174

1    radiologists with units.  I mean, I don't know.
2    Q         Does that, the columns on the left,
3    correspond to the person on the right?
4    A         I have no idea.
5    Q         Next page is another 942.  Strategy
6    session 7/21/21, did that occur?
7    A         I think Dana and Will or just Dana met
8    with Patel and Pampati physically, and I'm not sure
9    if it may have been on that date or not.  I'm not a
10   hundred percent sure.
11   Q         Would that have been at the knowledge
12   if not direction of TRG?
13   A         Yeah, I'm sure TRG had the knowledge.
14   Q         They wanted this to work out?
15   A         Yes.
16   Q         I notice under the profitability plan
17   number one, RCM recoveries, that's revenue cycle
18   management; right?
19   A         Uh-huh.  (Affirmative)
20   Q         First bullet, combined monthly gross
21   billing, DM, Data Marshall, and ADV -- that's short
22   for Advocate; is that right?
23   A         Uh-huh.  (Affirmative)
24   Q         -- equals 2.2 million.  Is that how you
25   read this, sir?

175

1    A         Yes.  Charges, 2.2 million in charges.
2    Q         Where does it say charges?
3    A         It doesn't say, but that is what it is
4    because of the next item.
5    Q         Well, as I see the bullet above it, it
6    says RCM recoveries.  Why would that not be what's
7    received?
8    A         Because you got to go to the next
9    bullet point.
10   Q         Okay.  Benchmark 33 -- so the second
11   bullet point under this sub-bullet point, benchmark
12   33 percent gross recovery equals 650,000
13   conservative, current state equals 450,000 per
14   month patient revenue; is that right?
15   A         For the month, yes, patient revenue.
16   Q         So what's that mean?
17   A         So our goal is to get 33 percent gross
18   recovery of that 2.2 million in charges.  That's
19   very typical, meaning that's an aggressive route,
20   but, you know, we've seen that in many markets that
21   are high in Medicaid population, Medicare,
22   Medicaid, where we can potentially get that.  So 33
23   percent of 2.2 million is that -- okay, 33 percent
24   of 2.2 million I believe is 650,000.  Conservative,
25   I guess they're saying that's a conservative

176

1    number.  But because of the current state it's
2    really more like 450,000 because we're not
3    collecting based on all the issues that we talked
4    about, so it's not really 33 percent is what
5    they're saying.  It's the plan.  It's not what's
6    happening.
7    Q         Right.
8    A         It's basically this is what we need to
9    do to get to profitability.  So we're collecting
10   450,000, but the rad expense is 700,000.  You know,
11   and then June rad payroll was 600,000, but we're
12   collecting 450,000 current state.
13   Q         If you'll turn to the next page, this
14   is another 942.  Do you consider this part of this
15   profitability plan?
16   A         Yeah, I guess so.  One, two -- I don't
17   see three in here.
18   Q         Actually, it looks like three is in
19   this watermark.
20   A         Oh, yeah.  Three is there.  Yeah, so
21   it's probably part of this profitability plan.
22   Q         And it says, TRG will start to provide
23   Drs. P and P with call log data to reinforce the
24   actual service levels.  What's being discussed
25   here?

Anand Lalaji, M.D.   8/1/2022

45  (Pages 177 to 180)

---

177

1    A        So, you know, radiology departments,
2    you know, historically they are -- unfortunately,
3    like to point the finger at the teleradiology group
4    and the radiologists themselves, so they complain
5    that we're not responding to their phone calls, and
6    we're saying we are.  So we recorded the call log
7    data so that we can send it to P and P so that they
8    can show them that they're incorrect.
9    Q        Number five, TRG pledges to work to
10   continue to improve its call response service
11   level.  What's being mentioned here?
12   A        That's the same thing as process of,
13   you know, call service, customer service, the call
14   center.
15   Q        When it says it's going to work to
16   continue to improve, what do you understand that to
17   mean?
18   A        We always look at as a company, as a
19   whole, if we get a complaint, we look at whether
20   there is issues on our side or on the client side.
21   Sometimes there's just on the client side,
22   sometimes it's somewhat on our side, and sometimes
23   it's minimal on our side but most of it on the
24   client side.  So we always look to look at our own
25   processes to make sure that they're functioning at

---

178

1    a high level.
2    Q        And then number six, TRG proposes a new
3    compensation structure for Drs. P and P.  That is
4    -- would replace what was in their share purchase
5    agreement?
6    A        Correct.
7    Q        -- as well as the employment
8    agreements?
9    A        Correct.
10   Q        That was never agreed upon, was it?
11   A        I don't think so.  This is an MOU.
12   Q        Right.  Then if you turn the page to
13   943, do you know what this is?
14   A        I think they threw in another
15   acquisition that they were doing.
16   Q        Who was that?
17   A        I think it's 2nd Generation.  I don't
18   know why they would throw that in.  Maybe they
19   thought -- let me see here.  I think this is --
20   yeah, I have no idea why they would put that in.
21   This is just a different acquisition that had
22   nothing to do with Gram and Hazard.  I think it's
23   just their to-do.  They were advising us on that
24   deal.
25   Q        Even though there are references to P

---

179

1    and P and Anand, these would be -- this is about
2    some other deal?
3    A        Yeah, I don't know.  I don't know why
4    they would put that in there.  It's bizarre.
5    There's no numbers next to it.  Like it's weird; it
6    stops at seven, so I don't know where this came
7    from.  You know what I mean?  Like it looks like
8    this is the end of the proposed solution, and
9    there's no other number.
10   Q        But as I understand it, if something
11   came from Crenshaw it would have Crenshaw's number
12   on it, and this does not.  This is presumably from
13   TRG.  Do you know, Dr. Lalaji, have you seen this
14   before today?
15   A        Yes.
16   Q        When?
17   A        In different pieces, I mean, whenever
18   2nd Generation was advising us.  I guess right
19   around the time of e-mails of when they were
20   speaking with Dr. Patel and Pampati.  I don't know
21   exactly what time.
22   Q        If you'll turn to the next again 943,
23   do you know what that is?
24   A        Yeah, I mean, again it's probably some
25   sort of RCM report, but it's kind of off center and

---

180

1    discombobulated a little bit.
2    Q        Well, now on these columns on the right
3    of this page 943, I'm looking on April 2021, I see
4    Ayos, Emelita, 190.  What does that number mean?
5    A        I have no idea.
6    Q        I noticed in some previous columns
7    there were references to units.  If you'll go back
8    to page 942, and it's going to be the first page
9    942, it's the columns there on the right, says
10   August 2020, internal doctor Ayos, Emelita, units
11   57.  Do you know what this is?
12   A        I have -- I don't know what units mean.
13   That's not -- I don't know.  It could mean -- it
14   could be a ICD-9 count or it could be a CPC count,
15   it could be numbers of studies.  I'm not sure.
16   Yeah, it's something related to that, though.
17   Q        If you'll go to page 944, this would be
18   the second page 944, past acquisition lessons
19   learned and adjustments, what is this?
20   A        It's probably something that -- it's
21   probably something that 2nd Generation sent to TRG
22   in terms of its evaluation.  We do a -- you know,
23   typically after any acquisition we do sort of a
24   lessons learned and any adjustments that we need to
25   make moving on to other acquisitions.

---

Anand Lalaji, M.D.    8/1/2022

181

1    Q        Show me in here where it says something
2    about Pampati or Patel being the cause of so much
3    of these problems or shirking their fiduciary
4    duties or anything like that.
5    A        RCM companies were not managed post
6    close, causing significant amount of AR to age
7    greater than 90 days. That's -- change in RCM
8    companies without identifying an internal owner,
9    which we did, which was Patel and Pampati, to
10   closely manage the transition and ensure both new
11   and aged claims were being billed timely. This is
12   what they did not do, which is what they did all
13   along until we acquired the practice and what they
14   were supposed to do moving forward.
15   Q        And then the solution for both of those
16   things, TRG has assigned all RCM management
17   responsibilities to the office of the CFO.  Would
18   that be Crenshaw?
19   A        No.  It's just whoever the future CFO
20   would be.
21   Q        And then the other solution, TRG hire
22   an experienced RCM analyst in Q4 or Q1 2022 with
23   goal of moving all billing functions.  It says
24   nothing about Pampati and Patel or having a
25   physician or somebody else.

183

1    you know, I would have to see the whole
2    spreadsheet.  I don't know if there's anything
3    missed in the middle too.  Like, you know, that
4    could be the top, but then at the bottom there
5    could be stuff in between.
6    Q        Sure.
7    A        I don't know why it's cut off.
8    Q        Well, if this pertain to a
9    spreadsheet for directly billed reads, is that a
10   term that TRG uses, directly billed reads?
11   A        No.
12   Q        Okay.  Still in the same document,
13   though, this is the second page 945, this appears
14   to be part of this issue and solution analysis, and
15   it says, purchase agreement and integration process
16   was not properly aligned to protect TRG's
17   profitability at all costs.  What do you understand
18   that to mean?
19   A        Yeah, so this is a problem where you
20   have family that's part of the deal, and so I, you
21   know, unfortunately trusted Dr. Patel and Pampati
22   because we thought that, you know, we were close
23   and family, so we did not structure clawbacks, we
24   did not -- based on collections, et cetera, because
25   this to us seemed like a, you know, really good

182

1    A        This document is not focused on all of
2    the stuff that Patel and Pampati did wrong. It's
3    about lessons on a large scale in terms of -- you
4    know, basically that box said because Patel and
5    Pampati were -- you know, basically there was no
6    management of the AR, which is what they were
7    supposed to do, we have to figure out if we have
8    unfortunate previous owners like we have in this
9    deal that decide to do that, this is how we have to
10   protect ourselves to make sure that the AR comes in
11   in a timely fashion.  And in fact, that's what we
12   have done to date.
13   Q        If you'll turn to page -- I wonder --
14   if you could go back to page 942, the first page
15   942, and you see where it says directly -- this is
16   -- no, keep going back, 942.  The first -- the
17   problem is these things are misnumbered.  And then
18   up here it says, directly b-i.  You see that?
19   A        Yeah.
20   Q        If you come over here to page 945, this
21   is the first 945, and it says i-l-l-e-d reads.  So
22   when you put those two together do you think that
23   this is all part of the same spreadsheet here?
24   A        I'm not sure because it could be -- I
25   mean, it looks like that word flows possibly, but,

184

1    deal because we've worked together for so long and
2    we had a relationship, et cetera.
3           And so basically what 2nd Generation
4    was saying to us was, you know, you have to have
5    all of the protections in place because something
6    like this, regardless of whatever the family and
7    the relationship and everything that we did to, you
8    know, try to make sure that this deal was going to
9    go through did not come -- did not happen.  And so
10   that's why they're saying revised agreement and
11   overall compensation structure to sellers, which
12   includes contractual clawbacks and alignment with
13   business cash profits, because we have to make sure
14   that we're buying a practice because the owners
15   were collecting.  And when the owners don't collect
16   after acquisition, after the transaction, then all
17   of this has occurred because of that.  That's what
18   they're saying.
19   Q        So if you'll turn the page to 946, does
20   this appear to be part of the same analysis, what
21   went wrong?
22   A        Oh, this one.  Yeah, I think so.
23   Q        Have you seen this before?
24   A        Yes.  Vaguely, yes.
25   Q        And about when would you have seen it?

Anand Lalaji, M.D.   8/1/2022

185

1  A        When they prepared it and when they
2  were talking with Patel and Pampati.
3  Q        They are 2nd Generation?
4  A        Correct.
5  Q        As I read this it says, acquisition
6  assumed that TRG-Assist system, on top of RamSoft,
7  could be implemented practice-wide.  Pushback from
8  hospital keeps a large number of studies/reads off
9  of TRG-Assist, about 14,000 studies in May.
10        The third bullet point down here says
11  underneath that acquisition assumed TRG-Assist
12  system, P and P failed to ensure integration and
13  relationship with hospital.  What would P and P
14  have done to integrate this with the hospital?
15  A        We felt that Patel and Pampati did not
16  realistically use all of their so-to-speak pull
17  with the hospital and relationship with the
18  hospital to get the things that we needed which
19  they committed to before the acquisition to get
20  done.  And so they failed to ensure the integration
21  and relationship with the hospital.  That is our
22  estimation.
23  Q        Okay.  If you go down to the middle of
24  this, it says, cash outflow and cash inflows were
25  not aligned, and then there's a second bullet

186

1  point, compensation for the sellers annually, and
2  you got salary and earnout, AR buyout.  That AR
3  buyout, that is something that is a feature here
4  where TRG did agree to purchase this AR; correct,
5  some of this AR from Gram?
6  A        That's correct.
7  Q        Was that paid?  Did TRG pay for that?
8  A        Whatever we collected on their behalf
9  was paid.
10  Q        And then there's it says, total, a
11  million, 600 and change, and then the second bullet
12  point underneath that says, not included here, but
13  P and P's employment agreement also paid them 55
14  percent of net collections on reads and $1500 daily
15  rate.
16  A        For on-site work.
17  Q        Yeah.  That would've increased this
18  number by whatever those are; correct?
19  A        Yes.
20  Q        Who wrote this?  Did you write this?
21  A        No.  2nd Generation did.
22  Q        Then if you'll turn the page again, and
23  this is 947, it's the second 947, what's left to
24  fix.  The first item says, bridging gap of seller's
25  expectations, still assume four million, 600 and

187

1  change of earnout/AR buyout will be paid, debt for
2  TRG.  What do you interpret that to mean?
3  A        So just bridging gap of the seller's
4  expectations because -- so there's 4.69 million
5  left at that moment on the earnout because that's a
6  five-year earnout.  AR buyout will be paid.  So
7  it's just a matter of because there's so much
8  backlog collections that their expectation of when
9  they'll be paid will -- it's something left to fix.
10  It's their expectation.
11  Q        Okay.  I'm going to show you what will
12  be marked as Exhibit No. 21.
13        MR. HUNTER:  You about ready to
14        take a break?
15        MR. MORGAN:  Sure, we can take a
16        break.  It's about quarter after 3:00.
17        (A brief break is taken.)
18  Q        I gave you Exhibit No. 21, which is a
19  statement from Wayne Stratton dated December 2 of
20  2021.  Have you seen this before?
21        (Said document is filed with this
22        deposition and marked as Defendant's
23        Exhibit No. 21 for purposes of
24        identification.)
25  A        Yes, I have.

188

1  Q        And this is Dr. -- or the expert's
2  analysis of --
3        MR. HUNTER:  Dr. Wayne Stratton?
4        MR. MORGAN:  That's right.
5  Q        -- of what is owed to Dr. Patel and
6  Dr. Pampati.
7  A        His -- his opinion.  His analysis.
8  Q        His analysis.  Have you looked at it
9  before?
10  A        Vaguely, yes.
11  Q        Well, this is only on the salary
12  matters.  And he, as you can tell, has arrived at
13  these numbers, and I'm guessing you disagree with
14  him on this.  He says that this is what is still
15  owed.
16  A        Correct.  We disagree.
17  Q        How is it that you disagree?  What's
18  your reasons, your proof, for disagreeing with him?
19  A        Okay, so Patel and Pampati were -- hold
20  on.  Let me just read this again to refresh my
21  memory.  Okay.  Yeah, so he -- number four, it
22  says, payments for accounts -- I'm sorry.  Yeah,
23  number four, it says, I traced the activity in each
24  of these areas using the agreements, Dr. Patel's
25  bank statements, W-2s, and payroll information

Anand Lalaji, M.D.   8/1/2022

48  (Pages 189 to 192)

189

1  obtained from TRG, days worked log information from
2  TRG, billing records from the billing company,
3  summary information from TRG calculating amounts
4  paid and amounts due under the agreements and
5  records of Dr. Patel's and Dr. Pampati's cash
6  receipts.
7        So the first thing here is that
8  payments that were, you know, sort of -- there's
9  been discrepancies of what was paid for -- you
10 know, what was paid for their salary versus what
11 was paid for their fees for reading versus the
12 exact number of days that they were supposed to be
13 covering shifts on site, et cetera.  All of those
14 we have -- the numbers we have a disagreement with.
15 So that in itself, we disagree with these numbers.
16 And the amounts leaving the Peoples Bank account
17 and then going via several different routes to
18 Patel and Pampati and their mechanisms of delivery
19 of pay, he does not have access to those.  He just
20 knows that monies left the Peoples Bank account.
21 He doesn't have the accounting information from our
22 central payroll and AP system, et cetera.  So it's
23 not a --
24 Q        Where does he talk about the Peoples
25 Bank in Exhibit 21?

190

1  A        He does not talk about Peoples Bank.
2  Q        So what does what you were just saying
3  have anything to do with?
4  A        Because monies that were paid to them
5  based on whether they -- you know, like so for
6  example, Dr. Patel's bank statements, right?  So I
7  understand that we had written checks, and they
8  were not deposited in the bank, so those would not
9  be reflected in bank statements.
10 Q        Does that go on a -- in such a
11 circumstance is that reflected by TRG as a payment
12 to the doctor even though they didn't cash the
13 check?
14 A        We wrote a check to them, and they're
15 perfectly acceptable to be cashed, so --
16 Q        Well, my question is, is that a payment
17 on TRG's books?
18 A        Yes.
19 Q        It's not -- okay.  And that, what
20 you're talk -- tell me what you're talking about
21 there, please.
22 A        All I know is that we cut some checks
23 to them, and they did not deposit those checks.
24 Q        How many checks?
25 A        I don't know.

191

1  Q        And for how much?
2  A        I don't know.  That's what I'm saying,
3  that's not reflected in here.  You said, you know,
4  do I -- you know, would I disagree with this
5  assumption, and right then and there, you know,
6  that changes these numbers.  Plus the allocation of
7  what's salary versus what's fees for reading, we
8  also had an issue with the way he calculated that
9  as well.
10 Q        Is it TRG's position that Drs. Patel
11 and Pampati are owed anything for their salary?
12 A        It's our position that up to the point
13 of when we had to terminate them for cause they
14 have been compensated in full.
15 Q        For salary?
16 A        For everything.
17 Q        For fees for reading?
18 A        Everything.
19 Q        Coverage.
20 A        And earnout.
21 Q        And accounts receivable?
22 A        Based on all of the other items that
23 are related to that, yes.
24 Q        So you're saying that the accounts
25 receivable that TRG has collected, those have been

192

1  paid in full to Drs. Patel and Pampati?
2  A        The ones that we have collected on,
3  which in our assertion and what we are trying to
4  say to this court is that they were responsible for
5  not being able to collect their accounts
6  receivable.  They were supposed to continue on.  We
7  did not have -- that's why whenever we -- you know,
8  there's a whole presentation on this that should be
9  part of the discovery where there's millions of
10 dollars that have not been collected because of
11 that.
12 Q        And I'm looking at something that's
13 pretty straightforward here as coverage on the
14 first page of Exhibit 21, and this is simply just
15 adding up days that they were at work for which
16 they should have been paid an agreed-upon rate of
17 $1500 a day.  And is it TRG's position that this
18 has been paid?
19 A        It's TRG's position that this number is
20 incorrect of the exact amount of times that they
21 were actually on site fulfilling the scheduling gap
22 where they were supposed to be paid.  So this
23 number is incorrect.
24 Q        What's the correct number?
25 A        I don't know.

Anand Lalaji, M.D.   8/1/2022

193

1    Q        Well, I just went through this a minute
2    ago, and I said, do you owe this, do you owe that,
3    and everything you said was, paid in full, owe
4    nothing.  So now I'm hearing we don't really know
5    what the number is at least for coverage.
6    A        For coverage this number is incorrect.
7    That's what we know.  We know that we have paid
8    Dr. Patel and Pampati $1.6 million.
9    Q        Well, what does TRG say that it owes
10   Dr. Patel for coverage?
11   A        I don't know the exact number.
12   Q        Could it be 13,500?
13   A        It could be zero.
14   Q        Why don't you know the exact number?
15   A        Well, it's just something that I would
16   have to go back to -- with the finance department
17   and see what number they've come up with.  I
18   believe our own independent financial analyst also
19   analyzed the same data too so --
20   Q        Who's that?
21   A        -- it would be under -- basically we
22   agree with kind of some of his items, et cetera.
23   The name?  I don't know the name exactly.
24   Q        Did that person develop a report?
25   A        Yes.

194

1    Q        May we please get a copy of that
2    report?
3             MR. JOHNSON:  I think we did
4             provide it to you, but I could check
5             and make sure that was done.
6             MR. MORGAN:  What's the person's
7             name?
8             MR. JOHNSON:  John Libbert.
9             MR. MORGAN:  Lippert?
10            MR. JOHNSON:  L-i-b-b-e-r-t.
11   Q        And about when was that done,
12   Dr. Lalaji?
13   A        I don't remember exactly.
14   Q        I'm going to show you what will be
15   marked as Exhibit 22, and this is another report
16   from Wayne Stratton.  This one's dated February 22
17   of 2022.  This one addresses earnout.  Have you
18   seen this before?
19            (Said document is filed with this
20            deposition and marked as Plaintiff's
21            Exhibit No. 22 for purposes of
22            identification.)
23   A        Vaguely, yes.
24   Q        Why don't you look that over again,
25   please?

195

1    A        Okay.
2    Q        And do you agree with this statement
3    that there's $4,394,504 in earnout remain to be
4    paid to Patel and Pampati?
5    A        No.  We disagree with that number.
6    Q        What number does TRG have?
7    A        The number that would've been in the
8    move-forward solution plan that was proposed to
9    them.
10   Q        What's the basis of that number in the
11   move-forward solution plan?
12   A        The basis is that they breached
13   fiduciary duty, they prevented -- there was no
14   management of the collections, and none of these
15   monies existed because they were not collected at
16   all due to the fact that Patel and Pampati stopped
17   performing the functions that they were supposed to
18   do.
19   Q        So that reduces the purchase price of
20   the business?
21   A        Yeah, so in the SPA, first of all, the
22   revenue that comes in, the cash that comes in,
23   basically it reduces the purchase price in the SPA.
24   It reduces the earning.  So like for now there's
25   zero.  There's zero because there's no practice,

196

1    therefore, zero earnout.  It's a pro rata
2    reduction.
3    Q        Why don't you show me where that is on
4    Exhibit 10, please?  That's the share purchase
5    agreement.
6    A        Okay, so there's several areas.  So the
7    first one is in 1.3(a).  The parties have agreed
8    that the earnout amount shall be recalculated each
9    year of the earnout period commencing with the
10   first anniversary of the closing date based on the
11   revenues in the prior 12-month period, with the
12   first anniversary of the closing date based on the
13   revenues in the prior 12-month period.  Sorry; that
14   was repetitive.  The method of such recalculation
15   is set forth in Exhibit C and addendum.
16            And so then if you go to Exhibit C,
17   calculation of earnout adjustment.  If revenue goes
18   up, five percent commission to Gram, 12 months,
19   then reset only applies for earnout period.  If
20   revenue goes down, 12-month evaluation mark, reduce
21   by revenue percentage, remaining balance, and
22   divide accordingly representing a -- it's not
23   printed out, but it says, representing a pro rata
24   reduction.  That's what it should say, but I don't
25   think the whole thing printed here.  It's cut off

Anand Lalaji, M.D.   8/1/2022

197

1    here. Oh, here we go. It's on the last page back
2    here. If revenue drops by ten percent there will
3    be a pro rata reduction in earnout payments by ten
4    percent for the following 12 months basically. And
5    that's the revenue target basically.
6    **Q      What's the revenue target?**
7    A      Up there, six million. So it's
8    basically a pro rata reduction. So if it goes down
9    by 50 percent, the earnout goes down by 50 percent.
10   If it goes up, then the goal would be they would
11   get commission, five percent commission, on the
12   upward delta for the total earnout period. But if
13   the revenue drops, for example, if it drops by ten
14   percent, there'll be a pro rata reduction by ten
15   percent.
16   **Q      Would you agree with me that is where**
17   **the real money is in this agreement, the earnout?**
18   **The sale of this business is on the earnout?**
19   A      Yeah. There's no hard assets. It's
20   all cash play. It's all cash-based business, so
21   revenue has to be maintained.
22   **Q      And finally let me show you what'll be**
23   **marked as Exhibit 23.**
24           MR. HUNTER: Did he just say
25   finally? Does that mean he's done?

199

1    companies, thereby potentially increasing the value
2    of the purchase to the companies. What is meant by
3    that?
4    A      Well, first of all, this is an LOI, so
5    this is not binding once the SPA is signed, so, you
6    know, whatever may be in here and if it's different
7    in the SPA doesn't matter because this was the
8    original LOI.
9           But to specifically answer that, so all
10   of the cash that is in their accounts prior to
11   basically whatever the cash reserve that they have,
12   they would take, and they did. So if -- because if
13   we did take it, then that would potentially
14   increase the value.
15   **Q      I notice this LOI is dated March 31,**
16   **2020. On the next page, though, if you turn the**
17   **page, I see that page two it says March 8. Is that**
18   **you think just a typo?**
19   A      It may be. You know, this underwent
20   several revisions, so it could be. It could just
21   be another revision, or it's a typo. I think all
22   the other pages say the 8th, so that's probably a
23   typo.
24   **Q      And on number four of this, due**
25   **diligence, this essentially lays out what's**

198

1    **Q      Is this the letter of intent?**
2           (Said document is filed with this
3    deposition and marked as Defendant's
4    Exhibit No. 23 for purposes of
5    identification.)
6    A      Yes, this does look like the LOI.
7    **Q      I notice that this has stamps from both**
8    **Crenshaw and A. Patel, D. Could this have been**
9    **something that 2nd Generation would've had?**
10   A      We probably would've sent them the LOI
11   at some point.
12   **Q      I notice here on the first page of this**
13   **under practice acquisition it says that an**
14   **aggregate -- TRG would acquire the outstanding**
15   **stock of the companies for an aggregate purchase**
16   **price of approximately 5.845 million based on an**
17   **EBITDA multiple of 8X. That's what everybody was**
18   **expecting; right, an eight times value of this**
19   **company; right?**
20   A      Yeah, 8X, which is we gave them 8X
21   mainly because of our relationship. Normally the
22   standard in this size practice in any of the
23   radiology industry, it's five.
24   **Q      In the second paragraph of this number**
25   **one it says, TRG would not acquire the cash of the**

200

1    anticipated, certainly what's intended, by TRG to
2    conduct an examination of Gram and Hazard's
3    accounts and other business operations. Does TRG
4    have any statement here that something was withheld
5    from them during this due diligence period?
6    A      Yes, the fraud, the process by which
7    they interpreted studies at Mountain Comp. We were
8    never told that. We never discovered that in any
9    of the e-mail correspondences and due diligence, et
10   cetera.
11   **Q      What did TRG do to look at the**
12   **operations of Drs. Patel and Pampati as well as**
13   **Hazard and Gram?**
14   A      So as part of due diligence there's
15   like a template that has about 16 steps, and we
16   would send them each step with documents and
17   various things that they would have to provide, and
18   part of that is regulatory. And in that regulatory
19   it asks, are there any processes that are going on
20   that are not -- are, you know, not in compliance,
21   you know, all of that stuff that associates with
22   CMS, associates with all that. So they answered no
23   to all of those questions.
24   **Q      Did TRG look to see how in this case**
25   **Drs. Patel and Pampati do the billing with Mountain**

Anand Lalaji, M.D.   8/1/2022

201

1  Comp or just look at this template and the answers
2  to those questions?
3  A      No, no.  Then we dove in from a billing
4  standpoint, yeah, from the flow of information from
5  Mountain Comp to their billing company and the flow
6  of information from ARH to their billing company.
7  So we looked at that as well.
8  Q      And when you looked at that, whoever
9  looked at that found nothing that alerted them to
10  what are alleged to be fraud?
11  A      We did not find any specific indication
12  or anything that was stated to us about secretaries
13  signing in as radiologists to approve radiology
14  studies without the radiologist looking at the
15  final report.  None of that came out in our due
16  diligence, even with interviews and questions, et
17  cetera, to Patel and Pampati.
18  Q      Other than this allegation of fraud, is
19  there anything else that TRG feels was withheld or
20  was uncovered?
21  A      From the top of my head, that was the
22  main thing, because the billing process was working
23  smoothly because they were doing everything, you
24  know, that they were supposed to be doing.  Prior
25  to acquisition they were following up with the

202

1  billing company and doing all those things, which
2  was the most important thing.
3  Q      Are you aware of any instance since TRG
4  has been in charge of Gram or Hazard's billings or
5  receipts in which a billing has been declined or
6  denied because of this alleged fraud?
7  A      No, which is also a big problem because
8  any monies that were paid to Patel and Pampati
9  based on that fraud would have to be returned to
10  CMS, hence the self-reporting.
11          MR. MORGAN:  Let me check a couple
12      things.  We'll go off the record here,
13      but I think I may be done.
14          MR. HUNTER:  I just have one
15      document that I don't have copies of.
16      Can I get --
17          MR. MORGAN:  A copy?
18          MR. HUNTER:  Yeah.
19          MR. MORGAN:  Sure.
20          (A brief break is taken.)
21  Q      Sir, we're back on the record, and
22  you're still under oath.
23          Isn't it true that the 8X EBITDA that
24  was agreed upon for the general terms of value of
25  the company had to do with the assumption of the AR

203

1  of the business of Gram and Hazard?
2  A      No.
3  Q      You're saying it's entirely based on
4  family?
5  A      Yeah.  We gave them an extra -- gave
6  them more multiple based on our relationship with
7  them.
8          MR. MORGAN:  That's all the
9      questions I have right now.  I think
10      Mr. Hunter may have some.
11  ------------------------
12          EXAMINATION
13  BY MR. HUNTER:
14  Q      Yeah, I just have a few.  So is it
15  Lalaji or Lalaji?
16  A      It doesn't matter.  I've been called
17  six or seven different things.  Yeah, it's fine.
18          MR. HUNTER:  Should I just mark
19      this as 24?
20          MR. MORGAN:  That's fine with me.
21      (Said document is filed with this
22      deposition and marked as Plaintiff's
23      Exhibit No. 24 for purposes of
24      identification.)
25  Q      Dr. Lalaji, this is an excerpt from the

204

1  answer that the lawyers filed on behalf of you and
2  your companies and the counterclaim.
3  A      Uh-huh.  (Affirmative)
4  Q      And I just want to ask you about Count
5  III of your counterclaim and specifically paragraph
6  28, which is on page 16.  It says, Mr. Crenshaw was
7  neither present during the negotiations concerning
8  the plaintiffs' employment agreements nor for the
9  share purchase agreement, nor is he in privity of
10  contract with plaintiffs, nor did he have any
11  responsibility for decision or actions concerning
12  the plaintiffs.  Is that a true statement,
13  Dr. Lalaji?
14  A      That is true.
15  Q      The Peoples Bank in Hazard, Gram and
16  Hazard had an account there; is that true?
17  A      That's correct.
18  Q      And as I understand it, money was swept
19  out of that account to TRG's bank in Atlanta on a
20  daily or at least kind of regular basis?
21  A      Yeah, weekly, but not like swept.  Like
22  it's not a sweep account.  It's just our controller
23  at the time sent money like by wire.
24  Q      And was that done kind of on a regular
25  recurring basis ever since August of 2020 when the

Anand Lalaji, M.D.  8/1/2022

205

1  acquisition occurred?
2  A      Yes, that's correct.
3  Q      And did the plaintiffs -- did Dr. Patel
4  and Pampati know about that practice?
5  A      Yes.
6  Q      Did they have signatory authority on
7  the Peoples Bank account?
8  A      Yes.
9  Q      But they knew about the practice which
10  had taken place since August of 2020?
11  A      That's correct.
12  Q      And I take it that William Crenshaw had
13  nothing to do with setting up that procedure?
14  A      He did not.
15  Q      Is it true that ARH accounted for as
16  much as 70 percent of the revenues of Dr. Patel and
17  Pampati's practice?
18  A      Yes, at least.
19  Q      Okay.  So I take it that the
20  profitability of that relationship was important
21  for the acquisition?
22  A      That's correct.
23  Q      What, if anything, was done in advance
24  of the acquisition to make sure that ARH could be
25  integrated into the TRG practice?

206

1  A      We had several conference calls and
2  meetings.  In fact, we flew down to Hazard and had
3  several meetings with radiology directors, Patel
4  and Pampati, for the planning of the transition.
5  It was kind of broken up into technology,
6  operations, and finance basically.
7  Q      Was there any contact with ARH?
8  A      The contact with ARH was at the level
9  of the radiology directors, meaning the people that
10  ran the radiology department.
11  Q      I guess what I'm asking is, did you or
12  your due diligence team reach out to ARH in any
13  way?
14  A      We were asked not to do that based on
15  Patel and Pampati's guidance.
16  Q      Did Patel and Pampati actually hide the
17  transaction from ARH?
18  A      I do know that they did not -- they did
19  not tell ARH about the transaction, and when the
20  whole process of us trying to, you know, reveal
21  like what had happened, it was more of a deflection
22  into a management company as opposed to the actual
23  transaction itself.  So there were many instances
24  post acquisition that everybody on the ground still
25  thought that Dr. Patel and Pampati owned that

207

1  practice, which wasn't the case.
2  Q      And was it okay with you and TRG that
3  Dr. Patel and Pampati didn't alert ARH to the fact
4  that this transaction --
5  A      It was not okay.
6         MR. MORGAN:  Object to form, but
7  you can go ahead.
8  A      It was not okay.
9         MR. HUNTER:  That's all.
10         MR. MILLER:  No questions.
11         MR. MORGAN:  No follow-up.  That's
12  it.
13         As I understand it, there were two
14  things -- and you may be able to help
15  with this, two things that are needed,
16  Marybeth, that were going to be
17  produced.  Do you have the list of
18  that?
19         REPORTER:  You'd have to give me
20  some time.
21         MR. MORGAN:  One was I know
22  Mountain Comp's complaints about
23  Pampati and Patel that you were going
24  to provide these, Dr. Lalaji.
25         THE WITNESS:  Sorry; say again.

208

1         MR. MORGAN:  You had mentioned
2  earlier that you had e-mails from
3  Mountain Comp regarding complaints
4  about Pampati and Patel.
5         THE WITNESS:  Oh, in regards -- we
6  had -- yes, in regards to the signing
7  off on reports and in terms of catching
8  those; is that correct?  Was that in
9  that context, or was it --
10         MR. MORGAN:  If you have those,
11  yes.
12         THE WITNESS:  Yeah.  I don't know
13  how many there are, but we'll have to
14  produce those if you don't have them
15  already.  We'd have to look for them.
16         MR. MORGAN:  Okay.  And then this
17  move-forward plan, get a copy of that,
18  please.
19         MR. JOHNSON:  Just to clarify, does
20  it have to be -- are you talking about
21  mediation by move-forward plan or --
22  Doctor?  Dr. A?
23         THE WITNESS:  What?
24         MR. JOHNSON:  Were you referring to
25  the mediation discussions when you

Collins Sowards Lennon Reporting, LLC
859-402-0900

Anand Lalaji, M.D.   8/1/2022

53 (Pages 209 to 212)

---

209

1 talked about the move-forward plan?
2 THE WITNESS: Where were we talking
3 about this?
4 MR. JOHNSON: So earlier Luke was
5 asking what was owed I believe, and you
6 said that there was a move-forward plan
7 that would get this -- basically having
8 to do with the suit in Georgia and
9 everything else that's going on in this
10 case. Kind of ringing any bells?
11 MR. HUNTER: I thought it was when
12 he was asking how much they would be
13 owed.
14 MR. JOHNSON: He said --
15 THE WITNESS: No, no, no. I said
16 that there was a -- based on the
17 discussion with Dana Holmes and them
18 that there was a plan --
19 MR. JOHNSON: I see.
20 THE WITNESS: -- put in place to
21 move forward. It wasn't like called
22 the move-forward plan.
23 MR. JOHNSON: So you didn't mean
24 that in relation to this --
25 THE WITNESS: No.

---

210

1 MR. JOHNSON: -- litigation?
2 THE WITNESS: No, it was based on
3 there was a series of things that if
4 Patel and Pampati were agreed, you
5 know, they could do, then that would be
6 that plan. That was produced by 2nd
7 Generation.
8 MR. MORGAN: Hold on.
9 THE WITNESS: Sure.
10 ------------------------
11 RE-EXAMINATION
12 BY MR. MORGAN:
13 Q      Let me -- I'll show you my copy of --
14 well, Exhibit 20, please.
15 A      Twenty. Okay, here's 20. Let's see.
16 Oh, yeah.
17 Q      And then turn inside to 942, and it's
18 this one.
19 MR. HUNTER: Are we on the record?
20 MR. MORGAN: We're on the record.
21 Q      You see this?
22 A      This is it, number six.
23 Q      Number six is the move-forward plan?
24 A      Yeah, basically.
25 Q      And explain to me what that is, please.

---

211

1 A      That's just what we are proposing as
2 the move-forward plan, that for 12 months we'll pay
3 45,000 a month each in lieu of the various
4 compensation/consideration components in the SPA,
5 and then -- you know, and then that's what they
6 would get for the first 12 months. It won't be
7 reduced or increased by actual reads during this
8 transition period. And then we will start a 50
9 percent profit share to them of the operating
10 profit for G&H no longer than 12 months after the
11 MOU is implemented. So it was a combination of
12 45,000 a month plus 50 percent profit share.
13 Q      As I recall, I had some questions for
14 you about Wayne Stratton's letter from December the
15 2nd, and there are these numbers here, salary, fees
16 for reading, coverage, and accounts receivable, and
17 I was asking what was TRG -- you said you disputed
18 these numbers, and I said, well, what are TRG's
19 numbers, and I recall you said, it's on the move-
20 forward plan. So are you saying what's listed here
21 on page 942, this is what TRG's numbers are?
22 A      No. This is what -- I think we're
23 mixing a couple things in together. You had asked
24 me -- you had asked me at some point what TRG --
25 what was something of a solution or what was their

---

212

1 -- what was their intent or something, and I said,
2 it's this going-forward plan that 2nd Generation
3 met and discussed with P and P. That's what I
4 meant. That was the go-forward plan.
5 Q      Okay. Well, then let me ask, on these
6 numbers here that Wayne Stratton has put into his
7 letter of December 2, what does TRG agree with and
8 what does it dispute? And this is Exhibit 21.
9 A      Yeah, so TRG does not -- it disputes
10 everything there.
11 Q      Does it have its own valuation or
12 different numbers, or does it just simply say it
13 owes zero?
14 A      We -- our attorneys have done our own
15 evaluation, and we talked about that. So it shows
16 -- it shows different numbers to the -- that is
17 assumed within the $1.6 million already paid to
18 plaintiffs.
19 Q      Is this some kind of a report that TRG
20 has?
21 A      That's part of our analysis of -- yeah,
22 it's part -- not TRG, but our attorneys have that.
23 Q      Okay. And is this this Lippert or
24 Libbert thing?
25 MR. JOHNSON: Yes.

---

Anand Lalaji, M.D.   8/1/2022

213

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | **Well, we need a copy of that.** |
| 3 | | MR. MILLER:  Objection; work |
| 4 | | product. |
| 5 | A | Knew that was coming. |
| 6 | Q | **Well, if it's work product, then we** |
| 7 | | **need to have some -- we need to have what TRG says** |
| 8 | | **that it owes.  That why -- a big reason why we're** |
| 9 | | **here is to find out what TRG says that it's owed.** |
| 10 | | **And you don't have that information --** |
| 11 | A | I do not. |
| 12 | Q | **-- with you; is that right?** |
| 13 | A | I don't. |
| 14 | Q | **Did you look at it to get prepared for** |
| 15 | | **this?** |
| 16 | A | No. |
| 17 | | MR. MORGAN:  Okay. |
| 18 | | MR. MILLER: Please let me talk to |
| 19 | | Ethan -- let me talk to Ethan about it; |
| 20 | | we'll get back with you. |
| 21 | | MR. MORGAN:  Okay. |
| 22 | Q | **And then as far as the earnout goes,** |
| 23 | | **do I understand you to say that TRG owes zero on** |
| 24 | | **that --** |
| 25 | A | Yes. |

214

| | | |
|---|---|---|
| 1 | Q | **-- because no money's coming in?** |
| 2 | A | Correct. |
| 3 | | MR. MORGAN:  Okay.  That's it. |
| 4 | | ------------------------- |
| 5 | | (DEPOSITION CONCLUDED) |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

215

1  STATE OF KENTUCKY )
COUNTY OF FAYETTE )
2
3      I, MARYBETH C. SOWARDS, the undersigned
Certified Court Reporter and Notary Public, State
4  of Kentucky at Large, certify that the facts stated
in the caption hereto are true; that at the time
5  and place stated in said caption the witness named
in the caption, after being by me duly sworn, was
6  examined by counsel for the parties; that said
7  testimony was taken down in shorthand by me and
8  later reduced to typewriting under my direction;
9  and the foregoing is a true and complete record of
10  the testimony given by said witness.
11      No party to said action nor counsel for
12  said parties requested that said deposition be
13  signed by the testifying witness.
14      My commission expires:  January 11, 2023.
15      In testimony whereof, I have hereunto set
16  my hand and seal of office on this, the 20th day of
17  August, 2022.
18
19
20  _____
21  MARYBETH C. SOWARDS
22  Certified Court Reporter (KY)
23  Certification No. 20041D115
24  Notary Public, State-at-Large
25  Notary ID No. 613817

Anand Lalaji, M.D.   8/1/2022

216

**A**

**a.m** 1:18 162:13
**abdomen** 25:9,11 31:15
**ability** 19:15,22 20:1,3,4 28:20 28:22
**able** 33:14 52:14 58:4 90:1 131:24 134:22 153:20 153:21 165:9 192:5 207:14
**above-styled** 1:21
**absolutely** 28:6 121:17 133:21 148:15,25
**accept** 147:10
**acceptable** 30:5 190:15
**acceptance** 115:5 115:6
**accepted** 172:24
**access** 27:4 75:22 152:1,3,13,15,18 153:3,7,15,21 154:6 155:25 164:13 165:10 189:19
**accessed** 29:21
**accessing** 28:12
**accommodate** 22:2
**account** 69:18 70:5,7,7 104:16 189:16,20 204:16,19,22 205:7
**accounted** 205:15
**accounting** 18:4 18:10 97:18,24 98:8,15,22 189:21
**accounts** 104:12 107:12 120:10 121:9,16 132:17

132:25 188:22 191:21,24 192:5 199:10 200:3 211:16
**accuracy** 28:10
**accurate** 44:16 52:20 64:13 66:15 82:22 89:19
**accurately** 123:19
**achieve** 168:21
**acquire** 35:22 69:10 198:14,25
**acquired** 52:7 53:8 55:11 74:13 120:23 181:13
**acquisition** 35:23 36:14 37:15 39:6 42:16 44:2,3 51:21,22 52:25 54:20 55:21,23 57:25 65:18,19 74:22 178:15,21 180:18,23 184:16 185:5,11 185:19 198:13 201:25 205:1,21 205:24 206:24
**acquisitions** 36:17 180:25
**act** 46:15 74:10 75:2 161:3,8
**acting** 19:20,25 171:24
**action** 1:2,22 215:11
**actions** 44:1 118:15 125:16 204:11
**active** 13:5 55:5 110:20
**actively** 132:16,23 133:4
**activities** 95:6
**activity** 74:13 94:18,23 95:19

99:17,22 102:15 188:23
**actual** 21:4 74:9 160:6 167:3 173:8 176:24 206:22 211:7
**add** 29:9 61:17 167:13 168:1
**addendum** 196:15
**adding** 192:15
**addition** 99:16 144:22 145:17 146:1,8,14 147:3
**additional** 136:12 136:13 167:13
**additions** 29:15
**address** 38:23 39:12
**addressed** 4:12 84:24,24
**addresses** 194:17
**adds** 124:23
**adept** 30:2
**adhered** 116:23
**adjustment** 196:17
**adjustments** 180:19,24
**administrative** 54:24
**admit** 68:24,25
**ADT** 54:17
**ADV** 174:21
**advance** 205:23
**advising** 178:23 179:18
**Advocate** 158:4,4 174:22
**affect** 79:15,16
**Affirmative** 18:5 19:7 20:17 21:25 28:18 32:11 33:19 35:1 38:25 65:4 82:5 94:9 109:7 121:2 125:10 128:7

134:5 135:13 163:18 168:14 174:19,23 204:3
**affirmatively** 10:2 77:6
**afternoon** 147:9
**age** 181:6
**aged** 181:11
**agent** 37:9,12,17 37:21 38:24 39:7 39:9,19,20 40:3
**agents** 12:19
**aggregate** 198:14 198:15
**aggressive** 175:19
**ago** 8:5 9:11 30:11 34:13,17 48:25 82:7 89:15 91:15 101:18 108:12 111:21 128:16 133:13,17 152:6 159:23 164:11 193:2
**agree** 41:1,23 50:11 59:14,21 60:16 67:19 94:16 95:16,23 111:10,23 113:4 144:16 156:14 166:3 173:6 186:4 193:22 195:2 197:16 212:7
**agreed** 106:14 108:1 111:5,14 112:14 149:13 150:2,2,6 178:10 196:7 202:24 210:4
**agreed-upon** 192:16
**agreeing** 67:16
**agreement** 3:14 3:19 42:5,17 43:15,20,21 44:8 44:9,10,12,17

45:3 46:3 49:7 50:4,9,14 53:25 54:2 56:13,20 58:2,22 59:1 67:24 95:20 96:2 99:8 106:18 109:16 110:9 111:7,16,18,25 112:6 113:7,16 115:5 117:3,20 118:2,3,12 131:23 143:13 144:17 145:25 160:24 161:1,11 178:5 183:15 184:10 186:13 196:5 197:17 204:9
**agreement's** 109:25
**agreements** 42:16 43:11 94:20,24 95:22 96:6 117:24 125:3 178:8 188:24 189:4 204:8
**agrees** 115:24 116:12
**ahead** 45:18 46:6 47:10,20 50:22 53:19 117:15,16 130:19,20 131:12 207:7
**Akira** 85:3
**AL** 1:4,9
**alert** 207:3
**alerted** 201:9
**alerting** 93:24
**aligned** 183:16 185:25
**alignment** 184:12
**alive** 71:18
**Allan** 21:20
**allegation** 59:24 76:2 77:22 78:9 102:22 154:2

Anand Lalaji, M.D.   8/1/2022

217

201:18
**allegations** 41:21
75:15 86:19 87:6
88:3 99:22
122:25 161:13
**allege** 79:14
**alleged** 83:19
201:10 202:6
**allegedly** 83:5
120:20 123:18
**allocation** 191:6
**allow** 152:6
**allowing** 136:4
164:1,5,8
**Amazon** 23:11
**amended** 3:12
40:19,24 43:6
59:6
**amount** 8:19 55:9
74:20 89:14,17
181:6 192:20
196:8
**amounts** 43:8
189:3,4,16
**analysis** 18:20
19:4 20:20 30:12
30:16,17,17,18
107:10,11,15
108:14 136:17
170:25 183:14
184:20 188:2,7,8
212:21
**analyst** 181:22
193:18
**analyzed** 193:19
**Anand** 1:10,12
2:8 6:1,8 50:25
68:25 147:10
179:1
**and/or** 32:20 44:9
77:21
**anniversary**
196:10,12
**annual** 64:25 65:9
**annually** 186:1
**answer** 3:12 5:3

38:2 40:24 50:22
56:23 58:14
64:24 94:7 123:2
169:10 199:9
204:1
**answered** 89:21
115:16 200:22
**answering** 41:2
90:7 123:3 130:5
130:23
**answers** 10:8
42:23 56:6 59:4
86:17 128:15
201:1
**anticipated** 200:1
**anybody** 26:11
40:1 84:7 152:6
**anymore** 69:12
75:9
**anyway** 72:11
149:24
**AP** 69:14,18 98:20
189:22
**APA** 111:6,10
**APATEL-D-00...**
4:15
**appear** 92:6,10,12
93:17 173:22
184:20
**Appearances** 2:1
3:3
**appearing** 47:14
**appears** 109:18
140:9 157:15
162:14 163:10
173:21 183:13
**applies** 116:21
196:19
**apply** 50:19
116:24 118:7,14
**appreciate** 45:20
50:20 57:6,17
**appropriate** 52:1
**approval** 29:24
**approve** 26:20
78:6,9 154:10

201:13
**approved** 76:7
**approximate** 1:18
**approximately**
151:20 198:16
**April** 64:22 68:7
107:25 154:23
180:3
**AR** 147:12 173:4
181:6 182:6,10
186:2,2,4,5
187:6 202:25
**areas** 188:24
196:6
**ARH** 33:18,20,22
34:1,9,14,22,24
35:2,15 52:10
54:14,17 68:11
75:18,23 101:4
103:2 104:17,22
106:15,21,24
107:15,16,20
120:8,12 121:24
122:15 132:24
137:17 152:1,2,6
152:20 160:4,11
164:3,5,8,17,18
169:3 201:6
205:15,24 206:7
206:8,12,17,19
207:3
**ARH's** 104:18
**arm** 171:5
**arranged** 125:15
125:22
**arrangement** 17:4
54:9 100:25
**arrived** 188:12
**as-needed** 146:6
**Ashok** 162:1
**Ashokkumar** 1:3
2:23
**asked** 61:3 72:3,4
74:13 87:12 98:1
130:12,22
134:11 147:2

206:14 211:23
211:24
**asking** 35:6 40:18
47:2,3 49:11
50:17 57:1 60:25
61:23,24 62:1
63:15,18 71:12
72:17 81:24 83:3
87:18 89:22 96:3
114:10 115:14
118:16 128:5,14
128:15 129:10
130:4,14 135:14
147:5 148:3
153:23 156:24
168:12 206:11
209:5,12 211:17
**asks** 200:19
**aspect** 13:20
**aspects** 98:8
**assented** 125:6
**assert** 46:14,16
**assertion** 88:17,20
143:8 192:3
**assertions** 121:22
**asserts** 46:11 90:8
**assessed** 96:12
**assessment** 20:25
27:17,19 171:2
**assets** 197:19
**assign** 23:19
**assigned** 181:16
**assimilate** 132:17
**assist** 11:6 24:20
31:25 34:2,7
35:14 143:19
159:25
**assistant** 12:16
**associated** 27:25
82:22 83:17 84:7
86:1 120:11,19
123:24 132:9
145:11
**associates** 2:7
200:21,22
**assume** 88:2

102:11 113:24
186:25
**assumed** 185:6,11
212:17
**assumption**
102:17 191:5
202:25
**assurance** 25:19
26:13
**assure** 113:5
166:23
**Atlanta** 6:10,11
14:23,24,25
30:10 204:19
**attention** 11:19
40:18
**attest** 89:18
**attestation** 82:17
**attesting** 83:14
**attests** 82:21
**attorney** 57:14
115:10,17
119:20 127:1
**attorneys** 9:22
10:21 11:3,4,9
48:15 72:6 82:13
94:3 102:12
118:19 130:11
131:6 149:23
212:14,22
**August** 1:17 14:16
14:17 66:23 89:2
89:3 119:11
121:1 122:17
127:9 129:4,14
129:14,17
138:15 151:22
157:16 158:2
159:7 160:16
180:10 204:25
205:10 215:17
**authenticity** 79:11
**authority** 160:19
205:6
**available** 25:23
**avoid** 95:5

Anand Lalaji, M.D.   8/1/2022

218

avoiding 9:14
awarded 119:20
aware 39:18,22
    74:12,23 79:23
    80:2,3,11 125:4
    169:14 202:3
AWS 23:11 27:9
Ayos 166:5,13
    180:4,10
Ayos' 166:7

**B**
B 115:20
b-i 182:18
back 9:13 15:18
    15:25 26:5,8
    35:15 59:4 66:11
    67:11 69:9 77:21
    79:18 84:18
    86:12 99:13
    109:18 119:2,20
    127:21 137:3
    140:6,9 150:12
    150:15,16,16,17
    150:19 154:22
    165:22 170:8
    180:7 182:14,16
    193:16 197:1
    202:21 213:20
backlog 187:8
backlogged 84:3
bad 104:25 126:9
    159:21
bad-mouthing
    161:14
balance 196:21
balances 86:23
bank 61:17,17,19
    61:21 64:8 68:16
    68:21 69:1,3,3,4
    69:12,17,18 70:3
    70:5,5,6,8,13,18
    71:1,14,14 72:12
    188:25 189:16
    189:20,25 190:1
    190:6,8,9 204:15

204:19 205:7
bankruptcy 107:5
    108:20 116:14
Barry 2:19 17:19
    17:20
Barton 2:11,16
base 43:9 146:9
    146:14,25
    166:14
based 54:11 59:13
    59:22 62:6 64:10
    73:10 77:8 88:1
    88:3,22 112:16
    113:8 117:17
    118:7 132:1
    167:24 176:3
    183:24 190:5
    191:22 196:10
    196:12 198:16
    202:9 203:3,6
    206:14 209:16
    210:2
bases 102:19
    117:11
basically 11:10
    18:20,24 19:23
    19:24 20:12,20
    20:23 21:16
    22:16,17 23:25
    24:20,22,24
    25:20,25 26:11
    29:7,11,24 30:2
    31:7 36:19 53:17
    54:25 55:17,19
    55:24 56:5,10
    57:23,24 60:4,8
    64:23 65:17,18
    65:21,24 66:5
    69:22 71:24,24
    73:19,22 74:1
    75:3 80:25 82:13
    82:24 83:1 84:1
    95:8 96:14,18,20
    100:15 107:14
    108:7 125:24
    130:23 132:25

133:1 134:7,16
    137:11,14 138:4
    138:7 142:15
    145:11,14,22
    148:22 150:5
    154:7,14,18
    167:20 176:8
    182:4,5 184:3
    193:21 195:23
    197:4,5,8 199:11
    206:6 209:7
    210:24
basis 52:16 55:8
    59:25 61:9 63:8
    65:1,10 86:23
    87:2,22 88:6,19
    88:21 99:23
    100:5 101:8,10
    117:21 151:14
    195:10,12
    204:20,25
batch 165:7
Bates 110:13
Bates-stamped
    4:15
battle 165:15
beginning 35:18
    36:2 66:1 135:3
begins 140:9
behalf 1:3,13 2:2
    2:7,18 115:12
    122:21 171:10
    186:8 204:1
behavior 55:13
    94:18,23 95:19
    96:4 99:7
behaviors 95:6
behold 160:9
believe 15:7 47:5
    69:20 70:14,15
    72:6 76:21 81:22
    87:1 88:4 90:24
    95:13 100:1,6
    112:25 115:19
    120:12 122:10
    124:13,15

127:19 129:16
    130:7 139:21
    141:5 142:6
    162:20 165:18
    171:19,20 172:5
    172:5 175:24
    193:18 209:5
bell-shape 67:9
bells 209:10
belt 24:24
benchmark
    175:10,11
beneficial 41:19
benefit 18:13 19:6
    35:5,7 111:1
best 51:5 115:16
    158:12 168:21
better 9:5 83:2
    173:3
big 132:7 147:22
    154:16 167:19
    202:7 213:8
bigger 98:3
biggest 126:14
    132:8 137:1
bill 55:10 99:1,3
    99:10 160:5
billed 32:10,13,15
    52:11 92:2
    181:11 183:9,10
biller 158:5
billing 48:7 49:21
    50:3 51:10,15
    52:2,6,8,10,10
    52:13,17,17 53:3
    53:10,14,18 54:5
    54:7,13,18,19,23
    55:6,16,19 56:2
    56:2,4 68:9 84:8
    93:13,16 157:18
    160:1,1,5 174:21
    181:23 189:2,2
    200:25 201:3,5,6
    201:22 202:1,5
billings 202:4
bills 92:6 98:24

BIM 12:14
binding 199:5
bit 14:8 37:16
    57:10 83:2 99:21
    100:4 150:22
    155:11,20 162:9
    180:1
bizarre 179:4
black 162:14
blah 163:10,10,10
blameless 97:6
blew 137:11
blockade 120:16
    163:22,25
blockades 167:25
board 12:3,4
    13:13,14 15:17
    15:22 16:7,15
    18:23 24:9 49:13
    49:15 132:22
board- 25:23
    28:15 93:11
board-certified
    22:25 26:16
    32:16 76:8,10
    93:7
bolster 107:18
bolus 165:7
books 42:12
    190:17
bosses 137:2
bottom 41:17 78:8
    162:12 170:11
    183:4
bought 37:8,19
    51:12 66:18
    109:1 134:9,25
    136:19 157:19
    160:7
box 146:6 182:4
boxes 52:21
Boyer 2:10,15
branch 137:17
breach 46:15,17
    75:14 125:16
    128:20 129:9

Anand Lalaji, M.D.   8/1/2022

219

breached 44:4 51:23 99:17 124:19 134:10 195:12
breaches 47:25 117:18,19,22
breaching 99:23
break 84:13,15,17 118:21,24 187:14,16,17 202:20
bridge 171:20
bridging 186:24 187:3
brief 84:17 187:17 202:20
bring 35:21 124:23 139:10 139:10 155:21
bringing 142:11 172:22,23
brings 35:24 125:11
broke 124:20
broken 52:23 206:5
brought 11:18 53:5 96:9,9,19 98:18,19 124:8 166:20
Brown 1:15 2:19
buffer 171:25
built 58:2
bullet 141:22 142:20 144:1 146:18 149:11 151:23 152:24 164:19 166:4 167:5,8 174:20 175:5,9,11 185:10,25 186:11
bunch 50:7
burnout 26:23
busier 98:4
business 6:22 9:2

9:8 12:15 15:7 19:20 21:23 22:6 22:7,8,17 35:22 37:4 51:6 55:24 72:1 77:23 95:9 97:11 108:13 122:5 142:12 159:6 184:13 195:20 197:18 197:20 200:3 203:1
businesses 15:5
busy 97:20
buy 132:18,19,21 148:11 149:4
buyer 51:7
buying 36:16 184:14
buyout 136:14 186:2,3 187:1,6

C

C 1:13 115:24 116:10 196:15 196:16 215:2,21
C-level 12:24 16:16 18:24,25
calculated 191:8
calculating 189:3
calculation 196:17
calculations 88:22
calendar 4:4 155:20
calendars 154:24
call 143:14,15 176:23 177:6,10 177:13,13
called 23:21 25:21 26:1 29:25 34:19 54:17 203:16 209:21
calls 55:14 63:13 63:14 160:21 177:5 206:1
cancer 79:2,3

capabilities 23:18
capable 26:6
capacities 49:18
capacity 91:4 152:8
caps 163:2
caption 3:2 215:4 215:4,5
captured 55:9
car 132:18
care 31:25 78:20 78:23 79:15 94:17,22 95:18 95:24 96:13 97:11 129:16,22 130:6 131:22 132:24 148:19 148:24,24 149:1 149:2,5
cares 22:9
case 9:3 10:8 20:19 68:18 83:18 86:2 97:14 119:18 123:25 128:6,9 130:22 130:25 131:1,4 132:2 144:13 154:7,8,10 200:24 207:1 209:10
cases 23:19 26:4 74:16 136:5 144:9 145:13 153:1,15,18,20 165:4,6,9,16,21 165:23 168:5
cash 4:12 20:14 20:14,15 21:4,8 56:9 149:17,17 184:13 185:24 185:24 189:5 190:12 195:22 197:20 198:25 199:10,11
cash-based 197:20

cashed 190:15
CAT 25:9,10
catch 80:8
catching 78:25 208:7
Caudill 127:2,4 127:18 129:6 132:1
caught 79:17 80:6 148:3
cause 46:3,9 47:23 48:6 49:23 181:2 191:13
caused 125:16 129:23 149:6,7
causing 181:6
center 139:16 156:6 177:14 179:25
centers 22:9 129:16 131:22
central 23:7,8,9 69:14,18 189:22
centralized 23:6 27:4,8,21
CEO 12:4,5 49:15 126:25 127:2 138:1
certain 18:23 19:2 27:1 43:22 79:7 110:18 112:16 120:16 134:19 150:4
certainly 45:22 68:14 129:24 200:1
Certificate 3:6
certification 24:9 79:11 215:23
certified 1:13 25:24 28:16 73:21 93:12 215:3,22
certify 215:3
certifying 83:12 83:13

cetera 25:14,17,21 26:20,23 28:8 30:7 33:12 72:2 80:24 108:6 117:7 121:20 135:24 137:22 149:20 153:11 167:22 171:1,3 172:14 183:24 184:2 189:13,22 193:22 200:10 201:17
CFO 12:9 16:9 17:2,8,18,22,24 18:13 19:6,14,21 19:25 20:2 49:12 49:14 85:19 181:17,19
chain 3:23 4:4,7 4:12
chair 49:13,16
challenges 4:12
chance 131:3
change 13:12 29:9 37:17 39:10,13 72:4 116:3 166:13 173:15 181:7 186:11 187:1
changed 13:8,11 22:1 37:21
changes 26:19 29:15 191:6
changing 37:9
chaotic 97:21
charge 18:9 22:13 22:15 168:23 202:4
charges 52:9,11 175:1,1,2,18
check 31:10 52:21 190:13,14 194:4 202:11
checked 25:1,2 164:21
checking 31:11

Collins Sowards Lennon Reporting, LLC
859-402-0900

Anand Lalaji, M.D.   8/1/2022

220

checks 25:20
  26:14 190:7,22
  190:23,24
chief 12:5,6,6,10
  12:21 16:8,10,14
  17:2,10,22,24
  18:3 21:13,18
  30:1
chime 155:20
chiming 50:21
Chloe 13:22,23
  14:5 15:16
choice 149:12,12
choosing 31:12
chunk 147:22
Circuit 1:1,22
circumstance
  190:11
circumstances
  7:20,25 8:1 27:1
  28:2
City 6:14,15,21
Civil 1:2,21
claim 52:22 74:11
  75:2 78:13,18,22
  102:8,10 125:11
  131:19 137:24
claims 52:14 53:4
  55:9 74:10 75:16
  91:11 101:8,10
  102:19 124:8,17
  160:5 181:11
clarify 63:24
  146:16 208:19
clarifying 64:16
clause 99:19
clawbacks 183:23
  184:12
clear 17:21 55:17
  73:9 74:9,25
  75:15 136:19
clearly 39:23
  53:11 89:3 92:13
  95:10 124:22
client 19:10 24:5
  28:3 30:21,22

35:22 56:22
  89:12 93:14,15
  158:23 177:20
  177:21,24
clients 18:14 23:8
  26:4 54:9 89:13
  120:11 121:23
  126:9 134:6
  135:16
clients' 19:6
clinical 16:14 25:3
clinically 96:11
clinicians 122:14
  157:5
clip 137:15
close 181:6 183:22
closed 71:24
closely 181:10
closing 112:8
  196:10,12
cloud 23:11 28:17
  35:8 91:20
CMS 73:16 74:10
  75:1,1,11 78:22
  82:17 83:5,20
  84:7 156:19
  200:22 202:10
code 152:3
coincidence 144:3
collaborate 51:2
collateral 115:22
collect 60:4 62:12
  158:15 184:15
  192:5
collected 144:19
  186:8 191:25
  192:2,10 195:15
collecting 176:3,9
  176:12 184:15
collection 43:23
  52:23 111:25
  112:6 173:4
collections 48:8
  51:11,15,19 52:9
  52:24 56:7 60:5
  134:21 136:11

149:20 151:18
  151:19 160:13
  183:24 186:14
  187:8 195:14
collectively 84:22
Collins 158:20
columns 174:2
  180:2,6,9
combination
  211:11
combined 16:25
  174:20
come 14:10 50:3
  51:16 58:14
  66:10 67:14
  80:25 114:8
  155:12 160:23
  169:1,9,11 170:8
  182:20 184:9
  193:17
comes 25:1 32:7
  77:21 135:7
  182:10 195:22
  195:22
coming 20:21 21:8
  24:23 43:24,25
  44:6,20 47:2,6,8
  51:19 56:8 91:7
  106:23 107:13
  141:6 148:18
  149:25 168:25
  213:5 214:1
commencing 1:17
  196:9
comment 156:9
  156:12,18
  157:25 161:12
  166:18 168:18
comments 121:23
  123:18 125:7
  127:25 133:13
commission 46:14
  196:18 197:11
  197:11 215:14
commitments
  172:11

committed 73:10
  185:19
committee 164:7
common 148:12
COMMONWE...
  1:1
communicated
  127:4
communicating
  103:21 104:2,4
communication
  55:6 82:11
  104:11
communications
  82:14
communicative
  96:20 158:17,22
  159:4,14
community
  168:24
Comp 35:17,18
  36:1 73:19 74:17
  75:16 76:1,25
  77:13 104:2,7
  126:15,18,23
  200:7 201:1,5
  208:3
Comp's 207:22
companies 24:21
  36:21 37:1 46:8
  51:3,5,6 60:11
  99:18,20 102:23
  107:16 181:5,8
  198:15 199:1,2
  204:2
company 8:13,13
  11:9 13:20 15:9
  22:15,16 35:24
  36:18,20 37:4
  51:15,21 52:8,11
  52:13,17,18 53:3
  53:10,14 54:13
  54:18,19,23 55:7
  55:16 56:2,5,7
  65:16 107:10
  141:13,17

146:13 148:1,12
  149:4,18 157:18
  177:18 189:2
  198:19 201:5,6
  202:1,25 206:22
compare 68:8
compensated
  60:10 143:20
  146:12 191:14
compensation
  145:15 178:3
  184:11 186:1
compensation/c...
  211:4
compiled 171:20
complain 177:4
complaint 3:12
  5:3 40:19,25
  41:3,19 43:6,6
  59:6,6,16,20
  60:12 68:13
  72:16 73:11
  85:24 86:12
  117:6 153:25
  177:19
complaints 10:6
  141:3 207:22
  208:3
complete 74:5
  163:22,25 215:9
compliance 29:18
  29:19,25 30:8,9
  200:20
components 211:4
computer 27:16
con 62:19
concerning
  148:21 204:7,11
concerns 93:25
CONCLUDED
  214:5
conclusion 50:18
  57:1
conduct 43:21
  91:23 108:14
  128:22 200:2

**Collins Sowards Lennon Reporting, LLC**
**859-402-0900**

Anand Lalaji, M.D.   8/1/2022

221

conference 206:1
confident 77:15
confirm 60:19
confirmation 84:3
confirmed 110:2
connection 46:12
    51:3 155:16
conservative
    175:13,24,25
consider 176:14
consideration
    107:8
considering 107:7
consistent 52:7
consistently 52:14
constituting 46:15
consultant 18:12
consultants 19:9
    171:24
consulting 141:13
    141:17 171:5
consults 15:8
contact 37:25 80:1
    126:22 159:2
    206:7,8
contacted 83:5
    160:20
contacting 83:20
    84:5
contained 47:6
    86:19
content 103:11
context 8:15 208:9
continue 70:16
    177:10,16 192:6
continued 38:7
    137:14 139:13
    139:17
continuing 51:4
continuity 52:15
contract 58:24
    104:17,18,23
    105:11,21,23
    106:3,21 109:3,6
    115:15 120:1
    122:7 125:2,17

126:11,12,17,23
129:15,23 130:6
130:8,9 131:17
131:18 132:1,5,8
137:11 147:12
147:24 148:23
204:10
contracts 22:8
    58:25 120:8,8,9
    120:15,19 125:6
    125:14,22,23
    129:12,13,19
contractual
    184:12
contrast 25:12,12
    156:8,19,21
    157:3
controller 98:19
    204:22
conversation
    150:5 155:17
conversations
    126:25
conveyor 24:24
convicted 46:11
copies 81:14
    202:15
copy 16:4 42:17
    44:16 45:2,10
    70:22 194:1
    202:17 208:17
    210:13 213:2
copying 151:13
corner 150:4
corporate 11:21
    12:1 13:1,7 36:9
    38:1 49:11,12
    58:18 61:1,15
    62:15
correct 6:24 16:12
    16:17 17:16
    19:19 24:15
    27:13,17,18
    28:23 30:19,24
    32:18 33:18,19
    41:8 43:3,4

46:22 47:13
59:14 64:18 65:6
65:7,11 66:20,24
66:25 67:2 68:5
68:6 70:8,10
71:6,17,18 72:23
72:24 73:2,3
75:17 76:5,11,20
77:4,13 78:15
80:7,10 85:12
89:4 90:15,19
91:24,25 92:3,7
92:24 93:9,10,14
94:5,6,18,22
95:18 96:4,13
97:15,24 98:9,10
98:13 99:5
101:13,20
106:17,24
107:22 112:23
113:9 114:7
127:11,22
139:20 141:4,6
141:11 142:2,3
144:21 146:23
151:2,3 157:24
158:6,10,22
163:17 164:18
167:16 168:7
171:11 172:7
178:6,9 185:4
186:4,6,18
188:16 192:24
204:17 205:2,11
205:22 208:8
214:2
corrected 95:21
    96:6
corrective 95:4,14
    97:3
correctly 96:1
    99:6
correspond 174:3
correspondence
    127:19 157:15
correspondences

200:9
corruption 25:4
cost 141:25
    142:14,21 144:6
    167:13 168:1
costing 142:10
costlier 155:23
costs 20:20 21:7
    21:11 140:2
    183:17
could've 148:3
counsel 10:2
    13:19,21 14:3,4
    15:6 48:10 83:1
    102:13 107:3
    108:3,3 215:6,11
counsels 108:8
count 128:19,24
    180:14,14 204:4
counter 123:23
counterclaim 5:4
    117:7,10,11,13
    117:17,22 119:4
    119:5,8,25
    122:23 123:22
    124:1,6,9,14,18
    125:9 128:24,24
    131:20 204:2,5
counterclaims
    130:14,16
countries 91:21
country 23:20
    24:21 36:24
    134:24 142:24
    152:10 164:12
    164:13
counts 85:24
    119:25 122:23
County 73:5
    215:1
couple 138:5
    202:11 211:23
course 58:3 59:2
court 1:1,13,22
    107:3 119:13,18
    119:19 192:4

215:3,22
covenants 53:24
    57:23 58:24
    117:20
cover 21:10 156:7
    156:21 157:6
coverage 191:19
    192:13 193:5,6
    193:10 211:16
covered 157:4,5
covering 105:25
    145:8 189:13
COVID 169:3
CPC 180:14
created 36:18
    105:25 106:19
creating 146:20
credential 169:8
credentialed
    151:25 155:14
    155:25 164:5,14
credentialing
    12:13 51:13
    163:9 169:4,6
credentials 74:1
    75:22 76:19,22
    77:1,23 78:3,4
    83:13
credibility 126:11
    129:2,11
Crenshaw 2:8,18
    18:9,11 19:3
    20:10 98:7
    136:18 140:21
    151:13 170:25
    179:11 181:18
    198:8 204:6
    205:12
Crenshaw's
    179:11
CT 31:15
CTs 26:2 28:7,21
current 85:19
    175:13 176:1,12
currently 81:20
curve 67:9

Anand Lalaji, M.D.   8/1/2022

222

curveball 58:15
customer 12:19
   177:13
customers 103:22
cut 183:7 190:22
   196:25
cybersecurity
   152:5 164:11
cycle 54:7 174:17

**D**

D 2:3,19 198:8
da 146:11,11,11
   146:11
daily 43:9 52:16
   145:17 146:1,8
   146:13 186:14
   204:20
damages 91:10
   128:20 129:1,9
   129:10 132:9
Dana 141:8,10,12
   170:24 174:7,7
   209:17
data 52:16 53:10
   53:14 55:15 56:2
   157:17,17 158:2
   158:3,24 159:12
   159:13,17 160:4
   160:11,11 173:3
   173:7 174:2,2
   176:23 177:7
   193:19
date 39:10 54:20
   85:14 126:21
   127:15 174:9
   182:12 196:10
   196:12
dated 3:14,17,19
   3:23 4:2,4,7,10
   4:13,20,22,24
   100:12 140:10
   162:13 187:19
   194:16 199:15
dates 25:14 61:12
day 138:2 142:21

143:1,14,16,20
143:25 144:3,8
144:13,23 145:5
145:8,11 146:13
146:19,24 147:9
162:16 164:20
165:5,10 167:21
168:3,5 192:17
215:16
days 10:3 53:9,13
   55:7,16 67:5,10
   108:4,14 160:3
   181:7 189:1,12
   192:15
daytime 167:12
deal 18:17 22:14
   33:5 91:11
   111:18 151:21
   164:13 178:24
   179:2 182:9
   183:20 184:1,8
dealing 8:6 68:1
   91:10 144:1
deals 119:25
debt 187:1
debts 70:13
December 64:21
   187:19 211:14
   212:7
decide 182:9
decided 18:23
   21:16 33:14
   105:23 106:1
   108:25
decipher 18:16
decision 21:10
   29:9,10 108:1
   139:6 204:11
decision- 18:18
decision-making
   19:15,22 20:1,3
   20:4,8
decisions 19:2
   108:11,17
declaring 37:23
declined 202:5

defamations
   132:3
default 115:7
defendant 2:18
   40:25 41:1 94:15
   94:21 95:24
   129:8
Defendant's 3:12
   5:3 40:24 41:5
   187:22 198:3
defendants 1:10
   2:7 41:2,20 43:1
   43:2 59:5 68:19
   86:18 88:23
   94:17,21 95:5,17
   95:21 96:5 97:5
   97:8 119:21
   121:5 125:2,15
   125:22 128:19
defense 15:9,10
   15:12,13 94:12
   115:21
defenses 115:21
defer 118:19
defined 44:11
definitely 14:20
   89:20
deflection 206:21
degree 99:12
Delare 13:22
delay 9:14 31:23
   166:1
deliver 22:12
delivered 111:7
delivery 189:18
delta 197:12
demographic
   52:18 160:6
denial 61:9 62:10
   87:2 88:2
denied 202:6
denies 86:17
deny 41:20 59:24
   60:8,19,21,23
   66:5 86:18
denying 61:5,8

62:5 66:11,15
86:24 88:16
department 12:10
   12:11 18:4 19:11
   19:12,13 97:19
   98:8,22 193:16
   206:10
departments 12:8
   165:11 177:1
depends 92:8
depose 132:3
deposit 190:23
deposited 68:16
   69:1,8 190:8
deposition 1:3,12
   1:19 7:14 9:21
   10:15 38:19 40:9
   41:5 44:24 47:12
   48:13,24 49:7
   58:3 59:2 61:3
   85:6,22 103:13
   109:12 112:10
   119:1 128:5,12
   130:4,23 135:5
   140:13 151:8
   155:2 157:21
   161:5,20 170:1
   170:16 187:22
   194:20 198:3
   203:22 214:5
   215:12
describe 20:7
   21:23 28:2
described 31:21
   32:25 35:11
describing 34:22
designed 113:5
Despite 70:11
detail 57:10
details 119:14
determine 21:3
determined 21:4,7
   23:14
determining
   107:15
develop 193:24

developed 36:15
diagnosis 32:3
diagnostics
   142:17
dial 27:16
DICOM 25:4
dictate 76:3
dictating 73:20
   79:6
dictation 76:17
difference 36:8,10
different 12:8
   13:9 15:8 18:17
   20:12 22:2,19
   23:3 31:14 34:18
   64:2 70:8 76:21
   95:11 99:3 106:1
   120:10 121:8
   134:21 139:2,3
   144:2 154:3,3
   173:8 178:21
   179:17 189:17
   199:6 203:17
   212:12,16
differentiate
   159:11
difficulty 160:17
diligence 65:3
   74:14 199:25
   200:5,9,14
   201:16 206:12
direct 72:8
direction 106:2
   174:12 215:8
directions 162:15
directly 164:9
   182:15,18 183:9
   183:10
director 12:11,12
   12:13,14,22
   51:25 127:1
   156:4
directors 12:16
   164:21 206:3,9
disagree 43:10,13
   43:16,17,19 87:6

Anand Lalaji, M.D. 8/1/2022

223

88:17 146:10
156:8,11,12,13
156:18 165:12
188:13,16,17
189:15 191:4
195:5
**disagreeing** 88:20
188:18
**disagreement**
189:14
**disappointing**
149:21
**discharge** 116:13
116:14
**disclose** 95:4 97:3
**disclosures**
110:14
**discombobulated**
180:1
**discovered** 126:8
200:8
**discovery** 82:10
127:20 131:10
192:9
**discrepancies**
189:9
**discussed** 176:24
212:3
**discussion** 109:2
209:17
**discussions**
208:25
**disparaged** 99:19
102:23 124:20
133:4
**disparagement**
125:19
**disparaging** 103:6
103:8 121:23
122:8 123:12,18
133:12 161:14
**dispute** 9:2 76:9
95:9 212:8
**disputed** 211:17
**disputes** 212:9
**disputing** 76:12

76:14
**dissipating** 68:19
**dissolved** 71:5,6
71:11,15
**distributing** 68:20
**divide** 196:22
**divided** 17:1
**DM** 4:7 174:21
**doctor** 31:9 33:10
45:17 57:11
133:8 141:25
142:4,5,17,18
167:10,13,17
180:10 190:12
208:22
**doctor's** 77:24
**doctors** 70:10
77:8 94:1 133:8
139:3 168:25
169:1,7
**doctrine** 75:12
**document** 4:15
27:23,24 29:21
38:18 41:4,16
42:21 44:18,23
45:12 48:12 49:9
57:23 109:11,21
118:6,7,17
124:22 140:12
151:7 155:1
157:20 161:4,19
169:25 170:5,15
182:1 183:12
187:21 194:19
198:2 202:15
203:21
**documentation**
27:20 38:3
**documenting**
28:14
**documents** 9:23
10:1,4,5,9 11:1,3
11:5,7,11,12
15:20,21 40:15
85:5 86:1 109:22
112:1,7 118:8,20

123:24 200:16
**doing** 20:2,3
26:10 31:11 32:1
38:7 39:3 44:2
47:11 52:6 54:25
55:18,25 78:10
78:11 89:3
100:17,20
107:10,14,20
119:21 126:2
131:15 134:10
135:10 136:7
139:8 165:8
178:15 201:23
201:24 202:1
**dollar** 89:14,17
**dollars** 137:9
192:10
**Don** 11:18 50:20
62:16 63:1,16
**Don's** 47:11
**Donald** 2:14
**door** 76:4,7
**dosages** 25:13
31:17
**dove** 201:3
**downs** 97:12
**Dr** 4:2,2,9,24 9:12
32:22,22 33:9,10
47:20 48:22
50:23,25 51:17
57:13,20 61:22
61:25 63:12,20
71:12 76:9 84:24
84:25 85:2,2
90:25 121:21
129:5 137:18,19
137:19,20,23
138:3,3 147:8
155:15 156:5
161:18 162:1,4
162:15 163:11
163:14 164:16
164:20 165:12
165:18,20 166:2
166:5,6,7,8,10

166:12,21
167:11 168:15
168:20 179:13
179:20 183:21
188:1,3,5,6,24
189:5,5 190:6
193:8,10 194:12
203:25 204:13
205:3,16 206:25
207:3,24 208:22
**drill** 97:19
**drop** 68:10
**dropped** 134:22
**drops** 56:1 197:2
197:13,13
**Drs** 3:17 4:9 41:24
72:22 73:2 77:17
84:21 99:24
103:17 110:6
144:18 159:25
160:15 172:12
176:23 178:3
191:10 192:1
200:12,25
**due** 65:3 74:14
160:13 189:4
195:16 199:24
200:5,9,14
201:15 206:12
**duly** 6:2 215:5
**duties** 46:10,14
50:19 51:4,8
52:1 99:23 181:4
**duty** 44:19 46:15
47:2,5 48:7
49:20 50:10,15
56:15,20 57:15
58:17 67:12
99:18 117:18
124:19 134:10
195:13

**E**

**e-** 147:6 153:24
162:20
**E** 116:12

**e-mail** 3:23 4:2,4
4:7,9,12 9:13
18:12 19:10,13
93:23 94:3 104:8
140:8,10,11
147:4,9 151:12
151:15 154:22
157:15 160:15
161:15,17
162:13 170:5
200:9
**e-mailing** 9:12
**e-mails** 10:20,22
10:22 11:18
81:22 82:2
103:25 127:20
137:3,12 140:6
141:5 179:19
208:2
**e-signature** 153:2
154:4,5,8
**earlier** 98:1 110:2
117:23 147:11
168:18 208:2
209:4
**early** 160:10
**earn-** 147:16
**earning** 195:24
**earnout** 113:1
118:4 136:11,13
147:15 186:2
187:5,6 191:20
194:17 195:3
196:1,8,9,17,19
197:3,9,12,17,18
213:22
**earnout/AR** 187:1
**earnouts** 43:9
112:24 135:7
147:23
**easier** 154:21
**East** 2:5
**Eastern** 23:12
119:19 129:17
131:22
**EBITDA** 147:25

Anand Lalaji, M.D.   8/1/2022

224

198:17 202:23
educate 63:9
effect 108:16
effective 166:16
effectively 126:10
efficacy 142:8
efficiency 142:9
    167:24
efficient 142:10
    142:18
effort 153:18
efforts 173:5
eight 15:15 30:11
    34:12 38:8 63:22
    64:20,20 65:14
    198:18
eight-month
    60:17
either 62:23
    103:17 124:15
    139:22 173:11
elders 162:10
electronically
    52:22 77:24
Emelita 180:4,10
emergency 26:3
    28:4 30:22
emphasizes 99:12
employed 19:14
    42:20 76:24 77:1
    81:19 101:5
employee 53:24
    57:22 58:23,24
    117:20
employees 41:24
    42:1,7,9,12,13
    67:15 72:1
    136:24 137:1
employment
    42:15,17 43:14
    43:20 44:8 45:3
    45:11 46:3,7,20
    50:9,13 84:21
    94:19,24 95:20
    95:22 96:2,6
    99:8 117:20,23

125:3 143:13
    144:17 145:25
    160:25 161:11
    178:7 186:13
    204:8
endeavor 126:20
engagement 55:6
enlist 141:8
enlisted 141:8
enrollment 51:14
    53:5
ensure 52:1,18
    181:10 185:12
    185:20
entail 136:8
enter 111:5,14
entered 125:2
entirely 203:3
entities 99:1
    100:20 108:19
entitled 43:11
    109:16 122:24
    125:1 143:13
    144:18 146:1
entity 13:5 36:12
    37:5,5 42:8,10
    42:19 54:14
    76:23
equals 174:24
    175:12,13
equivalent 172:9
ER 164:19
errors 32:8
especially 20:13
    82:12
essentially 24:23
    31:25 53:16 76:4
    136:8,15 199:25
estimation 87:5
    153:16 185:22
et 1:4,9 25:14,16
    25:20 26:19,23
    28:8 30:7 33:12
    72:2 80:24 108:6
    117:7 121:20
    135:24 137:22

149:20 153:11
    167:22 171:1,3
    172:14 183:24
    184:2 189:13,22
    193:22 200:9
    201:16
Ethan 2:9 11:18
    16:1 45:6,19
    62:24 63:1
    213:19,19
Europe 13:4 37:2
    37:3
evaluating 142:8
evaluation 51:1
    180:22 196:20
    212:15
event 46:9 140:23
    159:3 164:11
eventually 138:24
    158:9
everybody 151:16
    198:17 206:24
exact 62:7 71:20
    89:16,17 103:11
    126:21 127:2
    128:17 189:12
    192:20 193:11
    193:14
exactly 36:3 45:14
    55:20 75:11 78:7
    86:7,11 87:14
    101:6 104:8
    126:7 127:15
    134:4 149:25
    153:6 161:9,9
    179:21 193:23
    194:13
exam 24:4 25:12
    26:18,22 31:24
    32:2 92:12 93:10
examination 3:4,5
    6:4 93:17 200:2
    203:12
examinations
    22:24
examined 6:3

215:6
examining 23:5
example 32:21
    33:9 37:8 53:9
    53:15 55:17 96:8
    99:1 104:2
    141:25 142:4,21
    143:25 190:6
    197:13
examples 78:24
exams 22:12
    73:20
exception 118:11
    118:18
exceptions 118:13
excerpt 203:25
exchange 161:18
exchanges 137:12
exclusive 145:1
exclusively 14:1
excuse 50:16
    62:14 84:11
execute 111:18
    112:23
executed 111:6,16
executive 16:10
exercised 94:17
    94:21,22 95:17
    95:24
exhibit 3:8,11,13
    3:15,18,21 4:1,3
    4:6,8,11,14,16
    4:18,21,23 5:1
    38:10,20 40:6,8
    40:11,23 41:6,13
    41:15 42:23
    44:14,25 45:4
    46:4 47:4,5,21
    48:23 49:19,22
    49:22 50:8,14
    51:8 52:1 53:17
    56:17 57:22 59:7
    70:20,21 84:22
    85:7 86:13 94:8
    99:14 109:13,15
    140:5,14 146:4

151:5,9 154:21
    155:3 157:14,22
    160:14 161:6,17
    161:21 163:7
    169:21 170:2,9
    170:17 187:12
    187:18,23
    189:25 192:14
    194:15,21 196:4
    196:15,16
    197:23 198:4
    203:23 210:14
    212:8
exhibited 97:10
Exhibits 3:4,7
existed 195:15
existing 103:22
    104:12 158:14
expanded 22:2
expect 26:4
    132:18
expectation 187:8
    187:10
expectations
    186:25 187:4
expected 132:20
expecting 198:18
expense 176:10
expenses 69:19,24
    70:9
experienced
    181:22
expert's 188:1
expires 215:14
explain 19:8 43:17
    92:15 120:5
    151:24 210:25
explanation 63:16
    85:3
explanatory
    156:10 157:6
express 57:16
    172:19
expressed 56:21
    85:11 117:11
extend 116:2

Anand Lalaji, M.D.   8/1/2022

225

extends 67:9
extra 164:23
 203:5
eyes 26:21 31:1

**F**

F 2:9
facilitate 52:2,5
 53:18 55:18
facilities 105:7,13
 105:14 121:24
 121:25
facility 165:25
fact 15:21 19:23
 51:16 60:6,9
 62:6 73:12 75:10
 83:14 88:3,21
 89:18 90:24
 97:22 103:25
 125:16 126:1,8
 130:7 141:7
 142:7 148:5,19
 167:25 182:11
 195:16 206:2
 207:3
factor 168:21
facts 19:24 215:3
failed 54:4 95:3
 95:13 97:2
 128:21 185:12
 185:20
fails 156:18
failure 137:16
 138:9,16
fair 98:23 102:17
 154:25
fall 161:25
false 74:10,11
 75:1 121:4,10,11
 121:11,13,21
 122:2
falsify 154:14
falsities 120:17,20
familiar 82:16,19
 169:24 170:21
family 162:5,6,7

183:20,23 184:6
 203:4
far 62:24 75:20,24
 93:2 213:22
fashion 182:11
fast 79:6 165:16
faster 30:25 31:5
 32:4
FAYETTE 215:1
FCA 75:2 78:22
feature 186:3
February 64:21
 194:16
federal 119:13,19
fee 22:13 54:8
 143:4,9 144:5,19
 145:12 146:2
 147:1
feel 84:9 118:1
 145:16,24
 159:21
feels 201:19
fees 43:8,9 119:20
 144:10 145:17
 145:18 146:1,8,9
 146:13 189:11
 191:7,17 211:15
felony 46:12
felt 165:23 185:15
fiduciary 44:4,19
 46:15 47:1,5
 48:7 49:20 50:5
 50:15,19 53:21
 56:15,20 57:15
 57:21 58:1,16
 67:12 88:10,13
 99:17,23 117:18
 124:19 134:10
 148:17 181:3
 195:13
field 169:16
Fifteen 163:8
figure 67:16
 103:13 135:11
 167:23 169:21
 182:7

file 52:21 107:4,5
filed 1:20 3:12
 14:11,15 38:18
 41:4 44:23 73:1
 75:9 85:5 108:19
 109:11 119:8,13
 119:25 124:6
 127:9 140:12
 151:7 155:1
 157:20 161:4,19
 169:25 170:15
 187:21 194:19
 198:2 203:21
 204:1
filing 60:8 73:5
filled 54:23
final 73:13 74:3
 201:15
finalize 78:9
finally 197:22,25
finance 12:9 18:17
 19:11,11,13
 171:5 193:16
 206:6
financial 12:6
 18:3 65:16 66:8
 107:15 144:5
 193:18
financially 148:16
 151:18
find 31:18 45:14
 50:1 51:24 53:21
 58:1 85:22 132:3
 201:11 213:9
finding 29:6,7
findings 28:14,14
 29:1 32:3 76:3
 76:17 77:8 78:7
 82:23 83:16
fine 149:23 172:4
 203:17,20
finger 177:3
finish 58:9 72:19
fire 47:7 97:19
 138:2,4
fired 47:3 48:4

85:10,14 87:17
 90:4,5,6,17
firm 15:1
first 6:2 21:9 25:1
 25:2 26:11,12
 29:5,20 38:14
 44:15 45:24
 47:24 50:24
 67:14 95:15,16
 99:15 108:22
 109:25 115:4
 126:13 140:8
 146:6 149:9
 151:23 159:1
 171:14 173:20
 174:20 180:8
 182:14,16,21
 186:24 189:7
 192:14 195:21
 196:7,10,12
 198:12 199:4
 211:6
fit 64:14
fits 65:13
five 21:6 31:14
 36:23 144:9
 152:5 173:14
 177:9 196:18
 197:11 198:23
five-year 187:6
fix 77:24 78:5
 79:19 186:24
 187:9
fixed 53:5 54:23
 80:15
flatly 86:17
flew 206:2
flip 70:23 109:17
 149:9
flow 4:12 61:14
 144:6 201:4,5
flows 160:5
 182:25
fluoro 166:14
focus 40:18 61:25
 158:14

focused 182:1
folded 71:20
folks 54:24 98:20
 153:9
follow 33:11 54:4
 67:6 118:4 133:3
 134:17 136:2
 161:1
follow-up 207:11
followed 40:4
 69:22 83:23
following 46:9
 126:1 161:10
 197:4 201:25
follows 6:3
foregoing 215:9
forever 156:25
form 44:21 47:9
 63:7 69:5 93:18
 117:14 130:18
 131:11 167:24
 207:6
format 170:19
forth 33:13 51:8
 137:3 165:22
 196:15
forward 32:4
 131:25 160:21
 168:16 181:14
 209:21 211:20
found 21:9 96:22
 201:9
four 7:18 16:25
 17:7 30:8 31:13
 98:21,21 137:10
 147:14,16 152:5
 155:6 186:25
 188:21,23
 199:24
fractional 14:2
fracture 79:4,4
frame 138:14
frankly 158:12
fraud 46:15 73:10
 73:12 75:16
 82:15 83:19 90:6

Anand Lalaji, M.D.   8/1/2022

226

| | | | | |
|---|---|---|---|---|
| 154:2 200:6 | 171:21 186:24 | 153:7 158:3 | 26:13 27:22 | 59:11,21 60:1,13 |
| 201:10,18 202:6 | 187:3 192:21 | 207:19 | 28:17 31:21 | 60:16 61:5,12 |
| 202:9 | gaps 143:19,21 | given 7:14 73:13 | 38:16 54:17 | 62:1,11 64:10,12 |
| fraudulent 83:6 | gather 11:10 | 79:18 215:10 | 73:14 76:4 83:9 | 64:15 65:5 66:18 |
| 99:17,22 | gathering 171:3 | gives 164:13 | 93:15 107:8 | 68:20 69:11,16 |
| free 90:20 | general 13:19,21 | giving 115:2 | 196:17,20 197:8 | 69:19 70:17 |
| frequently 13:14 | 14:2,4 15:6 69:9 | 128:15 150:14 | 197:9,10 213:22 | 71:23 73:16 77:3 |
| friend 162:5 | 102:13 108:3,3 | 154:13 164:15 | going 20:22 26:6 | 77:4,5,10,21 |
| front 140:5 | 121:19 122:5,7 | global 26:9 | 33:6 36:1,8 38:9 | 89:11 97:7 98:25 |
| Frost 1:15 2:19 | 128:14 172:21 | go 10:4 20:8 23:14 | 40:11,22 45:13 | 103:1,2,22 |
| FTE 172:8,8,10 | 172:22 202:24 | 23:25 24:17 27:3 | 48:6 53:4,7 54:1 | 104:13 106:20 |
| 172:24 | generally 72:21 | 27:8 30:8,25 | 56:12 62:23,25 | 106:25 107:4,12 |
| fulfill 138:6 | generate 22:14 | 34:1 45:13,18,25 | 63:2,5 67:11 | 107:17,21 109:1 |
| 145:22 | 142:22 143:2 | 46:6 47:10,20 | 68:3 69:2,9,16 | 109:4,23 120:7,8 |
| fulfilling 192:21 | 144:10,14 | 49:19 50:22 | 69:23,25 72:5,11 | 120:11 121:25 |
| full 6:7 20:20 | 145:13 | 52:16 53:13,19 | 74:8 80:21 89:18 | 125:24 129:20 |
| 30:17 55:9 81:2 | generating 144:12 | 53:20 54:1 55:16 | 90:1 96:17 99:13 | 132:17 134:25 |
| 113:21 116:16 | Generation | 56:5,7 57:4 59:4 | 104:13 105:24 | 135:7 148:16,20 |
| 147:12 191:14 | 171:20,24 | 67:5 72:2 75:5 | 107:4,5 108:6 | 148:24 151:17 |
| 192:1 193:3 | 178:17 179:18 | 76:6 77:9 78:25 | 113:6 116:7 | 157:18 160:24 |
| full-scale 81:9 | 180:21 184:3 | 81:6 84:15 86:12 | 127:21 128:3,6 | 178:22 186:5 |
| full-time 139:22 | 185:3 186:21 | 87:25 92:16 | 130:10 137:3,5 | 196:18 200:2,13 |
| 140:1 172:9 | 198:9 210:7 | 94:10,10 96:16 | 140:4,7 150:1,7 | 202:4 203:1 |
| Fulton 73:5 | 212:2 | 105:24 106:1,14 | 153:14 156:25 | 204:15 |
| functionalities | gentleman's 127:3 | 108:1,12 117:14 | 156:25 158:8 | Gram/Hazard 4:4 |
| 20:2 | George 32:22,22 | 117:16 118:22 | 169:20 171:15 | 4:17 70:5 171:17 |
| functioning 55:21 | 33:9,10 166:12 | 126:2 127:21 | 177:15 180:8 | grammar 25:20 |
| 177:25 | Georgia 6:10 7:12 | 130:19,20,25 | 182:16 184:8 | 26:14 |
| functions 181:23 | 39:24 69:4 72:12 | 131:12 132:16 | 187:11 189:17 | grave 74:20 |
| 195:17 | 73:1,6,11 74:24 | 134:6 136:20 | 194:14 200:19 | 151:17 |
| funds 68:16,20 | 78:19 82:12,25 | 145:21 146:7 | 207:16,23 209:9 | greater 181:7 |
| 71:13 | 209:8 | 149:22 152:23 | going-forward | greedy 135:20,21 |
| further 110:24 | get-go 134:21 | 152:24 153:19 | 212:2 | grew 13:11 |
| future 4:17 | getting 10:15 | 158:15 160:22 | good 47:15 113:6 | gross 174:20 |
| 171:17 181:19 | 52:20 53:14 | 166:7 175:8 | 147:9 183:25 | 175:12,17 |
| | 98:24 141:1,4 | 180:7,17 182:14 | goods 144:6 | ground 54:24 |
| **G** | 146:25 149:19 | 184:9 185:23 | Gotcha 163:1 | 122:14 133:9 |
| G 46:17 158:1 | 154:14 164:24 | 190:10 193:16 | governing 42:8 | 137:6,7 157:9 |
| G&H 2:8 36:11 | 165:5 | 196:16 197:1 | grab 11:10 40:6 | 206:24 |
| 36:12 42:2 | GH 168:15 | 202:12 207:7 | 146:4 163:6 | group 2:8 3:16 |
| 211:10 | Gillum 154:23 | go-forward 212:4 | Gram 1:9 2:7 3:10 | 37:6 76:21 110:1 |
| gallstones 79:3,3 | give 7:21 10:14 | goal 35:20 132:18 | 20:19 32:20 33:3 | 110:3 139:3 |
| game 63:3 | 18:20 49:25 57:2 | 136:15 153:12 | 33:7,13 36:13,16 | 177:3 |
| games 63:5 | 70:19 73:25 | 168:16 175:17 | 37:8,19 38:1,14 | groups 100:18 |
| gamut 81:2 | 75:21 107:17 | 181:23 197:10 | 38:15 41:25 42:3 | grown 21:24 |
| gap 55:1 145:8,22 | 110:10 123:11 | goes 24:10 25:6 | 42:7,8,9,13 | growth 12:6,21 |

Anand Lalaji, M.D.   8/1/2022

227

13:12 16:9 17:2
17:10,23,24
21:14,19 22:3
**guarantee** 109:2,3
109:6 110:20,22
111:17 112:14
**guaranteed**
112:18
**guarantor** 110:1
110:25 111:6,15
112:14,18
113:11,20,21
114:4,9,10,22
115:1,2,4 116:15
**guarantor's**
114:22,25 116:1
**guarantors**
113:23
**guaranty** 3:19
109:16 111:23
113:2,5,10 115:6
118:2
**guess** 39:6 79:24
87:24 103:6
175:25 176:16
179:18 206:11
**guessing** 188:13
**guidance** 33:11
120:14 206:15
**guidelines** 74:10
75:1
**guys** 30:16 57:5
90:16 137:10
153:13 161:2

**H**

**H** 158:1
**habitual** 46:9
**half** 17:1 84:1
94:25 95:1
128:16
**hand** 43:18
116:25 130:1
146:5 215:16
**handed** 70:21
**handle** 24:23

**happen** 31:10
54:12 75:9 80:3
83:18 104:13
152:15 184:9
**happened** 34:8
51:18 55:22
56:11 69:21
128:16 152:5,19
206:21
**happening** 74:19
95:9 96:10 126:5
149:25 150:1
160:13 171:6
172:1 176:6
**happens** 29:4
108:24 135:25
144:2 145:20
**happenstance**
145:20
**harassment**
137:24
**hard** 168:21
197:19
**Harlan** 105:16
139:16,16,22
168:22
**harm** 81:2 133:2
**Hazard** 2:7 20:19
32:20 33:3,7,13
36:13,16 38:23
41:25 42:3,7,8
42:10,14 59:12
59:22 60:1,13,16
64:10,13,15 65:5
66:19 68:17,21
69:3,12,16,20
70:18 71:23
73:16 77:5,10,21
89:11 97:7 98:25
103:3,22 104:14
106:21,25 107:5
107:12,18,21
109:1,4,23
119:18 120:7,9
120:12 121:25

125:24 129:20
132:17 133:7
134:25 135:8
138:10,13,19,20
139:23 148:16
148:20,24
151:18 155:23
157:18 168:22
178:22 200:13
203:1 204:15,16
206:2
**Hazard's** 200:2
202:4
**head** 10:2 60:23
61:1 65:1,23
66:14 77:6
100:23 103:20
122:19 123:14
124:7 201:21
**heading** 41:10
94:11
**headquartered**
7:11
**healthy** 168:16
**hear** 42:11 97:5
133:18 172:19
**heard** 62:24 97:18
127:17 129:18
133:5 152:25
161:13
**hearing** 193:4
**heart-** 163:19
**Heather** 163:9
169:4
**held** 60:7 125:24
**help** 34:21 45:6
48:11,15 135:21
141:8,10 170:12
207:14
**helped** 139:23
140:2
**helping** 18:15
98:7 153:17
**hemorrhaging**
21:1
**hereto** 215:4

**hereunder** 46:10
113:11 116:1,16
**hereunto** 215:15
**Herron** 166:8,19
**hiatus** 90:25
**hide** 206:16
**high** 102:25
175:21 178:1
**high-quality** 32:7
**highest** 67:8 78:4
**highlight** 48:21
**highlights** 169:23
**highly** 96:20
**hire** 134:11
137:20 138:2
144:10 155:9
167:10 172:8,10
181:21
**hired** 136:4
137:19 138:3
141:15
**hiring** 172:17
**historical** 21:5
64:25
**historically** 64:14
177:2
**history** 25:3,13
**hit** 132:6
**hitting** 78:9
**hoarding** 154:19
**hold** 46:19 48:22
50:5 54:3 58:9
59:19 61:24 62:1
79:23 116:3
162:19 188:19
210:8
**holding** 36:18,21
37:1,4
**Holdings** 2:7
11:23 36:10,12
42:1,9,13 110:5
113:25 114:6
**holiday** 155:22
156:1
**Holmes** 141:9,10
141:10 151:13

170:24 209:17
**home** 163:13
**hop** 57:12
**hoping** 146:21
**hospital** 33:4
35:15 52:17
53:11 55:16 68:3
137:6 138:1,5
145:9,21 152:8,9
152:14,15,18
164:12 168:23
172:11,13 185:8
185:13,14,17,18
185:21
**hospitals** 22:9
68:6
**host** 11:8
**hour** 1:18
**hours** 10:16,19
84:12 102:3
150:7 167:22
**house** 14:4
**how's** 16:23
**hundred** 7:19
29:17 115:10
135:9 174:10
**hundreds** 89:12
89:13 137:8
**Hunter** 2:19 3:5
17:17 18:2 41:13
118:25 135:4
187:13 188:3
197:24 202:14
202:18 203:10
203:13,18 207:9
209:11 210:19
**hurdle** 152:22
**hurt** 132:9

**I**

**i-l-l-e-d** 182:21
**ICD-9** 180:14
**ID** 215:25
**idea** 10:14 155:21
171:13 173:19
174:4 178:20

Anand Lalaji, M.D.   8/1/2022

228

180:5
**identical** 84:23
**identification**
38:21 41:7 45:1
85:8 109:14
140:15 151:10
155:4 157:23
161:7,22 170:3
170:18 187:24
194:22 198:5
203:24
**identified** 81:11
141:21
**identifies** 38:15
**identify** 58:4 59:3
142:9
**identifying** 181:8
**II** 128:24
**III** 204:5
**image** 76:13
**images** 29:22
31:18 59:13,23
79:9 83:15 93:10
94:2
**imaging** 22:9,10
25:5 156:6
**immediate** 153:3
**immediately**
55:12 71:25 75:7
96:12 133:20
134:22 138:2
165:24
**impairment**
115:22
**implementation**
12:22
**implemented**
185:7 211:11
**important** 20:13
67:23 202:2
205:20
**impossible** 169:18
**improper** 84:9
**improve** 172:13
177:10,16
**in-** 14:3 172:10

**incentive** 55:15
**incident** 152:5
**include** 51:4
113:17 124:1
140:21
**included** 186:12
**includes** 184:12
**including** 116:13
**income** 136:12,13
147:14
**incorrect** 103:5
111:24 177:8
192:20,23 193:6
**increase** 199:14
**increased** 186:17
211:7
**increasing** 199:1
**independent** 29:1
113:12,16
193:18
**Index** 3:1,3
**India** 26:8 27:2,8
27:11 91:1 92:5
**indicate** 29:14
**indication** 201:11
**indicators** 106:12
**individuals**
102:12 134:19
**industry** 51:6
198:23
**inevitable** 158:13
**inflows** 185:24
**inform** 166:16
**information** 3:9
12:15 25:16
52:10,19 55:3
61:14 73:25 82:6
83:23 88:22
91:22 100:4
101:3 103:16
104:6 122:22
130:13,15 132:1
160:6 188:25
189:1,3,21 201:4
201:6 213:10
**informational**

171:3
**initial** 27:23 68:10
93:17 171:1
**initially** 50:25
**initials** 92:8,11
93:17
**injunction** 68:18
69:1,6,21 70:11
70:22 71:3,15,24
72:9
**ins** 23:17
**inside** 210:17
**installed** 163:13
**instance** 202:3
**instances** 79:14,24
81:10 122:18
161:24 206:23
**institution** 24:5
**instructions** 33:12
**insurance** 22:15
22:16 52:19
54:11 55:3 60:11
**insurer** 93:13
**insurers** 52:14
**intake** 20:14
**integrally** 65:3
**integrate** 185:14
**integrated** 205:25
**integration**
183:15 185:12
185:20
**intended** 200:1
**intent** 4:24 198:1
212:1
**interest** 55:17
**interface** 22:11
54:17
**interfaced** 33:22
**interfere** 126:23
**interfered** 125:14
125:21,25
126:17 130:8
131:19
**interference**
120:1,5,13 125:1
132:8,13,14

**interfering** 120:15
**interim** 18:9,12
19:5,14,25 20:10
98:18
**internal** 26:10
27:24 180:10
181:8
**internally** 82:10
91:25
**interpret** 187:2
**interpretation**
24:3 30:5 31:23
**interpreted** 35:13
200:7
**interrupt** 50:17
92:19
**interventional**
138:10,13,17
142:1
**interviews** 201:16
**intimately** 51:18
82:19
**inventory** 158:15
**investigating**
160:12
**investigation** 81:9
82:15
**investigative**
102:12
**investigator** 84:4
**involve** 8:6 75:16
**involved** 51:18
65:3
**involving** 9:2
**IR** 141:25 142:4
142:16
**issue** 43:18 51:14
51:15 53:4 74:23
96:8,9,14,18,21
116:25 144:11
165:3 167:19
183:14 191:8
**issued** 68:18 70:23
**issues** 54:22 81:7
86:2 96:23 97:13
172:1 176:3

177:20
**it'll** 138:5
**italics** 162:18
**item** 86:5 166:20
173:1 175:4
186:24
**items** 43:22 103:5
191:22 193:22

**J**

**January** 17:8,17
17:21,25 64:21
71:7,8 215:14
**jobs** 72:5
**Joe** 163:20
**John** 194:8
**Johnson** 2:9 39:12
45:9,16,22 47:13
47:16,19 48:18
56:22 57:4,8,11
71:10 110:12
141:9 194:3,8,10
208:19,24 209:4
209:14,19,23
210:1 212:25
**jointly** 113:20
114:9
**judge** 72:4,7,10
119:20
**July** 66:24
**jumped** 96:19
**June** 17:10,15,23
17:24 60:15 61:7
62:3,13 63:22
64:6,22 66:24
67:25 104:21
107:20 140:10
141:2,19 147:17
176:11
**justification**
128:22
**justify** 142:21
143:7 144:1

**K**

**keep** 40:11 42:5,6

Anand Lalaji, M.D.   8/1/2022

229

| | | | | |
|---|---|---|---|---|
| 44:20 47:2,6,8 | 20:19 21:9,16 | 124:5,21 125:12 | 107:23 162:6 | **leaving** 189:16 |
| 51:23 57:5 66:17 | 22:14 23:7,23 | 126:7,13,21,24 | **knows** 23:17 | **LeBlanc** 85:4 |
| 69:23 71:18 | 25:1 26:3 30:6 | 127:4,15,23,24 | 189:20 | **led** 133:1 |
| 170:12 182:16 | 32:6,22 33:5 | 128:3,13,14 | **KY** 215:22 | **left** 79:7 98:15 |
| **keeping** 15:14,16 | 34:24 35:20,21 | 130:24 131:9 | | 166:1 169:8,9,11 |
| 15:19 50:3 68:20 | 35:23 38:2 44:3 | 132:15,20 133:2 | **L** | 169:12 174:2 |
| 167:20 | 45:19 47:25 | 133:8,11,13,14 | **L** 2:14 51:25 | 186:23 187:5,9 |
| **keeps** 185:8 | 48:14 51:14 53:6 | 133:16 135:1,23 | **L-i-b-b-e-r-t** | 189:20 |
| **Kentucky** 1:1,14 | 53:16,18,21,23 | 136:7 137:20,23 | 194:10 | **legal** 13:20 50:18 |
| 1:17,20,23 2:5 | 54:22 55:2,23 | 138:7 140:18,19 | **labor** 147:13 | 57:1 115:15 |
| 2:11,16,21 3:9 | 56:3,4,5 57:14 | 141:20 142:7,11 | **lag** 67:1,4 | 162:5 |
| 37:13,18,24 | 58:3 60:9,22,22 | 142:15 143:7 | **laid** 162:14 163:7 | **lessons** 180:18,24 |
| 38:13 39:21,24 | 60:23,25 61:13 | 145:12 147:18 | **Lalaji** 1:10,12 2:8 | 182:3 |
| 40:3 100:7,21 | 62:7 63:8 64:19 | 147:18,21 148:2 | 4:2,9 6:1,8 47:20 | **let's** 17:21 20:9 |
| 101:11 103:18 | 65:9,12,12,19 | 148:3,6,8,9,23 | 48:22 50:23,25 | 21:23 45:20 47:4 |
| 119:13,19 | 66:1,4,6,14 | 149:2,22 151:6 | 57:13,20 61:25 | 50:7,8 53:25 |
| 129:17 131:22 | 69:22 71:21 | 152:1,21,22 | 63:12,20 68:25 | 59:4,17,17 60:15 |
| 169:17 215:1,3 | 72:13,19 73:21 | 153:6,10,12,16 | 71:12 179:13 | 62:20 64:19 |
| **kept** 13:16,18 | 74:6,7,14,16,20 | 154:16 156:24 | 194:12 203:15 | 84:14 86:12 89:2 |
| 69:25 | 75:6,20 77:14,16 | 159:16,20 160:7 | 203:15,25 | 115:9,20 118:21 |
| **Key** 168:21 | 79:10 80:18,21 | 162:8,8 163:3 | 204:13 207:24 | 151:22 170:20 |
| **Kim** 158:20,22 | 80:25 81:3,8,8 | 165:15 170:7 | **language** 115:15 | 170:22 171:19 |
| 159:10,12,12,13 | 81:18 82:9,12,13 | 171:2,5 172:15 | 115:16 | 210:15 |
| **kind** 13:1 18:16 | 82:18 83:1,25 | 172:18,21,22 | **large** 1:14 182:3 | **letter** 4:19,22,24 |
| 23:22,24,24 | 84:2 85:18 86:14 | 173:18,23 174:1 | 185:8 215:3 | 99:13,19 100:12 |
| 27:19 38:17 40:4 | 86:23 87:8,10,13 | 175:20 176:10 | **largest** 12:11 | 101:22 115:24 |
| 42:11 97:6,21 | 87:15,18,19,19 | 177:1,2,13 | **law** 1:15 71:9 75:1 | 116:12 198:1 |
| 102:6 115:7 | 87:19,21 88:4 | 178:13,18 179:3 | **lawsuit** 14:11,15 | 211:14 212:7 |
| 131:15 148:12 | 89:7,8,24,25 | 179:3,6,7,13,20 | 73:1,5 108:16 | **letterhead** 99:15 |
| 152:22 162:9 | 90:11 94:12 | 179:23 180:11 | 132:11 | **letters** 3:16 72:22 |
| 171:2,25 172:24 | 95:10 98:4 100:3 | 180:12,13,22 | **lawsuits** 8:2,4 | **level** 78:4 102:25 |
| 173:21 179:25 | 100:23 101:4,5,7 | 182:4,5 183:1,2 | **lawyer** 16:1 | 171:2 177:11 |
| 193:22 204:20 | 101:7,12,19 | 183:3,7,21,22,25 | 144:10 | 178:1 206:8 |
| 204:24 206:5 | 102:20,24,25 | 184:4,8 189:8,10 | **lawyers** 9:14 | **levels** 21:5 29:18 |
| 209:10 212:19 | 103:11,19,19,20 | 190:5,22,25 | 11:13,16 81:15 | 30:8 176:24 |
| **Kirkpatrick** | 103:21 104:6,10 | 191:2,3,4,5 | 82:2,8 93:24 | **leveraged** 24:22 |
| 166:6,11 | 104:11,15 | 192:7,25 193:4,7 | 169:22 170:10 | **Lexington** 1:16 |
| **knew** 102:15 | 105:10 106:11 | 193:7,11,14,23 | 204:1 | 2:5,11,16,21 |
| 107:24 154:19 | 107:9,9,11,14 | 199:6,19 200:20 | **lays** 114:21 | 149:15 150:7 |
| 205:9 213:5 | 108:5,5,7 110:19 | 200:21 201:24 | 199:25 | **liabilities** 110:21 |
| **know** 10:6,13,21 | 114:12,14,16 | 205:4 206:18,20 | **leadership** 19:11 | **liability** 26:23 |
| 11:2,18 12:7 | 115:23 116:21 | 207:21 208:12 | 19:12 | 74:20 116:1 |
| 13:10 15:19,24 | 117:19 119:14 | 210:5 211:5 | **learned** 180:19,24 | **liable** 113:13,16 |
| 18:14,16,22,23 | 120:1,3,24 122:4 | **knowledge** 174:11 | **learning** 80:20 | 113:20 114:9 |
| 19:2,9,10,21,23 | 122:7,24 123:5,6 | 174:13 | **leave** 86:22 | **Libbert** 194:8 |
| 19:24 20:11,12 | 123:14,15,16,17 | **known** 80:18 | 138:25 | 212:24 |

Anand Lalaji, M.D.   8/1/2022

230

license 74:5
licensed 24:1,6
licensing 12:13
lie 136:18
lieu 211:3
lifted 71:4
light 104:7
limitation 116:13
Limited 13:4 37:3
limits 26:22
line 42:25 56:25
lines 22:3
Lippert 194:9
 212:23
list 23:21,22,23,24
 23:25 115:2
 133:8 207:17
listed 114:6 127:8
 211:20
listen 64:3 137:14
listening 137:2
listing 40:2
litigation 210:1
little 14:7,7,8,8
 32:6 37:16 43:25
 44:7 53:8 54:8
 57:9 83:1 97:21
 99:21 100:4
 152:22 155:11
 155:20 162:9
 166:21 167:1
 180:1
live 6:9,13 23:3
 155:22
lived 6:11,18
LLC 1:15 2:8,8,19
 113:6
lo 160:9
locally 164:22
 165:19,20 166:1
located 1:16
locating 11:6
location 23:8,10
 27:9 28:13,17
 58:13 99:4
 145:21 155:16

locum 139:12
 155:9,24
locums 133:7
 134:12,13,14
 139:4,7,19,20
 166:8,19 172:12
log 23:6 33:14
 77:23 83:12
 153:19 160:19
 176:23 177:6
 189:1
login 73:25 75:21
 76:19,22 154:6
logins 153:1,24
 154:13 163:14
LOI 198:6,10
 199:4,8,15
London 12:23,25
 13:2
long 6:11 7:8 14:5
 63:6 77:16 82:7
 97:23 98:2 157:7
 169:8 184:1
long-time 162:4
longer 107:1,20
 138:22 211:10
look 10:9 26:17,18
 26:22 27:17
 28:22 29:5,6
 31:1,6 32:2
 44:15 56:12 57:9
 64:4 65:17,24
 66:2,2,8 68:8
 72:16,18 74:7
 76:2 86:3 89:5
 91:2,5,12 93:8
 94:7 95:2 96:16
 101:21 115:20
 127:21 150:15
 151:5 154:7
 155:19 157:13
 167:3 169:24
 177:18,19,24,24
 194:24 198:6
 200:11,24 201:1
 208:15 213:14

looked 48:11
 76:13 78:16
 83:15,15 91:9
 119:5 124:14
 154:9 155:10
 188:8 201:7,8,9
looking 10:20,22
 30:6 41:22 45:10
 48:1 51:24 54:21
 59:7 64:4 68:13
 74:3 85:25 91:21
 92:14 93:1 94:1
 116:6 143:12
 180:3 192:12
 201:14
looks 28:19 30:14
 79:9 157:11
 170:21,22,23
 173:23 176:18
 179:7 182:25
lose 72:5 131:25
 137:8 148:11
 149:4
losing 149:18
loss 55:2 106:21
 129:2,5,11,13,23
lost 129:15,17
 130:6,8 132:5
 169:3
lot 24:21 26:3
 69:21 72:1 80:18
 98:4,24 136:1,6
 165:17 167:4
 169:18
lots 34:6,10
low 160:13
Luke 2:3 63:3
 84:11 209:4
lunch 118:24

— M —

M.D 1:10,12 2:8
 2:23 6:1
MAC 84:7
Maclin 4:19,22
magnitude 9:9

mail 147:7 162:21
main 1:16 2:5,20
 20:15 43:18
 54:14 70:7
 105:22 152:17
 201:22
maintain 30:3
 43:22 55:24
maintained 28:11
 197:21
maintaining 30:4
making 18:19
 25:3,4 28:14
 31:12 51:10,10
 53:3 54:22 55:19
 121:4,8 122:3
 126:8,9 143:11
 171:18
mal 7:22 8:12
 15:13
mall 138:19,21
 139:11,23
 155:13 157:2,7
 166:5,11,13,22
 167:1 168:22
mammos 166:11
manage 181:10
managed 181:5
management
 12:15 51:2 54:7
 98:20 174:18
 181:16 182:6
 195:14 206:22
managers 12:17
 165:9
managing 12:24
manner 81:13
Manning 30:10
March 64:22
 107:25 199:15
 199:17
margin 146:20
mark 196:20
 203:18
marked 38:10,19
 40:23 41:5 44:13

44:24 84:22 85:6
 109:12,15 140:5
 140:13 151:4,8
 154:20 155:2
 157:14,21
 160:14 161:5,16
 161:20 169:20
 170:1,9,16
 187:12,22
 194:15,20
 197:23 198:3
 203:22
markets 175:20
Marks 166:8,19
Marshall 157:17
 157:17 158:2,3
 158:24 159:12
 159:13,17
 160:12 173:3,7
 174:21
Martin 30:10
Marybeth 1:13
 38:6 207:16
 215:2,21
massive 79:1
 152:4,19 158:14
 164:10,10
 169:14
matches 29:7
material 46:13,17
 81:14
matter 51:17 72:9
 168:6 187:7
 199:7 203:16
matters 137:13
 188:12
MC 131:23
McBrayer 2:4
MCHC 73:18
 75:8 78:24 79:18
 79:25 80:6,11,16
 81:20 131:23
 132:5,24 152:25
 153:6,15,18
 154:15,16
 160:20,21,23,25

Anand Lalaji, M.D.   8/1/2022

231

161:14 166:23
167:2
**McKesson** 33:4
33:16,17,24 34:3
34:5 163:12
164:9 167:9
**MD** 51:25
**mean** 9:8 22:7
33:25 35:3 37:17
50:17 52:4 69:20
73:7 80:9,20
82:9 85:25 86:5
87:8 88:23 89:8
97:20 103:24
105:8 106:22,23
111:13,20 112:3
112:12,15,19
113:14 114:19
115:8,22 116:9
118:13 132:11
132:18 142:23
145:6 147:2,23
148:7 149:14
150:13 158:19
158:21 159:18
160:18 166:24
168:12 172:5,8
174:1 175:16
177:17 179:7,17
179:24 180:4,12
180:13 182:25
183:18 187:2
197:25 209:23
**meaning** 77:1
175:19 206:9
**means** 25:8 58:15
95:8 112:16,20
115:9,11 154:11
158:16
**meant** 31:20
199:2 212:4
**measures** 52:1
**mechanism**
105:25
**mechanisms**
80:13 81:1

189:18
**med** 7:22 8:12
15:13
**mediation** 208:21
208:25
**Medicaid** 73:17
175:21,22
**medical** 6:19 30:1
138:19,21
139:11,16,23
155:13 157:2,7
166:5 168:23
169:2
**Medicare** 73:17
75:13 156:20,23
157:8 175:21
**meet** 13:14 29:18
**meeting** 29:19
108:4 155:16
**meetings** 15:17,22
16:5 21:15,17
52:8 206:2,3
**members** 74:1
**Memorandum**
4:17 171:16
**memorialize**
75:10
**memory** 9:18
125:12 128:17
188:21
**men** 85:23
**mention** 156:19
**mentioned** 11:4
13:13 18:3 19:5
21:24 103:3
119:4 177:11
208:1
**message** 121:7,8
**met** 149:15 174:7
212:3
**metadata** 29:13
**method** 196:14
**methodology**
24:25 120:13
**middle** 183:3
185:23

**Mike** 127:2,4,18
129:5 132:1
**milk** 134:7
**Miller** 2:14 44:21
47:9 50:16 62:14
62:18 63:2,13
69:5 84:11
117:14 130:18
131:11 207:10
213:3,18
**million** 62:2,7,12
64:6,9 66:13
87:11 174:24
175:1,18,23,24
186:11,25 187:4
193:8 197:7
198:16 212:17
**millions** 192:9
**mind** 66:17
**minimal** 177:23
**minor** 41:9
**minute** 111:21
133:13 193:1
**minutes** 13:16
16:4 26:5 28:7
31:14 102:6,7
133:17 155:8
**misconduct** 46:12
**misnumbered**
182:17
**misrepresentati...**
46:16
**missed** 105:2
183:3
**misses** 26:23
**missing** 80:24
**misspoke** 50:12
**mistake** 80:12
**mistakes** 78:5
79:1,17 80:6,8
80:10,19 81:11
**mixing** 211:23
**model** 21:23 22:6
22:7,8,17
**modifications**
26:19 29:16

30:15
**modify** 29:10
116:2
**modifying** 74:18
**moment** 86:7
101:14 102:21
103:10 120:23
131:21 134:8,25
148:22 187:5
**Monday** 1:17
**money** 21:1,10
43:24 44:6,7,20
47:2,6 54:8 56:8
56:10 60:1,2
61:21 65:25 66:1
66:10 68:25 69:2
69:8,8,16 70:2,4
70:6,12,25 71:2
72:11 88:18
90:10 106:23
135:6,7 136:8
142:11 147:22
147:24 148:11
148:20,25 149:4
149:18 150:16
197:17 204:18
204:23
**money's** 214:1
**monies** 60:6
189:20 190:4
195:15 202:8
**monitored** 160:8
**monitoring**
164:24
**monitors** 164:23
**monologue** 57:18
**month** 13:15 14:9
55:8 149:19
175:14,15 211:3
211:12
**monthly** 29:18
174:20
**months** 10:25
15:15 48:25
55:21 56:1 58:10
63:22 64:17,18

64:19,20,20,22
64:23,23 65:14
65:20,20,20 66:4
66:9 67:7,15
99:4 147:15,16
151:21 158:3,18
159:1,5,18,23
160:3 164:7
169:6 196:18
197:4 211:2,6,10
**Morgan** 2:3 3:4,5
6:5 17:19 18:1
38:6 40:6,10
41:14 45:19
47:11,15,17
48:19 50:20 57:3
57:6,16 62:16,20
63:4,15 70:19
84:14 109:9
110:15 118:21
187:15 188:4
194:6,9 202:11
202:17,19 203:8
203:20 207:6,11
207:21 208:1,10
208:16 210:8,12
210:20 213:17
213:21 214:3
**Morris** 30:10
**MOU** 178:11
211:11
**Mountain** 35:17
35:18 36:1 73:19
74:17 75:16 76:1
76:24 77:13
104:2,7 126:14
126:17,22 200:7
200:25 201:5
207:22 208:3
**move** 26:20 29:12
32:4 84:2 166:5
166:6 209:21
**move-** 211:19
**move-forward**
195:8,11 208:17
208:21 209:1,6

209:22 210:23 211:2
moved 75:8 98:3 119:18
movement 98:4
moves 25:18
moving 159:17 168:16 180:25 181:14,23
MRIs 26:2
multiple 24:7 28:8 41:2 56:4 198:17 203:6
Must've 125:23
mutual 106:7,8,18 107:25
mutually 105:23 106:14

**N**

name 6:7 7:2,6 13:2 93:17 127:4 193:23,23 194:7
name/address 39:9
named 215:4
names 92:6,9 123:12,15,16,17
national 158:5
nature 142:12
necessarily 22:1 121:10 166:2
need 9:5 28:4 37:25 40:4 57:4 81:14 82:6 86:23 88:9,13 92:20 133:11 142:22 143:1 147:11,12 155:9 157:12 158:15 160:17 163:21 166:4,5 166:14 172:11 176:8 180:24 213:2,7,7
needed 35:7 55:10 144:23 150:4

151:16 172:12 185:18 207:15
needing 153:14
needs 37:25 52:16 141:23 142:13 144:7
negative 104:7 122:8 132:2
negatively 133:5
neglect 46:10
negotiations 204:7
neither 149:24 204:7
net 142:25 186:14
never 33:14,20 51:12 72:3 134:20 178:10 200:8,8
Nevertheless 85:10
new 6:14,14,15,18 6:21 8:3 35:21 42:15 168:25 169:1 178:2 181:10
news 152:25
nine 41:17 64:22 64:23,23 65:20 66:4,9 67:14 151:21,23
nods 10:2 77:6
noncompete 99:18,25 100:2,8 101:9 102:9 124:20
Nope 32:14 102:11 105:3
norm 163:21 164:12
normal 31:20 54:6 82:10 134:14 145:19 152:9 155:10 165:8
normally 69:17 160:4 198:21

Notary 1:13 215:3 215:24,25
notice 1:4,20 46:8 115:6,7,25 170:12 174:16 198:7,12 199:15
noticed 58:10 161:24 180:6
notices 115:7
notify 72:10
Novarad 153:3,19 160:19
November 14:21 64:21 160:11
now's 58:17 128:10 130:1
number 41:17 42:24 43:7 59:8 59:11,16,20 60:12,19,22 61:10,18 62:7 66:11,13,14,16 67:17,20 68:13 68:17 72:18,25 75:5 96:22,25 97:16 146:21 172:16 173:1,18 174:17 176:1 177:9 178:2 179:9,11 180:4 185:8 186:18 188:21,23 189:12 192:19 192:23,24 193:5 193:6,11,14,17 195:5,6,7,10 198:24 199:24 210:22,23
numbers 40:12 54:22 59:18 110:13 136:18 167:3 170:11 179:5 180:15 188:13 189:14 189:15 191:6 211:15,18,19,21

212:6,12,16

**O**

oath 6:2 81:24 84:19 119:3 202:22
object 44:21 47:9 48:20 63:7,13 69:5 71:10 117:14 130:18 131:11 207:6
objecting 56:24 62:17
objection 57:18 57:19 63:11,17 172:16,20 213:3
objections 62:21 63:6
obligate 118:2
obligations 110:21 112:14 112:17,22,23 113:11,12,14,23 116:3,4,15,17
observations 77:9 91:24 93:6,9 135:12
observed 156:1
obtain 42:15 54:8
obtained 189:1
obviously 46:17 98:3 113:2 124:22 171:23
occasion 93:20 119:8
occasions 8:23 24:16
occur 35:16 93:21 104:20 174:6
occurred 75:11 97:7 100:10 102:16 104:19 111:22 118:9 127:17 184:17 205:1
occurring 34:11

53:13 55:20 74:21 171:23
October 14:21 60:14 61:6 62:3 62:13 63:22 64:6 64:21 66:18,22 67:25 72:23 90:17,21,21 93:24 100:12,16 101:1 103:17 121:3 122:17 160:10
offer 99:19
offhand 10:13 38:2 101:6
office 37:24 38:16 164:23 181:17 215:16
office-based 22:10
officer 12:5,6,7,10 12:21 16:9,11,14 16:16 17:3,10,23 17:24 18:4 21:14 21:19 30:1
offices 1:15 26:8
official 24:3
officially 83:14
offshore 24:22 28:20 32:13 93:16
oh 24:19 39:14 82:4 88:12 112:2 124:12 144:25 170:23 171:3 173:13 176:20 184:22 197:1 208:5 210:16
okay 7:20 8:20 9:17 22:21 23:9 24:20 25:21 35:25 39:18 42:22 45:15 46:2 47:15,18 49:18 49:23,24 50:13 50:24 51:25 54:14 56:12,19

Anand Lalaji, M.D.   8/1/2022

233

57:3,8 61:16 62:21 64:1,16 73:9 77:16 83:11 86:16 93:1,6,23 95:2 112:5,9 114:18 119:11 120:2,9 124:15 133:25 134:6 141:18 144:25 145:20 146:15 146:16 147:8 155:7 156:17 159:8 162:21 163:1,8 166:15 166:17 167:14 168:4,7,9,10 169:10 170:8,23 171:14 175:10 175:23 183:12 185:23 187:11 188:19,21 190:19 195:1 196:6 205:19 207:2,5,8 208:16 210:15 212:5,23 213:17,21 214:3
**old** 173:4
**older** 150:22
**on-** 142:17
**on-site** 105:6,9,12 105:15 142:4 143:22 152:13 186:16
**once** 10:17 13:15 72:8 78:2 98:3 199:5
**one's** 194:16
**ones** 10:12 48:11 54:10 73:13 75:24 117:5 162:22 163:4 192:2
**ongoing** 55:5 107:19 126:24
**Opal** 34:19
**open** 26:17 29:5

**opens** 29:22
**operate** 51:4 69:13 122:6
**operated** 51:7 173:15
**operates** 36:13 37:5
**operating** 12:5,10 51:20 69:18 211:9
**operations** 4:12 4:17 12:12 106:20 171:17 200:3,12 206:6
**opinion** 26:11,12 27:24 188:7
**opportunities** 95:4,14 97:4
**opportunity** 108:13 122:20
**opposed** 13:12 206:22
**option** 107:6 150:12
**order** 45:5 52:5 52:13 54:6,12 55:10,15 69:10 69:14,15,23 70:9 75:10 76:6 142:25 144:5 146:20 149:21 150:2
**organic** 35:21
**organize** 18:16
**original** 169:24 199:8
**outcome** 126:9 158:13
**outflow** 185:24
**outflows** 20:22
**outlined** 150:5
**outpatient** 126:14
**outs** 23:17
**outside** 16:18 28:13 29:2 30:13 31:2 77:10 92:25

94:1
**outstanding** 198:14
**overall** 172:25 184:11
**overflows** 167:22
**overhead** 139:24
**oversee** 98:7
**owe** 193:2,2,3
**owed** 43:8 44:7 59:11 70:13 87:4 87:16,23 88:5,18 90:18 188:5,15 191:11 209:5,13 213:9
**owes** 90:9 193:9 212:13 213:8,23
**owned** 7:8 159:6 206:25
**owner** 49:19 50:12 110:25 181:8
**owners** 50:1,10 135:2 182:8 184:14,15
**ownership** 17:7 17:11
**owns** 16:20,23 36:13 37:5

**P**

**P** 140:24,24 172:12,13 176:23,23 177:7 177:7 178:3,3,25 179:1 185:12,12 185:13,13 186:13 212:3,3
**P's** 186:13
**p.m** 162:16
**PA** 2:10,15
**PACS** 33:4 34:18 35:19 78:2 134:18 152:2,3 152:16,18 155:14

**page** 38:14 39:8,9 39:14,15,16,16 41:15,16 42:22 42:23 46:2 50:24 68:12 72:17 94:11 99:15 109:17,18,25 110:23 112:13 113:10 114:15 140:8,9 146:5 149:9 151:17 155:6 158:1 162:12 170:6 171:15 173:17 173:20 174:5 176:13 178:12 180:3,8,8,17,18 182:13,14,14,20 183:13 184:19 186:22 192:14 197:1 198:12 199:16,17,17 204:6 211:21
**pages** 116:8 170:12 199:22
**paid** 42:25 43:2 52:15 60:11 69:23 85:13,23 86:4,9,11,22,25 87:1,3,5,8,10,12 87:13,16,23 88:2 88:13,24 89:23 90:2,3,9,12 98:24 141:1,4 142:25 143:1 145:4,7 146:13 146:23 147:11 173:25 186:7,9 186:13 187:1,6,9 189:4,9,10,11 190:4 192:1,16 192:18,22 193:3 193:7 195:4 202:8 212:17
**Pampati** 3:17 4:10 9:12 41:24 43:7

43:11 44:1,18 47:1,21 48:1 49:21 50:15 53:1 53:12 54:20 55:12 57:24 58:16 59:14,23 60:3 61:22 67:13 72:22 73:2,10,18 73:24 74:2,15,25 75:21 76:2,10 77:2,18 78:10,17 79:2,18,20 80:1 80:7,16 81:12 82:14 84:21,25 85:2 86:24 88:1 88:5,25 89:23 90:25 93:25 99:24 103:17 104:1,12 106:9 106:15 110:7 120:15 121:21 127:17 129:21 132:22 133:12 133:19 134:7 137:13,19 138:3 139:6 140:21,24 141:4,21 143:4 144:18 146:21 147:8 149:16 153:5,8,9 154:18 155:15 159:25 160:16 164:17 165:20 166:2,21 167:20 171:4,22 171:24 172:15 173:11 174:8 179:20 181:2,9 181:24 182:2,5 183:21 185:2,15 188:6,19 189:18 191:11 192:1 193:8 195:4,16 200:12,25 201:17 202:8 205:4 206:4,16 206:25 207:3,23

Anand Lalaji, M.D.   8/1/2022

234

208:4 210:4
**Pampati's** 64:11
76:25 132:12
189:5 205:17
206:15
**pandemic** 68:1
**paper-clipped**
40:16
**paperclip** 40:16
**paperwork** 25:2,2
31:11
**paragraph** 41:17
42:24 43:7 50:25
59:7 68:13,15
72:21,25 99:16
114:20 116:21
118:6 198:24
204:5
**paragraphs** 41:21
72:18 86:13,18
86:19,21 88:16
**Pardon** 45:16
**part** 10:8,11 11:2
13:19 20:6 32:21
32:24 33:5 37:14
39:5 42:16 43:19
43:20 49:3 61:14
67:8 95:4,14,15
95:16 97:3,8
98:6 99:6 102:2
102:18 104:22
109:22 137:21
141:13 149:10
150:17 151:1
156:2 168:23
169:17 176:14
176:21 182:23
183:14,20
184:20 192:9
200:14,18
212:21,22
**part-time** 14:3
**participate** 55:13
**particular** 24:2
33:10 62:18 81:7
83:18 91:8 97:14

99:10 115:11
118:12,17 121:8
143:7,9 144:13
**parties** 97:13
131:14 158:13
172:25 196:7
215:6,12
**parting** 106:8
**partner** 12:24
135:24 152:17
**party** 54:13
215:11
**passed** 164:6
**Patel** 1:3 2:23
3:17 4:2,9,24
9:12 41:24 43:7
43:10 44:1,19
47:1,22,25 49:21
50:15 51:17 53:1
53:12 54:20
55:12 57:24
58:16 59:13,23
60:2 61:22 64:11
67:13 72:22 73:2
73:9,17,24 74:2
74:15,25 75:21
76:2,9,25 77:2
77:17 78:10,17
79:1,18,20 80:1
80:7,16 81:12
82:14 84:24 85:2
86:24 87:25 88:4
88:25 89:22
93:25 99:24
103:17 104:1,11
106:9,15 110:6
120:15 121:21
127:17 129:5,21
132:12,21
133:12,18 134:7
137:12,19 138:3
139:7 140:21,24
141:4,21 143:5
144:18 146:21
149:16 153:5,8,8
154:18 156:5

159:25 160:15
161:18 162:1,4
162:15 164:16
165:18,20 166:2
166:10,21,21
167:11,19
168:15,20 171:4
171:22,23
172:15 173:11
174:8 179:20
181:2,9,24 182:2
182:4 183:21
185:2,15 188:5
188:19 189:18
191:10 192:1
193:8,10 195:4
195:16 198:8
200:12,25
201:17 202:8
205:3,16 206:3
206:15,16,25
207:3,23 208:4
210:4
**Patel's** 84:21
154:6 163:11
164:20 165:12
188:24 189:5
190:6
**pathway** 131:24
**patient** 43:23
78:20,23,25
79:15 81:4,6
82:23 83:17
175:14,15
**patients** 52:19
55:4 73:14,16,16
156:20,23 157:1
157:8
**pay** 56:10 64:12
69:10,15,19 70:9
70:11,12,12 71:2
107:14 112:24
143:7 144:4,8,13
150:16 166:7
186:7 189:19
211:2

**payer** 51:14
**payers** 54:11
**paying** 144:11
145:12 147:25
166:9
**payment** 32:10
85:16 113:22
116:4,16 147:12
190:11,16
**payments** 43:12
66:3 69:11,12
70:16,17 89:1
173:24 188:22
189:8 197:3
**payroll** 69:14,18
141:24 142:14
142:16 176:11
188:25 189:22
**pays** 22:16
**PCCEK** 131:22
**pelvis** 25:9,11
31:15
**penalized** 119:21
**pending** 1:22
**people** 11:8 12:20
16:18 53:6 62:22
68:2 72:1,5 74:4
75:22 76:22,25
81:18,19 91:20
98:21 101:4,4
123:12,15,16,17
139:2 142:10
169:4 206:9
**Peoples** 68:16,21
69:3,12,17 70:3
70:5,6,13 71:1
71:14 72:11
189:16,20,24
190:1 204:15
205:7
**percent** 7:19
16:22,25 17:1,7
29:17 54:10
71:21 73:15
106:25 115:10
134:13 135:9

138:12 142:25
144:19 145:10
145:14,17 146:2
146:9,25 152:11
154:17,17
169:16 174:10
175:12,17,23,23
176:4 186:14
196:18 197:2,4,9
197:9,11,14,15
205:16 211:9,12
**percentage**
196:21
**percentages** 17:12
**perfectly** 190:15
**performance**
46:13 104:23
113:8,22 116:17
116:22
**performed** 30:12
65:2 83:19
116:23
**performing** 65:3
195:17
**period** 22:19
60:14,17 62:3
64:17 67:2,25
88:1 89:6,15,17
98:11 100:15
119:24 120:22
122:15 124:4
126:7 127:7,8
130:25 196:9,11
196:13,19
197:12 200:5
211:8
**permission**
153:24
**permitted** 160:24
**perpetrated** 73:12
**Perry** 1:1,22
**person** 28:12,19
28:25 29:2,15
39:19 62:21
76:18,24 92:12
92:14 93:11,16

Anand Lalaji, M.D.   8/1/2022

235

97:23,23 98:15
113:15 135:21
138:25 149:13
150:6 157:17
169:5 174:3
193:24
**person's** 138:22
194:6
**personally** 37:18
159:16
**personnel** 121:24
**persons** 32:12
92:1,4 113:13
**pertain** 183:8
**Phillippines** 26:8
27:2,8,12 92:5
92:14
**phone** 177:5
**physically** 145:21
174:8
**physician** 80:14
82:21 96:15
181:25
**physicians** 32:19
56:10 69:15
103:4 122:14
157:3 172:14
**pick** 81:7
**picture** 66:8
**pieces** 18:21 49:8
179:17
**place** 10:5 27:14
52:2 66:7 111:18
165:3 168:17
184:5 205:10
209:20 215:4
**placed** 6:2 49:20
69:4,22
**places** 45:23 50:14
**plaintiff's** 3:8,11
3:13,15,18,21
4:1,3,6,8,11,14
4:16,18,21,23
5:1 38:19 44:24
59:10 85:6
109:12 140:13

151:8 155:2
157:21 161:5,20
170:1,16 194:20
203:22
**plaintiffs** 1:4,5,13
2:2 11:1 42:25
43:2 86:21 87:22
88:23 90:9 95:3
96:9,22,25 97:15
118:16 122:24
125:4,4,13,20
128:21 141:11
143:13 145:25
148:13 151:13
204:10,12 205:3
212:18
**plaintiffs'** 3:12
5:3 40:24 94:19
94:24 95:19,22
96:5 99:7 125:16
128:20 129:9
204:8
**plan** 167:8 174:16
176:5,15,21
195:8,11 208:17
208:21 209:1,6
209:18,22 210:6
210:23 211:2,20
212:2,4
**planned** 166:11
**planning** 151:1
206:4
**platform** 33:2,2,4
33:8 35:14,25
36:2
**play** 63:3 197:20
**pleading** 61:11
**pleadings** 61:4
**please** 6:6 10:14
12:1,2 15:25
19:8 20:7 34:21
40:7 44:17,22
46:1 48:9 50:22
70:20 80:15
86:14 140:6
146:5 151:5,24

160:21 161:1
190:21 194:1,25
196:4 208:18
210:14,25
213:18
**pledges** 177:9
**plenty** 136:25
137:2
**PLLC** 2:4
**plus** 78:23 146:25
191:6 211:12
**point** 8:14 18:22
29:8 31:10 36:2
36:5 64:16 90:17
100:25 101:15
101:16 107:2
135:4 141:2
142:20 146:18
147:17 151:24
152:24 159:5
175:9,11,11
177:3 185:10
186:1,12 191:12
198:11 211:24
**points** 35:25
141:22 149:11
**poor** 104:23
**populated** 25:14
**population** 175:21
**portal** 33:15
**portion** 46:13
**position** 51:3
58:16 59:10
62:11 63:21
95:10 191:10,12
192:17,19
**positive** 4:12
**possibility** 62:8,9
129:24
**possible** 9:6
131:14 134:8
155:12 156:22
**possibly** 98:2
126:2 147:23
182:25
**post** 51:21 160:20

160:21,25 181:5
206:24
**post-dating** 44:3
**potential** 81:2
**potentially** 175:22
199:1,13
**power** 95:12
**practice** 21:2,6,7
43:23,24,25 44:5
44:6 50:2,6,10
51:12 52:7,25
53:1,8 54:7,13
55:11,20 56:9
65:18 66:8 69:10
69:13,23 70:10
70:16 71:18,19
71:23,25 74:13
74:21,22 75:4,7
96:11 100:18
120:23 132:19
132:21 133:19
134:8,9,16,24
135:1,2 136:9,19
137:21 139:13
150:3,12,17,19
151:2 154:17,18
158:1 160:8
173:15 181:13
184:14 195:25
198:13,22 205:4
205:9,17,25
207:1
**practice-wide**
185:7
**practices** 51:5
126:3 152:11
**predating** 44:2
**prelim** 25:22,22
**preliminary** 26:2
26:10 27:24
73:24
**preparation**
101:23 103:13
112:7,9
**prepare** 85:21
123:21 171:8

**prepared** 49:11
85:25 89:10,11
89:20 185:1
213:14
**present** 2:22
19:17 20:23
128:21 130:13
138:15 156:7,15
204:7
**presentation**
192:8
**presented** 84:8
**presenting** 19:23
19:24 20:18
**preserved** 57:19
**president** 158:23
**press** 173:3
**presumably**
127:10 179:12
**pretty** 18:13 77:15
192:13
**prevent** 94:17,22
95:18,25 97:11
**prevented** 195:13
**preventing** 68:19
**prevents** 26:22
**previous** 50:12
51:17 67:6 135:2
180:6 182:8
**previously** 1:20
108:20
**price** 195:19,23
198:16
**Prieto** 2:10,15
**Primary** 129:16
129:22 130:6
131:22 132:24
**primer** 49:4 102:2
**principal** 38:16
**printed** 140:7
196:23,25
**printout** 38:10
**prior** 11:12 15:18
25:3,14 48:23
51:7,9,21 52:6,6
52:25 54:19,20

Anand Lalaji, M.D.   8/1/2022

236

55:21 64:18 65:5
74:21,21 94:4
100:15 196:11
196:13 199:10
201:24
**privilege** 128:22
**privity** 204:9
**pro** 196:1,23
197:3,8,14
**probably** 11:17
14:8,19 34:12
39:5 48:25 60:7
71:25 85:19
108:10 126:13
131:5 149:23
158:25 176:21
179:24 180:20
180:21 198:10
199:22
**problem** 106:20
137:1 148:10,15
149:3,6,8 152:4
154:16 161:2
164:17,18,20
165:1 168:2,3
182:17 183:19
202:7
**problems** 49:10
97:6,7 106:22
141:18,20 181:3
**procedure** 1:21
11:2 136:2
205:13
**process** 20:8 30:2
32:25 33:1,12
34:2,8,22,23,25
35:9 37:14,22
39:5 40:2,3 45:6
73:7,17,18 83:23
84:8 91:19 92:16
92:25 107:19
120:14 132:16
134:17 136:5
161:9 172:25
177:12 183:15
200:6 201:22

206:20
**processes** 31:9
36:19 121:19
126:1 134:11,23
177:25 200:19
**proclaims** 39:19
39:20
**produce** 11:3
208:14
**produced** 10:10
82:7 104:1
169:22 171:1
207:17 210:6
**product** 213:4,6
**production** 10:25
11:5 170:10
**productive** 167:11
**productivity**
166:7,14
**profit** 211:9,10,12
**profitability**
174:16 176:9,15
176:21 183:17
205:20
**profitable** 168:16
**profits** 184:13
**program** 30:9
**progress** 56:6
**prompt** 96:1 99:6
**promptly** 94:18
94:23 95:18 96:4
96:13 97:15
**proof** 101:2
127:16 131:4
188:18
**proper** 52:2,5
53:18 54:5
**properly** 183:16
**proposal** 171:18
**proposed** 4:17
169:2 171:16
172:2,3,4,16
173:1 179:8
195:8
**proposes** 178:2
**proposing** 211:1

**proposition**
147:10
**protect** 182:10
183:16
**protections** 184:5
**protocol** 33:12
132:16
**prove** 128:4,6,8
128:21 130:10
130:22 131:1
**provide** 22:10,24
56:23 82:8
176:22 194:4
200:17 207:24
**provided** 59:5
81:15 82:1 95:5
130:15
**providing** 104:6
105:12 122:22
**proving** 130:7,25
**provision** 47:24
48:6
**Public** 1:14 215:3
215:24
**pull** 85:19 124:23
185:16
**pulled** 166:23
**purchase** 3:14
42:5 43:21 44:9
44:10,11,17 49:6
50:4 53:25 54:1
54:2 56:13,20
58:2,21 59:1
65:6 109:4,23
111:15 112:1
113:7 118:3
178:4 183:15
186:4 195:19,23
196:4 198:15
199:2 204:9
**purchased** 41:25
**purchaser** 110:6
110:21,25 111:6
111:15 112:15
112:17 113:21
114:6,10 115:25

116:14,15,17
**purpose** 36:15
73:5,8 74:24
110:9
**purposes** 37:22,23
38:20 41:6,18
44:25 85:7
109:13 140:14
148:1 151:9
155:3 157:22
161:6,21 170:2
170:17 187:23
194:21 198:4
203:23
**pursuant** 1:19,20
**purview** 53:12
**Pushback** 185:7
**pushed** 166:9
**put** 11:9 25:11,13
25:16 27:19,23
31:17 35:8 36:1
36:4 70:7 71:25
78:8 91:24
102:14,14 103:7
132:20 136:18
137:7,16 153:1
153:24 154:7,24
167:9,17 168:6
178:20 179:4
182:22 209:20
212:6
**puts** 73:23 74:19
**putting** 138:17
**puzzled** 135:10

**Q**

**Q1** 181:22
**Q4** 181:22
**quality** 25:19
26:13 28:10
31:10 103:6
104:25 122:4
**quarter** 148:6,7
187:16
**quarters** 65:19
**quashed** 71:3

**query** 11:10
**question** 38:3
41:23 44:22
46:25 59:20,21
63:20,24,25 64:5
64:24 66:6 70:2
74:14 76:16
87:20 90:7,8
110:12 123:4
124:16 129:7
130:19 133:23
145:24 156:11
159:9 190:16
**questioning** 56:25
**questions** 10:7
36:9 38:1 47:18
58:14 80:1 89:10
89:21 123:2
128:14 130:4,5
130:24 134:1
200:23 201:2,16
203:9 207:10
211:13
**queue** 26:15
**quick** 28:3
**quickly** 28:5
96:21
**Quintairos** 2:10
2:15
**quit** 97:24 98:12
**quite** 68:11
**quiz** 124:10,12,24

**R**

**R** 1:3 2:23
**rad** 152:13 153:2
154:5 155:25
168:22 176:10
176:11
**radiation** 25:13
31:17
**radiologist** 22:12
23:15 24:5,10,11
24:17 25:23,24
26:6,15,16 28:16
29:22 31:13,19

Anand Lalaji, M.D.   8/1/2022

237

32:16 73:21 76:8
78:5 79:5,8,12
83:8 92:25
105:13,15
122:13 123:11
137:17,18
138:10,13,18,20
139:11,12,15,22
140:1 142:1,8
143:8 144:4,7,13
151:25 154:4
156:7,15,23
157:4,8,10,12
164:6 169:14,15
201:14
**radiologist's**
23:18 78:3
**radiologists** 22:18
22:23 23:1,13
24:1,8 26:9,10
27:7 30:4 32:19
33:3,6 64:12
69:24 71:22,22
73:12 91:23
102:25 103:4
105:9 120:18
121:9,24 123:10
126:6 133:6,7
134:14 136:4
137:6,9 142:24
153:19 154:15
154:25 164:14
165:25 169:17
172:10,17,24
174:1 177:4
201:13
**radiology** 2:7,8
3:16 24:4 32:20
37:6 74:4,6
100:7 105:6
110:1,2 127:1
138:17 152:17
177:1 198:23
201:13 206:3,9
206:10
**rads** 155:10

**raise** 63:16
**raised** 6:20
**Raju** 158:2
**rambling** 63:6,10
**RamSoft** 33:2,7
33:15,20,23 34:7
34:11,16,20 36:1
36:5 75:8,19
168:3 185:6
**ran** 206:10
**ransomware**
152:19
**rata** 196:1,23
197:3,8,14
**rate** 143:20
146:12 186:15
192:16
**RCM** 174:17
175:6 179:25
181:5,7,16,22
**Re-Examination**
3:5 210:11
**reach** 45:16
206:12
**reach-outs** 56:4
**react** 153:11
**reactions** 157:3
**read** 25:24 26:6
33:3,15 35:19
41:18 43:8 54:15
54:16 68:14
73:11 76:13
78:14 83:11
86:14 100:6
101:11 103:2
109:24 112:3
114:16 123:23
123:23 125:11
134:12,13,15,15
136:1,1,4,6
137:8,8,15 143:4
143:9 144:7,8,19
145:13,17 146:2
146:9,24 147:1
152:1,6 153:1,2
153:14,20 154:5

154:7,8,15,22
156:1 160:19,20
160:25 163:11
163:13 164:7,8
164:14,22,25
165:19,20,24
166:8,9,11,21
167:10 174:25
185:5 188:20
**reading** 59:13,23
66:6 74:16 80:16
81:12 136:3
137:4 145:9,10
153:18 165:16
165:21,25
166:22,25 167:2
167:4 189:11
191:7,17 211:16
**readings** 61:22
100:17
**readout** 142:20
144:1
**reads** 24:11,14
52:20 60:11
64:11 79:15 89:1
100:9,20 103:2
103:18 104:10
105:2 136:20
142:9,16 143:2
144:15,20
147:13 153:8
172:12 182:21
183:9,10 186:14
211:7
**ready** 9:20 10:15
25:22,22 114:17
151:6,11 187:13
**real** 49:10 147:13
147:24 197:17
**realistically**
185:16
**reality** 42:13
**realized** 99:4
**really** 13:10,11
17:12 19:18
31:20 40:17 57:1

62:10 66:1 90:24
99:11 132:6
134:3 143:21
148:5 153:5
158:14 165:1
176:2,4 183:25
193:4
**realm** 65:24
**reason** 43:19
59:12,22 95:25
96:23 97:1,16
100:1 104:22
105:4,5,6,20,22
151:2 159:17
213:8
**reasonable** 94:17
94:22 95:18,24
96:13 97:10
**reasons** 46:20
47:3,6 48:3
85:11 188:18
**rebounded** 68:7
68:10
**recalculated**
196:8
**recalculation**
196:14
**recall** 8:25 9:4,6
9:10,11 10:19
37:9 39:3 40:1
101:17 109:8,21
111:21 119:22
128:23 138:16
140:11 162:18
163:14 211:13
211:19
**receipts** 21:5
43:24 54:11 61:7
61:11 63:21
64:10,15,17
66:22 67:5 189:6
202:5
**receivable** 191:21
191:25 192:6
211:16
**receivables** 98:20

**receive** 28:7 62:2
62:4 89:1
**received** 59:12,22
60:6,13,16 61:12
64:9 66:7,22
68:20 72:23 84:4
101:3 123:18
175:7
**receiving** 10:25
**recitals** 110:8,24
113:1
**recollect** 170:5
**recollection** 91:16
102:10
**record** 6:6 56:24
57:5,12 63:17
72:10 84:16,18
118:23 119:2
202:12,21
210:19,20 215:9
**recorded** 81:21
177:6
**records** 15:15,16
15:22 61:17,18
61:19 64:8 68:9
68:9 85:20 89:5
91:2,5,8,10,10
91:12 189:2,5
**recovered** 68:10
**recoveries** 174:17
175:6
**recovery** 175:12
175:18
**recruit** 166:15
168:22
**recruiting** 169:16
172:23
**recurring** 204:25
**red** 162:17,22
163:2
**reduce** 139:24
140:2 172:11,12
196:20
**reduced** 211:7
215:8
**reduces** 195:19,23

**Collins Sowards Lennon Reporting, LLC**
**859-402-0900**

Anand Lalaji, M.D. 8/1/2022

238

195:24
**reduction** 196:2
196:24 197:3,8
197:14
**refer** 41:19 96:7
161:25 162:10
**reference** 57:25
112:25
**references** 110:18
178:25 180:7
**referred** 97:19
162:21
**referring** 24:19
80:13 94:20
147:4,6 208:24
**reflect** 61:10
**reflected** 190:9,11
191:3
**reflection** 158:16
**reflective** 61:11
61:21
**refrain** 148:12
**refresh** 9:18
102:10 188:20
**refreshes** 125:12
**refuse** 159:25
**refused** 137:14
**refusing** 153:7
**regard** 18:19
106:2 107:18
127:5 148:19
165:22
**regarding** 3:10
38:1 208:3
**regardless** 149:7
157:10 184:6
**regards** 208:5,6
**Regional** 139:16
**registered** 37:9,11
37:17,21 38:24
39:7,9,19,20
40:3
**regular** 204:20,24
**regulatory** 31:16
74:23 200:18,18
**reinforce** 176:23

**rejoin** 118:25
**rejoins** 135:4
**related** 142:6
143:22 180:16
191:23
**relates** 140:23
**relating** 146:18
**relation** 209:24
**relationship** 97:12
104:5 120:24
126:10 173:2
184:2,7 185:13
185:17,21
198:21 203:6
205:20
**released** 52:12
**relying** 55:23
**remain** 42:9 195:3
**remaining** 196:21
**remember** 9:15
10:24 14:14
32:22 68:22,23
79:19 92:10 99:2
111:19 125:7,7,8
155:17 161:17
171:7 194:13
**remembered**
91:17
**remote** 156:2,25
**remotely** 156:21
157:7 164:9,14
**renew** 104:23
105:11,21 116:2
**renewal** 105:23
106:3,5
**renewed** 106:4
**rep** 49:11 58:19
**repeat** 87:20
170:13
**repetitive** 196:14
**rephrase** 87:21
**replace** 178:4
**replacement**
141:23 142:13
**replacing** 142:16
**report** 20:13,15

25:7 26:20 28:11
29:6,12 32:6,7
35:14 73:14,23
74:4,9 77:25
78:3,7 79:9,10
79:12 80:14 81:5
82:22 83:8,10,15
83:16 153:2
154:5 179:25
193:24 194:2,15
201:15 212:19
**Reporter** 1:13
38:7 109:10
207:19 215:3,22
**Reporter's** 3:6
**reports** 12:4 20:12
22:12 29:23 55:3
74:2,8,18 75:23
75:25 78:13,24
78:25 79:1 80:17
80:18,23 83:6
153:25 154:14
208:7
**represent** 65:16
**representation**
105:7
**representative**
11:21 49:12 61:2
61:15 62:15
**represented** 74:15
**representing**
62:22 196:22,23
**reputation** 129:2
129:11 132:6,7
133:2
**request** 10:25
**requested** 215:12
**required** 44:19
143:18
**requirement**
44:18 82:17
155:25
**requirements**
125:5
**requires** 137:7
156:19

**research** 82:25
**reserve** 58:1
199:11
**reserving** 58:18
**reset** 196:19
**reside** 39:21,23,24
**residency** 6:16,18
74:6
**resigned** 98:12
**resolve** 95:12
**resolved** 96:24
97:17
**resources** 1:9 2:7
3:10 24:22 38:15
47:8 160:24
**respect** 113:13
**respective** 94:19
94:24 125:3,5
**respond** 84:1
155:8 167:14
**responded** 162:15
**responding** 177:5
**responds** 147:8
155:11 166:10
166:22
**response** 43:5
59:17 163:11,16
164:21 166:15
167:6,16 168:7
177:10
**responses** 162:17
162:19,20,24,25
163:3
**responsibilities**
50:1,4 57:24
114:23,25
181:17
**responsibility**
44:5 50:5 53:22
57:22 58:1 83:11
88:10,13 102:18
148:17 204:11
**responsible** 50:2
51:1 61:3 192:4
**Rest** 166:12
**restart** 43:2

**restaurant** 149:15
150:7
**result** 106:19
107:13 128:20
129:9
**results** 26:5
168:21 173:9,13
**retained** 131:23
131:23
**retire** 98:1 151:1
**retirement** 150:21
153:14
**retroactively**
71:11 80:20
**returned** 202:9
**reveal** 206:20
**revenue** 20:14,21
22:14 54:7,10
64:25 106:25
107:18 129:3,5
136:9 142:22,25
143:2 144:12,14
144:19 146:22
174:17 175:14
175:15 195:22
196:17,20,21
197:2,5,6,13,21
**revenues** 59:12,22
64:9 196:11,13
205:16
**review** 9:23 10:1
11:12,15 48:23
49:6 140:5
**reviewing** 32:12
**reviews** 91:23
**revised** 184:10
**revision** 199:21
**revisions** 199:20
**revolving** 96:10
**right** 6:23 10:13
20:5 22:4 24:13
27:9,21 37:10,18
38:3 39:24 40:20
46:5,23 47:12
48:15 58:4 59:2
62:25 64:18 65:1

Anand Lalaji, M.D.   8/1/2022

239

| | | | | |
|---|---|---|---|---|
| 65:13 66:18,19 | **run** 29:24 36:19 | 191:2,24 203:3 | **sec** 61:24 | 183:1 193:17 |
| 67:15,18,22 | 55:24 | 211:20 | **second** 3:12 30:18 | 199:17 200:24 |
| 76:10 77:11,25 | **running** 53:1 | **says** 42:24 43:7 | 31:9 39:8,16 | 209:19 210:15 |
| 78:18,20,21,21 | **runs** 12:25 | 46:25 47:21 | 40:19,24 41:16 | 210:21 |
| 84:6 85:11 87:9 | **rural** 169:17 | 50:25 55:18 | 42:25 43:6 46:20 | **seeing** 171:6 |
| 89:12 91:13 | | 60:13 70:24 | 48:22 50:24 54:3 | **seen** 26:11 40:13 |
| 95:25 98:15 | **S** | 86:18 94:15 95:7 | 58:9 59:5,19 | 40:19 41:10 |
| 102:21 103:10 | **salaries** 71:2 | 95:20 99:16 | 79:23 108:12 | 109:19 152:14 |
| 106:11,15 | 85:14 86:22 | 109:25 111:2,3,7 | 110:10 125:1 | 170:13,19 |
| 107:21 110:3 | 88:14 | 111:14 112:13 | 175:10 180:18 | 175:20 179:13 |
| 111:2,8 113:3 | **salary** 43:9 144:11 | 113:11,19 114:1 | 183:13 185:25 | 184:23,25 |
| 114:5 115:13 | 146:9,14,25 | 114:1,3,9 115:1 | 186:11,23 | 187:20 194:18 |
| 119:9,12,16 | 186:2 188:11 | 125:2,4,13,18 | 198:24 | **self-report** 75:12 |
| 128:1 131:15,21 | 189:10 191:7,11 | 128:19 140:23 | **secretaries** 75:22 | 83:22 |
| 132:19 134:21 | 191:15 211:15 | 141:22 142:20 | 78:11 154:13 | **self-reporting** |
| 135:8 138:23 | **sale** 51:7,9 197:18 | 143:18 146:6,8 | 201:12 | 202:10 |
| 140:24 141:14 | **sales** 12:22 | 146:11 147:9 | **Secretary** 3:9 | **sell** 133:19 150:12 |
| 142:1 143:14 | **sat** 21:15 | 148:6 149:3 | 37:24 38:13 | **seller's** 186:24 |
| 144:9,23 146:5,7 | **satellite** 26:7 | 152:24 154:4 | **section** 48:2 51:22 | 187:3 |
| 146:15 147:2,24 | **satisfied** 167:15 | 155:19 156:3,5 | 51:23,25 53:17 | **sellers** 184:11 |
| 148:1,8 150:23 | **satisfy** 116:15 | 162:17 164:19 | 53:22 65:15 | 186:1 |
| 157:19 158:5,24 | **save** 150:3 | 166:4 167:11 | 113:10 116:9 | **selling** 151:2 |
| 159:6 160:18 | **saving** 141:24 | 168:15,20 175:6 | 118:18 | **send** 19:10 22:11 |
| 164:4,17 165:2 | 142:14 | 176:22 177:15 | **sections** 110:18,19 | 23:8 26:4 34:6 |
| 167:6,7 168:10 | **saw** 102:8 112:6 | 180:9 181:1,23 | 113:9 116:22 | 71:14 81:16 |
| 170:11 173:25 | **saying** 39:21 | 182:15,18,21 | 118:19 | 151:15 165:6,6,9 |
| 174:3,18,22 | 42:11 57:20 | 183:15 185:5,10 | **security** 73:25 | 177:7 200:16 |
| 175:14 176:7 | 59:25 61:5,18 | 185:24 186:10 | 116:4 | **sending** 34:14,15 |
| 178:12 179:18 | 62:5 64:3 67:12 | 186:12,24 | **see** 20:25 28:20 | 91:19 151:14 |
| 180:2,9 188:4 | 70:11 80:5 86:8 | 188:14,22,23 | 29:7 38:3,17 | 165:4,4,23 |
| 190:6 191:5 | 86:10 87:7,22 | 196:23 198:13 | 39:9,12 46:18 | 167:12,18,21 |
| 198:18,19 203:9 | 89:20 90:16 | 198:25 199:17 | 47:24 53:22,25 | 168:2,5 |
| 213:12 | 96:14 97:5,9,10 | 204:6 213:7,9 | 59:17,18 64:20 | **sense** 80:15 |
| **ringing** 209:10 | 97:17 99:24 | **scale** 182:3 | 67:14 85:20 | 132:21 133:22 |
| **role** 18:15 142:19 | 100:5,19 117:25 | **scan** 25:9,10 | 90:22 91:3 93:23 | 134:2,4 135:18 |
| **room** 26:3 28:4 | 118:5,5 119:15 | 80:22 | 94:11 109:17 | 153:13 171:25 |
| 30:22 145:9 | 120:17,18 121:6 | **scanned** 80:17 | 111:25 112:5,9 | **sent** 9:13 11:13,16 |
| **rotate** 166:13 | 121:16 126:16 | **schedule** 17:2,6 | 115:9 118:17 | 24:4,7 27:2 |
| **rotation** 139:18 | 128:10 129:8 | 145:8 156:22 | 136:20 140:16 | 30:20 34:10 |
| 166:6 | 131:7,17 133:11 | 157:1,7 | 149:2 151:22 | 35:12,15 76:18 |
| **route** 175:19 | 133:18 137:3 | **scheduling** 143:19 | 154:4,22 155:9 | 80:6 93:12,24 |
| **routes** 189:17 | 151:24 155:9 | 143:21 145:22 | 156:2 163:2 | 140:19 165:16 |
| **RS** 167:9,12 | 159:3 166:25 | 192:21 | 170:20,22,22 | 171:4 180:21 |
| **ruined** 126:10,16 | 175:25 176:5 | **school** 6:19 | 171:19 175:5 | 198:10 204:23 |
| **rule** 82:17 | 177:6 184:4,10 | **Schroeder** 21:20 | 176:17 178:19 | **sentence** 94:25 |
| **rules** 1:21 40:4 | 184:18 190:2 | **seal** 215:16 | 180:3 182:15,18 | 97:17 113:19 |

Anand Lalaji, M.D.   8/1/2022

240

| | | | | |
|---|---|---|---|---|
| 115:11 116:20 | 44:9,10,11,16 | 177:20,20,21,22 | sit 145:13,21 | 159:20 |
| 142:6 146:7 | 49:6 50:4 53:25 | 177:23,24 | site 27:21 105:9 | somewhat 177:22 |
| 150:11 | 54:1,1 56:13,20 | sides 141:20 | 142:18 143:16 | soon 136:19 |
| separate 76:23,23 | 58:2,21 59:1 | sign 22:8 24:18 | 145:7,9 156:7,20 | sorry 43:1 45:8 |
| 85:24 106:14 | 113:6 118:3 | 29:1,11 74:2 | 156:24 157:5 | 49:15 50:12 |
| 108:1 125:14,21 | 178:4 196:4 | 75:23 85:4 | 163:12,14 165:9 | 62:16 77:4 92:19 |
| 143:3 145:14 | 204:9 211:9,12 | signatory 205:6 | 189:13 192:21 | 100:14,14 116:5 |
| separately 121:7 | shared 17:11 | signature 77:24 | sites 126:3 | 139:25 149:11 |
| 141:16 | shareholders | 78:8 82:16 | situation 19:4 | 164:3 168:18 |
| separation 106:7 | 110:7,22 111:5 | 109:18 125:6 | 96:12 151:17 | 188:22 196:13 |
| September 66:23 | 111:14 113:5 | signatures 77:1 | Situational | 207:25 |
| 69:2 70:3,23 | 115:6,24 116:18 | 153:25 | 171:15 | sort 18:22 20:14 |
| 71:8 89:3 160:10 | sheet 25:15,16 | signed 72:9 76:7 | six 55:21,25 65:20 | 24:4,24 26:9 |
| series 92:17 210:3 | shift 143:16 166:7 | 85:2 115:18 | 66:9 158:3 159:1 | 28:10 33:12 |
| servers 23:7 | shifts 189:13 | 148:23 169:6 | 178:2 197:7 | 35:24 42:5 43:10 |
| service 12:19 | shirking 181:3 | 199:5 215:13 | 203:17 210:22 | 47:25 55:15 |
| 172:13 173:3 | short 84:13,15 | significant 79:17 | 210:23 | 62:11 75:13 |
| 176:24 177:10 | 174:21 | 106:20 133:2 | six-week 90:25 | 81:24 83:23 |
| 177:13,13 | shortage 169:15 | 181:6 | sixth 112:12 | 99:12 104:5 |
| services 23:12 | shorthand 215:7 | significantly 56:7 | size 198:22 | 107:14 120:16 |
| 68:2 105:13 | should've 82:7 | 68:11 136:21 | Skinner 158:20 | 132:7,8 135:1 |
| 122:1 146:7,12 | show 18:20 20:11 | 146:19 153:17 | slot 138:6 | 144:5 152:20,21 |
| 158:24 159:19 | 38:9 40:22 44:13 | signifying 110:13 | slow 84:2 137:4 | 164:10 171:4,21 |
| servicing 107:12 | 44:14,17 49:20 | signing 74:16,17 | 153:11 | 171:25 179:25 |
| session 174:6 | 50:13 56:19,24 | 75:24 82:24,24 | slower 32:6 | 180:23 189:8 |
| set 25:5,17 30:9 | 57:13,23 64:8 | 201:13 208:6 | small 11:17 54:10 | sorts 133:10 |
| 33:9,13 51:8 | 84:21 88:22 | signs 24:12 | 65:15 | sound 119:9,12 |
| 112:16 147:11 | 104:1 109:15 | similar 9:2 125:14 | smoothly 201:23 | sounds 26:25 |
| 155:14 163:14 | 130:1,2,14 | 125:21 | so-to-speak | source 27:21 |
| 164:7 196:15 | 131:24 140:4 | simple 92:15 | 185:16 | 147:14 |
| 215:15 | 151:4 154:20 | 128:4 | software 134:23 | sources 57:15 |
| sets 26:21 31:1 | 157:14 161:16 | simply 61:17 | 163:12 | SOWARDS 1:13 |
| setting 205:13 | 169:20 170:9 | 147:4 168:9 | sold 144:6 150:20 | 215:2,21 |
| seven 12:17 34:12 | 177:8 181:1 | 192:14 212:12 | sole 110:25 | SPA 110:18 111:1 |
| 34:17 36:23 | 187:11 194:14 | Singh 137:18,20 | solely 157:4 | 111:11 113:9 |
| 92:11 179:6 | 196:3 197:22 | 137:23 138:3,3 | solution 172:16 | 116:22 117:2,21 |
| 203:17 | 210:13 | single 26:5 35:25 | 179:8 181:15,21 | 117:24 195:21 |
| Seventeen 6:12 | showed 19:3,14 | 54:21 60:5 | 183:14 195:8,11 | 195:23 199:5,7 |
| 7:10 | 94:3 148:21 | 149:19 170:6 | 211:25 | 211:4 |
| severally 113:20 | 149:16,18,24 | sir 2:11,16 6:6 | solutions 172:2,3 | spacing 25:20 |
| 114:9 | showing 164:24 | 40:13 41:11,14 | 172:4 173:2 | speak 122:13 |
| sexual 137:24 | shown 40:8 | 48:13 59:19 | solve 96:21 | speaking 63:4,6 |
| SG&A 144:7 | shows 19:12 | 68:13 70:2 89:22 | solvent 148:16 | 63:10 102:25 |
| shaking 65:23 | 212:15,16 | 94:8 100:4 | somebody 18:15 | 122:21 179:20 |
| shape 167:23 | sic 96:1 99:7 | 145:24 174:25 | 171:10 181:25 | specific 37:11,16 |
| share 3:14 43:21 | side 173:25 | 202:21 | someone's 142:16 | 86:5 88:9 89:14 |

Anand Lalaji, M.D.   8/1/2022

241

specifically 10:22
  15:19 20:18 35:3
  49:23 72:17
  86:20 91:6
  102:24 104:10
  113:3 123:4,6,20
  127:22 133:14
  138:11 146:18
  147:19 199:9
  204:5
specifics 119:15
  122:25
specify 22:19
speed 26:7 32:5
  45:5
spell 7:4
spending 30:6
  147:13
spent 10:15
spoke 9:22 155:15
spread 10:17,18
spreadsheet
  173:21 182:23
  183:2,9
spring 98:25
  161:25
stability 65:16
staff 53:6 74:1
  168:24 169:2
stamps 198:7
stand 135:6
standard 198:22
standing 57:17
standpoint 24:9
  29:25 36:14 56:9
  201:4
stapled 40:15
start 23:23 34:11
  45:24 47:4 60:15
  133:20 171:16
  176:22 211:8

89:14,15 91:12
105:5,5 115:14
115:15 122:18
122:25 128:15
201:11

started 17:8,9,10
  17:13 136:20
  157:16 158:25
  160:12
state 1:14 3:9 6:6
  24:2,6 37:12
  81:19,20 83:1
  100:7,21 101:11
  103:18 119:18
  175:13 176:1,12
  215:1,3
State's 37:24
  38:13
State-at-Large
  215:24
stated 51:17 72:7
  86:6 117:6 163:9
  201:12 215:3,4
statement 63:19
  64:13 95:17
  125:8 133:24
  148:14,21
  159:22 165:13
  172:7 187:19
  195:2 200:4
  204:12
statement's 107:3
statements 61:4
  81:21,23 82:2
  121:4,12,21
  122:2,7 126:9
  188:25 190:6,9
states 23:1,3
  28:13,15,16
  31:16 32:17 48:7
  91:21 93:1,8,12
  94:1 169:15
stating 116:24
station 25:6,7,18
  25:19 26:13
stats 164:19,23
status 25:21 73:24
stay 50:7,8 71:1
  98:2 108:13
stayed 97:25
step 26:1,2 69:9

200:16
stepped 55:12
steps 4:7 52:16,22
  75:5 92:11,18
  200:15
stipulation 70:15
  152:20
stipulations
  112:17 114:21
  161:1
stock 42:4 198:15
stop 75:7 136:22
stoppages 52:24
stopped 134:9,10
  195:16
stops 52:23 179:6
straight 102:4
straightforward
  192:13
Strategy 174:5
Stratton 4:19,22
  187:19 188:3
  194:16 212:6
Stratton's 211:14
street 1:16 2:5,20
  167:9
structure 12:2
  13:1,7,12 36:9
  178:3 183:23
  184:11
studies 23:4,22
  24:17,23 25:3
  28:21 34:6,6,10
  35:4,7,13 54:15
  54:16 78:14,16
  91:20 100:7
  101:11 134:12
  146:24 156:1,8
  156:19,21
  157:11,13
  167:18,20
  180:15 185:9
  200:7 201:14
studies/reads
  185:8
study 22:13 23:14

24:7,11,14,25
25:14,24 26:17
26:21 27:1,25
29:5,5,12,22
30:7 54:9 76:3
77:9 93:1 154:7
154:9
stuff 31:12,16
  32:1 43:10 45:21
  50:8 134:23
  148:18 168:8
  169:19 182:2
  183:5 200:21
sub-bullet 175:11
submit 52:14 56:3
submitted 32:9
  83:21,22,24
subsidiary 12:23
  12:25 13:3 42:10
subspecialized
  23:19
subspecialty
  23:16,18
successful 121:20
sue 8:13
sued 7:23 8:9,16
  8:18,20,24 9:1
  37:22
suffered 128:20
  129:9 132:10,12
suggested 165:8
suggestion 18:21
suggests 95:17
suit 8:12 73:11
  74:24 75:10
  78:19 209:8
suite 2:4,10,15,20
  18:24,25
summary 154:25
  189:3
summer 68:3,4,8
sums 88:5 90:9
supervisors 12:18
support 26:7,9
  28:9
supporting 71:23

supports 130:13
  130:16
supposed 44:2
  51:9,20 55:2
  71:1 89:9 133:25
  136:2,3,6 137:21
  181:14 182:7
  189:12 192:6,22
  195:17 201:24
sure 7:18,19 16:2
  16:6 22:22 25:3
  25:4 28:9 29:19
  29:20 30:3 31:12
  36:3 37:14 47:19
  51:10,11,13,19
  53:3,12 54:22
  55:8,19 58:12
  64:24,25 74:8
  75:6,6 77:12,14
  80:23 81:16,17
  82:3 83:8 85:16
  86:6,10 89:6,16
  91:15 92:21,23
  99:9,10 104:8
  110:11 113:18
  115:10 116:11
  119:10 127:2,3
  129:25 140:22
  143:11 148:4
  163:4 165:14
  169:13 174:8,10
  174:13 177:25
  180:15 182:10
  182:24 183:6
  184:8,13 187:15
  194:5 202:19
  205:24 210:9
suretyship 115:21
surprising 162:6
sweep 204:22
swept 204:18,21
switch 36:4 158:4
switched 34:19
switching 134:18
sworn 215:5
system 27:4 29:21

Anand Lalaji, M.D.   8/1/2022

242

31:8,21 33:5,16
33:17,21,22,23
34:3,5,7,18
35:15,19 54:18
69:14 70:1 75:8
75:19,23 76:1
78:1,2 132:20
133:6 152:2,2,3
152:7,16,18
153:4,7,22
154:15 155:15
164:9 167:24
185:6,12 189:22
systems 134:18
167:11

**T**

T 163:14
T-e-j-a-l 7:5
table 96:19
tail 65:25
take 40:16 45:13
47:11 65:14,15
65:17,22 66:6
69:9 71:13 72:11
72:12 77:23
83:25 84:13,14
95:4,14 97:3
116:3 118:21
122:6 138:5
150:15 166:24
167:1 168:23
187:14,15
199:12,13
205:12,19
taken 1:3,13,19
8:14 70:6 84:17
118:15,24
187:17 202:20
205:10 215:7
takes 31:4,7,7,13
31:25 73:22
talk 115:12 129:5
131:5 171:25
189:24 190:1,20
213:18,19

talked 10:21 59:8
88:7 99:21
117:23 133:5
134:20 176:3
209:1 212:15
talking 22:20
33:18 40:1 45:10
53:2 84:20
108:11 117:12
125:20 127:5
134:19 138:14
142:5 143:6,23
144:3 145:23
146:17 159:12
163:23,24 185:2
190:20 208:20
209:2
talks 41:20 59:11
68:15,17 72:21
72:25
target 197:5,6
targeted 173:4
task 141:16
169:18
TAT 166:24
team 23:17 26:9
28:9 96:15 103:7
140:10,17,19
160:22 165:17
165:23 206:12
tech 25:15,15
technologists
137:25
technology 22:11
206:5
Tejal 7:3 16:8,13
16:21 20:5,8
21:12,13
telerad 155:22
156:16
teleradiology 22:8
22:17 35:12
152:10 169:19
177:3
tell 12:1 16:1 34:4
58:19 70:24 73:4

75:24 81:3 83:21
102:22 117:10
126:3 134:3
135:25 136:16
137:16 138:11
159:15 169:23
188:12 190:20
206:19
telling 89:16
159:10 160:17
161:2,8
template 25:8,8
25:11,16,17
31:13 200:15
201:1
templated 92:12
templaters 92:9
templates 25:10
templating 25:7
temporary 55:2
68:18 70:22
ten 8:5 26:5 31:14
42:24 151:23
197:2,3,13,14
term 183:10
terminate 159:19
191:13
terminated 46:7
46:21 100:11,15
104:3 106:6
120:25
termination 46:2
47:23 48:5 49:23
72:22 84:20 94:5
99:13 103:23
terms 19:20 29:10
29:25 43:14,20
43:23 52:8 53:2
68:11 82:11
83:20 107:9
116:3 117:22
118:3,19 120:13
125:5 130:25
144:17 150:3
151:17 161:10
180:22 182:3

202:24 208:7
terrible 137:24
testified 6:3
101:22
testify 48:16
102:19
testifying 11:21
48:17,18 215:13
testimony 101:23
123:22 215:7,10
215:15
text 137:12
thankfully 79:17
Thanks 17:20
theirs 163:5
theirself 39:20
theoretically
136:10
thereabouts 15:15
thing 20:16 21:22
28:22 40:12
66:17 67:22
70:24 77:21
81:25 99:10
145:15 150:21
158:12 159:21
159:24 166:18
169:13 173:16
177:12 189:7
196:25 201:22
202:2 212:24
things 18:17,23
22:2 23:5 31:19
41:23 44:1 53:7
65:8 79:7 87:25
95:10 96:7 97:16
97:20 103:3
108:6,6 115:2
116:24 120:17
120:18 123:13
126:4 150:4
165:8 181:16
182:17 185:18
200:17 202:1,12
203:17 207:14
207:15 210:3

211:23
think 8:17 10:7,23
17:22 36:3 38:5
40:25 44:11
51:16 66:4 67:21
67:22,23 84:23
85:1 94:15 99:9
99:11,21 107:2
109:20 116:7
120:22 124:21
124:23 127:2
129:21 130:17
131:10,21
133:25 140:20
143:8 144:24,25
145:2 158:25
160:1,9 165:14
165:17,21
170:20,25 171:4
172:21 173:20
174:7 178:11,14
178:17,19,22
182:22 184:22
194:3 196:25
199:18,21
202:13 203:9
211:22
thinking 81:6
third 39:15 42:23
53:17 110:24
149:19 152:24
185:10
third- 54:12
Thirty 169:15
thirty-first 94:12
thought 147:6
178:19 183:22
206:25 209:11
thousands 137:9
three 10:16,19
17:6 29:18 30:8
65:19 66:9 67:7
75:12 98:21
102:3 109:19
133:17 137:10
150:10 168:25

Anand Lalaji, M.D.   8/1/2022

243

168:25 173:1
176:17,18,20
**three-hour** 49:3
102:2 124:4
**threw** 178:14
**throw** 178:18
**thrown** 92:21
162:9
**Thursday** 102:1
**till** 131:7 166:15
**time** 8:19,20
10:15 13:10
14:10 18:8 20:10
21:14,19 22:19
30:7 31:8 39:10
45:13 47:24
49:25 53:3 58:7
58:13,17 60:18
61:12 64:17
65:15 67:2,25
71:20 72:6 85:22
86:11 88:1 89:6
89:14,15,17 90:3
90:17 96:17
97:24 98:12
101:15,16
107:23 112:8
116:2,2 120:22
122:15 124:4
126:7 127:7,8
128:10,12,13
130:1,3,5,25
133:7 138:12,12
138:14 141:2
147:13 148:4
149:24 156:23
157:8 160:8
165:14 166:12
172:23 179:19
179:21 204:23
207:20 215:4
**timely** 60:7
113:22 181:11
182:11
**times** 7:17 8:17
9:1 29:24 30:5

55:14 128:16
137:10 192:20
198:18
**timing** 66:2
**title** 16:13 19:5,17
41:10
**to-do** 178:23
**to-heart** 163:20
**today** 49:4 101:22
131:2 164:21
179:14
**today's** 48:24 49:7
101:23
**Todd** 1:15 2:19
**told** 123:12
133:12 134:18
134:20 138:1,4
149:20 150:25
158:2 200:8
**top** 12:3 13:14
23:23 40:17
42:24 60:23 61:1
65:1 66:14
100:23 103:20
109:24 122:19
123:14 124:7
136:12,13,14
140:8 171:16
183:4 185:6
201:21
**topics** 61:2
**tortiously** 125:13
125:21,25
**total** 43:1,3
186:10 197:12
**totality** 49:9 80:9
**totally** 152:9
154:3,3
**touch** 11:10
**traced** 188:23
**track** 170:12
**tracking** 29:14
**Tracy** 154:23
155:11 156:3
**Tracy's** 164:23
**tradition** 162:10

**trained** 32:2
**transaction** 111:1
184:16 206:17
206:19,23 207:4
**transcribe** 77:10
**transcribed** 76:4
78:2 79:10
**transcribing**
76:18
**transcriptionist**
73:20,22 76:23
77:13 78:6 79:5
92:7 93:18 154:9
154:12
**transcriptionists**
92:9
**transcrivener**
77:17,20 79:25
**transfer** 52:9
**transferring**
21:10
**transition** 181:10
206:4 211:8
**trauma** 26:4
**traumas** 28:8
**TRG** 2:7 4:7 6:22
7:9 8:7,9,21,23
9:1 10:10 11:23
11:23 12:2 13:4
13:7 14:1,5 16:7
16:20 18:4 19:15
21:10,23 34:15
34:25 36:10,10
36:12,21 37:3,6
37:18 41:24,25
42:1,8,12 43:10
46:10 47:5 58:13
59:20,21 61:5,15
62:1,22 64:5,8
67:15 68:24
69:17,25 70:4,7
71:22 72:3,10
73:1 74:19 83:5
84:8 86:17 89:3
90:8,9 97:19
103:1,3,9 104:7

104:12,25
106:14 107:3,4
109:3,5 110:3,5
113:6,24 114:4
115:13 118:2
121:4,16,23
122:8,21 131:23
139:10 142:25
154:23 155:12
155:22 160:22
160:23 161:14
165:5,16,24
171:10,23 172:4
172:7 173:2,6
174:12,13
176:22 177:9
178:2 179:13
180:21 181:16
181:21 183:10
186:4,7 187:2
189:1,2,3 190:11
191:25 193:9
195:6 198:14,25
200:1,3,11,24
201:19 202:3
205:25 207:2
211:17,24 212:7
212:9,19,22
213:7,9,23
**TRG's** 8:15 49:12
58:15 62:11
63:21 86:23
87:22 88:2 89:12
97:24 106:18
108:19 126:17
133:2 137:16
138:9 158:5
183:16 190:17
191:10 192:17
192:19 204:19
211:18,21
**TRG-** 24:19 34:1
**TRG-Assist** 24:20
24:24 26:24
32:24 33:1 34:14
34:17,23 91:19

185:6,9,11
**trial** 128:13 131:8
**tried** 96:20 97:15
134:7 136:23
141:8 173:11
**troubling** 148:14
**true** 39:22 44:16
65:23 103:5
121:14,15
150:20 173:12
202:23 204:12
204:14,16
205:15 215:4,9
**trust** 29:13
**trusted** 183:21
**truth** 121:15
**try** 92:13 95:12
97:11 103:12
167:24 184:8
**trying** 14:14 108:5
131:1,13,16
135:11 136:12
154:24 159:15
159:20 167:23
169:21 170:21
173:6,8 192:3
206:20
**Tug** 137:17,18,25
**turn** 39:8 41:15
42:22 68:12
132:23 146:5
173:17 176:13
178:12 179:22
182:13 184:19
186:22 199:16
210:17
**turnaround** 96:17
**turning** 150:3
**Twenty** 210:15
**two** 8:1 16:22
26:21 29:23 31:1
39:16 46:2 62:22
75:9 81:1 84:12
85:24 98:1 99:4
140:9 146:6
150:7 153:13

155:8 158:1
160:3 164:22
176:16 182:22
199:17 207:13
207:15
type 15:12 24:25
26:7 51:13,14
92:4 102:15
144:5 170:19
types 15:8 80:19
typewriting 215:8
typical 54:6
172:23 175:19
typically 8:22
29:4 53:23 66:23
67:5 180:23
typo 41:9 94:16
111:11 125:15
199:18,21,23

**U**

U.S 25:23 26:10
26:15 29:2,15
30:4,13,14,16
31:2,3,6
U.S.-based 37:4
Uh-huh 18:5 19:7
20:17 21:25
28:18 32:11
33:19 35:1 38:25
65:4 82:5 94:9
109:7 121:2
125:10 128:7
134:5 135:13
163:18 168:14
174:19,23 204:3
ultimately 18:22
ultrasound 25:15
unable 160:23
unavoidable
116:16
uncle 162:1,11
uncovered 201:20
underlies 85:23
131:19
underlined

162:18,22
underneath 12:4
12:7,16,17,18
110:8 185:11
186:12
undersigned
215:2
understand 11:20
24:12 34:21 48:5
48:14 77:7 92:22
106:19 116:19
119:7 129:7
143:12 144:16
156:3 159:24
165:17 177:16
179:10 183:17
190:7 204:18
207:13 213:23
understandable
171:22
understanding
4:17 63:25 73:4
82:20 83:3,4,7
90:23 93:4 109:5
110:9,17 171:17
understood 138:6
underwent 199:19
unfortunate 182:8
unfortunately
30:1 137:22
155:24 162:8
177:2 183:21
unified 23:21
United 23:1 28:13
28:15,16 31:16
32:17 91:21
92:25 93:7,12
94:1 169:15
units 173:24 174:1
180:7,10,12
unreasonably
95:3,13 97:2
update 171:15
upload 54:16
ups 97:12
upset 96:15

upshot 106:4
upward 197:12
urgent 22:9
use 24:25 152:25
154:9 185:16
uses 33:18 183:10
usually 8:14 67:8
81:1 83:24 97:13
utilize 34:1,22
35:9
utilized 34:24
35:2
utilizing 34:16

**V**

vaguely 11:4
155:18 161:23
170:21 171:7
184:24 188:10
194:23
valid 74:9 110:19
Valley 137:17,19
137:25
valuation 212:11
value 198:18
199:1,14 202:24
variations 13:9
25:10 31:15
various 43:8
80:13 99:1 110:8
133:9 200:17
211:3
vehemently
150:18
vendors 69:24
70:1,12
verbal 81:23
127:22,25
verbally 122:11
verified 10:6
verifies 79:8
verify 44:15 78:6
verifying 79:10
version 74:3
versus 20:15,21
23:14 66:7

120:17 123:20
189:10,11 191:7
vested 17:1
viability 43:22
vice 158:23
Videoconference
2:13
viewer 27:23,24
viewing 74:18
views 29:22
violated 75:1
88:12 99:18,24
100:2 101:8
102:9
violation 74:11
75:2,2 78:22
94:19,23 95:19
95:21 96:2,5
99:7 100:8
violations 75:11
117:2,4,19 118:1
118:8,11
violative 95:5
Virginia 23:12
virtual 169:18
visibility 172:13
visited 169:7
voice-dictate
26:19 32:3
154:10
volume 24:23 68:9
71:21 105:14
VS 1:7

**W**

W-2s 188:25
wages 86:22
wait 96:12 131:7
waives 115:5,20
want 29:9 32:4
41:22 45:24
49:25 54:4 56:23
57:12 63:7 65:9
83:10 86:20
109:17 134:3
144:14 150:19

153:10,11
159:19,21
164:22 165:19
204:4
wanted 97:25
106:1 111:17
135:24 174:14
wanting 82:13
wants 28:3
warrant 105:15
wasn't 19:18 36:3
71:3 105:22
106:4,5 109:4
117:25 147:4
159:1,1 168:8
207:1 209:21
watch 30:3
water 99:1,10
waterfall 144:6
watermark
176:19
way 2:11,16 18:6
19:18 21:5,7
26:12 40:10 42:7
51:20 53:1 54:19
55:1,20 70:17
75:9 78:4 80:22
87:22 106:15
140:6 149:10,13
155:13 165:8
167:23 191:8
206:13
Wayne 187:19
188:3 194:16
211:14 212:6
ways 106:8 108:1
we'll 28:7 84:15
170:8 202:12
208:13 211:2
213:20
we're 38:5 40:10
55:2 56:24 58:17
62:25 63:2,5
66:15 76:14
80:20 84:5,18
119:2 128:18

Anand Lalaji, M.D.   8/1/2022

245

131:15 142:15
143:23 144:3
145:12 156:24
156:24 159:15
165:5 176:2,9,11
177:5,6 184:14
202:21 210:20
211:22 213:8
**we've** 9:8 83:24
84:3,12 130:22
141:21 165:24
175:20 184:1
**Web** 23:12
**website** 38:14
**Wednesday** 102:1
**week** 47:17 54:21
55:7 102:1
108:10 119:17
155:13,23 156:2
**weekly** 55:7
204:21
**weird** 80:23 153:9
179:5
**welcome** 68:14
**went** 53:9 70:3,4
91:1 92:16 99:3
132:23 138:7
160:1 184:21
193:1
**weren't** 68:2 90:5
107:24 128:1
134:22
**West** 1:16 2:20
**What'd** 103:8
**whatever's** 29:8
42:20
**When's** 122:16
**Where'd** 6:13
**whereof** 215:15
**Whitesburg**
105:19
**Why'd** 151:15
**wife** 6:25 7:8
151:14 155:19
**wife's** 162:7
**willful** 46:12

**William** 2:8,18
18:8,11 19:3
98:6 136:17
205:12
**wire** 204:23
**withdrawn** 69:4
**withheld** 200:4
201:19
**witness** 1:10 45:5
45:18,21 63:10
63:18 77:6
207:25 208:5,12
208:23 209:2,15
209:20,25 210:2
210:9 215:4,10
215:13
**witnesses** 81:18
**woman** 13:24
**wonder** 182:13
**Wood** 2:10,15
**word** 149:2
168:12 182:25
**words** 79:6 83:9
92:20
**work** 14:1,22 15:9
15:9,10 16:24
32:9,13,15 60:2
64:18 66:21,23
67:6 89:3,23
90:2,6 91:2 92:2
92:5 97:13
107:16,21 108:5
132:19 133:4
141:1,10,23
142:12 144:9
155:10,13,22
163:21 168:20
174:14 177:9,15
186:16 192:15
213:3,6
**worked** 32:20
77:17 103:1,1
184:1 189:1
**workflow** 12:19
23:16
**working** 3:23

81:20 90:20,23
90:24 91:3 133:6
133:20 141:1
152:8 164:25
165:13,19 166:3
166:12 172:8
173:2 201:22
**works** 8:22 14:3
42:7
**workstation**
163:13 167:9
**world** 37:23
**would've** 44:4
51:12 66:22
71:19,19,24 72:1
102:14 119:11
136:10 139:23
149:23 151:20
186:17 195:7
198:9,10
**wouldn't** 67:13
75:18 81:7,8
102:13,14
**wound** 126:5
**write** 186:20
**writing** 122:9
**written** 46:8
146:10 190:7
**wrong** 61:19 81:6
182:2 184:21
**wrote** 186:20
190:14

**X**

**Y**

**yeah** 8:14,22
10:11 11:5 15:11
17:14 20:6,11
21:17 27:6,13,22
29:17 30:24 31:4
35:10 36:17
38:12,22,22 39:2
39:17,25 42:15
42:19 43:16
45:18 47:16

48:25,25 49:8
56:14,16 57:21
59:9 60:8 64:3
65:14 66:25 69:7
72:20 73:9 76:6
77:12 78:1,18
79:22 82:3,3
84:14 90:22 97:2
97:20,21,25 99:3
100:20 102:3,5
106:11,24
108:23,25
110:17 111:17
112:8,25 113:25
115:14 121:11
121:11,17
124:11 125:11
130:21 131:13
131:14 135:9
138:16 139:5,12
140:20 143:21
143:24 144:21
145:2 146:15,15
148:2 155:5
156:10 157:12
158:9,25 159:15
162:6,9 166:18
168:20 170:7,19
170:20,23 171:3
172:5 173:8,9,14
174:13 176:16
176:20,20
178:20 179:3,24
180:16 182:19
183:19 184:22
186:17 188:21
188:22 195:21
197:19 198:20
201:4 202:18
203:5,14,17
204:21 208:12
210:16,24 212:9
212:21
**year** 9:11 14:6,9
14:20 17:9,13
20:9 36:6 65:20

67:10 83:25 84:1
89:15 91:15
101:18 104:19
104:21 119:12
128:16 141:3,7
159:6,7 196:9
**years** 6:12 7:10
8:5 9:9 13:8
21:6 30:11 34:13
34:17 55:25 98:1
138:5 152:6
153:6 162:7
164:11 173:14
**yield** 173:9,10,11
**York** 6:14,14,15
6:18,21 8:3
**you-all** 110:16
**young** 137:25

**Z**

**zero** 193:13
195:25,25 196:1
212:13 213:23

**0**

**1**

**1** 1:17 3:2 40:7,8
59:7 86:13
107:20
**1,500** 143:14,20
143:25
**1,586,000** 43:1
**1,586,599.60** 43:3
**1.3(a)** 196:7
**1.6** 87:10 193:8
212:17
**10** 3:13 44:14,25
56:17 196:4
**10/28/21** 3:17
**10:25** 162:13
**100** 16:22
**109** 3:18
**11** 3:15 84:22 85:7
99:14 215:14
**12** 3:18 66:9 94:11

Anand Lalaji, M.D.   8/1/2022

246

109:9,13,16
118:22 139:3
159:18 169:5
196:18 197:4
211:2,6,10
**12-month** 65:17
196:11,13,20
**12/2/21** 4:20
**120** 67:9
**13** 3:21 140:5,14
**13,500** 193:12
**14** 4:1 151:5,9
163:7,8
**14,000** 185:9
**140** 3:21
**15** 4:3 26:5 41:21
139:3 154:21
155:3 157:16
**1500** 142:21 143:1
143:16 144:3,8
144:13,23 145:4
145:8,11 146:12
146:19,23
186:14 192:17
**151** 4:1
**155** 4:3
**157** 4:6
**16** 4:6 41:21
157:15,22
200:15 204:6
**161** 4:8,11
**169** 4:14
**17** 4:8 9:8 13:8
160:14 161:6
**170** 4:16
**18** 4:11 151:14
161:17,21
162:13
**180** 67:5,9
**187** 4:18
**19** 4:14 43:7 59:8
129:4 169:21
170:2
**190** 180:4
**194** 4:21
**198** 4:23

**19th** 129:14
**1st** 104:21

**2**

**2** 3:3 45:4 46:4
47:4,5,21 48:23
49:19,22 50:8,14
57:22 146:4
187:19 212:7
**2,000** 55:5
**2,600,000** 60:14
60:17 61:6
**2.2** 113:11 114:8
174:24 175:1,18
175:23,24
**2.4** 114:15
**2.6** 62:2,7,12 64:6
64:9 65:13 66:13
67:14,17
**2/22/22** 4:22
**20** 4:16 26:5 28:7
59:11,15,16,20
61:7 62:3,13
63:22 64:6 68:8
93:24 102:6,7
138:15 161:25
170:9,17 210:14
210:15
**20041D115**
215:23
**201** 2:5
**2019** 34:19 68:4
**2020** 22:20 60:14
66:18,22,24
67:24 68:4,7
121:1 122:17
158:2 180:10
199:16 204:25
205:10
**2021** 17:10 22:20
60:15 69:2 70:4
71:8 72:23 89:2
89:4 93:24 98:25
100:16 103:17
121:3 127:10
140:10 157:16

159:7 160:16
161:25 180:3
187:20
**2022** 1:17 71:7,8
181:22 194:17
215:17
**2023** 215:14
**203** 3:4,5 5:1
**20th** 127:9 215:16
**21** 4:18 14:17,21
17:15,23,24
60:12 61:7,11,23
62:3,13 63:23
64:2,4,7 97:22
122:17 147:17
161:18 187:12
187:18,23
189:25 192:14
212:8
**21-CI-00221** 1:2
**210** 3:5,5
**214** 3:5
**215** 3:6
**21st** 129:17
**22** 4:21 17:17,22
17:25 22:20
68:15 194:15,16
194:21
**23** 4:23 68:14,17
197:23 198:4
**24** 5:1 203:19,23
**2452** 2:11,16
**25** 154:17 160:16
**250** 1:16 2:20
**27** 90:21
**28** 72:18,21,25
90:21 103:17
204:6
**2800** 2:20
**28th** 90:17 100:13
100:16 101:1
**29** 72:18 86:13
87:6
**2nd** 171:19,24
178:17 179:18
180:21 184:3

185:3 186:21
198:9 210:6
211:15 212:2

**3**

**3** 3:3,4 70:20,22
**3/14/22** 3:12
**3/31/20** 4:25
**3:00** 187:16
**30** 86:13 154:17
154:17
**30-** 67:4
**30-page** 45:12
**300** 2:10,15
**31** 86:13 199:15
**32** 86:14 87:6
**3200** 142:22 143:2
144:14 146:22
**33** 175:10,12,17
175:22,23 176:4
**33,000** 55:4
**35** 165:25
**35,000** 55:3
**38** 3:8

**4**

**4** 140:10
**4,394,504** 195:3
**4.69** 187:4
**4/27-28/21** 4:5
**40507** 2:5,21
**40509** 2:11,16
**41** 3:11
**44** 3:13
**45** 53:9 142:25
**45,000** 211:3,12
**450,000** 175:13
176:2,10,12

**5**

**5** 3:4
**5.845** 198:16
**5/18** 4:2
**5/18-21/21** 4:13
**50** 16:23,23 28:7
53:9,13 55:16

134:13 146:14
160:2 197:9,9
211:8,12
**55** 144:19 145:10
145:14,17 146:1
146:9,25 186:13
**57** 180:11
**5th** 156:1

**6**

**6** 3:4
**6/1** 166:16
**6/4-5/21** 3:23
**60** 71:21 108:14
**600** 186:11,25
**600,000** 176:11
**613817** 215:25
**650,000** 175:12,24

**7**

**7** 38:6
**7/1/2021** 168:17
**7/21/21** 174:6
**7:16** 162:16
**70** 152:11 205:16
**700,000** 176:10
**75** 73:15

**8**

**8** 3:8 38:10,20
199:17
**8/16/21** 4:7
**8/17/20** 3:14,19
**8/25/21** 4:10
**8/31/21** 160:20,21
160:25
**80** 73:15
**85** 3:15
**8th** 199:22
**8X** 147:25 198:17
198:20,20
202:23

**9**

**9** 3:11 41:6,13,13
41:15 42:23 70:3

Anand Lalaji, M.D.   8/1/2022

247

70:23 94:8
**9:00** 1:18
**90** 181:7
**90-** 106:24
**90-day** 67:4
**900** 2:4
**941** 171:14,15
  173:18
**942** 173:20 174:5
  176:14 180:8,9
  182:14,15,16
  210:17 211:21
**943** 178:13 179:22
  180:3
**944** 180:17,18
**945** 182:20,21
  183:13
**946** 184:19
**947** 186:23,23
**95-1/2** 16:25
**965** 170:6
**99** 54:10 138:12

# EXHIBIT 7

**Robert E. Maclin, III**

| | |
|---|---|
| **From:** | Aaron Hostettler <aaron@hmrkylaw.com> |
| **Sent:** | Wednesday, May 10, 2023 3:00 PM |
| **To:** | Luke Morgan; Robert E. Maclin, III |
| **Cc:** | Jay Milby Ridings |
| **Subject:** | Patel v. Gram Resources |
| **Attachments:** | 20230510135217.pdf |

Attached please find defendants' answers/responses to plaintiffs' fourth Interrogatories and Requests for documents

Thank you,

*R. Aaron Hostettler, Esq.*
Hamm, Milby & Ridings, PLLC
120 N. Main St.
London, KY 40741
(606) 864-4126
(606) 224-0329 (mobile)
(606) 878-8144 (fax)
aaron@hmrkylaw.com

COMMONWEALTH OF KENTUCKY
33rd JUDICIAL DISTRICT
PERRY CIRCUIT COURT
CIVIL ACTION NO. 21-CI-00221
*SPECIAL JUDGE HON. KIMBERLY CHILDERS*

ASHOKKUMAR R. PATEL, M.D.
and MAHENDER PAMPATI, M.D.                                    PLAINTIFFS

VS.

GRAM RESOURCES, INC.;
HAZARD RADIOLOGY ASSOCIATES, INC.;
ANAND LALAJI, M.D.; TRG HOLDINGS G & H, LLC;
THE RADIOLOGY GROUP, LLC and WILLIAM CRENSHAW          DEFENDANTS

## DEFENDANTS' ANSWERS AND RESPONSES TO PLAINTIFFS' FOURTH INTERRGATORIES and REQUESTS FOR DOCUMENTS
*** *** ***

Come now the defendants, Gram Resources, Inc; Hazard Radiology Associates, Inc.;

Anand Lalaji, M.D.; TRG Holdings G & H, LLC; and The Radiology Group, LLC (collectively

"the defendants"), by and through counsel, and for their Answers and Responses to the plaintiffs'

fourth Interrogatories and Requests for Production of Documents, herewith answer and respond

as follows:

## ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:**          Please identify any Medicare and Medicaid or

Centers for Medicare and Medicaid ("CMS") investigation, state or federal, of, concerning, or

related in any fashion to Defendants and/or Defendants' respective medical practices. This is

with respect to which Defendants were a subject from January 1, 2000, to the present.

Page 1 of 6

**ANSWER:**   The defendants object to the scope of Interrogatory No. 1 inasmuch as the same calls for the defendants to provide information spanning more than twenty-three (23) years. Defendants respectfully submit that the scope of Interrogatory No. 1 is therefore overly broad and unduly burdensome. Without waiving the objection and insisting upon same, the defendants state that they have not been the subject of any Medicare or Medicaid or Centers for Medicare and Medicaid ("CMS") investigation to their knowledge other than the matter which is a subject of defendants' Counterclaim against the plaintiffs relating to the plaintiffs' repeated failures to sign and authenticate their reads submitted to CMS with respect to Mountain Comprehensive Healthcare. In addition, in or near August 2019 the defendants' third party billing service Accel Billing Services, a Georgia entity, upon information and belief, was the subject of a Medicare / Medicaid / CMS investigation relating to its billing practices which was, to the defendants' understanding, resolved and which did not directly involve these defendants.

**INTERROGATORY NO. 2:**   State whether any Defendants have ever been investigated by Medicare or Medicaid or CMS, state or federal, with respect to any of Defendants' billing practices or any such practices of Defendants' medical practices.

**ANSWER:**   See answer to Interrogatory No. 1 above along with same objections.

**INTERROGATORY NO. 3:**   State whether Defendants have ever been investigated by Medicare or Medicaid or CMS, state or federal, with respect to any certifications or any diagnostic reads or interpretations or studies by Defendants.

**ANSWER:**   See answer to Interrogatory No. 1 above along with same objections.

**INTERROGATORY NO. 4:**   State whether Defendants have ever reported or disclosed any certification practice, any billing practice, or any other matter to Medicare or Medicaid or CMS or any of their affiliated agencies with respect to any Medicare or Medicaid

matters, state or federal, including but not limited to certifications of any diagnostic reads or

studies or any billing practices or other submissions to CMS, Medicare, or Medicaid.

**ANSWER:**   Defendants object to Interrogatory No. 4 on the grounds that same is

overly broad and unduly burdensome and unlimited as to scope and duration.  Without waiving

the objection and insisting upon same, upon learning that the plaintiffs had certified radiology

reads to Medicare, Medicaid, and CMS without signing and authenticating those reads in

violation of established Medicare, Medicaid and CMS guidelines, the defendants self-reported

the matter to the Medicare, Medicaid, and CMS.

**INTERROGATORY NO. 5:**   State whether the Defendants have ever been

reprimanded by Medicare or Medicaid or CMS or any or state or federal agency with respect to

any aspect of plaintiffs' medical practices including but not limited to certifications of reads of

diagnostic studies or images of any billing practices.

**ANSWER:**   No.


**RESPONSE TO REQUESTS FOR PRODUCTION OF DOCUMENTS**

**REQUEST NO. 1:**  Produce all documents in your possession, custody, or control

relating to any investigation of Defendants by Medicare, Medicaid, CMS, or the Department of

Health and Human Services ("HHS") or any other state or federal agency relating to any aspect

of the plaintiffs' medical practices.

**RESPONSE:**   Defendants object to Request No. 1 as overly broad and unduly

burdensome and not reasonably limited in scope and duration.  Without waiving the objection

and insisting upon same, plaintiffs are referred to the attached correspondence from Medicare,

Medicaid and CMS relating to the defendants' self-reporting of the practices of Dr. Patel and Dr.

Pampati in certifying radiology reads to Medicare, Medicaid, and CMS for payment without signing and authenticating the certifications and allowing secretaries or assistants to sign the plaintiffs' signatures with respect to submissions to Medicare, Medicaid, and/or CMS for payment for reading of radiology services in violation of established Medicare / Medicaid / CMS guidelines and procedures.

**REQUEST NO. 2:**  Produce any and all reprimands ever issued by Medicare, Medicaid, CMS, or HHS or any other state or federal agency in any way relating to Defendants' medical practices.

**RESPONSE:**  Subject to same objections raised in response to Request No. 1 above, None.

**REQUEST NO. 3:**  Produce all records relating to any reporting by Defendants relative to any aspect of the plaintiffs' medical practices including but not limited to their certification of reads or diagnostic studies or any billing practices.

**RESPONSE:**  Subject to same objections raised in response to Request No. 1 above, see attached records produced with these responses.

**REQUEST NO. 4:**  Produce any and all documents relating to any investigation conducted by Medicare or Medicaid, state or federal, or CMS or HHS or any other state or federal agency relating to any aspect of Defendants' medical practices.

**RESPONSE:**  Subject to same objections raised in response to Request No. 1 above, See attached.

**REQUEST NO. 5:**  Produce each and every document evidencing or referring to a communication between and among the Defendants, joint or severally, their respective agents and employees, and any government agency or instrumentality, public or private insurance

Page **4** of **6**

company and/or healthcare facility (including but not limited to Appalachian Regional

Healthcare Inc., and Mountain Comprehensive Care Center) for which, a subject matter, is a

concern, issue, reference, report, claim and/or assertion by Defendants, jointly or severally, that

Plaintiffs, jointly or severally, have violated and/or acted contrary to any rule, regulation, policy,

procedure and/or law that may be applicable to Plaintiffs' joint or several actions in providing

healthcare services and/or seeking remuneration for healthcare services provided by Gram

Resources and/or Hazard Radiology.

  **RESPONSE:** Subject to same objections raised in response to Request No. 1 above, see

attached.

**VERIFICATION**

  Comes now Dr. Anand Lalaji, M.D. and herewith states that he has reviewed the

foregoing Answers to Interrogatories and that same are true and correct as he verily believes.

            _____

            ANAND LALAJI, M.D

STATE OF GEORGIA
COUNTY OF ___Fulton___

  SUBSCRIBED, SWORN TO, AND ACKNOWLEDGED before me by Anand Lalaji,
M.D., this the __10__ day of __May__ , 2023.

            _____
            NOTARY PUBLIC SIGNATURE
            __Kimberly Mellons__
            NOTARY PUBLIC PRINTED NAME
            My Commission Expires ___July 28, 2026___
            My Notary ID: _____

Page 5 of 6

Respectfully submitted,

HAMM, MILBY & RIDINGS, PLLC
120 NORTH MAIN STREET
LONDON, KY 40741
EMAIL: aaron@hmrkylaw.com
PHONE: 606-864-4126
FAX: 606-878-8144
*Counsel for defendants, Gram Resources, Inc;*
*Hazard Radiology Associates, Inc.; Anand Lalaji,*
*M.D.; TRG Holdings G & H, LLC; and*
*The Radiology Group, LLC*

BY: /s/ R. Aaron Hostettler
    HON. R. AARON HOSTETTLER
    HON. JAMES MILBY RIDINGS
    HON. KELSEY LEE BRYANT

CERTIFICATE OF SERVICE:

I do hereby certify that a true and correct copy of the foregoing Answers to Interrogatories and Response to Requests for Production of Documents was placed in the regular U.S. mail, postage prepaid, and addressed to the following:

COPIES TO:

Hon. Robert E. Maclin III
Hon. Lisa English Hinkle
Hon. Luke Morgan
McBrayer, PLLC
201 East Main Street, Suite 900
Lexington, KY 40507

Hon. Barry Hunter
Frost Brown Todd, LLC
250 W. Main Street, Suite 2800
Lexington, KY 40507

This the _10th_ day of May 2023.

OF COUNSEL FOR ABOVE DEFENDANTS

Page 6 of 6

**Aaron Hostettler**

| | |
|---|---|
| **From:** | Aaron Hostettler |
| **Sent:** | Wednesday, May 10, 2023 2:55 PM |
| **To:** | Aaron Hostettler |
| **Subject:** | FW: HHS OIG Self-Disclosure: Ashokkumar Patel |

**From:** Hilton, Jennifer L (OIG/OCIG) <Jennifer.Hilton@oig.hhs.gov>
**Sent:** Friday, March 18, 2022 12:35 PM
**To:** Chloe Dallaire <cdallaire@theradiologygroup.org>
**Subject:** HHS OIG Self-Disclosure: Ashokkumar Patel

I am writing to inform you that your submission to the Office of Inspector General (OIG) Self-Disclosure Protocol (Protocol) made on behalf of the above entity has not been accepted. By declining to accept this submission into the Protocol, the OIG is not expressing an opinion regarding the conduct disclosed or your legal position.

Jennifer Hilton
Paralegal Specialist
U.S. Department of Health & Human Services
Office of Counsel to the Inspector General

COMPANY CONFIDENTIAL This email message including any attachments, may contain confidential and/or privileged information and is intended solely for the use of the intended recipient(s). Any unauthorized review, use, disclosure, distribution or copying is prohibited. If you are not the intended recipient, kindly contact the sender by replying to this email and destroy and delete all copies of this message. Any distribution, dissemination or other use of the contents of this message by anyone other than the intended recipient is strictly prohibited.
COMPANY CONFIDENTIAL This email message including any attachments, may contain confidential and/or privileged information and is intended solely for the use of the intended recipient(s). Any unauthorized review, use, disclosure, distribution or copying is prohibited. If you are not the intended recipient, kindly contact the sender by replying to this email and destroy and delete all copies of this message. Any distribution, dissemination or other use of the contents of this message by anyone other than the intended recipient is strictly prohibited.

# EXHIBIT 8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| ASHOKKUMAR R. PATEL, M.D., *et al*, | ) | |
| | ) | |
| | ) | No. 6:21-CV-141-REW-HAI |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| GRAM RESOURCES, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | | |

\*\*\* \*\*\* \*\*\* \*\*\*

On July 26, 2021 Plaintiffs Ashokkumar R. Patel, M.D., and Mahender Pampati, M.D., (Plaintiffs) filed suit in Perry County Circuit Court, raising wage and other claims stemming from an alleged breach of employment agreements between Patel, Pampati, and Defendants Gram Resources, Inc. (Gram) and Hazard Radiology, Inc. (Hazard). DE 1-3 at 2. In addition to Gram and Hazard, the complaint also named as defendants Anand Lalaji, M.D., (Dr. Lalaji); TRG Holdings G & H, LLC, (TRG); The Radiology Group, LLC (Radiology Group); and William Crenshaw (Crenshaw) (collectively, Defendants). *Id.* at 1-2. Defendants timely filed to remove pursuant to 28 U.S.C. § 1446(b) on a theory of § 1332 diversity jurisdiction. DE 1 at 5 ¶ 18. Plaintiffs then moved to remand, describing Defendants' attempted removal as a procedurally deficient and meritless effort to frustrate a restraining order issued (or at least announced) in Perry Circuit Court on August 13, 2021. DE 6 at 5-6.

The Court immediately had concerns about its jurisdiction. Because the citizenship of the parties would be determinative, the Court directed Defendants to show cause for why the matter should not be remanded and to respond to DE 6. DE 7. They complied, and Plaintiffs replied. *See* DE 9; DE 13. Defendants (including those subject to a fraudulent joinder argument) also answered

1

and asserted counterclaims.   DE 11.   The question of jurisdiction is therefore ripe for review.

Defendants, seeking removal, face the burden of establishing federal jurisdiction. *Coyne v. Am.*

*Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999).   They plainly fail in the showing, and the Court

**REMANDS** for inarguable lack of subject matter jurisdiction.

**I.      Analysis**

*Defendants' Citizenship*

Because Plaintiffs' Kentucky citizenship is not in dispute,[1] the presence of a single, validly

joined Kentucky citizen would spoil the requisite complete diversity and foreclose this Court's

jurisdiction.[2] § 1332. Here, Plaintiffs allege that Gram Resources, Hazard Radiology, and Dr.

Lalaji are all Kentucky citizens. DE 6 at 8, 9. Defendants directly dispute Dr. Lalaji's Kentucky

citizenship. DE 9 at 5-6. But on the question of Gram and Hazard's citizenship, they equivocate in

an apparent but unsuccessful effort to avoid the central question of Gram and Hazard's state of

incorporation.

The answer to that question, as Plaintiffs note and Defendants implicitly (perhaps

explicitly[3]) concede, is that Gram and Hazard are incorporated in Kentucky. *See* DE 6 at 8; DE 9

at 6-7. And "[t]he federal diversity jurisdiction statute provides that 'a corporation shall be deemed

to be a citizen of any State by which it has been incorporated *and of the State where it has its*

*principal place of business*[.]'" *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1185 (2010) (quoting 28

---

[1] *See* DE 1 at 5 ¶ 19; DE 6 at 8; DE 20-3 at ¶¶ 2,3.

[2] Complete diversity is foundational. *See Lincoln Prop. Co. v. Roche*, 126 S. Ct. 606, 609 (2005); *Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C.*, 176 F.3d 904, 907 (6th Cir. 1999). Here, the Court focuses on the citizenship analysis. The conclusion, indeed, the construct of a removed case involving forum plaintiffs, eliminates the need to assess the forum defendant rule.

[3] Defendants adopt positions that are, at times, irreconcilable. In the briefing, they try to claim that Gram and Hazard are not Kentucky citizens. In the pleadings, they aver that both currently ARE Kentucky corporations. DE 11 ¶ 3. The governing contracts say the same.

U.S.C. § 1332(c)(1)) (emphasis in original, version at time). This means that "[a] corporation has dual citizenship: it is a citizen of its state of incorporation and the state where its principal place of business is located." *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 222–23 (4th Cir. 2019).

Defendants, in an audacious attempt to shoulder into federal court, contort the English language, and ignore decades of established caselaw, suggest that *Hertz* means the Court should assess a corporation's principal place of business and then query whether diversity exists relative only to that location; this basically would ignore the second leg of dual citizenship. Again, as is well-recognized in this Circuit and across the land, "[a] corporation is a citizen of *both* the state in which it is incorporated *and* the state in which the corporation's principal place of business is located." *Beanstalk Innovation, Inc. v. SRG Tech., LLC*, 823 F. App'x 404, 408 (6th Cir. 2020) (emphasis added); *Hertz*, 130 S. Ct. at 1185. Because there are two, independent bases of corporate citizenship (location of incorporation and principal place of business), and due to the complete diversity predicate, the Court directed Defendants to address "the claimed *Hertz* theory as to both prongs of corporate citizenship[.]" DE 7.

Defendants failed to comply with that clear directive. They instead strain to shift the focus to the citizenship of Gram and Hazard's alleged LLC parent or parents. DE 9 at 6. But "a corporate subsidiary's citizenship is distinct from a corporate parent's citizenship[.]" *Pegasus Indus., Inc. v. Martinrea Heavy Stampings, Inc.*, No. 3:16-CV-00024-GFVT, 2016 WL 3043143, at *3 (E.D. Ky. May 27, 2016) (citing *Schwartz v. Elec. Data Sys., Inc.*, 913 F.2d 279, 283 (6th Cir. 1990)). "When formal separation is maintained between a corporate parent and its corporate subsidiary, federal court jurisdiction over the subsidiary is determined by that corporation's citizenship, not the citizenship of the parent." *Schwartz*, 913 F.2d at 283 (noting that "[s]o far as we can determine,

3

every court of appeals that has considered the question has reached this conclusion"); *see also U.S.I. Properties Corp. v. M.D. Const. Co.*, 860 F.2d 1, 7 (1st Cir. 1988). Defendants make no legal argument and offer no proof to suggest the Court should look past the citizenship of Gram and Hazard.

Against that backdrop, and mindful that Defendants face the burden to justify removal, the Court rejects Defendants' theory of citizenship. Defendants do not dispute that Gram and Hazard are incorporated in Kentucky. *See* DE 6 at 8; DE 9 at 6-7. Per the documents tendered by Plaintiffs, each entity filed annual reports in the Commonwealth as recently as June of 2021.  DE 6-5. Further, Defendants describe each as Kentucky incorporated in DE 11 ¶ 3 (counterclaim). Corporations are citizens of the state where they are incorporated. *See Hertz*, 130 S. Ct. at 1185; § 1332(c)(1).  The entities here may or may not also be Georgia citizens, based on *Hertz* analysis. If so, that would merely add a second state of citizenship, not supplant Kentucky as a citizenship locus for each.  With Plaintiffs as Kentucky citizens and at least two Defendants as Kentucky citizens, the facial jurisdictional defect is evident.

*Fraudulent Joinder*

Because, then, this action's only path to federal court is through diversity jurisdiction, and Gram and Hazard are Kentucky citizens and non-diverse, Defendants can preserve the case only by showing that Plaintiffs fraudulently joined Gram and Hazard  to this dispute. *Jerome-Duncan,* , 176 F.3d at 907. The burden is a heavy one. *Kent State Univ. Bd. of Trs. v. Lexington Ins. Co*, 512 F. App'x 485, 489–90 (6th Cir. 2013). A non-diverse defendant's joinder is fraudulent only if it is "clear that there can be no recovery [against that defendant] under the law of the state on the cause alleged or on the facts in view of the law." *Alexander v. Elec. Data Sys. Corp.*, 13 F.3d 940, 949 (6th Cir. 1994) (internal quotation omitted). In other words, the removing party must show

4

that there is no "colorable basis for predicting that a plaintiff may recover against [that defendant.]" *Coyne*, 183 F.3d at 493. "If the plaintiff has even a 'glimmer of hope,' then any charge of fraudulent joinder fails and the Court must remand the case to state court for want of subject-matter jurisdiction." *Christensen v. ATS, Inc.*, 24 F. Supp. 3d 610, 613 (E.D. Ky. 2014) (internal citation omitted); *see also Hartley v. CSX Transp.*, 187 F.3d 422, 426 (4th Cir. 1999) ("Once the court identifies this glimmer of hope for the plaintiff, the jurisdictional inquiry ends.").

"[T]he plaintiff's actual motive is irrelevant to the fraudulent-joinder inquiry[.]" *Freitas v. McKesson Corp. (In re Darvocet, Darvon & Propoxyphene Prod. Liab. Litig.)*, 889 F. Supp. 2d 931, 936–37 (E.D. Ky. 2012) (citing *Jerome-Duncan*, 176 F.3d at 907). Because of the significant resources wasted by a dispute's improper admission into federal court, and this case is a worthy exemplar, federal jurisdiction should be "strictly construed" with "all doubts resolved in favor of remand" when evaluating removal. *Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 550 (6th Cir. 2006). "[A]ny doubts regarding federal jurisdiction should be construed in favor of remanding the case to state court." *Gaither v. Beam Partners, LLC*, No. 3:16-CV-094-GFVT, 2017 WL 1217166, at *2 (E.D. Ky. Mar. 31, 2017).

In assessing whether joinder was fraudulent, the Court employs "a test similar to, but more lenient than, the analysis applicable to a Rule 12(b)(6) motion to dismiss." *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 433 (6th Cir. 2012). As with a 12(b)(6) motion, the Court "must resolve 'all disputed questions of fact and ambiguities in the controlling . . . state law in favor of the non[-]removing party.'" *Coyne*, 183 F.3d at 493 (quoting *Alexander*, 13 F.3d at 949). "Courts ordinarily do not consider matters outside the pleadings on a motion to dismiss[.]" *Dunnigan v. Fed. Home Loan Mortg. Corp.*, 184 F. Supp. 3d 726, 734 (D. Minn. 2016) (citing Fed. R. Civ. P.

12(d)).[4] However, in evaluating fraudulent joinder, the Court can pierce the pleadings and consider the sort of evidence it would at summary judgment solely "for the limited purpose of determining whether there are 'undisputed facts that negate the [plaintiff's] claim.'" *Casias*, 694 F.3d at 433 (quoting *Walker v. Phillip Morris USA, Inc.*, 443 F. App'x 946, 952-54 (6th Cir. 2011)).

Here, Defendants cryptically argue fraudulent joinder, contending Plaintiffs have no colorable claim against Gram or Hazard because, relative to the cited causes of action in the complaint, neither "has the ability to perform such actions against Plaintiffs per the Declaration of Defendants." DE 9 at 4 (citing DE 9-1). Defendants do not explain what they mean, and the declaration cited hardly carries self-evident force. Dr. Lalaji alleges certain things, relative to "The Radiology Group," but does not even mention Gram or Hazard. The declaration, not sworn or offered under § 1746, is a legal and factual nullity.

What the Court sees in the pleadings is this:

Plaintiffs allege that they are employees of Gram and Hazard. Plaintiffs tender written August 17, 2020 employment agreements validating the characterization. DE 1-3, Exhibits 1 and 2. In the Complaint, each Plaintiff alleges that the employing entities, to include Gram and Hazard,[5] a) failed to pay statutory wages due, in violation of KRS Chapter 337 and b) breached the employment agreements. While Defendants home in on the included account-sweeping sub-dispute, the lead theories in the case stand essentially unaddressed. An employee claiming owed wages and contract benefits surely must (or at minimum, may) include the responsible entity(ies)

---

[4] "Matters outside the pleadings include 'any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings.'" *Dunnigan*, 184 F. Supp. 3d at 734 (quoting *Gibb v. Scott*, 958 F.2d 814, 816 (8th Cir.1992)).

[5] Defendants agree that Gram and Hazard, among others, "entered into respective Employment agreements with Plaintiffs." DE 11 ¶ 20 (counterclaim).

in the suit.  Each employment agreement is for a five year term, commencing August of 2020, between the respective Plaintiff and the Gram and Hazard entities.  "The Radiology Group" is not a listed employer. Plaintiffs detail the bases for the wage and contract claims.  The plausibly pleaded counts naming Gram and Hazard easily survive the low bar of fraudulent joinder scrutiny.[6]

Defendants, tasked with a heavy burden to show fraudulent joinder, offer only a generalized recitation of the standard followed by several vague and conclusory statements devoid of supportive authority or real analysis. The effort is sharply out of sync with the burden.  Here, the thin and under-supported theory of fraudulent joinder will not keep the case in federal court.

*Motion for Attorney Fees*

Plaintiffs also move for attorney fees pursuant to 28 U.S.C. § 1447(c), which allows for the Court to award "just costs and any actual expenses, including attorney fees" incurred as a result of removal. "[F]ee awards are inappropriate unless 'the removing party lacked an objectively reasonable basis for seeking removal.'" *Powers v. Cottrell, Inc.*, 728 F.3d 509, 515 (6th Cir. 2013) (quoting *Martin v. Franklin Capital Corp.* 546 U.S. 132, 139 (2005)). They are the exception, not the norm. *Paul v. Kaiser Found. Health Plan*, 701 F.3d 514, 523 (6th Cir. 2012). Thus, absent "unusual circumstances" a court should not award fees. *Powers*, 728 F.3d at 515 (internal citation omitted).

---

[6] Even Defendants reference Plaintiffs "respective Employment Agreements" in justifying the swept local accounts. DE 9, at 8.  Amazingly, Defendants claim fraudulent joinder—that Gram and Hazard have no colorable place in this case—and then assert counterclaims BY GRAM and HAZARD against Plaintiffs over the same employment contracts. *See* DE 11, at Counts I and II (counterclaim).  Defendants Gram and Hazard seek affirmative relief from the Court under the same agreements Plaintiffs proffer in the complaint.  The Court could not rationally find Gram and Hazard fraudulently joined in this context, where both sides are fighting over the duties, responsibilities, and performance under the same agreements.

Here, Defendants' stark lack of an objectively reasonable basis for seeking removal qualifies this matter for a fee award. It is well-settled law that "[a] multi-state corporation . . . 'must be treated as a citizen both of its state of incorporation and of the state of its principal place of business.'" *Franzel v. Kerr Mfg. Co.*, 959 F.2d 628, 629 (6th Cir. 1992) (quoting *Schwartz*, 913 F.2d at 284); *see also Beanstalk*, 823 F. App'x at 408. Defendants removed, it seems, with no thought, or no objectively reasonable thought, of the effect of Gram and Hazard's known Kentucky formative lineage.

Further, the Court notes that Defendants' "primary basis for ignoring the citizenship of Gram Resources and Hazard Radiology Associates is fraudulent joinder." *See* DE 9 at 3. A party seeking fraudulent joinder, as explained above, faces a distinct and significant burden. For the reasons stated, this is no close call. The lack of penetrating argument on either Kentucky citizenship or the plausibility of the claims says much. The response to DE 6 made no argument under § 1447(c). An award of fees is proper. Given the lack of contest, the conservative total sought (meaning actual expenses surely surpass and subsume the total), and the obvious intensity of the work caused by the removal, the Court will award the requested $6,000.00 against Defendants.

*Motion for a Restraining Order & Extension of Time*

The DE 5 and DE 15 motions for a restraining order and DE 8 agreed order for extension of time are **DENIED** for lack of federal jurisdiction.

*Motion to File Reply Under Seal*

Finally, Plaintiffs move for leave to file their reply (DE 13) to Defendants' response to the motion to remand under seal. DE 12 (Motion). The target documents are, of course, presumptively public. *See, e.g.*, LR 5.6(a). And, "[o]nly the most compelling reasons can justify non-disclosure of judicial records." *Knoxville News–Sentinel Co.*, 723 F.2d 470, 476 (6th Cir. 1983). Plaintiffs,

as movant, bear the burden of overcoming the "strong presumption in favor of openness[.]" *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016). Here, Plaintiffs seek to seal the entirety of their reply because it contains private, confidential information about business agreements, payments, and financial data. Although Plaintiffs' concern is understandable, their proposed remedy is overbroad. Accordingly, the motion is granted, but Plaintiffs shall file, within five (5) days of this Order, a redacted version of the reply for public docketing.   The redaction may cover all specific financial data and the tendered agreements (exhibits 1-3) with DE 12.  The balance, including all of the substantive argument, redacting only quoted figures, must be public.  The redacted version will be available publicly; the original version will remain under seal.

## II.   Conclusion

Accordingly, as stated above,

1) The DE 6 motion to remand is **GRANTED, and the Court REMANDS the case to the state court, for further proceedings**;

2) Plaintiffs' motion for attorney fees pursuant to 28 U.S.C. § 1447(c) is **GRANTED. Removing Defendants, those on DE 1, shall jointly and severally pay Plaintiffs the amount of $6,000.00 within thirty days**;

3) The DE 5 and DE 15 motions for a restraining order are **DENIED federally and reserved to the state court**;

4) The DE 8 motion for an extension of time is **DENIED federally and reserved to the state court**; and

Case: 6:21-cv-00141-REW-HAI   Doc #: 16   Filed: 08/25/21   Page: 10 of 10 - Page ID#: 563

5)  The DE 12 motion to file the DE 13 reply under seal is **GRANTED** on the terms stated

above. Plaintiffs **SHALL** file a redacted version within 5 days of the filing of this

Order.

This the 25th day of August, 2021.

Signed By:

*Robert E. Wier*

**United States District Judge**

# EXHIBIT 9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| EMELITA AYOS, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:23-CV-12-CHB-HAI |
| | ) | |
| v. | ) | |
| | ) | |
| TRG HOLDINGS G&H, LLC, *et al.*, | ) | |
| | ) | RECOMMENDED DISPOSITION |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

On January 17, 2023, Defendants TRG Holdings G & H, LLC ("TRG"), Anand Lalaji, M.D. ("Dr. Lalaji"), Gram Resources, Inc. ("Gram"), Hazard Radiology Associates, Inc. ("Hazard"), and The Radiology Group, LLC ("The Radiology Group") (collectively, "Defendants"), through counsel, removed this case from the Perry Circuit Court on the basis of diversity jurisdiction under 28 U.S.C. §§ 1332(a) and 1441. D.E. 1. The matter was referred to the undersigned for pretrial management. D.E. 7. On January 23, Plaintiff moved to remand this matter back to state court, arguing that the removal was improper based on the forum defendant rule and its untimeliness. D.E. 10. Defendants responded (D.E. 18) and Plaintiff replied (D.E. 19).

**I.**

Diversity-based removal requires "plausible allegation[s]" of complete diversity and a sufficient amount in controversy. *Naji v. Lincoln*, 665 F. App'x 397, 400 (6th Cir. 2016). The removing party "bears the burden[.]" *Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 549 (6th

1

Cir. 2006).  A corporation is a citizen of the states where "it has been incorporated and . . . where it has its principal place of business[.]"  28 U.S.C. § 1332(c)(1).

28 U.S.C. § 1441(b)(2) prohibits removal of a case solely on the basis of diversity jurisdiction under § 1332(a) "if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. 1441(b)(2).  Courts have debated whether this so-called "forum defendant rule" is a jurisdictional or procedural issue in the Sixth Circuit.  *Cronin v. Kentucky Horse Park Found., Inc.*, Civil Action No. 5:15-197-KKC, 2016 WL 1633294, at *1 (E.D. Ky. Apr. 22, 2016) ("[D]istrict courts in this Circuit have consistently held: 'the Sixth Circuit has not addressed whether the forum defendant rule is a jurisdictional or procedural issue.'") (collecting cases); *but cf. Regions Bank v. Am. Just. Sch. of L., Inc.*, No. 5:08-CV-134-M, 2009 WL 909548, at *3 (W.D. Ky. Mar. 30, 2009) (discussing conflicting Sixth Circuit holdings as to whether the forum defendant rule is jurisdictional or procedural); *Uboh v. United States Equestrian Found.*, 384 F. Supp. 3d 780, 783 (E.D. Ky. 2019) ("The weight of federal authority has concluded that the forum defendant rule is a procedural defect that may be waived, not a jurisdictional defect that deprives the court of subject matter jurisdiction.").  Regardless of whether the forum defendant rule presents a procedural or jurisdictions hurdle, Plaintiff timely filed a motion to remand and raised the issue therein.  28 U.S.C. § 1447(c) (providing that procedural defects "must be made within 30 days after the filing of the notice of removal").

Plaintiff argues that TRG, Gram, Hazard, and Dr. Lalaji are all citizens of Kentucky.[1]  D.E. 10 at 4-6.  Defendants directly dispute Dr. Lalaji's Kentucky citizenship. D.E. 18 at 6.  However,

---

[1] Plaintiff erroneously asserts that a limited liability company's citizenship is determined in the same manner as a corporation.  Unlike corporations, a limited liability company's citizenship is determined by "the citizenship of each of its members." *Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468, 494 (6th Cir. 2015) (quoting *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009)).

Defendants' response is devoid of any information or argument as to the citizenship(s) of TRG, Gram, and Hazard.  The Notice of Removal addresses the citizenship of TRG, Gram, Hazard, and Dr. Lalaji as follows:

> 5. Defendants, Gram Resources, Inc., and Hazard Radiology Associates, Inc., were originally incorporated in Kentucky by Ashokkumar Patel. Ashokkumar Patel and Mahender Pampati previously served as the officers and directors of the corporation until August 1, 2020, when Defendant, TRG G&H Holdings, LLC acquired 100% ownership of Gram Resources, Inc. and Hazard Radiology Associates, Inc. After that date, Anand Lalaji and Tejal Lalaji became the sole officers and directors of Gram Resources, Inc., and Hazard Radiology Associates, Inc.

> 6. Defendant, Anand Lalaji, M.D., and unnamed party, Tejal Lalaji, are husband and wife, and both are residents and citizens of the State of Georgia.

> 7. Defendant, TRG G&H Holdings, LLC, is a limited liability company formed in Kentucky by Defendant, Anand Lalaji, on July 7, 2020 as its only member. Its physical address is 3475 Piedmont Rd NE, Suite 1150, Atlanta, GA, 30305, USA. TRG G&H Holdings, LLC, is a citizen of the State of Georgia by virtue of its sole owner and member, Defendant, Anand Lalaji, M.D., being a resident and citizen of Georgia.

D.E. 1 at 2-3.  Defendants concede that Gram and Hazard are Kentucky corporations in the Notice of Removal.  *Id.* ¶ 5.  Further, Plaintiff has attached screenshots from the Kentucky Secretary of State's website with registration information for Gram, Hazard, and TRG.  D.E. 10-1; D.E. 10-2; D.E. 10-3.  These records indicate that Gram and Hazard are Kentucky corporations with the same principal office in Hazard, Kentucky.  D.E. 10-1; D.E. 10-2.  Because they were incorporated and have their principal place of business in Kentucky, Gram and Hazard are citizens of Kentucky.  *Beanstalk Innovation, Inc. v. SRG Tech., LLC*, 823 F. App'x 404, 408 (6th Cir. 2020) ("A corporation is a citizen of both the state in which it is incorporated and the state in which the corporation's principal place of business is located.").  Given Gram and Hazard's citizenship and

3

this matter having been brought in Kentucky, the forum defendant rule prohibits removal to federal court. 28 U.S.C. 1441(b)(2).

Despite filing a response to Plaintiff's motion to remand, Defendants have failed to even acknowledge the forum defendant rule, let alone attempt to explain why it does not prevent removal. *See* D.E. 18. Rather, Defendants focus on the timeliness of removal and otherwise assert that "the parties are diverse for purposes of diversity jurisdiction." *Id.* at 6. Although Defendants' response ignores this clear impediment, this is not the first time they have made "an audacious attempt to shoulder into federal court." D.E. 10-7 at 3 (copy of *Patel v. Gram Resources, Inc.*, No. 6:21-CV-141-REW-HAI (E.D. Ky. Aug. 25, 2021)). Like in the present case, Gram, Hazard, TRG, Dr. Lalaji, and The Radiology Group were defendants in *Patel* and removed the case to federal court on the basis of diversity jurisdiction. *Id.* at 1. Because the plaintiff was also a citizen of Kentucky, District Judge Wier ordered Defendants to show cause why the matter should not be remanded.[2] *Id.* at 1-2. There, Defendants "strain[ed] to shift the focus" on the citizenship of Gram and Hazard's alleged LLC parent(s). *Id.* at 3. Here, Defendants have put forth even less effort by ignoring Hazard and Gram's citizenship altogether. The Court can only assume Defendants intended to "shift the focus" to Gram and Hazard's alleged LLC parent(s) in this case as well by stating in the Notice of Removal that Gram and Hazard were "originally incorporated in Kentucky" but were later acquired by TRG. D.E. 1 ¶ 5. In any event, Judge Wier foreclosed this argument in *Patel*:

> But "a corporate subsidiary's citizenship is distinct from a corporate parent's citizenship[.]" *Pegasus Indus., Inc. v. Martinrea Heavy Stampings, Inc.*, No. 3:16-CV-00024-GFVT, 2016 WL 3043143, at *3 (E.D. Ky. May 27, 2016) (citing *Schwartz v. Elec. Data Sys., Inc.*, 913 F.2d 279, 283 (6th Cir. 1990)). "When formal separation is maintained between a corporate parent and its corporate subsidiary, federal court jurisdiction over the subsidiary is determined by that corporation's

---

[2] Judge Wier also clarified that the plaintiff's Kentucky citizenship "eliminate[d] the need to assess the forum defendant rule." D.E. 10-7 at 2 n.2.

> citizenship, not the citizenship of the parent." *Schwartz*, 913 F.2d at 283 (noting that "[s]o far as we can determine, every court of appeals that has considered the question has reached this conclusion"); *see also U.S.I. Properties Corp. v. M.D. Const. Co.*, 860 F.2d 1, 7 (1st Cir. 1988). Defendants make no legal argument and offer no proof to suggest the Court should look past the citizenship of Gram and Hazard.
>
> Against that backdrop, and mindful that Defendants face the burden to justify removal, the Court rejects Defendants' theory of citizenship.

D.E. 10-7 at 3-4. Thus, to the extent Defendants attempt to assert it again here, this LLC-parentage argument is without merit. Judge Wier conclusively held in *Patel* that Gram and Hazard are citizens of Kentucky. *Id.* at 4. Defendants have stayed silent on the issue in their response, and nothing in the record indicates that Hazard's or Gram's citizenship has changed. Rather, Defendants' own Notice of Removal confirms that the entities are Kentucky corporations. D.E. 1 ¶ 5. Thus, "with at least two Defendants as Kentucky citizens, the facial [] defect is evident." D.E. 10-7 at 4; *see* 28 U.S.C § 1441(b)(2). Due to this clear defect, the Court need not address the timeliness of the removal. Accordingly, based on the forum defendant rule, this matter should be remanded back to state court.

## II.

Plaintiff's motion also requests that the Court award attorney's fees under 28 U.S.C. § 1147(c) and additional sanctions as deemed appropriate. D.E. 10 at 7-9. Given the longstanding, unambiguous forum defendant rule and Judge Wier's order in *Patel* resolving any doubt as to the citizenship of Gram and Hazard, the undersigned finds that sanctions are appropriate. "[F]ee awards are inappropriate unless 'the removing party lacked an objectively reasonable basis for seeking removal.'" *Powers v. Cottrell, Inc.*, 728 F.3d 509, 515 (6th Cir. 2013) (quoting *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005)). In *Patel*, Judge Wier held that "Defendants' stark lack of an objectively reasonable basis for seeking removal qualifies this matter for a fee

5

award." D.E. 10-7 at 8. Based on Judge Wier's clear holding, Defendants' removal of this case was at a minimum objectively ***unreasonable***. Thus, attorney's fees and sanctions are appropriate in this case. However, further process on the sanctions request, including any hearing, should be deferred until District Judge Boom rules on this recommendation that this matter should be remanded back to state court. At that time, Judge Boom may refer the matter to the undersigned for any further necessary proceedings concerning sanctions.

### III.

For these reasons, the undersigned hereby **RECOMMENDS** that Plaintiff's motion to remand (D.E. 10) be **GRANTED IN PART** and this matter be **REMANDED** back to state court.

Any objection to this recommendation must be asserted in response to this Recommended Disposition. The Court directs the parties to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b) for appeal rights and mechanics concerning this Recommended Disposition, issued under subsection (B) of the statute. Within fourteen days after being served with a copy of this decision, any party may serve and file specific written objections to any or all findings or recommendations for determination, de novo, by the District Judge. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Wandahsega*, 924 F.3d 868, 878 (6th Cir. 2019).

This the 13th day of April, 2023.

Signed By:

*Hanly A. Ingram*

**United States Magistrate Judge**

Case: 6:23-cv-00012-CHB-HAI  Doc #: 29  Filed: 05/03/23  Page: 1 of 3 - Page ID#: 1619

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

|  |  |  |
|---|---|---|
| EMELITA AYOS, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6:23-CV-012-CHB |
| | ) | |
| v. | ) | |
| | ) | **ORDER ADOPTING MAGISTRATE** |
| TRG HOLDINGS G&H, *et al.*, | ) | **JUDGE'S REPORT AND** |
| | ) | **RECOMMENDATION** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Recommended Disposition filed by United States Magistrate Judge Hanly A. Ingram.  [R. 28].  The Report and Recommendation addresses the Plaintiff's Motion to Remand & Sanctions. [R. 10].

Specifically, Magistrate Judge Ingram examined the forum defendant rule and recommends that the Motion to Remand be granted because complete diversity does not exist. [*See* R. 28, p. 5].  Magistrate Judge Ingram also addressed the Plaintiff's motion for sanctions based on Defendant's conduct and observed that attorney's fees and sanctions are appropriate in this case.  [*Id.* at 6 ("Based on Judge Wier's clear holding, Defendants' removal of this case was at a minimum objectively ***unreasonable***.")].  However, Magistrate Judge Ingram acknowledged that further process on the sanctions request would be needed if the motion to remand were to be granted.  [*Id.*].

Magistrate Judge Ingram's Recommended Disposition advised the parties that any objections were to be filed within fourteen days.  [*Id.*]  The time to file objections has now passed, and neither party has filed any objections to the Recommended Disposition nor sought an extension of time to do so.

- 1 -

Generally, this Court must make a de novo determination of those portions of a recommended disposition to which objections are made. 28 U.S.C. § 636(b)(1). When no objections are made, this Court is not required to "review . . . a magistrate's factual or legal conclusions, under a *de novo* or any other standard." *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Parties who fail to object to a Magistrate Judge's recommended disposition are also barred from appealing a district court's order adopting that recommended disposition. *See United States v. White*, 874 F.3d 490, 495 (6th Cir. 2017); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). Nevertheless, this Court has examined the record and agrees with the Magistrate Judge's Recommended Disposition. The Court will therefore adopt it as the opinion of the Court and grant Plaintiff's Motion to Remand. Additionally, although the Court is remanding this case back to state court, it retains jurisdiction over Plaintiff's request for sanctions. *See Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 645 (6th Cir. 2006) ("[T]he Supreme Court has consistently held that federal courts retain jurisdiction over issues—such as sanctions—that are collateral to the merits.").

Accordingly, the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. The Magistrate Judge's Recommended Disposition [**R. 28**] is **ADOPTED** as the opinion of this Court.

2. The Plaintiff's Motion to Remand & Sanctions is **GRANTED** in part [R. 10]. Specifically, this matter **SHALL** be **REMANDED** back to state court.

3. This matter is once again **REFERRED** to Magistrate Judge Ingram for any further necessary proceedings concerning Plaintiff's motion for sanctions [R. 10].

4. To the extent any other motions remain pending, they are **DENIED** as moot.

Case: 6:23-cv-00012-CHB-HAI   Doc #: 29   Filed: 05/03/23   Page: 3 of 3 - Page ID#: 1621

This the 2nd day of May, 2023.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

EMELITA AYOS, M.D.,                    )
                                       )
        Plaintiff,                     )        No. 6:23-CV-12-CHB-HAI
                                       )
v.                                     )
                                       )
TRG HOLDINGS G&H, LLC, *et al.*,       )
                                       )        ORDER
        Defendants.                    )
                                       )
                                       )
                                       )
                        *** *** *** ***

On May 3, 2023, District Judge Boom adopted the undersigned's Report and Recommendation that this matter should be remanded back to state court. D.E. 29. The Court retains jurisdiction over Plaintiff's motion for attorney's fees and sanctions, which Judge Boom referred to the undersigned for any further necessary proceedings. *Id.*

As indicated in the Report and Recommendation, attorney's fees and sanctions are appropriate in this case. D.E. 28 at 5-6. However, Plaintiff's motion does not specify the amount of costs and attorney's fees requested. The motion also fails to identify the sanctions sought or supporting authority for the request.

Accordingly, **IT IS HEREBY ORDERED THAT** Plaintiff **SHALL** file an itemization of just costs and actual expenses, including attorney's fees, incurred in connection with the removal and remand of this action **on or before Thursday, May 25, 2023.** In the same filing, Plaintiff **SHALL** supplement her motion for sanctions and identify with particularity authority that supports her request and the sanctions sought, as required by Joint Local Rule 7.1(a). If Defendants object

1

Case: 6:23-cv-00012-CHB-HAI   Doc #: 30   Filed: 05/04/23   Page: 2 of 2 - Page ID#: 1623

to the amount of costs claimed or the sanctions sought by Plaintiff, they **SHALL** file written objections **within ten days** of service of Plaintiff's itemized costs and sanctions supplement.

This the 4th day of May, 2023.

Signed By:

*Hanly A. Ingram*

United States Magistrate Judge

COMMONWEALTH OF KENTUCKY
33rd JUDICIAL DISTRICT
PERRY CIRCUIT COURT
CIVIL ACTION NO. 21-CI-00221
*SPECIAL JUDGE HON. KIMBERLY CHILDERS*

### *ELECTRONICALLY FILED*

ASHOKKUMAR R. PATEL, M.D.
and MAHENDER PAMPATI, M.D.                                           PLAINTIFFS


VS.


GRAM RESOURCES, INC.;
HAZARD RADIOLOGY ASSOCIATES, INC.;
ANAND LALAJI, M.D.; TRG HOLDINGS G & H, LLC;
THE RADIOLOGY GROUP, LLC and WILLIAM CRENSHAW          DEFENDANTS


### RESPONSE TO PLAINTIFFS' SECOND MOTION FOR SANCTIONS
*** *** ***

Come now the defendants, Gram Resources, Inc; Hazard Radiology Associates, Inc.; Anand Lalaji, M.D.; TRG Holdings G & H, LLC; and The Radiology Group, LLC, by and through counsel, and for their Response to the plaintiffs' second Motion for Sanctions relative to the deposition testimony of defendant Dr. Anand Lalaji, M.D., herewith state as follows:

The defendants adopt and incorporate by reference the separate Affidavit of Anand Lalaji, M.D. which has been filed contemporaneously with this responsive pleading. The Affidavit establishes that Dr. Lalaji did not at any time give materially false or misleading testimony but instead, has at all times testified based upon his understanding of the status of the submission of the defendants' self-reporting to the Department of Health and Human Services / Office of Inspector General ("HHS" and "OIG") relating to the proscribed practices of plaintiffs Patel and Pampati of allowing their secretaries and administrative assistants to sign their names

authenticating radiological reads in association with fees for services Medicare/Medicaid billing to the Centers for Medicare/Medicaid Services ("CMS").

Dr. Lalaji understood and continues to maintain that The Radiology Group employee responsible for submitting the self-disclosure to HHS/OIG resubmitted the disclosure into the OIG portal after the submission was initially rejected. At no time was the submission rejected on its merits as is evidenced by the responsive email from OIG produced in discovery.

To be sure, the relief which the plaintiffs seek – excluding Lalaji (who is not merely a witness but a party to these proceedings and a member of the limited liability company defendants) would constitute an extraordinary remedy and would be tantamount to the entry of a default as Dr. Lalaji is the defendants' principal witness in this case. The plaintiffs would have this Court deny the defendant Lalaji and the defendants their constitutional, fundamental right to a fair trial, to due process, and to confront and testify against those plaintiffs who have filed this civil action.

The plaintiffs have not and cannot cite this Court to a single precedent which has ever held that a Court may sanction a party by disallowing his testimony at trial when at best there is a factual dispute relative to the party's testimony. In the present case the plaintiffs contend that Dr. Lalaji gave false testimony, yet they have tendered no affidavit which would support their slanderous assertions. Dr. Lalaji denies by affidavit ever giving false testimony in this case. At best there is an issue of fact as to the truthfulness of his statements in his deposition testimony and the plaintiffs do not have a single witness who will testify to the material falsity of Dr. Lalaji's testimony.

The second Motion for Sanctions is without merit and should be overruled.

Respectfully submitted,

HAMM, MILBY & RIDINGS, PLLC
120 NORTH MAIN STREET
LONDON, KY 40741
EMAIL:  aaron@hmrkylaw.com
PHONE:  606-864-4126
FAX:  606-878-8144
*Counsel for defendants, Gram Resources, Inc;*
*Hazard Radiology Associates, Inc.; Anand Lalaji,*
*M.D.; TRG Holdings G & H, LLC; and*
*The Radiology Group, LLC*

BY: /s/ R. Aaron Hostettler_____
      HON. R. AARON HOSTETTLER
      HON. JAMES MILBY RIDINGS
      HON. KELSEY LEE BRYANT


**CERTIFICATE OF SERVICE:**

      I hereby certify that a copy of the foregoing Motion was electronically filed with the Clerk of the Court by using the E-filing system and that a true and accurate copy of the foregoing has been served via the E-filing system and/or via first class U.S. Mail on the following:


**COPY TO:**

Hon. Robert E. Maclin III
Hon. Lisa English Hinkle
Hon. Luke Morgan
McBrayer, PLLC
201 East Main Street, Suite 900
Lexington, KY 40507

Hon. Barry Hunter
Frost Brown Todd, LLC
250 W. Main Street, Suite 2800
Lexington, KY 40507

Hon. Kimberly Childers, Judge
c/o angelashort@kycourts.net


      This __17th___ day of May 2023.

/s/ R. Aaron Hostettler
OF COUNSEL FOR ABOVE DEFENDANTS

<div align="center">

**COMMONWEALTH OF KENTUCKY**
**PERRY CIRCUIT COURT**
**CIVIL ACTION NO. 21-CI-00221**
*FILED ELECTRONICALLY*

</div>

**ASHOKKUMAR R. PATEL, ET AL.**                                                    **PLAINTIFFS**

v.        **PLAINTIFFS' REPLY TO LALAJI DEFENDANTS' RESPONSE AND**
          **AFFIDAVIT/ OPPOSITION TO PLAINTIFFS' SECOND MOTION**
          **FOR SANCTIONS AGAINST LALAJI DEFENDANTS**

**GRAM RESOURCES, INC., ET AL.**                                                   **DEFENDANTS**

<div align="center">

***** ** ** *****

</div>

Come Plaintiff, Ashokkumar R. Patel, M.D. ("Dr. Patel") and Plaintiff, Mahender Pampati, M.D. ("Dr. Pampati"), by counsel, and make this Reply to the Response and Affidavit of Defendant, Anand Lalaji, M.D. In Opposition ("Lalaji Defendants' Response/Affidavit/Opposition") to Dr. Patel's and Dr. Pampati's Second Motion for Sanctions against Defendant, Anand Lalaji, M.D. ("Lalaji"), Defendant, Gram Resources, Inc. ("Gram Resources"), Defendant, Hazard Radiology Associates, Inc. ("Hazard Radiology"), Defendant, TRG Holdings G &H, LLC ("TRG"), Defendant, The Radiology Group, LLC ("Radiology Group") (and together with Gram Resources, Hazard Radiology, Lalaji, TRG and collectively the "Lalaji Defendants"). For reasons set forth in Dr. Patel's and Dr. Pampati's Second Motion for Sanctions against the Lalaji Defendants and as set forth herein, the Court should sanction the Lalaji Defendants including, but not limited to, the exclusion of the testimony of Lalaji on any topic at trial of this matter on behalf of himself and/or by reason of Lalaji's blatant perjurious clear and unequivocal deposition testimony, *occurring on not one, but two separate occasions; and the Lalaji Defendants' history of abuse of the rules of civil procedure.*

1.        The material falsity of Lalaji's clear and unequivocal deposition testimony is shown by the following and undisputed email communication dated *March 18, 2022* only recently

<div align="center">

1

</div>

produced at approximately 4:00 p.m. on May 10, 2023[1] from Jennifer Hilton, Paralegal Specialist,

U.S. Department of Health & Human Services, Office of Inspector General to Chloe Dallaire, *the*

*Lalaji Defendants' in-house counsel which is of record herein* ("OIG March 18, 2022 Email") and

which states:

> **From:** Hilton, Jennifer L (OIG/OCIG) <Jennifer.Hilton@oig.hhs.gov>
> **Sent:** Friday, March 18, 2022 12:35 PM
> **To:** Chloe Dallaire <cdallaire@theradiologygroup.org>
> **Subject:** HHS OIG Self-Disclosure: Ashokkumar Patel
>
> I am writing to inform you that your submission to the Office of Inspector
> General (OIG) Self- Disclosure Protocol (Protocol) made on behalf of the above
> entity has not been accepted.  By declining to accept this submission into the
> Protocol, the OIG is not expressing an opinion regarding the conduct disclosed
> or your legal position.
> Jennifer Hilton
> Paralegal Specialist
> U.S. Department of Health & Human Services
> Office of Counsel to the Inspector General

    2.      The material and false clear and unequivocal testimony of Lalaji on behalf of the

Lalaji Defendants, which the Lalaji Defendants do not deny occurred and is of *record herein*

without limitation is:

    a.      That during the Dep. of Lalaji, individually and as the designated representative of

the entity Lalaji Defendants occurring August 1, 2022 ("Lalaji 2022 Dep.") Lalaji clearly and

unequivocally testified as follows:

> *you know, it could take them up to a year to a year and a half to basically respond,*
> *you know, because they just move very slow and they're backlogged. So we've got*
> *confirmation that all of that has been received and that an investigator will be*
> *contacting us, and that's where we're at right now. (emphasis added)*

*Emphasis added.*  See Lalaji 2022 Dep. At pp. 83-84.

---

[1] The Lalaji Defendants' new counsel's diligence and attention to professional responsibility is acknowledged.

b.      That during the April 3, 2023 Dep. of Lalaji ("Lalaji 2023 Dep.") Lalaji clearly and

unequivocally testified as follows:

> Q      Have you heard back from anybody on this report?
> A      *We received confirmation that it was received, and since that point we have not heard back yet.*
> Q      Any idea when any report will be back or any response will be back?
> A      *No.  It could take up to six years.*
> Q      So as you sit here today, you don't know if there's going to be any action taken by HHS or whoever you reported to; correct?
> A      *We do not know.*

*Emphasis added.*  See Lalaji 2023 Dep. At pp. 75-77.

3.      Numerical paragraphs 5, 6, 9 and 11 of the Lalaji Defendants' Affidavit/Opposition

contain hearsay which must be disregarded and not considered by the Court.  See KRE 802.

4.      There are no inconsistencies in the testimony of Lalaji in the Lalaji 2022 Dep. and

the Lalaji 2023 Dep. and it is clear and unequivocal.  The purported testimony of Lalaji in the

Lalaji Defendants' Affidavit/Opposition is clearly in direct contradiction to Lalaji's clear and

unequivocal testimony in both the Lalaji 2022 Dep. and the Lalaji 2023 Dep. that the Lalaji

Defendants' initial self-report had been confirmed by the OIG as having been received, that

nothing on the Lalaji Defendants' initial self-report had been heard back by the Lalaji Defendants,

that the Lalaji Defendants did not know "if there's going to be any action taken by HHS or

whoever" the Lalaji Defendants reported to and that an OIG investigator would be contracting the

Lalaji Defendants.   There was no disclosure of the OIG March 18, 2022 Email or any so-called

resubmission.  Accordingly, the Lalaji Defendants' Affidavit/Opposition should not be considered

to avoid sanctions. See *Lipsteuer v. CSC Transp. Inc.*, 37 S.W. 3d 732 (Ky. S.Ct. 2000).

5.      Numerical paragraphs 2, 3, 10, 11 and 12 of the Lalaji Defendants'

Affidavit/Opposition in substantial part and/or in whole contain conclusory statements and

opinions and legal opinions.  Such statements do not fit the definition of lay opinion under KRE

3

701.   These statements, other than the few statements of facts contained therein, must be disregarded, and not considered by the Court under KRE 701 and KRE 702, and for the reasons set forth in Dr. Patel's and Dr. Pampati's motion to exclude the proffered "expert" testimony of Lalaji.

6.   Notwithstanding the not-based-on-personal-knowledge hearsay and conclusory statements and opinions and legal opinions, as well as uncorroborated and thus inadmissible statements made in the Lalaji Defendants Affidavit/Opposition, the following numerical paragraphs of the Lalaji Defendants' Affidavit/Opposition in fact substantiate and further demonstrate the Lalaji Defendants' perjurious behavior, conduct and actions:

| NUMERICAL PARAGRAPH OF LALAJI DEFENDANTS' AFFIDAVIT/OPPOSITION | PERJURIOUS BEHAVIOR, CONDUCT AND ACTIONS OF LALAJI DEFENDANTS |
|---|---|
| 4.   In response to that initial disclosure, on or near March 18, 2022, the OIG responded in writing that the defendants' submission had not been accepted.  The OIG was careful to state that "by declining to accept this submission into the Protocol, the OIG is not expressing an opinion regarding the conduct disclosed or your legal position." | A. Admission that the OIG in fact declined "initial reporting" *which is clearly contrary to the Lalaji Defendants' testimony in those sections of the Lalaji 2022 Dep. and the Lalaji 2023 Dep. without limitation as referenced above*; |
| 5. After the OIG self-disclosure Protocol declined acceptance of the initial reporting, your Affiant was informed and verily believes that Ms. Selma Tinnell, a former employee of The Radiology Group, LLC ("TRG") resubmitted the self-disclosure to the Protocol. | B. Admission that the Lalaji Defendants had in fact heard back from the OIG *which is clearly contrary to the Lalaji Defendants' testimony in those sections of the Lalaji 2022 Dep. and the Lalaji 2023 Dep. without limitation as referenced above*;

C. Admission that there was and are no communications from the OIG that an OIG investigator would be contacting the Lalaji Defendants on the Lalaji Defendants' so-called "initial reporting" since it was not in the OIG self-disclosure protocol *which is clearly contrary to the Lalaji Defendants' testimony in those sections of the Lalaji 2022 Dep. and the Lalaji 2023 Dep. without limitation as referenced above*; |

4

| | D. Admission that the Lalaji Defendants' so-called "<u>initial</u> reporting" was not in the OIG self-disclosure protocol *which is clearly contrary to the Lalaji Defendants' testimony in those sections of the Lalaji 2022 Dep. and the Lalaji 2023 Dep. without limitation as referenced above*; |
| | E. Admission that the Lalaji Defendants' have no confirmations of any acceptance any acceptance of any self-reporting made by the Lalaji Defendants being in the OIG self-disclosure protocol *and which is clearly contrary to the Lalaji Defendants' testimony in those sections of the Lalaji 2022 Dep. and the Lalaji 2023 Dep. without limitation as referenced above*; and |
| | F. Admission that where the Lalaji Defendants' stand is not on an "initial reporting" *which is clearly contrary to the Lalaji Defendants' testimony in those sections of the Lalaji 2022 Dep. and the Lalaji 2023 Dep. without limitation as referenced above.* |
| 9. When your affiant testified in his Depositions to his belief that the defendants did in fact self-disclose the Medicare fraud perpetrated by the plaintiffs to the HHS/OIG self-disclosure Protocol, this testimony was based upon your affiant's understanding that after the initial submission was not accepted, the defendants through former TRG employee Selma Tinnell resubmitted the disclosure to the self-reporting Protocol and that the resubmission was in fact accepted and that the defendants are awaiting the OIG's investigation into the matter. Your affiant understands that these investigations can take years. | A. Admission that at the times of both the Lalaji 2022 Dep. and the Lalaji 2023 Dep. that the Lalaji Defendants were fully aware the OIG had declined acceptance of the Lalaji Defendants' initial reporting into the OIG self-disclosure Protocol *which is clearly contrary to the Lalaji Defendants' testimony in those sections of the Lalaji 2022 Dep. and the Lalaji 2023 Dep. without limitation as referenced above;* |
| | B. Admission that nowhere in the Lalaji Defendants' testimony in those sections of the Lalaji 2022 Dep. and the Lalaji 2023 Dep. without limitation as referenced above, or in fact anywhere was there any testimony of a resubmission to the OIG *which is clearly contrary to the Lalaji Defendants' testimony in those sections of the Lalaji 2022 Dep. and the Lalaji 2023 Dep. without limitation as referenced above.* |

7.    Moreover, the following paragraphs of the Lalaji Defendants' Supplemental Expert Witness Disclosure of Lalaji further substantiate and further demonstrate the Lalaji Defendants' perjurious behavior, conduct and actions:

| PARAGRAPH OF THE LALAJI SUPPLEMENTAL EXPERT WITNESS DISCLOSURE OF LALAJI | PERJURIOUS BEHAVIOR, CONDUCT AND ACTIONS OF LALAJI DEFENDANTS |
|---|---|
| It is anticipated that Dr. Lalaji will testify as to the consequences of said actions by Plaintiffs and the reasonably likely consequences said actions including the effects of such actions upon Defendants and the parties' patients.<br><br>3.    Upon discovering the actions of Drs. Pampati and Patel, Defendants are required by law to report the violations to the proper authorities; | A.  Lalaji failed to testify truthfully/disclose that the OIG in fact declined "initial reporting" *which is clearly contrary to the Lalaji Defendants' testimony in those sections of the Lalaji 2023 Dep. without limitation as referenced above;*<br><br>B.  Lalaji failed to testify truthfully/disclose that the Lalaji Defendants had in fact heard back from the OIG *which is clearly contrary to the Lalaji Defendants' testimony in those sections of the Lalaji 2023 Dep. without limitation as referenced above;*<br><br>C.  Lalaji failed to testify truthfully/disclose there was and are no communications from the OIG that an OIG investigator would be contacting the Lalaji Defendants on the Lalaji Defendants' so-called "initial reporting" since it was not in the OIG self-disclosure protocol *which is clearly contrary to the Lalaji Defendants' testimony in those sections of the Lalaji 2023 Dep. without limitation as referenced above;*<br><br>D.  Lalaji failed to testify truthfully/disclose that the Lalaji Defendants' so-called "initial reporting" was not in the OIG self-disclosure protocol *which is clearly contrary to the Lalaji Defendants' testimony in those sections of the Lalaji 2023 Dep. without limitation as referenced above;*<br><br>E.  Lalaji failed to testify truthfully/disclose that the Lalaji Defendants' have no |

6

|  | confirmations of any acceptance of any self-reporting made by the Lalaji Defendants being in the OIG self-disclosure protocol *which is clearly contrary to the Lalaji Defendants' testimony in those sections of the Lalaji 2023 Dep. without limitation as referenced above*; and |
|  | F. Lalaji failed to testify truthfully/disclose that where the Lalaji Defendants stand is not on an "initial reporting" *which is clearly contrary to the Lalaji Defendants' testimony in those sections of the Lalaji 2023 Dep. without limitation as referenced above.* |
|  | G. Lalaji failed to testify truthfully/disclose that the Lalaji Defendants made an alleged second submission and that at a minimum there exists no documentary evidence of any second submission. |

8.     As material as the allegations made by the Lalaji Defendants, that Dr. Patel and Dr. Pampati authorized and directed someone other than themselves to, using their personal login information, "fraudulently" electronically affix their electronic signatures to radiology study reports performed for Mountain Comprehensive Care Clinic patients are that the Lalaji Defendants would not during both the Lalaji 2022 Dep. and the Lalaji 2023 Dep are.:

A.     the Lalaji Defendants' hearsay-based excuse that Lalaji's materially false testimony "was based upon your affiant's understanding that after the initial submission was not accepted, the defendants, through former TRG employee Selma Tinnell, resubmitted the disclosure to the self-reporting Protocol and that the resubmission was in fact accepted", *is not reasonable, logical or legally admissible* and must not be accepted.

B.     the Lalaji Defendants' uncorroborated by and documents excuse that Lalaji's materially false testimony "was based upon your affiant's understanding that after the initial

submission was not accepted, the defendants, through former TRG employee Selma Tinnell, resubmitted the disclosure to the self-reporting Protocol and that the resubmission was in fact accepted" *is not reasonable, logical or legally admissible* and must not be accepted.

      C.     the Lalaji Defendants' hearsay-based excuse that a now missing employee "resubmitted the disclosure to the self-reporting Protocol and that the resubmission was in fact accepted and that the defendants are awaiting the OIG's investigation into the matter" *is not reasonable, logical or legally admissible* and must not be accepted.

      D.     the Lalaji Defendants' uncorroborated by any documents excuse that a now missing employee "resubmitted the disclosure to the self-reporting Protocol and that the resubmission was in fact accepted and that the defendants are awaiting the OIG's investigation into the matter" *is not reasonable, logical, or legally admissible* and must not be accepted.

      E.     the Lalaji Defendants' unsupported, uncorroborated hearsay allegation that the only documentary evidence showing the Lalaji Defendants "resubmission" of the disclosure to the self-reporting Protocol and that the resubmission was in fact accepted and that the defendants are awaiting the OIG's investigation into the matter" only *may* exist on Ms. Tinnell's now purged email account *is not reasonable, logical or legally admissible* and must not be accepted.

      9.     The Lalaji 2023 Dep. was of Lalaji in his individual capacity as an alleged "expert" and not as a corporate representative, thus compelling Lalaji to testify truthfully and accurately based on his own *personal knowledge* and not based on his "understanding", without full disclosure that Lalaji's testimony was based on hearsay. At no time during the Lalaji 2023 Dep. did Lalaji state or disclose that any of his testimony "was based upon your affiant's understanding that after the initial submission was not accepted, the defendants through former TRG employee Selma Tinnell resubmitted the disclosure to the self-reporting Protocol and that the resubmission

was in fact accepted." Thus, a further basis establishing the sanctionable perjurious actions and conduct of the Lalaji Defendants.

10.    The Lalaji Defendants' defense that somehow an affidavit is necessary to show that Lalaji gave false testimony and that Lalaji's conclusory statement that he did not give false defeats the clear record of Lalaji's undenied deposition testimony and OIG March 18, 2022 Email amply demonstrates the weakness and desperation of the Lalaji Defendants' opposition.

11.    On Thursday, May 18, 2023 at approximately 6:19 p.m. the Lalaji Defendants, by counsel produced[2] two email chains which are collectively attached hereto and made a part hereof as **Exhibit 1**, which is reproduced below:

**February 14, 2022 Email Chain**:

> **From:** Chloe Dallaire <cdallaire@theradiologygroup.org>
> **Sent:** Monday, February 14, 2022 7:31 PM
> **To:** Selma Tinnell <stinnell@theradiologygroup.org>; Anand Lalaji <alalaji@theradiologygroup.org>
> **Subject:** Fwd: Self Reporting Statement
>
> Get Outlook for iOS
>
> **From:** Chloe Dallaire <cdallaire@theradiologygroup.org>
> **Sent:** Monday, February 14, 2022 5:29 PM
> **To:** Chloe Dallaire
> **Subject:** Fwd: Self Reporting Statement
>
> So I looked over the protocol and from what I can tell, the following additional info is needed:
> • 	What laws were violated
> • 	Report findings of an internal investigation (this can probably be pretty broad)
> • 	Contact info for TRG's designated rep (that can be you or me) and a certification from that person that the submission contains truthful info etc. (I can draft this)
> • 	Details re the conduct necessitating the disclosure
> • 	the federal health care programs affected by the conduct
> • 	an estimate of the damages (this will be the most difficult and we can discuss how to calculate)
> • 	Description of the corrective action taken upon discovery

---

[2] Id.

9

- A statement of whether TRG knows the matter is under current investigation by a govn't agency
- Name of person authorized to enter into a settlement agreement

Hi Chloe,

Per our conversation:
- Contact information/details for the company in question (address/phone numbers) and the date of acquisition & discovery date of alleged fraudulent activity & how it was discovered
- Full names of the doctors with their NPI/EIN number(s) and their secretary names and contact information
- Any additional information we can or wish to provide; supporting documentation (provide current legal counsel contact information relating to current litigation as relevant to the fraud allegation being reported)

The above bullet points of information are what is needed to report the claim to the hotline representative. Once we decide on the discovery date, we can then proceed with the other detailed information to do the reporting, and we will need their NPI or EIN number (if we have that) so that TRG can be separated from the billing dates in question. Also, should they ask why the delay in reporting, we need to know how we want to address that as well.

I have included the website information below. The hotline is open from 8a-8p eastern time (1-800-447-8477, opt 4, then opt 3), Monday-Friday. From my conversation with Dr. A, TRG has until October of 2022 to report this. Perhaps we should wait until next week to do this reporting, so that you've had enough time to look through the information and to talk with Dr. A again to advise process and next steps, as we will need to gather the above information in providing a reporting statement to the rep?

Thanks.

https://oig.hhs.gov/compliance/self-disclosure-info/


**March 30, 2022 Email Chain:**

**From:** Chloe Dallaire
**Sent:** Wednesday, March 30, 2022 9:36 AM
**To:** Hilton, Jennifer L (OIG/OCIG) <Jennifer.Hilton@oig.hhs.gov>
**Cc:** Selma Tinnell <stinnell@theradiologygroup.org>
**Subject:** RE: HHS OIG Self-Disclosure: Ashokkumar Patel


Good morning Ms. Hilton, I am following up on my below request. I am trying to figure out whether the filing was deficient in some way or whether it was simply not accepted

for some independent reason. If the former, I would like to know the deficiency so that I can cure it.

Thanks in advance.

**Chloe Dallaire**
*General Counsel*

**From:** Chloe Dallaire
**Sent:** Friday, March 25, 2022 1:12 PM
**To:** Hilton, Jennifer L (OIG/OCIG) <Jennifer.Hilton@oig.hhs.gov>
**Subject:** RE: HHS OIG Self-Disclosure: Ashokkumar Patel

Hello Ms. Hilton, are you available for a quick call regarding this email?

**Chloe Dallaire**
*General Counsel*





*A Joint Commission accredited company*
"Seamless         Sub-Specialty              Radiology                    Interpretation"
*Customer First – Integrity – Teamwork - Work Life Balance*

**From:** Hilton, Jennifer L (OIG/OCIG) <Jennifer.Hilton@oig.hhs.gov>
**Sent:** Friday, March 18, 2022 12:35 PM
**To:** Chloe Dallaire <cdallaire@theradiologygroup.org>
**Subject:** HHS OIG Self-Disclosure: Ashokkumar Patel

I am writing to inform you that your submission to the Office of Inspector General (OIG) Self-Disclosure Protocol (Protocol) made on behalf of the above entity has not been accepted. By declining to accept this submission into the Protocol, the OIG is not expressing an opinion regarding the conduct disclosed or your legal position.

Jennifer Hilton
Paralegal Specialist
U.S. Department of Health & Human Services
Office of Counsel to the Inspector General

COMPANY CONFIDENTIAL This email message including any attachments, may contain confidential and/or privileged information and is intended solely for the use of the intended recipient(s). Any unauthorized review, use, disclosure, distribution or copying is prohibited. If you are not the intended recipient, kindly contact the sender by replying to this email and destroy and delete all copies of this message. Any distribution, dissemination or other use of the contents of this message by anyone other than the intended recipient is strictly prohibited.

11

COMPANY CONFIDENTIAL This email message including any attachments, may contain confidential and/or privileged information and is intended solely for the use of the intended recipient(s). Any unauthorized review, use, disclosure, distribution or copying is prohibited. If you are not the intended recipient, kindly contact the sender by replying to this email and destroy and delete all copies of this message. Any distribution, dissemination or other use of the contents of this message by anyone other than the intended recipient is strictly prohibited.

12.     These are the salient points from these emails in which provided further support for the motion for sanctions of Dr. Patel and Dr. Pampati against the Lalaji Defendants:

a.     Lalaji is copied on the emails, as well as shown to have been involved and thus having knowledge of internal conversations as to the reporting protocol all prior to the OIG March 18, 2022 Email.

b.     The Lalaji Defendants' General Counsel, Chloe Dallaire, still currently employed by the Lalaji Defendant (as shown on the email chains), and not former TRG employee Selma Tinnell, was the person employed by the Lalaji Defendants to "cure" any alleged deficiencies in the Lalaji Defendants' so-called "self-report: to the OIG. Thus, Lalaji's statement in the Lalaji Defendants' Response/Affidavit/Opposition that "former TRG employee Selma Tinnell resubmitted the disclosure" lacks credibility in that she never submitted the alleged first disclosure and is not a party to any emails with the OIG.

c.     No response to Ms. Dallaire's March 30, 2022 email to OIG Paralegal Jennifer Hilton was produced and thus it can be assumed there was no such response and thus there in fact was no resubmission of any self-report to the OIG.

d.     As shown by OIG Paralegal Jennifer Hilton's statement 'your submission" directed to Ms. Dallaire, Ms. Dallaire and not alleged former TRG employee Selma Tinnell, was the person employed by the Lalaji Defendants involved in the so-called self-reporting with the OIG.

e.     The Lalaji Defendants have no basis to assert that OIG is taking any action against

12

the Lalaji Defendants by reason of any actions or inactions of Dr. Patel and/or Dr. Pampati; and thus Lalaji's statement in the Lalaji Defendants' Response/Affidavit/Opposition" former TRG employee Selma Tinnell resubmitted the disclosure", which significantly does not disclose the inquiry and factual basis underlying said statement, does not comply with the requirements of CR 11 in that it was not "formed after reasonable inquiry" and "well grounded in fact".

13.    The Lalaji Defendants current perjurious actions are among the gravest and most serious and are clearly intentional.    The Lalaji Defendants' current actions and history of abuses of the Civil Rules warrant the Court's exercise of sanctions under its contempt power and for discovery abuse, by the exclusion of Lalaji's testimony on any topic at trial of this matter on behalf of himself or the Lalaji Defendants and the award in favor of Dr. Patel and Dr. Pampati of attorney's fees and costs in an amount to be determined by subsequent hearing by this Court.

Respectfully submitted,

/s/ Robert E. Maclin, III
Robert E. Maclin, III (KBA #43025)
Luke Morgan (KBA #83181)
McBrayer PLLC
201 East Main Street, Suite 900
Lexington, Kentucky 40507
remaclin@mcbrayerfirm.com
lmorgan@mcbrayerfirm.com
egreen@mcbrayerfirm.com
Counsel for Plaintiff, Ashokkumar R. Patel, M.D.
and Plaintiff, Mahender Pampati, M.D.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served, on this 19th day of May, 2023, via the Kentucky Courts e-filing system and electronically upon the following:

R. Aaron Hostettler, Esq.
Jay Milby Ridings, Esq.
Kelsey Lee Bryant, Esq.
Hamm, Milby & Ridings, PLLC
120 North Main Street

Barry D. Hunter, Esq.
Frost Brown Todd PLLC
250 West Main Street, Suite 2800
Lexington, KY 40508
bhunter@fbtlaw.com

13

London, KY 40741
aaron@hmrkylaw.com
jridings@hmrkylaw.com
kelsey@hmrkylaw.com
crystal@hmrkylaw.com
*Counsel for Defendants, Gram Resources,
Inc., Hazard Radiology Associates, Inc., TRG
Holdings G & H, LLC, The Radiology Group,
LLC, and Anand Lalaji, M.D.*

*Counsel for Defendant, William Crenshaw*

Courtesy Copy Via Email
To Hon. Kimberly Childers
c/o AngelaShort@kycourts.net

*/s/ Robert E. Maclin, III*
Robert E. Maclin, III (KBA #43025)

# EXHIBIT 1

**Robert E. Maclin, III**

| | |
|---|---|
| **From:** | Aaron Hostettler <aaron@hmrkylaw.com> |
| **Sent:** | Thursday, May 18, 2023 6:19 PM |
| **To:** | Luke Morgan; Robert E. Maclin, III |
| **Cc:** | Jay Milby Ridings |
| **Subject:** | Patel et al v. Gram Resources |
| **Attachments:** | FW: Self Reporting Statement; FW: HHS OIG Self-Disclosure: Ashokkumar Patel |

Luke / Rob – I am attaching two emails that I received today which are intended to supplement our prior discovery responses relating to submissions to CMS/HHS/OIG by the defendants.

Thank you,

*R. Aaron Hostettler, Esq.*
Hamm, Milby & Ridings, PLLC
120 N. Main St.
London, KY 40741
(606) 864-4126
(606) 224-0329 (mobile)
(606) 878-8144 (fax)
aaron@hmrkylaw.com

1

| | |
|---|---|
| **From:** | Chloe Dallaire <cdallaire@theradiologygroup.org> |
| **Sent:** | Wednesday, May 17, 2023 9:29 PM |
| **To:** | Aaron Hostettler |
| **Cc:** | Anand Lalaji |
| **Subject:** | FW: Self Reporting Statement |

**Chloe Dallaire**
*General Counsel*




*A Joint Commission accredited company*
*"Seamless Sub-Specialty Radiology Interpretation"*
*Customer First – Integrity – Teamwork - Work Life Balance*

**From:** Chloe Dallaire
**Sent:** Wednesday, May 17, 2023 9:26 PM
**To:** Chloe Dallaire <cdallaire@theradiologygroup.org>
**Subject:** FW: Self Reporting Statement

**Chloe Dallaire**
*General Counsel*




*A Joint Commission accredited company*
*"Seamless Sub-Specialty Radiology Interpretation"*
*Customer First – Integrity – Teamwork - Work Life Balance*

**From:** Chloe Dallaire <cdallaire@theradiologygroup.org>
**Sent:** Monday, February 14, 2022 7:31 PM
**To:** Selma Tinnell <stinnell@theradiologygroup.org>; Anand Lalaji <alalaji@theradiologygroup.org>
**Subject:** Fwd: Self Reporting Statement

Get Outlook for iOS

**From:** Chloe Dallaire <cdallaire@theradiologygroup.org>
**Sent:** Monday, February 14, 2022 5:29 PM
**To:** Chloe Dallaire
**Subject:** Fwd: Self Reporting Statement

1

So I looked over the protocol and from what I can tell, the following additional info is needed:

- What laws were violated
- Report findings of an internal investigation (this can probably be pretty broad)
- Contact info for TRG's designated rep (that can be you or me) and a certification from that person that the submission contains truthful info etc. (I can draft this)
- Details re the conduct necessitating the disclosure
- the federal health care programs affected by the conduct
- an estimate of the damages (this will be the most difficult and we can discuss how to calculate)
- Description of the corrective action taken upon discovery
- A statement of whether TRG knows the matter is under current investigation by a govn't agency
- Name of person authorized to enter into a settlement agreement

Hi Chloe,

Per our conversation:

- Contact information/details for the company in question (address/phone numbers) and the date of acquisition & discovery date of alleged fraudulent activity & how it was discovered
- Full names of the doctors with their NPI/EIN number(s) and their secretary names and contact information
- Any additional information we can or wish to provide; supporting documentation (provide current legal counsel contact information relating to current litigation as relevant to the fraud allegation being reported)

The above bullet points of information are what is needed to report the claim to the hotline representative. Once we decide on the discovery date, we can then proceed with the other detailed information to do the reporting, and we will need their NPI or EIN number (if we have that) so that TRG can be separated from the billing dates in question. Also, should they ask why the delay in reporting, we need to know how we want to address that as well.

I have included the website information below. The hotline is open from 8a-8p eastern time (1-800-447-8477, opt 4, then opt 3), Monday-Friday. From my conversation with Dr. A, TRG has until October of 2022 to report this. Perhaps we should wait until next week to do this reporting, so that you've had enough time to look through the information and to talk with Dr. A again to advise process and next steps, as we will need to gather the above information in providing a reporting statement to the rep?

Thanks.

https://oig.hhs.gov/compliance/self-disclosure-info/



https://oig.hhs.gov/compliance/self-disclosure-info/self-disclosure-protocol/



https://www.cms.gov/About-CMS/Components/CPI/CPIReportingFraud



## Reporting Fraud | CMS

Reporting Fraud Anyone suspecting healthcare fraud, waste or abuse is encouraged to report it. Find out how and where to report.

www.cms.gov

Respectfully,

*Selma D. Tinnell*

**Selma D. Tinnell**
**Senior Director of Administration**
**The Radiology Group**
**Office: 404-946-9630**
**Cell: 731-363-6363**



*A Joint Commission accredited company*
*"Seamless Sub-Specialty Radiology Interpretation"*
*Customer First – Integrity – Teamwork - Work Life Balance*

COMPANY CONFIDENTIAL This email message including any attachments, may contain confidential and/or privileged information and is intended solely for the use of the intended recipient(s). Any unauthorized review, use, disclosure, distribution or copying is prohibited. If you are not the intended recipient, kindly contact the sender by replying to this email and destroy and delete all copies of this message. Any distribution, dissemination or other use of the contents of this message by anyone other than the intended recipient is strictly prohibited.

COMPANY CONFIDENTIAL This email message including any attachments, may contain confidential and/or privileged information and is intended solely for the use of the intended recipient(s). Any unauthorized review, use, disclosure, distribution or copying is prohibited. If you are not the intended recipient, kindly contact the sender by replying to this email and destroy and delete all copies of this message. Any distribution, dissemination or other use of the contents of this message by anyone other than the intended recipient is strictly prohibited.

COMPANY CONFIDENTIAL This email message including any attachments, may contain confidential and/or privileged information and is intended solely for the use of the intended recipient(s). Any unauthorized review, use, disclosure, distribution or copying is prohibited. If you are not the intended recipient, kindly contact the sender by replying to this email and destroy and delete all copies of this message. Any distribution, dissemination or other use of the contents of this message by anyone other than the intended recipient is strictly prohibited.

COMPANY CONFIDENTIAL This email message including any attachments, may contain confidential and/or privileged information and is intended solely for the use of the intended recipient(s). Any unauthorized review, use, disclosure,

distribution or copying is prohibited. If you are not the intended recipient, kindly contact the sender by replying to this email and destroy and delete all copies of this message. Any distribution, dissemination or other use of the contents of this message by anyone other than the intended recipient is strictly prohibited.

DISCLAIMER: This email and any files transmitted with it are privileged and confidential information and intended solely for the use of the individual or entity to which they are addressed. This transmission may contain protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA). If you are not the intended recipient, please notify the sender by e-mail and delete the original message. Further, you are not to copy, disclose, or distribute this e-mail or its contents to any other person and any such actions are unlawful. This e-mail may contain viruses. THE RADIOLOGY GROUP has taken every reasonable precaution to minimize this risk, but is not liable for any damage you may sustain as a result of any virus in this e-mail. The recipient should check this email and any attachments for the presence of viruses. THE RADIOLOGY GROUP reserves the right to monitor and review the content of all messages sent to or from this e-mail address.

COMPANY CONFIDENTIAL This email message including any attachments, may contain confidential and/or privileged information and is intended solely for the use of the intended recipient(s). Any unauthorized review, use, disclosure, distribution or copying is prohibited. If you are not the intended recipient, kindly contact the sender by replying to this email and destroy and delete all copies of this message. Any distribution, dissemination or other use of the contents of this message by anyone other than the intended recipient is strictly prohibited.
COMPANY CONFIDENTIAL This email message including any attachments, may contain confidential and/or privileged information and is intended solely for the use of the intended recipient(s). Any unauthorized review, use, disclosure, distribution or copying is prohibited. If you are not the intended recipient, kindly contact the sender by replying to this email and destroy and delete all copies of this message. Any distribution, dissemination or other use of the contents of this message by anyone other than the intended recipient is strictly prohibited.
COMPANY CONFIDENTIAL This email message including any attachments, may contain confidential and/or privileged information and is intended solely for the use of the intended recipient(s). Any unauthorized review, use, disclosure, distribution or copying is prohibited. If you are not the intended recipient, kindly contact the sender by replying to this email and destroy and delete all copies of this message. Any distribution, dissemination or other use of the contents of this message by anyone other than the intended recipient is strictly prohibited.

| | |
|---|---|
| **From:** | Chloe Dallaire <cdallaire@theradiologygroup.org> |
| **Sent:** | Wednesday, May 17, 2023 9:26 PM |
| **To:** | Aaron Hostettler |
| **Cc:** | Anand Lalaji |
| **Subject:** | FW: HHS OIG Self-Disclosure: Ashokkumar Patel |

**Chloe Dallaire**
*General Counsel*




*A Joint Commission accredited company*
*"Seamless Sub-Specialty Radiology Interpretation"*
*Customer First – Integrity – Teamwork - Work Life Balance*

**From:** Chloe Dallaire
**Sent:** Wednesday, March 30, 2022 9:36 AM
**To:** Hilton, Jennifer L (OIG/OCIG) <Jennifer.Hilton@oig.hhs.gov>
**Cc:** Selma Tinnell <stinnell@theradiologygroup.org>
**Subject:** RE: HHS OIG Self-Disclosure: Ashokkumar Patel

Good morning Ms. Hilton, I am following up on my below request. I am trying to figure out whether the filing was deficient in some way or whether it was simply not accepted for some independent reason. If the former, I would like to know the deficiency so that I can cure it.

Thanks in advance.

**Chloe Dallaire**
*General Counsel*

**From:** Chloe Dallaire
**Sent:** Friday, March 25, 2022 1:12 PM
**To:** Hilton, Jennifer L (OIG/OCIG) <Jennifer.Hilton@oig.hhs.gov>
**Subject:** RE: HHS OIG Self-Disclosure: Ashokkumar Patel

Hello Ms. Hilton, are you available for a quick call regarding this email?

**Chloe Dallaire**
*General Counsel*

1





*A Joint Commission accredited company*
*"Seamless Sub-Specialty Radiology Interpretation"*
*Customer First – Integrity – Teamwork - Work Life Balance*

**From:** Hilton, Jennifer L (OIG/OCIG) <Jennifer.Hilton@oig.hhs.gov>
**Sent:** Friday, March 18, 2022 12:35 PM
**To:** Chloe Dallaire <cdallaire@theradiologygroup.org>
**Subject:** HHS OIG Self-Disclosure: Ashokkumar Patel

I am writing to inform you that your submission to the Office of Inspector General (OIG) Self-Disclosure Protocol (Protocol) made on behalf of the above entity has not been accepted.  By declining to accept this submission into the Protocol, the OIG is not expressing an opinion regarding the conduct disclosed or your legal position.

Jennifer Hilton
Paralegal Specialist
U.S. Department of Health & Human Services
Office of Counsel to the Inspector General

COMPANY CONFIDENTIAL This email message including any attachments, may contain confidential and/or privileged information and is intended solely for the use of the intended recipient(s). Any unauthorized review, use, disclosure, distribution or copying is prohibited. If you are not the intended recipient, kindly contact the sender by replying to this email and destroy and delete all copies of this message. Any distribution, dissemination or other use of the contents of this message by anyone other than the intended recipient is strictly prohibited.
COMPANY CONFIDENTIAL This email message including any attachments, may contain confidential and/or privileged information and is intended solely for the use of the intended recipient(s). Any unauthorized review, use, disclosure, distribution or copying is prohibited. If you are not the intended recipient, kindly contact the sender by replying to this email and destroy and delete all copies of this message. Any distribution, dissemination or other use of the contents of this message by anyone other than the intended recipient is strictly prohibited.